# Exhibit 1

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "**Agreement**") is dated effective as of the 5th day of November, 2007, by and among Smartmatic International Corporation, a Barbados corporation ("**Manufacturer**") and Sequoia Voting Systems, Inc., a Delaware corporation ("**Distributor**").

WHEREAS, Manufacturer designs, manufactures and sells proprietary products for the electoral automation market, including, but not limited to, the Products (defined below);

WHEREAS, Distributor desires to purchase the Products from Manufacturer to sell on a world-wide basis and Manufacturer is willing to permit Distributor to act as an exclusive distributor of the Products in the Territory (defined below), subject to the terms herein;

WHEREAS, the purchase and sale of the Products hereunder shall be in accordance with the terms and conditions of that certain Sale and Security Agreement (the "**Sale and Security Agreement**") entered into on December 15, 2006 between Smartmatic International Group, N.V., Smartmatic Corporation, Distributor, the USG Parties (as defined therein) and certain other parties thereto, which provides that, after a Final Sale (as defined therein), Distributor has the right, at its discretion, to purchase voting products from Manufacturer.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. General Agreement of Parties.

(a)     Purchase and Sale.  Manufacturer hereby agrees to sell and Distributor hereby agrees to purchase the Products (as hereinafter defined) on the terms and conditions contained in this Agreement.

(b)     Products.  The term "**Products**" shall mean only those product lines (the "**Product Lines**" and each, a "**Product Line**"), corresponding individual units of any Product Line and any peripherals, upgrades and modifications manufactured by Manufacturer as are listed in <u>Exhibit "A"</u> hereto.  Manufacturer may, at any time, upon one hundred eighty (180) days' written notice to Distributor, discontinue selling any or all of the Products without any liability to Distributor, except relating to Purchase Orders placed prior to receipt of Manufacturer's notice by Distributor for such discontinued Products.  For avoidance of doubt, discontinuation of a Product means that the Product is no longer sold by Manufacturer or its Affiliates to any other Person (as defined below) anywhere in the Territory.  In the event of any such discontinuance, Distributor shall have the right to use a third-party manufacturer and pay Manufacturer in the same manner as is provided under Section 3(g)(ii), in which event Manufacturer shall continue to make the then existing version of the software utilized in the discontinued Product software available to Distributor, although (i) Manufacturer will no longer have any obligation to support or update such software, and (ii) Distributor shall have the continuing access to

1

the already available source code to modify and support the software to support any existing customers of Distributor then using, or contractually committed to purchase, the discontinued Product(s). The parties may by mutual agreement in writing add Products to or remove Products from Exhibit "A" from time to time upon such terms and conditions as the parties may agree.

(c)     Territory. Distributor shall have the exclusive right to sell, distribute and promote the Products throughout the United States and its territories (the "**Territory**"), to governmental and governmental related entities of any kind, including but not limited to federal, state, provincial or local election boards or other electoral bodies (each, a "**Customer**"). Manufacturer covenants that as long as Distributor has the exclusive right to sell, distribute and promote any one or more of the Product Lines in the Territory, it shall not sell, lease, transfer or otherwise make available, and will not permit any other individual, company or entity of any kind (each a "**Person**") to sell, lease, transfer or otherwise make available, any such Product Line directly or through an agent or representative to end users in the Territory. Distributor covenants that it shall not at any time knowingly misrepresent the Products or their characteristics to any Customers or potential Customers nor take any other action which Distributor knows could adversely affect the reputation of the Products or of Manufacturer. Distributor may request to sell the Products in one or more international territories (collectively, the "**International Territories**") outside of the Territory and, unless Manufacturer (i) has firm plans to sell the Product Line directly in one or more of such International Territories or (ii) has already granted, or has firm plans to so grant, the right to, sell the Products in one or more of the International Territories, Manufacturer shall grant to Distributor the right to sell the Products in one or more of such International Territories.

(d)     Termination of Exclusivity in Territory. Except as provided by Section 3(g) of this Agreement, as to each Product Line, in the event Distributor fails to purchase the amount of such Product Line for the period identified in Exhibit "B" hereto, Manufacturer, as its sole and exclusive remedy, may, directly or indirectly, sell, lease, transfer or otherwise make available such Product Line in the Territory to parties other than Distributor.

**2. Delivery.** Each and every sale of Products hereunder shall be initiated by the delivery of a purchase order written by Distributor ("**Purchase Order**") to Manufacturer. Each Purchase Order shall set forth the quantity desired and the requested delivery dates and such other information and requirements as Manufacturer shall deem necessary. Except as set forth in Section 3(g) of this Agreement, Manufacturer agrees to deliver the Products as specified in Exhibit "C" after its receipt of the Purchase Order, with a bill of materials included. Except as set forth herein, the parties agree to negotiate in good faith to develop commercially reasonable delivery terms, including the delivery method, cut off dates for delivery F.O.B., insurance and cost of freight. In the event of a conflict between the terms of this Agreement and a Purchase Order, the terms of this Agreement shall govern and control.

