# Exhibit 2

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (the "**Agreement**") is made this 5th day of November, 2007, by and between SVS Holdings, Inc., a Delaware corporation ("**Acquirer**") and Smartmatic Services Corporation, a Barbados company ("**Seller**") (together, the "**Parties**" and each, a "**Party**").

WHEREAS, Acquirer and Smartmatic Corporation are parties to a Stock Purchase Agreement, dated as of September 18, 2007 (the "**Purchase Agreement**");

WHEREAS, as contemplated in the Purchase Agreement, Acquirer and Smartmatic International Corporation ("**Smartmatic International**") are parties to a Distribution Agreement dated as of the date hereof, pursuant to which Smartmatic International has the obligation to provide certain warranty obligations to Acquirer;

WHEREAS, in order to enable Acquirer to operate Sequoia Voting Systems, Inc. (the "**Company**") in an effective manner during a transition period after its sale to Acquirer, Smartmatic International shall contract with Seller, and Seller has agreed, to provide to Acquirer certain services for the periods and on the terms and conditions set forth herein; and

WHEREAS, the provision of services hereinunder shall be in accordance with the terms and conditions of Sale and Security Agreement (the "**Sale and Security Agreement**") entered into on December 15, 2006 between Smartmatic International Group, N.V., Smartmatic Corporation, Sequoia Voting Systems, Inc., the USG Parties (as defined therein) and certain other parties thereto, which required a transition plan such that Sequoia Voting Systems, Inc. would be able to itself service, support and maintain certain products previously developed by and purchased from Smartmatic International and set forth in Schedule A attached hereto ("**Products**");

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth herein and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree:

1. SERVICES

General. During the term of this Agreement, Seller (or an Affiliate of Seller designated by Seller for this purpose) shall provide, or shall contract with such designated Affiliate to provide, services as set out in Schedule A (individually, a "**Service**" and collectively, the "**Services**") with respect to the Products.

1.1 Level of Services. The Services shall be provided to Acquirer at commercially acceptable quality levels, which shall be substantially similar in scope, quality and nature to those provided to, or provided on behalf of, the Company prior to the date hereof and which shall in no event be lower than the levels at which such services were provided internally by Seller prior to the date hereof.

1.2 Cooperation. Each Party shall cause its employees to reasonably cooperate with employees of the other to the extent required for effective delivery of the Services. In addition,

each Party shall name a point of contact who shall be responsible for the day to day implementation of this Agreement, including attempted resolution of any issues that may arise during the performance of any of Party's obligations hereunder.

1.3   Third Party Services. Seller shall not have the right to engage the services of independent contractors to deliver or assist Seller in the delivery of Services contemplated under this Agreement without the prior written consent of Acquirer. In the event such consent is given, Seller will impose on such third parties the confidentiality obligations specified in this Agreement and will supervise the performance of such third parties to ensure that the Services meet, in all material respects, the requirements of this Agreement.

1.4   Additional Services. If requested by Acquirer, Seller shall provide services in addition to the Services to Acquirer to the extent permitted under the Sale and Security Agreement. To the extent permitted by the Sale and Security Agreement, the scope of any such services, as well as the prices and other terms applicable to such services, shall be as mutually agreed by Acquirer and Seller.

2.   PAYMENTS

2.1   Services Pricing. Schedule A indicates, with respect to each Service, the costs to be charged to Acquirer for such Service. It is the express intent of the Parties that the Service costs shall not exceed the fair market value of such Services. No travel or other expenses shall be incurred without the prior written consent of Acquirer, which consent shall not be unreasonably withheld, conditioned or delayed. All references to dollars or "$" shall mean U.S. dollars.

2.2   Invoicing and Payment. Within twenty (20) days following the end of each calendar month during the term hereof, Seller or its affiliates shall provide to Acquirer a single invoice in form, format and media reasonably acceptable to Acquirer (an "**Invoice**") totaling all charges incurred by Seller hereunder during such month. Such Invoice shall contain a brief description of each Service or direct cost giving rise to the charge, and a listing of any third party charges included therein. Acquirer shall pay all amounts due under each Invoice in U.S. currency no later than fifteen (15) days following receipt of an Invoice.

