**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
The Honorable Howard R. Tallman

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-24238 HRT |
| SVS HOLDINGS, INC. ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

**DEBTOR'S OBJECTION TO SMARTMATIC'S MOTIONS FOR AUTHORITY AND STANDING TO PROSECUTE CAUSES OF ACTION, OR ALTERNATIVELY, APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, CONVERSION TO CHAPTER 7**

SVS Holdings, Inc. ("**Debtor**") objects to the (a) *Motion for Authority and Standing to Prosecute Causes of Action on Behalf of the Debtor or, in the Alternative, for Appointment of a Trustee* ("**Standing Motion**" (Dkt. No. 106)), and (b) *Motion for Conversion of Chapter 11 Case to Case under Chapter 7* ("**Conversion Motion**" (Dkt. No. 103)), both filed by Smartmatic USA Corporation ("**Smartmatic**").[1] The following grounds support this Objection:

**Overview**

1. On Friday, September 21, 2012, Smartmatic filed two motions seeking alternative relief: (a) authority to prosecute avoidance actions; (b) appointment of a Chapter 11 trustee; or (c) conversion of the case to Chapter 7. Smartmatic's motions are largely designed to increase litigation leverage for a pending action Smartmatic initiated against Dominion Voting Systems, Inc. ("**Dominion**") in Delaware involving allegations of $20 million in damages.

2. For the reasons set forth herein, the Court should deny Smartmatic's request for authority to prosecute avoidance actions, for appointment of a Chapter 11 trustee, and for conversion. Instead, the Court should dismiss this Chapter 11 case. To the extent Smartmatic desires to sue Dominion or Jack Blaine, it can do so outside of the bankruptcy court. Alternatively, the Court should convert the case to Chapter 7.

---

[1] The use of the term "Smartmatic" herein likewise refers to its relevant affiliated entities, including any predecessor-in-interest.

## Case Background

3.     The principal parties in this dispute—Debtor, Smartmatic, Dominion, Sequoia Voting Systems, Inc. ("**Sequoia**"), and Jack Blaine—were or are engaged in the business of selling voting systems worldwide. While sometimes transacting with one another and attempting to partner with one another in various configurations, the parties have also largely been in direct competition, seeking to sell voting systems to local and national governments worldwide. As with any competitive business, some thrive, and others fail. Debtor and its wholly-owned operating company, Sequoia, failed. Smartmatic thrived, and continues to do so.

4.     Debtor filed this bankruptcy hoping to resolve and end a variety of longstanding disputes between itself and Smartmatic. Smartmatic is Debtor's largest creditor. Leading up to and through bankruptcy, Smartmatic has largely dictated Debtor's course.

5.     Debtor is a holding company. Other than officers, it never had any employees, and its only operation was management of its debts, books, and records. Its sole asset was and remains its stock in Sequoia, its wholly-owned subsidiary.

6.     Debtor acquired Sequoia from Smartmatic in 2007. Prior to Smartmatic's ownership, Sequoia's roots stretch back over a century to the introduction of the first lever-action mechanical voting systems. By the 1980s, Sequoia was a pioneer in the area of electronic voting systems. Smartmatic purchased Sequoia in 2005. Jack Blaine, a Smartmatic employee at the time, assisted in the acquisition. By 2006, Mr. Blaine was the president of Sequoia, then still owned by Smartmatic.

7.     In 2006, various political issues arose, and United States authorities became aware that Sequoia, through Smartmatic, was indirectly owned by Venezuelan citizens. The U.S. Committee on Foreign Investment in the United States ("**CFIUS**") began reviewing Smartmatic's purchase of Sequoia.

8.     To resolve potential issues with CFIUS, in 2007, Smartmatic transferred Sequoia to a new company formed for the acquisition, owned by U.S. citizens who were part of Sequoia's management. The new company was Debtor, and Debtor's majority shareholder was Mr. Blaine.

9.     Smartmatic has long sought and desired to keep the terms of the Sequoia sale to Debtor confidential. Confidentiality agreements thus prevent disclosure of the specific terms herein. Nevertheless, Debtor can disclose that as a component of the sale terms, Debtor was obligated to make certain payments to Smartmatic, among other obligations.

