**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-24238 HRT |
| SVS HOLDINGS, INC. ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

**SEQUOIA VOTING SYSTEMS INC.'S OBJECTION
TO SMARTMATIC'S MOTIONS FOR STANDING
TO PROSECUTE AVOIDANCE ACTIONS,
FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE,
OR CONVERSION TO CHAPTER 7**

Sequoia Voting Systems, Inc. ("**Sequoia**"), hereby objects to the (a) Motion for Authority and Standing to Prosecute Causes of Action on Behalf of the Debtor or, in the Alternative, for Appointment of a Trustee ("**Standing Motion**"), and (b) Motion for Conversion of Chapter 11 Case to Case under Chapter 7 ("**Conversion Motion**"), both filed by Smartmatic USA Corporation ("**Smartmatic**").  In support thereof, Sequoia states as follows:

**Summary**

1.      Through its Motions, Smartmatic seeks alternatively:  (a) standing and authority to prosecute avoidance actions; (b) appointment of a Chapter 11 trustee; or (c) conversion of the case to Chapter 7.  Because the alternate relief requested by Smartmatic would only serve to unnecessarily continue a no asset case in bankruptcy, while increasing claims against Sequoia, with no benefit for Debtor or its creditors, Sequoia opposes the relief requested.  The appropriate remedy at this stage of SVS Holdings Inc.'s ("**Debtor's**") bankruptcy is to dismiss the case.

1

**History**

2. Sequoia is not a debtor in bankruptcy. It is wholly owned by Debtor. Sequoia ceased operating in June 2010, and has been conducting its windup since then by resolving claims with creditors outside of bankruptcy.

3. Sequoia is a creditor in this case. Sequoia is scheduled as a creditor by Debtor in the amount of approximately $150,000.00. Sequoia's claims, for loans to Debtor, far exceed that amount.

4. Prior to ceasing its operations, Sequoia, with approximately 70 employees, sold voting machines and systems. It competed directly with Smartmatic, though it was formerly owned by Smartmatic. Smartmatic sold Sequoia to Debtor in 2007. Sequoia was not a party to sale agreements between Smartmatic and Debtor.

5. Until very recently, Sequoia has been unaware that Smartmatic asserts claims against Sequoia. After filing the Motions, Smartmatic counsel advised Sequoia's counsel that Smartmatic asserts claims in excess of $1 million against Sequoia.

**Sequoia's Transfers to Dominion Were Not  
Fraudulent and are Not Avoidable**

6. Smartmatic's principal basis for each of its alternatively requested motions is that that two transfers from Sequoia to Dominion Voting Systems, Inc. ("**Dominion**") are avoidable fraudulent transfers and avoidance actions should be asserted in Debtor's bankruptcy. However, Smartmatic sets forth no persuasive basis to allow the conclusion that the transfers were avoidable and could potentially provide assets to this estate.

7. From 2007 to 2010, Sequoia operated as an independent company, selling voting machines in multiple United States jurisdictions. However, the market demand for voting

systems dropped precipitously in 2008, and Sequoia struggled to earn sufficient revenues to fund its operations.

8. In 2007, Sequoia partnered with Dominion to bid for contracts in the State of New York. Through the joint effort, a majority of New York counties awarded contracts to Dominion/Sequoia. Nevertheless, the two companies disputed various obligations under the agreement.

9. In 2009, Sequoia was faced with having insufficient cash to meet its operating expenses. With no alternative funding sources, Sequoia utilized one of its few severable and saleable assets—its New York contract ("**NY Contract**") with Dominion. Dominion and Sequoia entered into an agreement whereby Dominion paid Sequoia $2.366 million and agreed to additional cash payments if any of the remaining undecided New York counties awarded additional contracts to Dominion. Dominion assumed the contractual obligations of Sequoia under the NY Contract, assumed its premises obligations in New York, and hired ten Sequoia employees to service the contracts.

10. Nothing in Sequoia's transfer of certain rights and obligations under the NY Contract is avoidable as a fraudulent transfer. Although Sequoia was in financial distress at the time, the deal was arm's length between two parties that were more competitors than business partners. The deal was highly beneficial for Sequoia in that it enabled Sequoia to continue to stay in business, continue servicing its other revenue generating contracts, while providing a significant and much needed capital infusion. There is no basis under either 11 U.S.C. § 548 or § 544 for Smartmatic, a Chapter 11 trustee, or a Chapter 7 trustee to avoid the transfer of the NY Contract. Aside from the fact that Sequoia is not the Debtor, and the transfer did not come from the Debtor, there is no colorable basis for Smartmatic to assert that Sequoia received less than

601629879

reasonably equivalent value for what it transferred to Dominion. The transfer enabled Sequoia to continue to operate, while providing over $2 million and an opportunity for further income, while significantly reducing Sequoia's operating expenses. The transfer is patently not avoidable.