WO 817863.2

**3. Price, Terms and Policies of Sale.**

(a)   Price and Terms.   The price of the Products sold by Manufacturer to Distributor and all terms and conditions of sale shall be as are specified by Manufacturer from time to time in writing; provided, that, Manufacturer shall not change the price during the first two years of this Agreement, and thereafter, not more than once per calendar year, and any such change shall be made in agreement with the Distributor based upon any changes in the costs of the Products then being actually incurred by Manufacturer compared to the actual costs incurred by Manufacturer at the time of any prior price increase.  The current prices and the current terms and conditions of sale for the Products in the Territory are set forth in Exhibit "C" hereto.  The parties agree to negotiate in good faith to determine the prices, terms and conditions of the sale of Products to Distributor for sale in the International Territory; provided, however, that in no event shall Manufacturer charge Distributor more than the most favorable terms then afforded by Manufacturer to any Person for Products for sale in the Territory.  Subject to timely delivery of non-defective, conforming goods, Distributor agrees to pay all prices as specified within seventy (70) days after delivery of such goods and to comply with all specified terms and conditions.

(b)   Disputes.   If either party enforces its rights under this Agreement by or through an attorney at law, the prevailing party (the one that substantially receives the relief being sought) shall be entitled to collect from the other party all costs, fees and expenses incurred in enforcing its rights under this Agreement, including court costs and reasonable attorneys' fees.

(c)   Warranty.   Manufacturer warrants that the Products meet Manufacturer's standard written specifications  as they shall be in effect at the time of sale of such Products for a period of one (1) year from the time of sale (the **"Warranty Terms"**). THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. MANUFACTURER SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE OR KIND WHATSOEVER AND IN NO EVENT SHALL MANUFACTURER'S LIABILITY FOR BREACH OF CONTRACT HEREUNDER, FOR NEGLIGENCE OR OTHERWISE, EXCEED THE AMOUNT OF THE PRICE OF THE PRODUCTS PURCHASED HEREUNDER. NO SUIT FOR BREACH OF WARRANTY SHALL BE BROUGHT LATER THAN ONE YEAR FROM THE TIME THE CAUSE OF ACTION ARISES.  DISTRIBUTOR'S EXCLUSIVE REMEDY AND MANUFACTURER'S ENTIRE LIABILITY FOR BREACH OF THE LIMITED WARRANTY IN CONTRACT, TORT OR OTHERWISE, WILL BE THE REPAIR OR REPLACEMENT OF THE DEFECTIVE COMPONENTS DURING THE WARRANTY PERIOD.  THIS WARRANTY DOES NOT APPLY TO PRODUCTS MANUFACTURED BY THIRD PARTIES PURSUANT TO SECTION 1(b) ABOVE OR PERMITTED MODIFICATIONS PURSUANT TO SECTION 5(b) ABOVE.

WO 817863.2

(d)     Acceptance of Products and Product Returns.  Inspection and acceptance of the Products shall be Distributor's responsibility. Distributor is deemed to have accepted the Products unless written notice of rejection is received by Manufacturer within twenty (20) days after delivery of the Products.  Distributor waives any right to revoke acceptance thereafter.   Distributor shall report any discrepancy in shipment quantity or damage within twenty (20) days after delivery. No return of Products shall be accepted by Manufacturer without a Return Material Authorization ("**RMA**") Number. Returned Products must be in Manufacturer's original shipping cartons, substantially complete with all packing materials. All Products for return shall be returned freight prepaid in the manner specified in the RMA.  If returned Products are claimed to be defective, a complete description of the nature of the defect must be included with the returned Products, according to the RMA Procedure specified in Exhibit "D" hereto. Products returned to Manufacturer but not eligible for return shall be returned to Distributor, freight collect. Manufacturer shall, at Manufacturer's sole cost and expense, provide any replacement parts, components, goods or services (to be provided by a service affiliate of Manufacturer) required to be provided under the Warranty Terms. Distributor shall, at Distributor's sole cost and expense, send the Products back to Manufacturer facility indicated in the RMA for any necessary repairs.  Manufacturer reserves the right, in its sole discretion, to contract with Smartmatic Services Corporation or another party to perform on-site repairs.  If Manufacturer fails to promptly address any defects, Distributor, in its sole discretion, may, but is not required to, repair any such defect.

(e)  Repair Services. Distributor is an authorized repair center for products in the U.S., and as such Manufacturer shall contract with Smartmatic Services Corporation or another party to provide Distributor with the training needed to provide repair services, according to Manufacturer's best judgment.  Parts and pieces needed for repair services will be provided by Manufacturer according to the procedure in Exhibit "D".  In the case of out-of-warranty repairs, Distributor shall pay all expenses relating to such repairs, including, but not limited to, all parts and labor, and Manufacturer shall not be responsible for any expenses related to out-of-warranty repairs.  If, upon instruction of the Manufacturer pursuant to a warranty repair that is covered under the RMA, the Manufacturer, in its sole discretion, decides to undertake the repair on-site, Manufacturer shall, at its expense, provide any needed replacement parts as specified on Exhibit "D" hereto and reimburse Distributor for the expense of labor costs associated with such warranty repair, which expenses shall be previously agreed by the parties (provided, however, if no agreement is reached, Manufacturer shall contract with Smartmatic Services Corporation or another party to provide the labor, at its own cost, and start to repair no later than three (3) days after the arrival of the parts Manufacturer sent).

(f)  Modification of Normal Credit Terms.  Notwithstanding the Manufacturer's normal credit terms, the Manufacturer reserves the right, in its sole discretion and in addition to any and all other rights and remedies, to defer deliveries and/or demand cash payment or satisfactory security for payment for Products ordered by Distributor in any of the following circumstances: (i) if any amount due from the Distributor to the Manufacturer remains unpaid at the due date; or (ii) if the Distributor's financial ability

4

becomes impaired as evidenced by delinquency of material payments to any vendor, beyond applicable grace and cure periods unless the obligation for the payment is then being contested in good faith.