2.3   Taxes. Any taxes (other than employment taxes for services provided by an employee of Seller or an Affiliate of Seller hereunder), duties, excises, tariffs, fees, assessments or levies imposed on the performance or delivery of Services or direct costs hereunder shall be the responsibility of Acquirer. Seller shall pay all such taxes incurred outside the United States, subject to reimbursement by Acquirer upon delivery of proof of payment, and Acquirer shall pay directly all such taxes incurred within the United States.

2.4   Records. Each of Seller and Acquirer shall keep such full and adequate records as are necessary to determine the charges to be assessed pursuant to this Section 2, and shall have reasonable access to such records of the other.

3.   SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Acquirer that:

2

3.1   Seller has all necessary rights and authority to grant Acquirer the rights granted herein and no Affiliates of Seller who are not signatories to this Agreement are required to grant such rights. Seller has obtained all necessary third party and governmental consents and authorizations to grant Acquirer the rights granted herein and to provide the Services as contemplated herein.

3.2   Seller is not in breach of any arrangement or agreement with any third party in respect of a Service to be provided to Acquirer that will be provided by a third party.

4.   CONFIDENTIALITY

4.1   Information Exchanges.  Subject to applicable law and good faith claims of privilege, each Party hereto shall provide the other Party with all information regarding itself and the transactions under this Agreement that the other Party reasonably believes are required to comply with all applicable laws, ordinances, regulations and codes in connection with the provision of Services pursuant to this Agreement.

4.2   Confidential Information.   Seller and Acquirer shall hold in trust and maintain confidential all Confidential Information relating to the other Party.  **"Confidential Information"** shall mean all information disclosed by either Party to the other in connection with this Agreement, whether orally, visually, in writing or in any other tangible form, and includes, but is not limited to, economic, scientific, technical, product and business data, business plans, and the like, but shall not include (i) information which becomes generally available to the public other than by disclosure in violation of the provisions of this Section 5.2, (ii) information which becomes available on a non-confidential basis to a Party from a source other than the other Party to this Agreement provided the Party in question reasonably believes that such source is not or was not bound to hold such information confidential, (iii) information acquired or developed independently by a Party without violating this Section 5.2 or any other confidentiality agreement with the other Party, and (iv) information that any Party hereto reasonably believes it is required to disclose by law, provided that it first notifies the other Party hereto of such requirement and allows such Party a reasonable opportunity to seek a protective order or other appropriate remedy to prevent such disclosure. Without prejudice to the rights and remedies of either Party to this Agreement, a Party disclosing any Confidential Information to the other Party in accordance with the provisions of this Agreement shall be entitled to equitable relief by way of an injunction if the other Party hereto breaches or threatens to breach any provision of this Section 4.2.

5.   INDEMNIFICATION

5.1   Indemnification by Seller.

    (a)   Indemnification.   Seller shall indemnify and hold Acquirer and its Affiliates harmless against any damages, costs and expenses (including reasonable attorneys' fees) arising from (i) gross negligence or intentional misconduct of Seller and its agents, consultants and employees in connection with the provision of any Services, or any other actions or inactions of Seller in connection therewith or (ii) the breach by Seller of any of its obligations hereunder.

3

(b) <u>Defense</u>. If notified promptly in writing of any action brought against Acquirer or its Affiliates based on a claim described in Section 5.1(a) above, and Seller reasonably agrees that such action is based on a claim described in Section 5.1(a) above, Seller shall defend such action at its expense and pay all costs, damages and settlements finally awarded in such action or settlement which are attributable to such claim. Seller shall have sole control of the defense of any such action and all negotiations for its settlement or compromise, provided such settlement or compromise includes an unconditional release of Acquirer and its Affiliates from all liability with respect to such claim in form and substance reasonably satisfactory to Acquirer. Acquirer shall reasonably cooperate with Seller in the defense of such claim, and may be represented, at Acquirer' expense, by counsel of Acquirer' selection.

5.2 <u>Indemnification by Acquirer</u>.