10.    In 2008, a dispute developed between Sequoia and Smartmatic regarding claims and rights under the 2007 sale agreement. Smartmatic filed suit against Sequoia in Delaware Chancery Court. Ultimately, the parties resolved the dispute with a second agreement that Smartmatic has again sought to keep confidential. The second agreement replaced the original obligations and again created payment and other obligations from Sequoia to Smartmatic.

11.    By 2009, however, Smartmatic asserted that Debtor was in default on its obligations. By early 2010, Debtor had been unable to resolve Smartmatic's demands. In early April 2010, Mr. Blaine met with Smartmatic's principal, Antonio Mugica, to propose a

restructuring of Debtor's obligations in a manner that would enable Debtor to resolve Smartmatic's default claims.

12. Smartmatic responded to the settlement overture on April 9, 2010 by commencing suit against Debtor in the Delaware Chancery Court, asserting various claims under the parties' second agreement. Smartmatic sought performance of Debtor's obligations to provide audited financial statements, as well as claims for payment.

13. Debtor objected to the suit, in part, based on a mandatory arbitration provision. After reviewing the issue, the Delaware Chancery Court ordered the dispute split so that certain of Smartmatic's claims remained in Delaware, and others would be heard in arbitration.

14. Smartmatic promptly commenced suit with AAA in New York on the arbitrable claims in April 2010. Smartmatic pushed to accelerate both actions, and by May 2010, Debtor faced imminent deadlines in both matters, in the two different forums. In Delaware, the court set trial for June 17, 2010, with Debtor's pretrial brief due on June 11, 2010. In New York, the arbitrator set a hearing for June 8, 2010.

15. With briefing deadlines and a trial date rapidly approaching in the Delaware Chancery Court, and a hearing in the arbitration set for June 8, 2010, Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on June 8, 2010. The filing stayed the two pending actions asserted by Smartmatic, and provided Debtor with an opportunity to attempt to resolve its disputes with Smartmatic other than in the Delaware Chancery Court or via arbitration.

*Smartmatic's Claims Against Dominion*

16. While Smartmatic was pursuing claims against Debtor in 2009, it entered into a licensing agreement with Dominion whereby it licensed Dominion's optical scan voting systems for purposes that included securing a contract for the Philippine elections in 2010. Sequoia was competing for the highly substantial bid, but it was awarded to Smartmatic.

17. Following various allegations of technical difficulties during the Philippine elections, Smartmatic and Dominion, on information and belief, asserted claims outside of court against one another for alleged breaches under the licensing agreement.

18. In June 2012, the Philippine Supreme Court upheld a $40 million purchase option payable to Smartmatic for the approximately 82,000 Dominion-licensed voting machines Smartmatic supplied in the 2010 election. Under that decision, upon information and belief, Smartmatic's obligations to Dominion increase by approximately $10-$20 million. However, to perform under the purchase option, Smartmatic needs Dominion's ongoing service under the licensing agreement to maintain and service the system.

19. On September 6, 2012, Smartmatic sued Dominion in Delaware Chancery Court, asserting various claims under the licensing agreement, and demanding Dominion's performance, or, in the alternative, declaration that Dominion has repudiated the licensing agreement and Smartmatic owes nothing to Dominion. Smartmatic also alleges that Dominion has violated an understanding that Dominion would not compete internationally with Smartmatic. Smartmatic

alleges that Dominion violated that understanding by securing contracts in Puerto Rico and Mongolia. On information and belief, Mr. Blaine was instrumental in securing those contracts on behalf of Dominion. Smartmatic asserts damages in excess of $20 million.

### Debtor's Chapter 11 Bankruptcy

20. Debtor scheduled four creditors:

    a. the IRS (claim amount unknown);

    b. Jack Blaine ($1,606,421.10);

    c. Sequoia Voting Systems, Inc. ($150,732.45); and

    d. Smartmatic Corporation ($9,619,180.97).

21. Additionally, the State of Delaware asserts a claim against Debtor for franchise taxes in the amount of approximately $133,000.