11. By early 2010, Sequoia's cash reserves were running out. It had no firm commitments for sufficient revenue to enable it to continue to operate. Sequoia management devoted increasing attention to finding a resolution that would enable as many of Sequoia's 67 employees to keep their jobs as possible, while also providing for payment to its creditors.

12. In January 2010, Dominion expressed interest in a potential transaction, and the parties began negotiations. After the parties first discussed a potential stock acquisition, Dominion determined that it was not interested in acquiring Sequoia's debt obligations.

13. Sequoia and Dominion continued to negotiate potential terms for a sale of Sequoia assets for several months. Sequoia entertained an offer by another potential buyer in February 2010, but concluded that the proposed offer was not preferable to attempting to continue to right its own ship, with potential revenue sources not yet closed off, and with the possibility of negotiating better terms with Dominion, or potentially another buyer.

14. Unfortunately, as time passed, additional revenue opportunities failed to materialize, and the only party interested in purchasing Sequoia's assets was Dominion. Sequoia was faced with dwindling cash, increasing demands and lawsuits from its creditors, no alternatives for loans or other capital infusions, and only one bidder in the marketplace interested in acquiring its assets. Sequoia could identify an imminent date in June 2010 when it would be unable to meet its payroll. Sequoia recognized that at the point it was unable to pay its employees, it would be out of business, and unable to service its contracts. Its going concern

value, reputation, ability to serve customers, and ability to sell its contract rights for value, would be significantly impaired, if not lost altogether.

15. Sequoia and Dominion vigorously negotiated the various terms at arm's length and ultimately came to an agreement that averted the only alternative—Sequoia closing its doors and laying off all employees. Sequoia closed the sale to Dominion on June 4, 2010 ("**Asset Sale**"). Through the sale of substantially all of its assets, Sequoia received $1 million cash, an additional $2 million placed in escrow subject to various contingencies, and up to $4.5 million in future contingent payments based on whether Dominion was able to obtain additional business in New York under the New York Contract. Additionally, all but four of Sequoia's employees were offered positions with Dominion, including Sequoia's president, Jack Blaine. The sale enabled nearly all of Sequoia's employees to avoid unemployment.

16. As with the transfer of the NY Contract to Dominion, nothing in the Asset Sale constitutes an avoidable fraudulent transfer under either 11 U.S.C. § 548 or § 544. Fundamentally, Sequoia received reasonably equivalent value for the assets transferred. Unlike products which have a readily discernible value based on an active market, the exact value of Sequoia's assets was effectively fixed by the price Dominion paid. There was no other competing bidder offering better terms. Faced with the alternative of having to lay off all of its employees, and attempting to transfer service contracts without technical personnel, or the sales personnel that acquired the contracts and continued the relationships with the customers, Sequoia obtained an excellent deal that far exceeded its only alternatives. It obtained millions of dollars to pay creditors, provided jobs for nearly all of its employees, and avoided what would have been a Chapter 7 case with minimal tangible or saleable assets.

17. Additionally, at the time of the sale, Sequoia's contracts and technology encompassed approximately 15% of the United States electorate. Had Sequoia not completed the sale to Dominion, Sequoia would have been unable to provide support, maintenance, spare parts, or other contract requirements to those jurisdictions. Many of those jurisdictions would have been unable to conduct elections. Consequently, had Sequoia ceased operations, and laid off all its employees, it would have had potentially catastrophic consequences. Through the sale, with the utilization of Sequoia's former employees, Dominion was able to immediately begin servicing those contracts and preserve those jurisdictions' ability to conduct elections.

18. There is no colorable basis for Smartmatic's assertion that the Asset Sale was an avoidable fraudulent transfer. While Smartmatic suggests that Sequoia could have obtained speculative alternatives to remain in business, or obtain greater value, no such alternatives existed. The fact that Sequoia was in distress does not make the transfer fraudulent, or avoidable. Dominion was an arm's length third party that paid millions of dollars for the assets, and hired virtually all of Sequoia's employees. The transfer is not avoidable by Smartmatic, or any potential trustee under either Chapter 11 or 7.

### There is No Reasonable Prospect of Any Recovery for the Estate on Smartmatic's Alleged Claims Against Dominion

19. Continuation of this case in bankruptcy, under either Chapter 11 or 7, merely to enable either Smartmatic or a trustee to pursue speculative avoidance actions would serve no clear purpose, particularly with respect to Smartmatic's alleged avoidance claims against Dominion. All of the transfers that Smartmatic alleges were direct transfers from Sequoia, who is not a debtor in bankruptcy. None of the alleged transfers came from Debtor.