(g)  Purchase Order Acceptance and Availability; Right to Outsource.  (i) All Purchase Orders shall be processed, shipped and filled at such locations as Manufacturer may designate.  Manufacturer shall notify Distributor in writing within 5 business days of each Purchase Order of its inability to timely fill any Purchase Order.  Subject to Section 3(g)(ii), in the event any Products are in limited supply or their availability is otherwise restricted, Manufacturer shall have the right in its discretion to equitably allocate the available Products to and among Distributor and other purchasers outside the Territory. Manufacturer shall not be liable in any manner for loss or damage arising out of any delay or default in shipment or delivery unless it has resulted from negligence.

(ii) In the event that Manufacturer notifies Distributor pursuant to Section 3(g)(i) that it is unable or unwilling to timely fill a Purchase Order for sale of Products in the Territory, Distributor has the right to obtain the hardware component of any such Product Line from a third party manufacturer at Distributor's sole cost and expense; provided, that, Distributor shall purchase the software component of any such Product Line from Manufacturer at the price set out in Exhibit "C"; provided, further, that Distributor shall pay to Manufacturer the royalty fee as set forth in Exhibit "C".  For the purposes of this Section 3(g)(ii), the software only costs shall be constant for the initial term of this Agreement plus the first renewal term, if any.

(h)  Fees and Expenses.  Manufacturer shall, at its cost and expense, obtain and maintain all licenses, permits and other authorizations for the conduct of its business outside the Territory and for shipment to and from Distributor of Products.  Distributor is responsible for any and all taxes (other than taxes levied on or measured by Manufacturer's income), or other charges of any nature imposed by any governmental authority, which shall become payable by reason of the sale or delivery of the Products hereunder or the conduct of Distributor's business (regardless of who actually remits such taxes).

(i)  Support and Training.  Manufacturer shall contract with Smartmatic Services Corporation or another party to provide Distributor with such training related to the operation and any other technical information relating to the Products as Distributor may reasonable deem necessary to assist Distributor in the sale and Customer support of the Products.

4.  **Obligations of Distributor.**  Distributor shall have those obligations set forth in this Agreement including, without limitation, the following:

(a)  Provide Product installation and training of Customer's personnel with respect to the Products and be responsible for the cost of installation, training and marketing materials related to the sale and distribution of the Product.

WO 817863.2

(b)     Provide ongoing day to day operation support for the Products.

(c)     Pay all costs of independent testing authorities, related professional support and individual units necessary for the Products to achieve certification.

(d)     To pay on time, according to terms and conditions.  If payment is delayed for more than 30 days following the payment due date, which default is not cured within 30 days, a two (2) % interest rate per month shall accrue on any outstanding balance until paid.

(e)     To notify Manufacturer prior to entering into an agreement to (i) purchase from a third party any electoral automation products for sale in the Territory that directly compete with the Products promptly after such decision is made but in no event less than 90 days prior to such purchase or (ii) manufacture Distributor's proprietary electoral automation products (other than Permitted Modifications) for sale in the Territory that will directly compete with the Products promptly after such decision is made but in no event less than 180 days prior to such sale.

**5.   Intellectual Property Rights.**

(a)     Intellectual Property Rights.  Each party shall retain its rights in any Intellectual Property Rights owned by or licensed to it prior to the Effective Date or owned or possessed in the future.  Manufacturer represents and warrants to Distributor, its successors and assigns that Manufacturer has all right, title and interest in and to the Intellectual Property relating to the Products.  Distributor acknowledges and agrees that, as between Distributor and Manufacturer, Manufacturer owns all Intellectual Property Rights relating to the Products other than the trademarks set forth on Exhibit E.  For purposes of this Agreement, "**Intellectual Property Rights**" shall mean rights in inventions, know-how, patents, registered designs, design rights, trade names, trademarks, trade dress, service marks, trade secrets, copyrights, semiconductor design rights, mask works and topography rights whether or not registered and including any application to register any of the same, and all rights or forms of protection of a similar nature or having equivalent effect which may subsist anywhere in the world.  The parties hereto do not intend and nothing in this Agreement provides for jointly developed Intellectual Property Rights.

(b)     Distributor and each of its designees have the right from time to time to modify, improve or enhance any of the Products (including, without limitation, source code revisions to fix any defects, enhance functionality, improve security or satisfy any governmental requirement), and all Intellectual Property Rights relating to such modifications, improvements or enhancements, to the extent severable from the Intellectual Property Rights relating to the Products shall be the sole property of Distributor. Each such modification, improvement or enhancement that is severable from the Intellectual Property Rights relating to the Products is referred to as a "**Permitted Modification**."   Distributor has the obligation to send to Manufacturer a fully

6

documented copy of any **"Permitted Modification"** developed, to be filed by Manufacturer and to keep track of any existing versions of its Product as long as Manufacturer is still selling the Product. Each party hereby agrees not to prosecute the other party for any infringement or misappropriation of any of its respective Intellectual Property Rights in connection with Customer support or in connection with any Permitted Modifications; provided, that Distributor, at a minimum, has paid to Manufacturer (i) the applicable 'software only' charges set out in Exhibit "C", plus any applicable amounts due for hardware for new units under this Agreement, and (ii) the Software Upgrade royalty fee for 'software only' upgrades as specified on Exhibit "C". The rights of Distributor and its designees under this Section 5(b) are perpetual and irrevocable and shall survive the termination of this Agreement, subject to the conditions and limitations set out in this Section.