(a) Acquirer shall indemnify and hold Seller and its Affiliates harmless against any damages, costs and expenses (including reasonable attorneys' fees) arising from (i) the negligence, gross negligence or intentional misconduct of Acquirer in connection with the receipt or use of any Services, or any other actions or inactions of Acquirer in connection therewith or (ii) the breach by Acquirer of any of its obligations hereunder.

(b) If notified promptly in writing of any action brought against Seller or its Affiliates based on a claim described in Section 5.2(a) above, Acquirer shall defend such action at its expense and pay all costs and damages finally awarded in such action or settlement which are attributable to such claim. Acquirer shall have sole control of the defense of any such action and all negotiations for its settlement or compromise, provided such settlement or compromise includes an unconditional release of Seller and its Affiliates from all liability with respect to such claim in form and substance reasonably satisfactory to Seller. Seller shall reasonably cooperate with Acquirer in the defense of such claim, and may be represented, at Seller's expense, by counsel of Seller's selection.

6. TERM AND TERMINATION

6.1 <u>Initial Term</u>. Unless earlier terminated in accordance with Section 6.3 below, the term of this Agreement shall be in effect for the latter to occur of (i) twelve (12) months from the date hereof, or (ii) termination of the last of the Services provided by Seller to Acquirer.

6.2 <u>[Reserved]</u>.

6.3 <u>Termination</u>.

(a) This Agreement may be terminated by either Party if the other Party (the "**Defaulting Party**") has materially breached its obligations under this Agreement and if the Defaulting Party has not cured such default within thirty (30) days following the date on which the other Party (the "**Notifying Party**") has given written notice specifying the facts constituting the default. Notwithstanding the foregoing sentence, this Agreement shall not be terminated due to a default by the Defaulting Party if such default is directly attributable to a breach of this Agreement by the Notifying Party.

4

WO 817864.2

(b) Any particular Service provided pursuant to this Agreement may be terminated by Acquirer at any time upon thirty (30) days prior written notice to Seller.

(c) Upon termination of this Agreement in accordance with the terms hereof, all rights and obligations of the Parties under this Agreement shall cease and be of no further force or effect, except that the provisions of Sections 4 and 5 of this Agreement, and Acquirer's obligation to pay any Invoice for Services provided by Seller prior to any termination or expiration of this Agreement, shall survive any such termination or expiration.

7. GENERAL

7.1 Assignment. Neither Party shall assign any of its rights or obligations hereunder without the prior written consent of the other Party. This Agreement shall be deemed to be for the benefit of Acquirer and its Affiliates, and all rights of Acquirer under this Agreement may be exercised by any Affiliate of Acquirer. This Agreement shall inure to the benefit of and be binding upon any successors or permitted assigns of the Parties.

7.2 Force Majeure. No Party shall bear any responsibility or liability for any Damages arising out of any delay, inability to perform or interruption of its performance of its obligations under this Agreement due to any acts or omissions of the other Party hereto or for events beyond its reasonable control including, without limitation, acts of God, acts of governmental authorities, acts of the public enemy or due to war, riot, flood, civil commotion, insurrection, labor difficulty, severe or adverse weather conditions, lack of or shortage of electrical power, malfunctions of equipment or software programs, or any other cause beyond the reasonable control of such Party.

7.3 Applicable Law and Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such state without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction. Each Party (a) submits to the jurisdiction of any court sitting in New York in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court and (d) waives any right it may have to a trial by jury with respect to any action or proceeding arising out of or relating to this Agreement. Each Party hereby waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of the other Party with respect thereto. Either Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 7.9. Nothing in this Section 7.3, however, shall affect the right of either Party to serve legal process in any other manner permitted by law.

7.4 [Reserved]

7.5 Relationship of the Parties. The relationship of the Parties is that of independent contractors. Nothing contained in this Agreement shall be deemed or construed to create or give rise to any partnership, joint venture or agency relationship between the Parties. Each Party

acknowledges and agrees that it neither has nor will give the appearance or impression of having any legal authority to bind or commit the other Party hereto in any manner. Each Party shall be solely responsible for compensation of its employees and neither Party shall have any obligations with respect to the employees of the other Party.