22. Debtor independently reviewed potential avoidance actions, including the potential claims alleged by Smartmatic, and determined it had no colorable avoidance claims. With respect to the alleged claims against Mr. Blaine, Debtor determined that Mr. Blaine has complete defenses, including (a) new value; and (b) the fact that any funds transferred to Mr. Blaine came from the non-debtor Sequoia, and not from Debtor. Debtor holds no fraudulent transfer claims against Mr. Blaine as any funds transferred to Mr. Blaine—aside from being transferred by a non-debtor entity—were provided for equivalent value of either services or the repayment of debt. Mr. Blaine's claims are derived from making loans to Sequoia—the non-debtor—so that Sequoia could pay its employee wages in periods where available cash was insufficient. Debtor determined that it had no colorable claims against Mr. Blaine.

23. As for Dominion, Debtor determined that it had no colorable claim either. Debtor made no transfers to Dominion. While Sequoia made two separate transfers to Dominion—the two transfers identified by Smartmatic—neither transfer is avoidable under any colorable theory based on the facts. Initially, Debtor's only claims would be derivative claims as a shareholder of Sequoia. Further, case law indicates that derivative shareholders, unlike creditors, may lack standing to avoid an entity's transfers. Additionally, nothing about either transfer indicated facts that would support a colorable fraudulent transfer claim. While the transfers occurred during periods of financial distress for Sequoia, Sequoia appears to have received more than reasonably equivalent value for its transfers. With respect to the New York contract transfer, Sequoia received over $2 million that enabled it to continue to operate. With respect to the June 2010 transfer, Sequoia received approximately $3 million, enabling it to resolve a significant number of creditor claims, plus secured employment for virtually all of its employees. In both instances, Debtor found no facts to indicate that Sequoia received less than reasonably equivalent value given that determination of "reasonably equivalent value" for the unique, market-sensitive assets would be necessarily dependent on finding that there was a better, alternate remedy available. Finally, because Sequoia is insolvent, and continues to have significant obligations to its own creditors, Debtor determined that any derivative claim by Debtor as a shareholder would necessarily entitle Sequoia's substantial creditors to recover the benefits of any recovery until

paid in full. Debtor identified no reasonable possibility—let alone probability—that expending the resources to pursue the claims would result in any benefit to Debtor's estate.

24.     Very little has happened in this Chapter 11 case in large part because neither Smartmatic, nor any other creditor, has compelled any activity. Debtor commenced this case to stop the litigation costs it was incurring in the two actions brought by Smartmatic and to obtain a stay from the accelerated briefing and hearing schedule it was facing in Delaware and New York. Debtor hoped that Smartmatic would recognize that there was little benefit to continuing litigation, with Debtor's sole asset as Sequoia—an entity that was and is insolvent, had ceased to operate, and was attempting to windup by resolving claims with its substantial creditors. Following the sale to Dominion in 2010, Sequoia resolved approximately $5.5 million in creditor claims for approximately $1.3 million, pursuing its windup and attempting to avoid Chapter 7.

25.     However, after Debtor's bankruptcy filing, Smartmatic took no action for over a year. Virtually nothing, other than Debtor's timely filing of monthly operating reports, occurred in the bankruptcy.

26.     In August 2011, over a year after the case was commenced, Smartmatic stirred, seeking and obtaining Rule 2004 discovery against Debtor. Debtor provided documents in response, and in September 2011 Smartmatic deposed Debtor's current CEO, Kevin Hurst, its former president, Mr. Blaine, and its former Chief Financial Officer, Peter McManemy. Immediately following the depositions, Debtor attempted to initiate settlement discussions with Smartmatic to explore a resolution of Smartmatic's claims in a manner that would enable the bankruptcy to be dismissed. Smartmatic, however, declined to engage in discussions.

27.     Also in August 2011, Smartmatic sought and obtained authorization to seek Rule 2004 discovery against Dominion. In October 2011, Debtor became aware that Smartmatic was attempting to schedule depositions with two Dominion officers. Debtor attempted to be included in the scheduling for the depositions so that it could attend, but Smartmatic maintained that Debtor could not attend the Rule 2004 exams, despite them emanating out of Debtor's bankruptcy case. Debtor elected not to seek an order from the Court allowing its attendance.