20. Smartmatic, a Chapter 11 trustee, or a Chapter 7 trustee could only assert Debtor's rights as Sequoia's shareholder. Sequoia has its own creditors in excess of $6 million, not

counting Smartmatic's recently alleged claim in excess of $1 million.  With Smartmatic's alleged claim included, Sequoia has over $7 million in creditor claims against it.  It has less than $1 million in assets.  To the extent Smartmatic or a trustee prosecutes avoidance claims on behalf of Debtor, those claims would be derivative claims of a shareholder.  As a shareholder of Sequoia, Debtor—or any estate representative asserting avoidance claims on its behalf—could not recover a dollar until all of Sequoia's creditors were paid in full.  Consequently, to the extent Smartmatic, or a trustee, could recover on Smartmatic's alleged highly speculative claims, the recovery would have to exceed approximately $6 million before Debtor's estate could recover a single dollar.  Smartmatic asserts no colorable basis that Dominion underpaid for both the NY Contract and the Asset Sale by more than $6 million.  Such a contention would be facially unsupportable under the indisputable facts of the significant value provided to Sequoia for those transfers.

21.    Further, given that Smartmatic apparently believes it is a creditor of Sequoia, it is not clear why it would prefer to assert Debtor's derivative shareholder claims for a recovery subordinate to Sequoia's creditors, to be shared pro rata with Debtor's other creditors, rather than simply directly asserting its claims as a Sequoia creditor.  Given that Smartmatic appears to have stronger direct claims outside of bankruptcy, there is no purpose for continuing bankruptcy under either Chapter 11 or 7 solely to provide Smartmatic with bankruptcy causes of action to assert.

### Smartmatic's Alleged Claims Against Mr. Blaine Do Not Appear Colorable and Will Only Delay and Impair Sequoia's Windup

22.    Smartmatic asserts that Debtor holds avoidance claims against Mr. Blaine. Debtor appears to have determined that it does not have cognizable avoidance claims against Mr. Blaine and has not pursued them.  Further, Sequoia transferred the funds to Mr. Blaine that Smartmatic alleges were transfers from the Debtor.  Notwithstanding the Debtor's scheduling of claims to Mr. Blaine, it is clear that the transfers to Mr. Blaine alleged by Smartmatic to be

7

avoidable are for transfers made by Sequoia to Mr. Blaine. As such, they are not avoidable in Debtor's bankruptcy.

23. In times of Sequoia's financial crisis, Mr. Blaine was the sole available source willing to loan money to Sequoia to enable it meet its immediate operational expenses—principally the payroll for nearly 70 employees. None of these employees were Debtor's employees, and Debtor did not utilize any of the funds loaned by Mr. Blaine. Further, Debtor had no cash with which to repay Mr. Blaine for these loans. All alleged funds transferred to Mr. Blaine were transferred from Sequoia's account.

24. Notwithstanding the repayment to Mr. Blaine of approximately $300,000 in loans, as alleged by Smartmatic, Mr. Blaine remains unpaid for nearly $3,000,000 from loans provided directly to Sequoia to meet its payroll and other operating expenses. These loans enabled Sequoia to continue to operate, and enabled the employees to receive paychecks and remain employed. Aside from Mr. Blaine's defense to a preference claim asserted on behalf of Debtor by either Smartmatic or a trustee under Chapter 11 or Chapter 7 that he did not receive any transfers from Debtor, Mr. Blaine appears to be able to have complete new value defenses under 11 U.S.C. § 547(c).

25. Nevertheless, to the extent any party—Smartmatic or a trustee under either Chapter 11 or 7—asserts claims against Mr. Blaine, Sequoia is obligated under its Bylaws to fund his defense costs and indemnify him for his fees and expenses. Consequently, while Smartmatic may be willing to expend money for speculative claims without a reasonable prospect of recovery, assertion of these claims will only deepen Sequoia's debts, and further impede its windup.

26.     Sequoia is obligated to indemnify and defend its current and former officers and directors from suit.  Mr. Blaine is Sequoia's former president.  Consequently, Smartmatic's request for either standing, for appointment of a Chapter 11 trustee, or for conversion to Chapter 7, for the purpose of asserting speculative, defendable claims against Mr. Blaine, would all negatively impact Sequoia's ongoing resolution of claims with its existing creditors.  Every dollar spent having to defend litigation against Mr. Blaine that appears to be unlikely to provide benefit for Debtor's estate, only deepens the loss for Sequoia's creditors.  This apparently includes Smartmatic, based on its recent allegations to Sequoia.  Where there is no clear benefit for Debtor's estate to pursue such claims, and there is a clear burden for such relief upon Sequoia, a non-debtor entity attempting to avoid Chapter 7, the Court should deny each of Smartmatic's requested alternative motions.