(c)     Distributor shall promptly notify Manufacturer upon Distributor learning of any threatened, actual or potential infringement or misappropriation of any of Manufacturer's Intellectual Property Rights. Distributor shall provide such assistance to Manufacturer in the prosecution or defense of infringement or other claims in respect of the Products or Manufacturer's Intellectual Property Rights, as Manufacturer may reasonably request from time to time, and at Manufacturer's cost. Except as otherwise provided in Section 9(b), nothing in this Agreement shall be construed or interpreted to require Manufacturer, and Distributor agrees that Manufacturer shall not be required, to take any action (including the institution, prosecution or defense of any lawsuit, the filing, prosecution or defense of any patent or trademark application, or any other action whatsoever) against any other manufacturer, distributor or other person or entity to prevent such other distributor, person or entity from violating any of the Manufacturer's Intellectual Property Rights, nor to otherwise establish, enforce, defend, preserve or protect the Manufacturer's Intellectual Property Rights in any respect or manner whatsoever, and any failure or refusal of Manufacturer to take any such action shall not constitute a default by Manufacturer pursuant to this Agreement, nor give rise to any claims by Distributor against Manufacturer, nor a waiver or abandonment of any of Manufacturer's Intellectual Property Rights. If Manufacturer fails or refuses to take any such action, Distributor, at its expense, may do so upon the prior written consent of the Manufacturer pursuant to written terms then agreed by the parties and Manufacturer, at Distributor's expense, shall cooperate with any such action taken by Distributor pursuant to this sentence.

(d)     Trademark Rights. Distributor requests and Manufacturer agrees to provide certain markings and identification on the Products sold and delivered by Manufacturer to Distributor, including the trademarks and/or trade name "Sequoia" or any other specified by the Distributor. Such markings and identification shall be specified in accordance with the requirements of Exhibit "E" hereto. The Manufacturer is hereby granted a limited trademark license with respect to the marks specified in Exhibit "E", such license being expressly limited to Products sold and actually delivered to Distributor. In no event may Manufacturer use such marks on any Products or other items of any kind used by Manufacturer or sold, licensed or otherwise delivered by Manufacturer to any other Person. Manufacturer acknowledges and agrees that it has no

7

right, title or interest in or to these marks, such rights, title and interest belonging solely to Distributor.

6. **Confidential Information.** Each party expressly undertakes to retain in confidence and to take commercially reasonable actions to require its employees and consultants or designees to retain in confidence, all proprietary information and know-how transmitted to it by the other party hereunder which such other party has identified in writing as confidential ("**Confidential Information**") and will make no use of such Confidential Information except under the terms of this Agreement. Except to the extent specifically authorized by the disclosing party in writing, Confidential Information shall be maintained in confidence in the same manner and to the same extent that the receiving party maintains its own Confidential Information in confidence. The parties agree that these confidentiality and use provisions shall not apply to any information that appears in issued patents or is publicly available, or which otherwise is or becomes generally and publicly known by any means other than disclosure by the disclosing party, its agents or employees.

7. **Compliance with Laws.** Each party hereto agrees to comply with all applicable federal, state, provincial and local laws, treaties, rules and regulations in effect in the Territory in respect of their activities contemplated by this Agreement. Each party shall comply with such laws, treaties, rules and regulations to the extent (a) such laws, treaties, rules and regulations are applicable to such party, or (b) such party's noncompliance would cause the other party hereto to be in violation of such laws, treaties, rules and regulations.

8. **Government Authorizations and Registrations.**

(a)     Subject to ownership of the Intellectual Property Rights relating to the Products, Manufacturer makes no representation or warranty with respect to the ability of Distributor, under the laws, treaties, rules and regulations of any jurisdiction in which Distributor is authorized to market or sell the Products hereunder, to so market or sell the Products in such jurisdiction.

(b)     Distributor shall be responsible at its sole cost, including the purchase of units of any Product Line, for obtaining, and shall use commercially reasonable efforts to obtain, any and all authorizations and certifications from any applicable federal, state, provincial and local authority that are required to sell the products and for it to perform its obligations under this Agreement, and if applicable, shall be responsible for filing or registering this Agreement with appropriate governmental authorities. Distributor shall provide proof of compliance with such required governmental authorizations to Manufacturer upon request.

(c)     Except for willful acts by Manufacturer to undermine (i) Distributor's performance of its obligations under this Agreement, (ii) Distributor's efforts to obtain any governmental certifications or approvals from time to time required in connection with the Products, or (iii) performance by Distributor to a Customer, Manufacturer shall

not be liable to Distributor if any required governmental authorization is delayed, denied, revoked, restricted or not renewed, or if Distributor is otherwise prohibited from marketing or selling the Products in any part of the Territory.

### 9. Indemnification.

(a)     Distributor hereby agrees to indemnify, defend and hold harmless Manufacturer, and its officers, directors, employees and affiliates (each, a "**Manufacturer Indemnified Party**") from and against any and all third party claims, demands, losses, liabilities, costs and expenses asserted against or suffered or incurred by (collectively, the "**Damages**") any Manufacturer Indemnified Party and arising from or related to, directly or indirectly, (i) the failure of the Product to comply in any respect with governmental requirements and standards applicable in the Territory, (ii) the Avante litigation and (iii) any breach by the Distributor of its obligations under this Agreement.