7.6 Registration. In the event that this Agreement is required to be registered with any governmental authority, Seller shall cause such registration to be made and shall bear any expense or tax payable in respect thereof.

7.7 Entire Agreement; Amendment. This Agreement constitutes the entire agreement between Seller and Acquirer with respect to the subject matter hereof. This Agreement shall not be amended, altered or changed except by a written agreement signed by the Parties hereto.

7.8 No Waiver. No delay or omission on the part of either Party to this Agreement in requiring performance by the other Party or in exercising any right hereunder shall operate as a waiver of any provision hereof or of any right or rights hereunder; and the waiver, omission or delay in requiring performance or exercising any right hereunder on any one occasion shall not be construed as a bar to or waiver of such performance or right, or of any right or remedy under this Agreement, on any future occasion.

7.9 Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to Acquirer:

SVS Holdings, Inc.
717 17th Street
Suite 310
Denver, CO 80202

Copy to:

Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
Attention: Robert L. Bodansky

If to Seller:

Smartmatic Services Corporation
Attn: Antonio Mugica
#4 Stafford House
Garrison Savannah

St. Michael
Barbados, W. I.

Copy to:

Sutherland, Asbill & Brennan LLP
1275 Pennsylvania Avenue N.W.
Washington, D.C. 20004-2415
Facsimile: (202) 637-3593
Attention: Jeffrey P. Bialos, Esq.

6

WO 817864.2

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

7.10 Section Headings; Definitions. Section headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement. Capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement.

7.11 Severability. If any provision of this Agreement shall for any reason be held illegal or unenforceable, such provision shall be deemed separable from the remaining provisions of this Agreement and shall in no way affect or impair the validity or enforceability of the remaining provisions of this Agreement.

7.12 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

7.13 Facsimile Signature. This Agreement may be executed by facsimile signature.

7.14 Retention of Liability by Seller. In the event Seller, where permitted in this Agreement, exercises its right to contract with any Affiliate of Seller to provide any services or to perform any obligation of Seller under this Agreement, Seller shall continue to be primarily liable for the provision of the service or performance of the obligation, and Seller will be fully liable to Acquirer if Seller's Affiliate fails to properly provide the service or perform the obligation. Without limiting the foregoing, Seller shall indemnify and hold harmless Acquirer, its officers, directors, shareholders, stockholders, affiliates and their respective successors and assigns from and against all claims, losses, expenses, including also reasonable attorneys fees and other damages of any kind incurred as a result of any of Seller's Affiliates failing to fully, timely and properly provide the specified services or perform the subject obligations.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, Seller and Acquirer have duly executed this Agreement as of the day and year first above written.

| SELLER | ACQUIRER |
|---|---|
| SMARTMATIC SERVICES CORPORATION | SVS HOLDINGS, INC. |
| By: *[signature]* | By: _____ |
| Name: Alfredo Anzola | Name: |
| Title: CFO / Director | Title: |

[Transition Services Agreement]

8

IN WITNESS WHEREOF, Seller and Acquirer have duly executed this Agreement as of the day and year first above written.

SELLER

SMARTMATIC SERVICES CORPORATION

By:
Name:
Title:

ACQUIRER

SVS HOLDINGS, INC.

By:
Name: PETER MCMANEMY
Title: CFO

[Transition Services Agreement]

8

WO 8177642

## SCHEDULE A

### SUPPORT SERVICES

For 12 months from the date of this Agreement, Seller shall or shall contract with another party to provide Acquirer with dedicated Seller consultants for **one hundred and sixty (160) work hours** each month to support and maintain the Products, including the Advantage Plus, the Edge Plus and the HAAT, and train and assist Acquirer as needed in developing the necessary expertise to itself support and maintain the Products at no direct cost to Acquirer. Any reasonable travel and expenses incurred during such 160 work hours per month will be covered by Acquirer.

If Acquirer requires Seller's Services beyond 160 work hours per month, Seller will provide Seller's consulting Services at the price of **eighty dollars ($80) per hour**, plus reasonable travel and expenses incurred.