28.     In January 2012, Debtor learned that Smartmatic had indeed deposed two Dominion officers.

29.     On April 19, 2012, Smartmatic counsel contacted Sequoia's counsel regarding the need to execute a tolling agreement regarding the Debtor's avoidance claims. Debtor had received no demands or other communications from Smartmatic since exchanging communications in October 2011 regarding Smartmatic's intent to depose the Dominion officers.

30.     Smartmatic, Sequoia, and Mr. Blaine entered into a tolling agreement on April 27, 2012, effective as of April 19, 2012.

31.     Under the tolling agreement, Sequoia and Mr. Blaine agreed to toll certain timing defenses that they could assert for as long as the tolling agreement was in place. The tolling would expire 90 days after termination by any party.

32. On September 6, 2012, four days before it filed suit against Dominion in Delaware Chancery Court, Smartmatic notified Sequoia and Mr. Blaine that it was terminating the tolling agreement, and intended to file motions in this Court seeking to prosecute avoidance actions.

33. On September 21, 2012, Smartmatic filed the Standing Motion and the Conversion Motion seeking the alternative relief requested.

## The Court Should Deny Smartmatic's Request for Standing to Prosecute Avoidance Actions

34. Avoidance claims are not assignable. *Hartford Underwirters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 7-8 (2000) (statutory language granting certain powers on behalf of trustees did not grant the same powers to unnamed entities, such as a creditor's committee); *In re Fox,* 305 B.R. 912, 915-16 (B.A.P. 10th Cir. 2004) (rejecting the notion that avoidance actions are assignable). Notwithstanding Smartmatic's arguments to the contrary and citations to Second Circuit authority, the U.S. Supreme Court has clearly indicated that avoidance claims are not even assignable to a creditor's committee, let alone a stand-alone creditor. *See Surf n Sun Apts., Inc. v. Dempsey*, 253 B.R. 490, 494 (M.D. Fla. 1999) (bankruptcy court may not grant standing to individual creditors to prosecute fraudulent transfer actions on behalf of estate).

35. The policy reason for why avoidance actions should not be assignable is clear. While a debtor in possession or trustee bears fiduciary obligations to an estate that create a check and balance on the formidable power to assert bankruptcy causes of action, a private assignee would not bear any fiduciary obligations. Smartmatic makes no attempt to assert claims as a fiduciary of the estate, or to accept fiduciary obligations. Smartmatic only seeks standing so that it may pursue claims without any fiduciary obligations, though it acknowledges that after payment of its litigation fees and costs, it would share any proceeds with other estate creditors.

36. Part of Smartmatic's goal appears to be to obtain estate funding for its litigation. Smartmatic indicates that if granted standing, it would be entitled to administrative claims for pursuing the litigation. *See* Standing Motion, p. 14, ¶ 40 ("If successful, the recoveries on the claims, net of reimbursement of Smartmatic's attorney's fees and expenses, will augment the bankruptcy estate for the benefit of creditors."). Consequently, Smartmatic seeks to have the bankruptcy estate fund its pursuit of its direct competitors—Dominion and Mr. Blaine.

37. Smartmatic sets forth no clear statement as to why it should be granted the power to pursue bankruptcy claims in the bankruptcy court—claims the Debtor believes are meritless—when it alleges it has standing to assert direct state law claims against the various non-debtor parties. Smartmatic asserts that it desires to seek fraudulent transfer claims against Dominion and preference and/or fraudulent transfer claims against Mr. Blaine. Yet, Smartmatic alleges that it is a creditor of both Debtor and Sequoia. If this Chapter 11 case is dismissed, Smartmatic is not prejudiced in any way. It may directly assert state law fraudulent transfer claims that mirror the claims it alleges herein, all without any limitation from the avoidance claim statute of limitations set forth in 11 U.S.C. § 546.

38. Since Smartmatic appears to have stronger, direct claims under state law that it can assert on its own behalf outside of bankruptcy, it is not clear why Smartmatic would be fighting so hard to obtain the bankruptcy causes of action. While Smartmatic is unlikely to admit it, the only plausible explanation is that Smartmatic desires to use the bankruptcy avoidance claims, and the bankruptcy forum, for the improper purpose of furthering its litigation against its direct competitor Dominion, and its employee Mr. Blaine, who assists Dominion in procuring international business in direct competition with Smartmatic. Though Smartmatic would certainly benefit from the litigation advantage of a second front against Dominion, with a separate suit against a key Dominion employee, Mr. Blaine, there is no compelling reason to award Smartmatic this significant power.