### The Court Should Dismiss this Case

27.     Pursuant to 11 U.S.C. § 1112(b), the Court should dismiss this case.  Dismissal is in the best interests of creditors and the estate.  Under 11 U.S.C. § 1112(b)(2), Smartmatic has set forth no reasonable likelihood that a plan will be confirmed under any reasonable time.  Alternatively, there is continuing loss and dimunition of the estate through accumulating administrative claims, and because Smartmatic's threatened claims would further diminish the value of Debtor's sole asset, Sequoia.

28.     There is no clear, or even likely benefit to continuing this bankruptcy case under either Chapter 11 or Chapter 7.  Debtor's sole asset is its stock in Sequoia, an insolvent entity that owes in excess of $6–7 million to its creditors, while holding cash assets of less than $1 million.  The only potential value in this estate is through highly speculative avoidance claims that appear valueless on their face.  Notwithstanding Smartmatic's willingness and desire to utilize the Bankruptcy Code's avoidance claims, and the Bankruptcy Court as a forum, to bring claims

9

against parties that appear to be its direct business competitors, such a purpose, even if pursued through a Chapter 11 or Chapter 7 trustee, is insufficient to justify this case remaining in bankruptcy.

29. Bankruptcy has provided Debtor with an automatic stay, while providing Smartmatic with the opportunity to conduct extensive discovery, at a leisurely pace, and identify any claims it may hold. Smartmatic's sole argument for continuing the bankruptcy is that the estate holds highly speculative claims that appear unlikely to prevail. Smartmatic fails to set forth any compelling reason to continue this case in bankruptcy.

30. Further, it is notable that Smartmatic, while only articulating two potential defendants in Dominion and Mr. Blaine, seeks authority to prosecute all avoidance claims. Smartmatic falsely states that Sequoia's CEO, Kevin Hurst, "would not want to pursue an action that attacks his own prior decisions, particularly where such actions might set the stage for future claims of breach of fiduciary duty." Standing Motion, ¶ 42. Smartmatic makes this vague threat of future litigation, while attempting to justify its failure to comply with the requirements for asserting a derivative claim, based on the patently false statement that Mr. Hurst served as "one of Sequoia's key negotiators on the 2010 APA." Mr. Hurst was neither a Sequoia officer, a "key negotiator," nor a decision maker of any kind with respect to the Asset Sale. There is absolutely no basis for Smartmatic to allege any breach of fiduciary duty against Mr. Hurst when he did not owe any fiduciary duty until after the Asset Sale was completed. The Court should reject Smartmatic's attempt to threaten Sequoia and Mr. Hurst through false allegations of wrongdoing and recognize that Smartmatic's desire for standing to prosecute avoidance claims, or for a trustee to do its bidding, would merely serve the improper purpose of harassing the potential defendants with meritless and vexatious claims.

601629879

31. While Smartmatic appears eager to pursue litigation, there is no benefit or purpose in granting Smartmatic the authority to do so in Bankruptcy Court using bankruptcy claims. Similarly, there is no apparent benefit or purpose in putting a trustee in place under either Chapter 11 or 7 where the only potential assets are clearly specious claims that appear to have no likelihood of providing assets to the estate, and appear only to be threatened for an improper purpose.

11

WHEREFORE, Sequoia requests that the Court deny Smartmatic's motion for standing to prosecute avoidance actions, its alternative request for appointment of a Chapter 11 trustee, and its alternative request for conversion to Chapter 7.  Instead, Sequoia requests that the Court dismiss this Chapter 11 case pursuant to 11 U.S.C. § 1112(b), and enter such other relief as is just and proper.

DATED:  October 5, 2012

>BAKER & HOSTETLER LLP
>
>s/ Lars Fuller
>Lars H. Fuller, No. 26051
>303 E. 17th Ave., No. 1100
>Denver, Colorado 80203
>Phone:  303-764-4114
>Fax:  303-861-7805
>Email:  lfuller@bakerlaw.com
>
>*Counsel for Sequoia Voting Systems, Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this I served the foregoing **SEQUOIA VOTING SYSTEMS' OBJECTION TO SMARTMATIC'S MOTION FOR STANDING TO PROSECUTE AVOIDANCE ACTIONS, FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR CONVERSION TO CHAPTER 7** on the following parties and upon the parties in interest set forth on the attached Mailing Matrix by placing the same in the U.S. Mail, first class postage prepaid, addressed as follows:

Ira S. Greene
Khang V. Tran
HOGAN LOVELLS US LLP
876 Third Avenue
New York, NY 10022

>s/ Trulee Hoy

601629879