(b)     Manufacturer hereby agrees to indemnify, defend and hold harmless Distributor and its officers, directors, employees and affiliates (each, a "**Distributor Indemnified Party**") from and against any and all Damages asserted against or suffered or incurred by any Distributor Indemnified Party and arising from or related to, directly or indirectly, (i) any claim other than the Avante litigation that any Product Line infringes any third party's trademark, patent or other intellectual property rights and (ii) any breach by the Manufacturer of its obligations under this Agreement.

(c)     The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with any indemnification claim which relates to any Damages indemnified against by it hereunder. If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any indemnification claim which relates to any Damages indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the indemnification claim so requires) notify the indemnified party of its intent to do so.  If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any indemnification claim which relates to any Damages indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such indemnification claim. If the indemnifying party shall assume the defense of any indemnification claim, the indemnified party may participate, at his or its own expense, in the defense of such indemnification claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if, (i) so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all indemnified Parties in connection with any indemnification claim.  The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such indemnification claim.  Notwithstanding anything in this Section

9

WO 817863.2

9(c) to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any indemnification claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the indemnification claim.  Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such indemnification claim, free of any participation by the indemnifying party, and the amount of any ultimate liability with respect to such indemnification claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Damages of the indemnified party relating to such indemnification claim through the date of its rejection of the settlement offer or (B) the aggregate Damages of the indemnified party with respect to such indemnification claim.  If the indemnifying party makes any payment on any indemnification claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such indemnification claim.

(d)     The indemnification obligations of the parties under this Section 9 shall survive the termination of this Agreement.

**10. Relationship of the Parties.**   The relationship of the parties is that of independent contractors.   Nothing contained in this Agreement shall be deemed or construed to create or give rise to any partnership, joint venture or agency relationship between the parties.  Each party acknowledges and agrees that it neither has nor will give the appearance or impression of having any legal authority to bind or commit the other party hereto in any manner.  Each party shall be solely responsible for compensation of its employees, including without limitation severance pay or other payments to employees upon termination of either this Agreement or such employees' employment, and neither party shall have any obligations with respect to the employees of the other.

**11. Force Majeure.**   Neither party shall be liable for any delays or failures to perform any of its obligations hereunder due to any causes or contingencies beyond each such non-performing party's control, including, without limitation, fires, accidents, Acts of God, war, strikes or other labor disputes, governmental actions, orders, or regulations, and any and all other similar matters beyond the control of the parties.

**12. Term and Termination.**

(a)     This Agreement shall remain in effect for a period of four (4) years from the date first mentioned above, and shall thereafter renew for successive periods of twelve (12) months each unless terminated in accordance with this Agreement, including, without limitation, this Section 12.  Either party may terminate this Agreement effective

10

at the end of the initial term or any renewal period upon written notice to the other party at least three hundred sixty (360) days before the end of the initial term or any annual renewal term of this Agreement.

(b)    This Agreement may be terminated by Distributor in the event of any of the following:

(i)    Manufacturer violates or fails to perform any obligation of Manufacturer under this Agreement in any material respect and such failure is not cured within thirty (30) days after written notice of such failure is given to Manufacturer by Distributor; or

(ii)    Manufacturer ceases to do business or becomes involved in insolvency or bankruptcy proceedings that are not stayed or discharged within forty-five (45) days of the initiation of such proceedings by or against Manufacturer.

(c)    This Agreement may be terminated by Manufacturer in the event:

(i)    Distributor violates or fails to perform any obligation of Distributor under this Agreement in any material respect and such failure is not cured within thirty (30) days after written notice of such failure is given to Distributor by Manufacturer;

(ii)    Distributor fails to pay to Manufacturer when due any sums owed by it to Manufacturer and such failure is not cured for a period of thirty (30) days after written notice of such failure is given to Distributor by Manufacturer; or

(iii)    Distributor ceases to do business or becomes involved in insolvency or bankruptcy proceedings that are not stayed or discharged within forty-five (45) days of the initiation of such proceedings by or against Distributor.

(d)    The rights and remedies of the parties provided herein shall be exclusive except that, with respect to (i) any matters for which indemnification is provided, (ii) the remedies available under Section 15, and (iii) the collection by Manufacturer of unpaid amounts due hereunder, the remedies herein are in addition to the indemnification, injunctive relief and collection rights and remedies provided by law or this Agreement.

### 13. Effect of Termination.

(a)    Each party hereby waives, releases and relinquishes any and all rights and remedies it may have to receive compensatory, precatory or any other similar damages of any nature for any termination of this Agreement, provided that each party reserves the right to recover its actual, direct damages in the event of a wrongful termination by the other party.  Notwithstanding anything to the contrary in this Agreement, each party agrees that regardless of the claim or the form in which any legal or equitable action may be brought by any party, no party shall be liable for any indirect, special, incidental,

11

consequential, exemplary or punitive damages, including, without limitation, loss of profits, promotional expenses, injury or reputation, or loss of customers.

(b)    Except in the event of a wrongful termination by the other party, no party shall be liable to the other party because of the expiration or termination of this Agreement for any loss or liability or any other damages of any kind, with no exceptions.