39. Further, Smartmatic's allegation of urgency and the potential loss of bankruptcy claims to a statute of limitations is undermined by Smartmatic first stopping the clock from running, and then starting it again. Smartmatic terminated the tolling agreement, and now alleges that this matter requires prompt adjudication to prevent the loss of "valuable claims." However, Smartmatic unilaterally determined the timing of the termination of the tolling agreement to clearly coincide with the lawsuit it filed against Dominion four days earlier. In fact, Smartmatic was so coordinated in its attempt to separate proceedings against Dominion that it ignored its requirement to first demand that Debtor assert the claims it seeks to take.

40. Smartmatic has rejected every alternate remedy and created the urgency it now claims compels the relief it seeks. At no point did Smartmatic contact Debtor and request that Debtor assert the claims. Smartmatic, conceding that it failed to follow the requirement, argues that such a demand would have been futile because Debtor's president, Kevin Hurst, is also the president of Sequoia, and was an "officer and key negotiator" of the Sequoia transaction with Dominion. Standing Motion, p. 14, ¶¶ 41-42. Smartmatic asserts that Mr. Hurst "would not want to pursue an action that attacks his own prior decisions." Those allegations are patently false. Mr. Hurst was neither an officer, a key negotiator, nor a decision maker of any kind in the negotiations and sale between Sequoia and Dominion. Mr. Hurst did not become an officer of Debtor or Sequoia until after the Dominion sale. Further, the false allegation of conflict is an attempt to distract from the fundamental reality—the alleged avoidance actions are meritless and would be a waste of the estate's resources.

41. While Smartmatic asserts weighted allegations of impropriety for Debtor's failure to prosecute this Chapter 11 case, the simple reality is that Smartmatic has always dictated the pace and direction of this case. Debtor filed this action to stay two actions asserted by Smartmatic that Smartmatic was aggressively accelerating in Delaware and New York. After the Chapter 11 filing, Smartmatic did nothing for over a year. Neither did any other creditor. Debtor had no need to incur the expense of preparing or filing a plan when the creditor that had pushed it into bankruptcy indicated no intent to take further action. After Smartmatic roused in the summer of 2011, all it did was seek discovery for its eventual suits against Dominion, and its employee, Mr. Blaine. Debtor has repeatedly offered and attempted to identify a resolution of Smartmatic's claims that would end further litigation. Smartmatic has only pursued the litigation path. Yet, nothing has prevented Smartmatic from filing its own plan. It has never sought to do so.

42. Assignment of the avoidance claims to Smartmatic, or appointment of a Chapter 11 trustee, would only prolong a Chapter 11 case for a debtor with no cash assets, growing administrative claims, for the sole purpose of pursuing costly, highly speculative, facially defeatable avoidance claims. Continuing this Chapter 11 proceeding serves no benefit to the estate, the other creditors, the Court, or the U.S. Trustee. It would only empower Smartmatic to further attack its competitors through litigation, but with the imprimatur of the bankruptcy court's blessing, and the ability to offset its costs through administrative claims. Further, once assigned to Smartmatic, such claims would be forever lost to the estate. To the extent the Court allowed the case to continue in Chapter 11, any future conversion to Chapter 7 would leave a Chapter 7 trustee powerless to control the administration of the estate, or the prosecution of the alleged claims.

### Dismissal is the Best Remedy

43. Neither standing for Smartmatic nor appointment of a Chapter 11 trustee is appropriate because this case should not remain in Chapter 11. There is no prospect of reorganization. Debtor's purpose for being in Chapter 11 has now ended. Debtor entered Chapter 11 to stay litigation with Smartmatic and attempt to resolve Smartmatic's claims out-of-court. Smartmatic has rejected that alternative, and clearly wants to proceed to litigation. However, there is no need to keep a Chapter 11 estate open, accumulating administrative expenses, burdening the Court and the U.S. Trustee's Office, for the possibility that Smartmatic's—or a Chapter 11 trustee's—litigation might bear fruit.