(c)    WITHOUT LIMITING THE FOREGOING, DISTRIBUTOR IS HEREBY WARNED THAT ANY TENDER, BID OR COMMITMENT BY DISTRIBUTOR TO, OR ANY CONTRACT BY DISTRIBUTOR WITH, PURCHASERS OF PRODUCTS IS MADE AT ITS OWN RISK AND THAT UPON THE TERMINATION OR EXPIRATION OF THIS AGREEMENT, MANUFACTURER MAY NOT ACCEPT DISTRIBUTOR'S ORDERS FOR PRODUCTS, AND DISTRIBUTOR MAY THEREFORE BE UNABLE TO FULFILL SUCH TENDERS, BIDS, COMMITMENTS OR CONTRACTS. NOTWITHSTANDING THE FOREGOING, EVEN AFTER THE EXPIRATION OR TERMINATION OF THIS AGREEMENT, MANUFACTURER SHALL MAKE SOFTWARE AVAILABLE FOR SALE TO DISTRIBUTOR IN ACCORDANCE WITH THE PROVISIONS OF SECTION 3(g)(ii) OF THIS AGREEMENT FOR AT LEAST FIVE YEARS SO THAT DISTRIBUTOR CAN ARRANGE FOR THIRD PARTY MANUFACTURE AND CAN CONTINUE TO MEET ITS CONTRACTUAL OBLIGATIONS TO CUSTOMERS.

**14. Assignment.**  Neither Manufacturer nor Distributor shall assign any of its rights or obligations under this Agreement without the prior written consent of the other party.  Any attempted assignment in contravention of this Section 14 shall be null and void and without force and effect.

**15. Right of Injunction.**  The parties acknowledge that a breach by Distributor of Sections 4(d) and (f) and 5(a), (b) and (c) of this Agreement will give rise to irreparable injury to Manufacturer, inadequately compensable in damages.  Accordingly, Distributor hereby agrees that Manufacturer shall be entitled to injunctive relief against the breach or threatened breach of the undertakings of Distributor contained in Sections 4(d) and (f) and 5(a), (b) and (c), without any requirement to post bond or other security therefor.

**16. Governing Law; Jurisdiction.**

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such jurisdiction without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

(b)    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any court located within the State of New York over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit,

WO 817863.2

action proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**17. Limitations.**  No action, regardless of form, or arbitration proceeding arising out of the transactions under this Agreement may be brought or initiated by any party against another party hereunder more than one (1) year after the facts creating the cause of action became known to the party bringing the action.

**18. Survival of Certain Representations, Covenants and Warranties.**  Any and all covenants, representations, or warranties made or given by any of the parties hereto under the terms hereof shall survive the execution of this Agreement and shall be binding upon and enforceable against the appropriate party or parties hereto for such period of time as specified by the applicable statute of limitations.

**19. Notices.**  Except for Purchase Orders and as otherwise expressly provided herein, any notice request, consent, demand or other communication required or permitted to be given by this Agreement shall be in writing and shall be personally served or sent by telecopy (with a copy by prepaid registered or certified mail sent on that same day), commercial courier service or prepaid registered or certified mail to the address of the applicable party set forth below (or to such other address as a party specify by notice given to the other parties in accordance with this Section 19). Any written notice delivered by telecopy shall be deemed to have been given on the day telecopied to the other party. Any written notice given by commercial courier service or registered or certified mail shall be deemed communicated on the day of actual receipt. Notices shall be delivered as follows:

If to Manufacturer:     Smartmatic International Corporation
                        Attn:  Antonio Mugica
                        #4 Stafford House,
                        Garrison Savannah
                        St. Michael
                        Barbados, W.I.
                        Facsimile:  246-228.77.34

                        With a copy (which shall not constitute notice) to:

                        Sutherland Asbill & Brennan LLP
                        1275 Pennsylvania Avenue, NW
                        Washington, DC  20004
                        Facsimile:  (202) 637-3593
                        Attention:  Jeffrey P. Bialos

WO 817863.2

If to Distributor:        Sequoia Voting Systems, Inc.
                              Attn: Jack Blaine
                              717 17th Street, Suite 310
                              Denver, CO 80202

                              With a copy (which shall not constitute notice) to:

                              Seyfarth Shaw LLP
                              815 Connecticut Avenue, NW
                              Suite 500
                              Washington, DC 20006
                              Facsimile: (202) 828-5393
                              Attention: Robert L. Bodansky

     **20. Remedies.** Except as otherwise provided for herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder, now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies by a party shall not constitute a waiver of the right to pursue other available remedies.

     **21. Binding Effect.** Except as provided herein, this Agreement shall be binding on and inure to the benefit of their respective successors and permitted assigns.

     **22. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid or unenforceable provision were omitted, unless the omission of such provision would deprive one of the parties of a material benefit of its bargain hereunder.

     **23. Entire Agreement.** This Agreement, including the Schedules hereto, embodies the entire agreement and understanding between the parties relating to the subject matter herein and supersedes all prior proposals, agreements and understandings related to such subject matter.

     **24. Counterpart.** This Agreement may be executed in as many counterparts as there are parties hereto and upon execution by all parties all counterpart copies shall be read as one agreement and as if all parties have signed the same agreement.

     **25. Applicability.** Any Products ordered by Distributor from Manufacturer on or after the date of this Agreement.

     **26. Retention of Liability by Manufacturer.** In the event Manufacturer, where permitted in this Agreement, exercises its right to contract with Smartmatic Services

14

Corporation, any other Affiliate of Manufacturer, or another individual or entity (each a "Manufacturer's Designee"), to provide any services or to perform any obligation of Manufacturer under this Agreement, Manufacturer shall continue to be primarily liable for the provision of the service or performance of the obligation, and Manufacturer will be fully liable to Distributor if Manufacturer's Designee fails to properly provide the service or perform the obligation. Without limiting the foregoing, Manufacturer shall indemnify and hold harmless Distributor, its officers, directors, shareholders, stockholders, affiliates and their respective successors and assigns from and against all claims, losses, expenses, including also reasonable attorneys fees and other damages of any kind incurred as a result of any Manufacturer's Designee failing to fully, timely and properly provide the specified services or perform the subject obligations.