44. Debtor's prospect for reorganization when it filed Chapter 11 was to wait to see if its sole asset—its stock in Sequoia—might obtain value. At the time Debtor filed, Sequoia was insolvent, and Debtor's stock was valueless. Nevertheless, Sequoia's contingent recoveries, and creditor resolutions, potentially could have resulted in net assets that after the Sequoia windup could be distributed to Debtor as its sole shareholders. At the time Debtor filed, Sequoia had just begun its windup, and was faced with more than $12 million in creditor claims. After two years of considerable efforts, Sequoia has resolved approximately $5.5 million in claims through payments of $1.3 million. After resolution of final claims from the asset purchase agreement with Dominion in April 2012, it is now unlikely that Sequoia will receive any further funds. At this point, it has approximately $700,000 with which to complete its windup, *i.e.*, to pay creditors that hold claims of approximately $6 million. There is virtually no likely prospect of Debtor's sole asset—its stock in Sequoia—having any value. And there is no further purpose for continuing the Chapter 11 case.

45. Similarly, conversion would only transfer an effectively assetless case to a Chapter 7 trustee for the sole purpose of pursuing highly speculative, expensive litigation with no apparent funding. There are no apparent assets for a Chapter 7 trustee either. While Smartmatic asserts that Debtor's avoidance claims are valuable, Debtor has determined that these claims are not recoverable, and are at best highly speculative.

46. Smartmatic is not prejudiced by dismissal. It may assert whatever claims it has in any applicable forum, and may continue to litigate its pending actions in Delaware and New York against Debtor. It does not need to assume the mantle of prosecuting claims for the benefit of other inactive creditors when it has the ability to prosecute identical claims for its own benefit.

47. Further, there are no claims that will be lost if the case is dismissed. The alleged "avoidance claims" are valueless. Mr. Blaine has complete defenses, including new value and the fact that all funds he received came from the non-debtor Sequoia—to the alleged preference claim. Prevailing on a claim against Mr. Blaine would require overcoming his apparent complete defenses, and subordinating his claims, to result in any meaningful distribution to Smartmatic. Instead, Smartmatic may assert direct claims against Mr. Blaine to the extent it believes it holds them as a creditor of Debtor.

48. Debtor's alleged claims against Dominion for avoidance of the transfer to Dominion is a derivative shareholder claim. Sequoia is an insolvent entity with over $6 million in unpaid creditors. Any avoidance recovery of a transfer from Sequoia must be paid first to Sequoia's creditors before it would go to Debtor, as a shareholder. There is no evidence that these specious, highly speculative avoidance claims would change this Debtor from being anything but a no-asset burden for a Chapter 7 trustee.

49. Further, a Chapter 7 trustee would have to overcome Dominion's apparent complete defense that it paid not only reasonably equivalent value for Sequoia, but overpaid. Dominion paid a minimum of $3 million for assets to a company that was very soon going to be out of operating capital and forced to shut its doors. Absent the sale to Dominion, Sequoia would have been out of business, with approximately 67 employees out of work, and no saleable assets, by the end of June 2010. With no other bidders in the marketplace, despite desperate attempts to locate them for over a year, and with Sequoia weeks away from having no value of any kind, there is no colorable basis for the argument that the transfer for Dominion was a fraudulent transfer.

## Alternatively, Conversion to Chapter 7

50. To the extent the Court determines that dismissal is not in the best interest of all parties-in-interest, Debtor requests, to the extent the Debtor cannot unilaterally decide, that the Court convert the case to Chapter 7.

51. To the extent the Court determines that the speculative claims alleged by Smartmatic deserve examination, an independent Chapter 7 trustee would best serve the estate, and balance the fiduciary responsibilities of pursuing avoidance claims without being motivated by a desire to harm and further litigate against business competitors.

WHEREFORE, Debtor requests that the Court deny the Standing and Conversion Motions, and enter such other relief as is just and proper.

Dated: October 5, 2012.

HOROWITZ & BURNETT, P.C.

s/ Kevin S. Neiman
Kevin S. Neiman, # 36560
1660 Lincoln Street, Suite 1900
Denver, CO 80264
Phone: (303) 996-8600
Fax: (303) 996-8636
E-mail: kneiman@hblegal.net

*Counsel for SVS Holdings, Inc.*