**[SIGNATURE PAGE FOLLOWS]**

WO 817863.2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SMARTMATIC INTERNATIONAL CORPORATION
"Manufacturer"

By: _____
Name:  Alfredo Anzola
Title:  CFO / Director _____

SEQUOIA VOTING SYSTEMS, INC.
"Distributor"

By: _____
Name: _____
Title: _____

16

WO 817863.2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**SMARTMATIC INTERNATIONAL CORPORATION**
"Manufacturer"

By: _____
Name: _____
Title: _____

**SEQUOIA VOTING SYSTEMS, INC.**
"Distributor"

By: _____
Name: PETER McMANEMY
Title: CFO

16

**Exhibit A**

**Products**

Edge II Plus
Advantage Plus
Edge2 Accessories
Hybrid Activator
Accumulator & Transmitter (HAAT)
HAAT Listener

**Exhibit B**
Exclusivity Purchase Amounts
(All references to dollars or "$" shall mean U.S. dollars.)

| Product Line | 2008 | 2009 |
|---|---|---|
| Edge II Plus | $    5,000,000 | $    7,000,000 |
| Advantage Plus | $    3,500,000* | $   15,000,000 |
| Hybrid Activator Accumulator & Transmitter (HAAT) and Listener | $    3,500,000 | $    6,000,000 |

*Unless no Customer in the United States purchases at least 200 full-face DREs, other than D10s for Louisiana and New Jersey.

WO 817863.2

**Exhibit C**
**Prices (per unit)**
**All prices are F.O.B. port of origin.  All insurance and cost of freight to be paid and arranged by Distributor.**

**[see attached]**



Oct-07

**Smartmatic International Corporation**
# 4 Stafford House, Garrison Savannah St Michael, Barbados, W.I.
Phone: +246-228.52.57 / Fax +246-228.77.34

v1.4

| | | | | | | weeks |
|---|---|---|---|---|---|---|
| **Edge2Plus** | | | | | | |
| Edge2plus Model 300 Rev C.04 with Windows XP/e, E2P/300 Firmware, Enounce VaryPlay, Amphenol Mechanism, COC/E2P, UTG300, ABLE/D, CHICAGO VERSION | $ | 2,061.97 | 100 | taiwan | 9 weeks | 14 |
| Edge2plus Model 300 Rev C.04 with Windows XP/e, E2P/300 Firmware, Enounce VaryPlay, Amphenol Mechanism, COC/E2P, UTG300, ABLE/D | $ | 2,184.47 | 100 | taiwan | 9 weeks | 14 |
| Edge2plus Model 300 Rev C.04 with Windows XP/e, E2P/305 Firmware, Enounce VaryPlay, Amphenol Mechanism, COC/E2P, UTG300, CHICAGO VERSION | $ | 2,048.97 | 100 | taiwan | 9 weeks | 14 |
| Edge2plus Model 300 Rev C.04 with Windows XP/e, E2P/305 Firmware, Enounce VaryPlay, Amphenol Mechanism, COC/E2P, UTG300, | $ | 2,171.47 | 100 | taiwan | 9 weeks | 14 |
| Edge2Plus Software - all current versions (software only) | $ | 300.00 | 1 | barbados | 1 day | 1 day |
| EM-1024 (Rev 2.0) ~ USB Pen Drive 1GB Yellow A-Case | $ | 54.80 | 100 | taiwan | 3 Weeks | 8 |
| UPS3500 ~ UPS 3500 for AC/DC (120V) | $ | 175.25 | 100 | taiwan | 9 weeks | 14 |
| PL-500/1 ~ UPS for 120V | $ | 82.54 | 100 | taiwan | 6 weeks | 11 |
| PL-500/2 ~ UPS for 240V | $ | 94.16 | 100 | taiwan | 6 weeks | 11 |
| Battery Lead Acid | $ | 50.58 | 100 | taiwan | 8 weeks | 13 |
| RCB1310 ~ Remote Unlock Electronic Button | $ | 21.70 | 100 | taiwan | 6 weeks | 11 |
| COC/E2P ~ Carrying on Case ABS/PC/FR for E2P | $ | 249.20 | 100 | taiwan | 8 weeks | 13 |
| UTG300 58-400 ~ Paper Roll for E2P | $ | 2.36 | 100 | taiwan | 6 weeks | 11 |
| Privacy Flaps | $ | 31.91 | 100 | taiwan | 6 weeks | 11 |
| **Edge2** | | | | | | |
| VVPAT/E2 Rev B ~ VVPAT for Edge2 with Bag | $ | 439.25 | 100 | taiwan | 6 weeks | 11 |
| ABU/E2 ~ Audio Box Unit for Edge 2 Rev C with bag | $ | 123.25 | 100 | taiwan | 6 weeks | 11 |
| **HAAT** | | | | | | |
| HAAT/LCM Model 50 with W/CE, HAAT/50 Firmware, COB-50 | $ | 512.77 | 100 | taiwan | 8 weeks | 13 |
| HAAT/LCM Model 80 with W/CE, HAAT/80, Firmware, COB-100, PRT, ICR | $ | 743.22 | 100 | taiwan | 8 weeks | 13 |
| HAAT/LCM Model 90 with W/CE, HAAT/90 Firmware, COB-100, PRT, ICR, Modem | $ | 757.71 | 100 | taiwan | 8 weeks | 13 |
| HAAT/LCM Model 100 with W/CE, HAAT/100 Firmware, COB-100, PRT, ICR, without Modem | $ | 743.67 | 100 | taiwan | 8 weeks | 13 |
| HAAT/LCM Model 100 with W/CE, HAAT/100 Firmware, COB-100, PRT, ICR, without Modem (CHICAGO VER.) | $ | 599.00 | 100 | taiwan | 8 weeks | 13 |
| Modem PCMCIA Sierra AC55D for HAAT/100 | $ | 191.26 | 100 | taiwan | 8 weeks | 13 |
| HAAT/LCM Model 110 with W/CE, HAAT/110 Firmware, COB-100, PRT, ICR, Ethernet | $ | 701.94 | 100 | taiwan | 8 weeks | 13 |
| HAAT Software - all current versions (software only) | $ | 100.00 | 1 | barbados | 1 day | 1 day |
| HAAT LISTENER (price per HAAT that connects) | $20 | | 2 | barbados | 1 day | 1 day |
| **AdvantagePlus** | | | | | | |
| ABU/AD ~ Audio Box Unit for Advantage Rev A | $ | 123.25 | 100 | taiwan | 6 weeks | 11 |
| ABL/E/L ~ Audio Box Unit for Advantage Plus | $ | 120.00 | 100 | taiwan | 6 weeks | 11 |
| Advantage L Rev C10 (includes VVPAT, ABLE/D and Firmware) | $ | 6,700.00 | 100 | USA | 16 weeks | 16 |
| Advantage Software - all current versions (software only) | $ | 500.00 | 1 | barbados | 1 day | 1 day |
| **IP Royalties** | | | | | | |
| Hardware Royalty (that allows Sequoia to buy HW from third party if Smartmatic refuses to manufacture) | 2% | | | of the HW cost (assuming the sw was bought from Smartmatic, but hw was provided by third party) | | |
| Software Upgrade Royalty (that allows Sequoia to create and sell all sorts of upgrades to the existing Smartmatic software) | 10% | | | of the end-user selling price of the modified version and/or uprade | | |

Lead times are for 10,000 units or less. For more than 10,000 units lead times would have to be agreed by the parties.
Smartmatic will always do its best efforts to manufature and deliver as soon as possible.
Lead times are indicative only. We commit to deliver in less than 13 weeks for products FOB Taiwan, to allow sequoia to deliver by ship, thus adding an est. 5 weeks for a total of 18 weeks (126 days)

All Prices are FOB. All Shipping and Handling costs to be paid and arranged by Sequoia.

**Exhibit D**

**RMA Procedure**

1. Sequoia may purchase parts in advanced in order to have a faster response time to their customers RMA claims, or in order to be able to offer extended warranty terms, or just to offer "customer paid" repair services.

2. Every time Sequoia may require to claim an RMA, they should fill and submit a "INTL RMA Claim Form" and send it to INTL Warranty, Parts and Repair Department, indicating among others for each Good, Replacement Component or Part damaged the following information:

   - Good, Replacement Component or Part number
   - Good, Replacement Component or Part description
   - Full description of Apparent Damage or Failure
   - Equipment model (if claiming a component, should indicate the model of the finish good from where the component or part was taken)
   - Equipment Revision (if claiming a component, should indicate the revision of the finish good from where the component or part was taken)
   - Equipment Serial Number (if claiming a component, should indicate the serial of the finish good from where the component or part was taken)
   - Date of replacement/repair ((if claiming a component, should indicate the date when the damaged part was replaced)
   - Others…

3. INTL will assign a RMA Claim number and send such number to Sequoia.

4. If such claim is approved:

   a) INTL will indicate if the damaged parts must be sent back, and it will indicate where to send them

   b) INTL will update the RMA form with such information

   4.1.  If INTL requires damaged part to be sent back:

      a) Sequoia must send back the damaged parts and will inform INTL about shipping date, courier and tracking number. The freight for such return will be covered by Sequoia

      b) INTL will update the form with such information

      c) INTL strives to have replacement parts returned within 30 days after receiving the damaged parts (but sometimes this may be affected based on the depth of the failure and material availability, so INTL can not guarantee that in all cases there will not be extended turn around times due to material availability).

WO 817863.2

d) INTL will slip back to Sequoia, and cover the shipping costs

e) INTL will update the RMA form with the date and tracking information of such return.

4.2.   If the damaged parts are not required to be sent back to INTL:

a) Sequoia shall destroy/discard such bad parts and inform INTL about the date of such destruction.

b) INTL strives to have replacement parts returned within 30 days after approving the RMA claim (but sometimes this may be affected based on the depth of the failure and material availability, so INTL can not guarantee that in all cases there will not be extended turn around times due to material availability).

f) INTL will slip back to Sequoia, the shipping costs will be split between sequoia and INTL

c) INTL will update the RMA form with the date and tracking information of such return.

5.   If parts or the damage is not covered or it is out of warranty:

a) INTL will indicate the claim's rejection and reason for such rejection, for each particular item in the RMA Claim form and inform Sequoia about such rejection.

WO 817863.2

**Exhibit E**
**Distributor's Trademarks**

Sequoia Voting Systems

Edge II Plus

Advantage Plus

HAAT

HAAT Listener