# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re<br><br>SVS HOLDINGS, INC.,<br><br>and<br><br>SEQUOIA VOTING SYSTEMS, INC.,<br><br>Debtors. | Case No. 10-24238 HRT<br>Chapter 7<br><br>Case No. 14-11360 HRT<br>Chapter 11<br><br>Jointly Administered under Case No.<br>10-24238 HRT |

### DECLARATION OF JACK BLAINE

I, Jack Blaine, hereby depose and state under oath as follows to the best of my knowledge and belief:

1.     I live in Lakewood, Colorado.

2.     I currently am Managing Director for International Sales at Dominion Voting Systems Corporation ("Dominion").  I formerly was Chief Executive Officer and a director of Debtor Sequoia Voting Systems Inc. ("Sequoia") and Chief Executive Officer and a director of Debtor SVS Holdings, Inc. ("SVS").  Before that I was employed by Smartmatic Corporation USA ("Smartmatic"), which I understand is the largest creditor of SVS and claims to be a creditor of Sequoia.

3.     I am submitting this affidavit in opposition to the motion of the Trustee of Sequoia to substantively consolidate Sequoia and SVS ("Motion").  I have read the Motion and disagree with its premise and several of the Trustee's central assertions.

4.     I graduated from UCLA in 1967 and received a Masters in Business Administration from the University of Detroit in the mid-seventies.

5.     I spent about three years as an officer in the United States Navy, thirteen years at Ford Motor Company and then nineteen years at the Unisys, a Fortune 500 company involved in

the manufacture and sale of business equipment. I held a number of sales-related and executive positions at Burroughs/Unisys, including President of Worldwide Sales and Services and Executive Vice President. I left the company in approximately 2002.

6.      In 2004, I went to work for Smartmatic, a Delaware corporation with corporate affiliates in Venezuela, the Netherlands, Barbados, the Dutch Antilles and the United States, among other countries. My external title was "President", although I was not a formal corporate officer.

7.      In 2005, I assisted Smartmatic in purchasing Sequoia, a long-established American voting systems company going back to the late 1800s, from a company called De La Rue. To my knowledge, prior to De La Rue, Sequoia had been owned by Jefferson Smurfit Group.

8.      After Smartmatic's purchase of Sequoia, I was appointed President of Sequoia for external purposes, although I was not a corporate officer.

9.      Approximately 18 months after the Smartmatic acquisition of Sequoia, the Committee on Foreign Investments in the United States ("CFIUS") began investigating the ownership of Sequoia by Smartmatic, ostensibly because of Smartmatic's Venezuelan connection and concerns about possible impacts on U.S. elections. As a result of the investigation, in December 2006, Smartmatic entered into a written agreement with the United States government to sell Sequoia within six months. A copy of the agreement (without exhibits) is attached hereto as Exhibit A.

10.      In order to enable Smartmatic to satisfy its obligations to the U.S. Government, Smartmatic encouraged Sequoia's management team to purchase Sequoia. I and other members of management were interested in purchasing Sequoia because we wanted the company to survive.

11.     Antonio Mugica, who controlled Smartmatic, indicated to Sequoia management that Smartmatic would sell Sequoia to us without an upfront cash payment. Smartmatic and its lawyers and our lawyers encouraged Sequoia management to organize SVS as a holding company that would purchase and own all of Sequoia's stock. SVS did not exist until Smartmatic contemplated selling Sequoia to Sequoia's then-management, and SVS was created specifically for the purpose of that transaction.

12.     In September 2007, Smartmatic entered into a Stock Purchase Agreement between and among SVS, Sequoia and various members of Sequoia management. Pursuant to the Stock Purchase Agreement, Smartmatic sold Sequoia to SVS for an unsecured promissory note issued and payable by SVS to Smartmatic and various contingent payments. SVS, which had no significant cash or other liquid assets, paid nothing upfront for the stock in Sequoia. Sequoia was not a signatory to or obligated to pay the note issued by SVS to Sequoia, and did not guarantee SVS's obligations under the note. Copies of the Stock Purchase Agreement (without exhibits) and the promissory note are attached hereto as Exhibits B and C.

13.     At or about the time of the Stock Purchase Agreement, one Smartmatic affiliate entered into a Distribution Agreement with Sequoia and another Smartmatic affiliate entered into a Services Agreement with SVS. Copies of these agreements are attached hereto as Exhibits D and E, respectively.

14.     In 2008, SVS entered into a Note Purchase Agreement whereby SVS agreed to purchase the promissory note from Smartmatic. A copy of that agreement is attached hereto as Exhibit F.

15.     From the agreements and promissory note executed in 2007 and 2008 involving Smartmatic entities, SVS and Sequoia, it is evident that Smartmatic was well aware of the

corporate distinction between Sequoia and SVS that arose from the creation of SVS at the suggestion of Smartmatic and its lawyers.

16.     SVS, as a holding company, had essentially only one significant asset – its stock in Sequoia. Initially SVS also had essentially only one significant creditor – Smartmatic – whose primary claim was under an unsecured promissory note that only SVS, and not Sequoia, executed, and in respect of which Sequoia was not an obligor or guarantor.  For all practical purposes, the only company other than Sequoia with which SVS had any significant involvement was Smartmatic.

17.     Sequoia, by contrast, had been (either as "Sequoia" or as a predecessor company) an operating company in the voting systems business for over 100 years.  Sequoia had hundreds of customers – states, counties, cities and towns – for its voting systems.  Sequoia also had dozens of trade creditors.  Based on my experience at Sequoia in dealing with the company's customers and creditors, many of which pre-dated SVS's ownership of Sequoia, they understood that they were dealing with Sequoia, the operating company; there was virtually no discussion about SVS.  Contrary to the Trustee's assertion in the Motion, I am aware of no creditor of Sequoia that based its decision to extend credit to Sequoia on the existence of SVS as a holding company owning the stock of Sequoia or on any asset or characteristic of SVS.

18.     Starting at least as early as mid-2007, Sequoia faced financial difficulties.  The financial panic of 2008 and resulting recession along with certification issues exacerbated those difficulties.

19.     Due to its financial difficulties, in 2009 Sequoia sold two of its biggest assets.  In a July 15, 2009, Asset Purchase Agreement, Sequoia sold a contract that it had with the State of New York to Dominion.  SVS was not a party to the transaction.  A copy of the July 2009 Asset

Purchase Agreement is attached hereto as Exhibit G.  In an October 2009 Asset Purchase Agreement, Sequoia sold its ballot printing business to Pro Document Solutions.  Again, SVS was not a party to the agreement.  A copy of this agreement (without exhibits) is attached hereto as Exhibit H.  In a June 2010, Asset Purchase Agreement, Sequoia sold substantially all its remaining assets to Defendant Dominion Voting Systems Inc. ("Dominion US").  A copy of this agreement (without exhibits) is attached hereto as Exhibit I.  Again, SVS was not a party to the agreement.  On that occasion, the board of directors of SVS approved a resolution authorizing the transaction as it constituted the sale of substantially all of Sequoia's then-existing assets.  A copy of the SVS board resolution is attached hereto as Exhibit J.

20.     Shortly after the June 2010, Asset Purchase Agreement, SVS filed a Chapter 11 petition because it had no ability to pay its $10 million unsecured promissory note to Smartmatic arising from SVS's purchase of Sequoia.  Sequoia, on the other hand, did not file for bankruptcy protection.  Sequoia had payments coming from its agreements with Dominion, which Sequoia intended to use to pay its employees and settle claims with creditors, and Sequoia believed that more value could be paid to creditors, and fewer costs would be incurred, through an out-of-court wind-down, as contrasted with a bankruptcy.  As a director of SVS, I voted in favor of SVS seeking bankruptcy protection in June 2010 because the company was unable to pay its large debt to Smartmatic.  At the same time, as a director of Sequoia, I concluded that Sequoia was better off remaining out of bankruptcy.  By staying out of bankruptcy, Sequoia would be able to continue to receive payments from Dominion, mitigate damage to its reputation, and could use that money to pay employees and to negotiate settlements with Sequoia creditors.

21.     Having worked for Smartmatic, Sequoia, and SVS before going to Dominion, I am familiar with the business and creditors of both Sequoia and SVS, as well as Smartmatic's

knowledge of the separateness of the two debtor companies. I believe that substantive consolidation would be inequitable to Sequoia's creditors and potentially to Dominion, and would unfairly benefit Smartmatic. Sequoia and SVS were two separate companies at the time SVS filed for bankruptcy in June 2010. Sequoia (or its predecessors) had been in existence as an operating company for over 100 years, while SVS had been in existence as a holding company for only three years. Sequoia's creditors dealt with Sequoia, and not with SVS; in fact most of Sequoia's creditors preceded SVS's ownership of Sequoia. Of all of the creditors of Sequoia and SVS, Smartmatic was the one most fully aware of the existence of both companies, of their relationship and the fact that SVS was an illiquid holding company with Sequoia as its only asset. Smartmatic played an instrumental role in arranging for Sequoia's management to purchase Sequoia through a holding company – SVS. Smartmatic took an unsecured promissory note from SVS but did not require a guarantee from Sequoia or require that Sequoia be a co-obligor on the note, or that the assets of Sequoia secure or serve as recourse for the note. Smartmatic seemingly would be the only – and an undeserved – beneficiary of substantive consolidation with the possible exception of me.

22.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 20, 2014
Denver, CO


Jack Blaine
Jack Blaine

# **EXHIBIT A**

## **(Filed Under Seal)**

# EXHIBIT B

9/18/67

STOCK PURCHASE AGREEMENT

BY AND AMONG

SVS HOLDINGS, INC.,

SEQUOIA VOTING SYSTEMS, INC.

AND

SMARTMATIC CORPORATION

Smartmatic and Sequoia Proprietary Information: Not for Disclosure to Third Parties

WO 797153.3

# TABLE OF CONTENTS

                                                                                                    Page

ARTICLE I      DEFINITIONS ....................................................................................... 2

    1.1        Certain Definitions............................................................................... 2

    1.2        Terms Defined Elsewhere in this Agreement ...................................... 8

    1.3        Other Definitional and Interpretive Matters ........................................ 9

ARTICLE II     SALE AND PURCHASE OF SHARES............................................... 11

    2.1        Sale and Purchase of Shares ............................................................... 11

ARTICLE III    PURCHASE CONSIDERATION ........................................................ 11

    3.1        Purchase Consideration....................................................................... 11

    3.2        Payment of Purchase Consideration ................................................... 11

    3.3        Liquidity Event Earn Out Payments ................................................... 11

    3.4        Selling Stockholder's Contingent Earn Out........................................ 13

    3.5        Earn Out on New Investment.............................................................. 15

ARTICLE IV     CLOSING AND TERMINATION....................................................... 15

    4.1        Closing Date......................................................................................... 15

    4.2        Termination of Agreement................................................................... 15

    4.3        Procedure Upon Termination............................................................... 16

    4.4        Effect of Termination........................................................................... 16

ARTICLE V      REPRESENTATIONS AND WARRANTIES REGARDING THE
               COMPANY............................................................................................ 16

    5.1        Organization and Good Standing; Subsidiaries .................................. 16

    5.2        Authorization of Agreement ................................................................ 17

    5.3        Conflicts; Consents of Third Parties.................................................... 18

    5.4        Capitalization ...................................................................................... 18

    5.5        Financial Statements ........................................................................... 18

    5.6        No Undisclosed Liabilities................................................................... 19

    5.7        Absence of Certain Developments....................................................... 19

    5.8        Taxes.................................................................................................... 19

    5.9        Real Property ....................................................................................... 20

    5.10       Tangible Personal Property.................................................................. 20

    5.11       Intellectual Property............................................................................. 20

ii

**TABLE OF CONTENTS**
(Continued)

|  |  | Page |
|---|---|---|
| 5.12 | Material Contracts | 20 |
| 5.13 | Employee Benefits Plans | 21 |
| 5.14 | Labor | 22 |
| 5.15 | Litigation | 22 |
| 5.16 | Compliance with Laws; Permits | 22 |
| 5.17 | Environmental Matters | 22 |
| 5.18 | Financial Advisors | 23 |
| 5.19 | No Other Representations or Warranties; Schedules | 23 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF THE SELLING STOCKHOLDER | 24 |
| 6.1 | Organization and Good Standing | 24 |
| 6.2 | Authorization of Agreement | 24 |
| 6.3 | Conflicts; Consents of Third Parties | 25 |
| 6.4 | Ownership and Transfer of Shares | 25 |
| 6.5 | Litigation | 25 |
| 6.6 | Financial Advisors | 25 |
| 6.7 | No Post-Closing Ownership Interest | 26 |
| 6.8 | No Other Relationship | 26 |
| 6.9 | Accuracy of Company Representations | 26 |
| ARTICLE VII | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER AND U.S. STOCKHOLDERS | 26 |
| 7.1 | Organization and Good Standing | 26 |
| 7.2 | Authorization of Agreement | 26 |
| 7.3 | Conflicts; Consents of Third Parties | 27 |
| 7.4 | Litigation | 27 |
| 7.5 | Investment Intention | 27 |
| 7.6 | Financial Advisors | 27 |
| 7.7 | [Intentionally Omitted] | 28 |
| 7.8 | [Intentionally Omitted] | 28 |

iii

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

## TABLE OF CONTENTS
### (Continued)

|  |  |  | **Page** |
|---|---|---|---|
| 7.9 | Condition of the Business | | 28 |
| 7.10 | Sale and Security Agreement | | 28 |
| 7.11 | U.S. Stockholders | | 28 |
| 7.12 | No Undisclosed Principal | | 28 |
| ARTICLE VIII | COVENANTS | | 28 |
| 8.1 | Access to Information | | 28 |
| 8.2 | Conduct of the Business Pending the Closing | | 30 |
| 8.3 | Consents | | 32 |
| 8.4 | Regulatory Approvals | | 32 |
| 8.5 | Further Assurances | | 33 |
| 8.6 | [Intentionally Omitted] | | 33 |
| 8.7 | [Intentionally Omitted] | | 33 |
| 8.8 | Preservation of Records | | 33 |
| 8.9 | Publicity | | 34 |
| 8.10 | [Intentionally Omitted] | | 34 |
| 8.11 | Insurance | | 34 |
| 8.12 | Disclosure Schedules; Supplementation and Amendment of Schedules | | 34 |
| 8.13 | Non-Solicitation | | 35 |
| 8.14 | Proprietary Intellectual Property | | 36 |
| 8.15 | Sale and Security Agreement | | 36 |
| 8.16 | Sale of Note of Unsecured Promissory Note; Right of First Refusal | | 36 |
| 8.17 | Covenants of Purchaser | | 37 |
| 8.18 | Blaine Non-competition and Non-solicitation | | 39 |
| 8.19 | No Adverse Actions | | 41 |
| 8.20 | No Control | | 41 |
| ARTICLE IX | CONDITIONS TO CLOSING | | 41 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | | 41 |
| 9.2 | Conditions Precedent to Obligations of the Selling Stockholder | | 42 |

iv

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

**TABLE OF CONTENTS**
**(Continued)**

|  |  | Page |
|---|---|---|
| 9.3 | Frustration of Closing Conditions | 43 |
| ARTICLE X | INDEMNIFICATION | 43 |
| 10.1 | Survival of Representations and Warranties | 43 |
| 10.2 | Indemnification by Selling Stockholder | 44 |
| 10.3 | Indemnification by Purchaser | 44 |
| 10.4 | Indemnification Procedures | 45 |
| 10.5 | Certain Limitations on Indemnification | 47 |
| 10.6 | Tax Treatment of Indemnity Payments | 47 |
| 10.7 | [Intentionally Omitted] | 47 |
| 10.8 | Exclusive Remedy | 47 |
| ARTICLE XI | PUT RIGHT | 48 |
| 11.1 | Put Right | 48 |
| ARTICLE XII | MISCELLANEOUS | 48 |
| 12.1 | Payment of Sales, Use or Similar Taxes | 48 |
| 12.2 | Expenses | 48 |
| 12.3 | Submission to Jurisdiction; Consent to Service of Process | 49 |
| 12.4 | Entire Agreement; Amendments and Waivers | 49 |
| 12.5 | Governing Law | 49 |
| 12.6 | Notices | 49 |
| 12.7 | Severability | 50 |
| 12.8 | Binding Effect; Assignment | 51 |
| 12.9 | Non-Recourse | 51 |
| 12.10 | Counterparts | 51 |
| 12.11 | U.S. Stockholders' Representative | 52 |
| 12.12 | Conditions Subsequent | 53 |

v

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

**Exhibits**

Exhibit A – Form of Temporary Servicing Agreement
Exhibit 3.2 – Form of Unsecured Promissory Note

**Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Knowledge of the Company |
| Schedule 8.2(b)(x) | Existing Discussion Parties |
| Schedule 8.17(b)(v)(B) | Executive Compensation Levels |
| | Disclosure Schedules |

vi

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT, (the "**Agreement**"), dated as of September 18, 2007, by and among SVS Holdings, Inc., a Delaware corporation ("**Purchaser**"), Sequoia Voting Systems, Inc., a Delaware corporation (the "**Company**"), Smartmatic Corporation, a Delaware corporation (the "**Selling Stockholder**"), and, solely for purposes of Sections 3.3, 7.10, 7.11, 7.12 and (in the case of Blaine only) Section 8.18 of this Agreement, Jack Blaine ("**Blaine**"), Peter McManemy ("**McManemy**"), Howard Cramer ("**Cramer**"), Phil Foster ("**Foster**"), Douglas H. Weinel ("**Weinel**"), Waldeep Singh ("**Singh**"), Brian G. Lierman ("**Lierman**"), Lawrence W. Korb ("**Korb**"), Edwin Smith, III ("**Smith**"), Michelle Shafer ("**Shafer**"), Randall Elder ("**Elder**") and Thomas E. Keeling ("**Keeling**" and, collectively with Blaine, McManemy, Cramer, Foster, Weinel, Singh, Lierman, Korb, Smith, Shafer and Elder, the "**U.S. Stockholders**") and, collectively with the Purchaser, the Company and the Selling Stockholder, the "**Parties**" and each, a "**Party**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in Section 1.1.

### W I T N E S S E T H:

WHEREAS, the Company is a wholly owned Subsidiary of the Selling Stockholder, which owns 1,000 shares of the Company's common stock having a par value of $0.001 (the "**Common Stock**") constituting all of the issued and outstanding shares of capital stock of the Company (the "**Shares**");

WHEREAS, the Selling Stockholder is a wholly owned Subsidiary of Smartmatic International Holding, B.V., a Netherlands company ("**Smartmatic Holding**");

WHEREAS, Smartmatic Holding, the Company, the United States Department of Justice, the United States Department of Homeland Security and the United States Department of Treasury entered into that certain Sale and Security Agreement on December 15, 2006 (the "**Sale and Security Agreement**"), pursuant to which the Smartmatic Holding is obligated to accomplish the Final Sale (as defined therein) of the Company;

WHEREAS, the Purchaser is wholly owned by the U.S. Stockholders;

WHEREAS, the Selling Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the Selling Stockholder, the Shares for the purchase price and upon the terms and conditions hereinafter set forth (the "**Stock Sale**"); and

WHEREAS, the Stock Sale constitutes a Final Sale as such term is defined in the Sale and Security Agreement and, pursuant to the terms of this Agreement and upon the consummation of the Stock Sale, "Smartmatic," as defined in the Sale and

1

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Security Agreement (which includes the Selling Stockholder), is irrevocably severing any and all ownership interest, including outstanding shares, in and to the Company.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Ancillary Agreements**" means, collectively, the Unsecured Promissory Note, the Distribution Agreement and the Temporary Services Agreement.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Stock Equivalent**" means any evidences of indebtedness, shares of stock or other securities that are convertible into or exchangeable with or without payment of additional consideration in cash or property, shares of Common Stock or Purchaser Common Stock, as applicable, and any options, warrants or other securities or rights to subscribe for, purchase or otherwise acquire shares of Common Stock or Purchaser Common Stock, as applicable, or any of the foregoing, in each case whether or not immediately exercisable.

"**Company Intellectual Property**" means all Intellectual Property, other than the Proprietary Intellectual Property, used, owned or developed by the Company.

2

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

"**Contract**" means any written contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, or license.

"**Control**" or "**Controlled**" has the meaning given in Section 721 of the Defense Production Act of 1950, which is codified at 50 App. U.S.C. § 2170, and its implementing regulations, which are codified at 31 C.F.R. Part 800.204.

"**CPI Index**" means the U.S. city average consumer price index for all urban consumers and for all items most currently reported by the U.S. Bureau of Labor Statistics as of the end of each calendar year or such other date as may be specified in this Agreement.

"**Distribution Agreement**" means the Distribution Agreement to be negotiated by the parties in good faith prior to the Closing Date.

"**Earn Out Payments**" means, collectively, Liquidity Event Earn Outs and New Investment Earn Outs.

"**EBITDA**" means with respect to any Person for any period, (a) Net After Tax Income; plus, (b) in each case, to the extent deducted in determining net income for such period (i) taxes, (ii) interest expenses and (iii) amortization and depreciation, all calculated on a consolidated basis in accordance with GAAP.

"**Environmental Law**" means any applicable Law currently in effect relating to the protection of the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"**Excluded Matter**" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Company operates; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to the Company; or (v) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the

3

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

transactions contemplated by this Agreement; provided that no Indemnified Matter shall constitute an Excluded Matter.

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Indebtedness**" of any Person means, without duplication, (i) the principal of and, accreted value and accrued and unpaid interest in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities); (iii) all obligations of the type referred to in clauses (i) through (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Indemnified Matter**" means (i) any civil or criminal liabilities relating to or arising out of the federal grand jury investigation(s) of Sequoia Voting Systems, Inc. in the U.S. District Court of the Southern District of Florida, including, but not limited to, any reasonable expenses incurred on or after the Closing Date in responding to any subpoena in connection with any such investigations and (ii) any violation by Selling Stockholder or its stockholders of the Sale and Security Agreement.

"**Initial Purchaser Common Stock**" means, at any time, the aggregate shares of Purchaser Common Stock issued at or prior to such time to the U.S. Stockholders (whether or not then held by the U.S. Stockholders).

"**Intellectual Property**" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "**Patents**"), (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (collectively, "**Marks**"), (iii) copyrights

4

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

and registrations and applications therefor, works of authorship and mask work rights (collectively, **"Copyrights"**) and (iv) all Software and Technology.

**"IRS"** means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

**"Knowledge of the Company"** means the actual knowledge of those Persons identified on Schedule 1.1(a), without independent investigation.

**"Knowledge of the Selling Stockholder"** means the actual knowledge of Antonio Mugica, without independent investigation.

**"Law"** means any foreign, federal, state, local law, statute, code, ordinance, rule or regulation.

**"Legal Proceeding"** means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

**"Liability"** means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto.

**"Lien"** means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude or transfer restriction.

**"Liquidity Event"** means the occurrence of any of the following after the Closing and prior to June 30, 2012: (i) the sale by the U.S. Stockholders (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Initial Purchaser Common Stock, (ii) the sale by Purchaser (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Common Stock, (iii) the sale of all or substantially all of the assets of the Company by any Person, or (iv) the dissolution or liquidation of the Purchaser.

**"Material Adverse Effect"** means a material adverse effect on (a) the business, assets, properties, results of operations or financial condition of the Company or (b) the ability of the Company to consummate the transactions contemplated by this Agreement, in each case, other than an effect resulting from an Excluded Matter.

**"Net After Tax Income"** means with respect to any Person for any period, such Person's consolidated net income after taxes, as determined in accordance with GAAP, for such period.

5

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Company, consistent with past practice, except that there shall be no payments of Selling Stockholder's obligations incurred on or after September 1, 2007, or other direct or indirect transfers of cash or assets of the Company to Selling Stockholder, its principals or Affiliates other than for expenses incurred prior to September 1, 2007.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"**Permitted Exceptions**" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance other than (a) deeds of trust or other Liens pertaining to debt obligations, and (b) any other items objected to by Purchaser within ten (10) business days after the Company provides a title report issued by the applicable title company; (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, provided appropriate reserves have been established by the Company and are reflected in the Financial Statements; (iii) [intentionally omitted]; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body; (v) title of a lessor under a capital or operating lease expressly disclosed by the Company and Selling Stockholder under this Agreement; and (vi) such other imperfections in title, charges, easements, restrictions and encumbrances which would not result in a Material Adverse Effect.

"**Permitted Minority Sale**" means the initial transaction(s) constituting a sale by the Purchaser (including by merger, consolidation or otherwise) after the Closing and prior to June 30, 2012 of not more than 20% of the Purchaser Common Stock outstanding after giving effect to such sale to a purchaser other than a U.S. Stockholder in exchange for an aggregate consideration of at least $3,000,000 (on a pro rated basis for a sale of less than 20% of such stock).

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Post Dilution Percentage**" means, at any time after a Permitted Minority Sale, the greater of (i) the percentage of Purchaser Common Stock then held by the U.S. Shareholders (and their transferees referred to in clause (iii) of Section 3.3(e) of the definition of "Liquidity Event") in the aggregate at such time after giving effect to such Permitted Minority Sale and (ii) 80%, unless Reznick, Grant Thornton or an adviser similar to the foregoing jointly selected by the Parties, determines such sale resulting in a

6

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Post Dilution Percentage of less than 80% is or will be accretive to the Purchaser or necessary for the Purchaser to continue as a going concern; provided, further, that the costs of which evaluation will be borne by the Company.

"**Proprietary Intellectual Property**" means all Intellectual Property owned or developed by the Selling Stockholder or any of its Affiliates (other than the Company), including but not limited to all intellectual property arising from or in respect of the Edge II Plus, Advantage Plus, Hybrid Activator, Accumulator & Transmitter (HAAT) and HAAT Listener and all peripherals from time to time pertaining to the foregoing.

"**Purchaser Common Stock**" means shares of common stock of the Purchaser having a par value of $0.001.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any other Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by the Person first referred to.

"**Tax**" or "**Taxes**" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs, duties, fees, assessments and charges of any kind whatsoever, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"**Taxing Authority**" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"**Tax Return**" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes the Selling Stockholder or any of their Affiliates.

7

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

"**Technology**" means, collectively, all information, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form, and all related technology.

"**Temporary Services Agreement**" means the Temporary Services Agreement in the form of Exhibit A attached hereto.

"**Waived Liquidity Event**" means a Liquidity Event with respect to which the Selling Stockholder has waived its rights pursuant to Section 3.3(c).

1.2   Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Agreement | Recitals |
| Balance Sheet | 5.5 |
| Balance Sheet Date | 5.5 |
| Claim | 8.7(c) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Common Stock | Recitals |
| Company | Recitals |
| Company Benefit Plan | 5.13(a) |
| Company Pension Plan | 5.13(b) |
| Company Property | 5.9 |
| Company Properties | 5.9 |
| Confidentiality Agreement | 8.6 |
| Consents | 8.3(b) |
| Continuing Employees | 8.10(a) |
| Copyrights | 1.1 (in Intellectual Property definition) |
| Environmental Permits | 5.17(a) |
| ERISA | 5.13(a) |
| Excess Proceeds | 3.3(a) |
| Financial Statements | 5.5 |
| Indemnification Claim | 10.4 |
| Indemnitees | 8.7(a) |
| Liquidity Event Earn Out Payment | 3.3 |

8

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

| Term | Section |
|------|---------|
| Losses | 10.2(a)(i) |
| Marks | 1.1 (in Intellectual Property definition) |
| Material Contracts | 5.12(a) |
| Owned Property | 5.9 |
| Owned Properties | 5.9 |
| Patents | 1.1 (in Intellectual Property definition) |
| Personal Property Leases | 5.10 |
| Purchase Consideration | 3.1 |
| Purchaser | Recitals |
| Purchaser Documents | 7.2 |
| Purchaser Indemnified Parties | 10.2(a) |
| Purchaser Plans | 8.12(b)(ii) |
| Real Property Lease | 5.9 |
| Sale and Security Agreement | Recitals |
| Securities Act | 7.5 |
| Selling Stockholder | Recitals |
| Selling Stockholder Documents | 6.2 |
| Selling Stockholder Indemnified Parties | 10.3(a) |
| Shares | Recitals |
| Smartmatic Holding | Recitals |
| Stock Incentive Plan | 8.10(c) |
| Stock Sale | Recitals |
| Survival Period | 10.1 |
| Unsecured Promissory Note | 3.2 |
| U.S. Stockholders | Recitals |

1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

9

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Exhibits/Schedules.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule or in one section of the Disclosure Schedule shall be deemed to have been disclosed on each other Schedule or section of the Disclosure Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that breach or violation exists or has actually occurred.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Reflected On or Set Forth In.  An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statements or (c) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(b)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties

10

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

### SALE AND PURCHASE OF SHARES

2.1    Sale and Purchase of Shares.    Upon the terms and subject to the conditions contained herein, on the Closing Date, the Selling Stockholder agrees to sell and transfer to Purchaser, and Purchaser agrees to purchase and acquire from the Selling Stockholder, the Shares.

## ARTICLE III

### PURCHASE CONSIDERATION

3.1    Purchase Consideration.    The aggregate consideration to be paid by the Purchaser to the Selling Stockholder for the Shares shall consist of (a) the Unsecured Promissory Note, (b) the Earn Out Payments, if any, and (c) the Selling Stockholder's Contingent Earn Out, if any (collectively, the **"Purchase Consideration"**).

3.2    Payment of Purchase Consideration.    On the Closing Date, Purchaser shall issue to the Selling Stockholder an unsecured promissory note in the principal amount of $2,000,000 in the form attached hereto as **Exhibit 3.2** (the **"Unsecured Promissory Note"**). The Earn Out Payments, if any, shall be payable as set forth in Sections 3.3 and 3.5 and the Selling Stockholder's Contingent Earn Out, if any, shall be payable as set forth in Section 3.4.

3.3    Liquidity Event Earn Out Payments.

(a)    Upon a Liquidity Event, the Purchaser or, upon a Liquidity Event described in clause (i) of the definition thereof, the U.S. Stockholders, as applicable, will pay to Selling Stockholder an earn out payment (the **"Liquidity Event Earn Out Payment"**) equal to (subject to the provisions of Section 3.3(d)) the product of (i) the applicable percentage set forth opposite the period listed in the table in Section 3.3(b) during which the date of such Liquidity Event falls and (ii) the Excess Proceeds; provided, that any rights to a Liquidity Event Earn Out Payment hereunder shall terminate upon a transfer by the Selling Stockholder of the Unsecured Promissory Note pursuant to Section 8.16. The obligations of each U.S. Stockholder under this provision are several and the liability of each U.S. Stockholder shall in no event exceed the net after-tax payment (taking into account any tax benefit to the U.S. Stockholder in connection with such Liquidity Event) actually received by the U.S. Stockholder which should have been paid to Selling Stockholder under this provision.

11

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

The term "**Excess Proceeds**" means, with respect to a Liquidity Event, the excess of the aggregate consideration received (or liquidation proceeds available, as applicable) by Purchaser or the U.S. Stockholders in such Liquidity Event over the sum of the aggregate amount of the original principal amount of the Unsecured Promissory Note in full plus the lesser of (A) $16,000,000 or (B) the aggregate of any amounts previously paid to Selling Stockholder as Earn Out Payments or Selling Stockholder's Contingent Earn Out. After any transaction described in clause (iii) of the definition of Liquidity Event, such transaction shall be deemed to be followed by a liquidation of the Company for purposes of determining the amount of proceeds available for distribution after such Liquidity Event.

To the extent the consideration received by the Purchaser or the U.S. Stockholders, as applicable, upon a Liquidity Event includes consideration in a form other than cash, then Purchaser or the U.S. Stockholders, as applicable, may at their option distribute to Selling Stockholder (i) a combination of such non-cash consideration (to the extent permitted by applicable Law) and cash having an aggregate value equal to the amount to which Selling Stockholder is entitled, so long as the amount of such cash is sufficient to pay Selling Stockholder's tax liabilities with respect to the entire amount of the Liquidity Event Earn Out Payment, or (ii) pay to Selling Stockholder an amount of cash equal to the fair market value of the Selling Stockholder's share of the non-cash consideration. For purposes of the preceding sentence, unless in the case of clause (i) of such sentence the value is established by the terms of the transaction constituting the Liquidity Event, the board of directors of the Purchaser shall in good faith determine the fair market value of the non-cash consideration received and the Purchaser or the U.S. Stockholders, as applicable, shall pay to Selling Stockholder an amount of cash equal to its share of such non-cash consideration; provided, however, that in the event of a dispute over the fair market value so determined by the board, the Purchaser and the Selling Stockholder shall each select an appraiser, who shall determine the fair market value of such non-cash consideration. If the fair market value of such non-cash consideration as determined by the two appraisers so chosen varies by less than five percent 5%, then the fair market value shall be the average of the two appraisals; if however, the two determinations are more than 5% apart, then the two appraisers shall select a third appraiser to provide an appraisal of the fair market value of such non-cash consideration. The third appraisal shall be prepared in a manner consistent with the other two appraisals and the two (2) appraisals separated by the fewest dollars shall be averaged to determine the fair market value. The determination of the fair market value of such non-cash consideration shall be binding on the parties hereto. The Purchaser and the Selling Stockholder shall each bear the costs of their appraiser and shall share equally the costs of any third appraiser.

(b)     The following percentages shall apply to the periods set forth below in determining any Liquidity Event Earn Out Payment:

12

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

| Period | Percentage |
|--------|-----------|
| Closing to 12/31/2008 | 80% |
| 1/1/2009 – 6/30/2009 | 70% |
| 7/1/2009 – 12/31/2009 | 60% |
| 1/1/2010 – 6/30/2010 | 55% |
| 7/1/2010 – 12/31/2010 | 50% |
| 1/1/2011 – 6/30/2011 | 45% |
| 7/1/2011 – 12/31/2011 | 40% |
| 1/1/2012 – 6/30/2012 | 35% |

(c)     The Selling Stockholder may waive its rights to receive its Liquidity Event Earn Out Payment if the Liquidity Event occurs during the period from and including January 1, 2010 through and including March 31, 2011, in which case the Selling Stockholder shall not receive the Liquidity Event Earn Out Payment, but the Selling Stockholder's rights to the Selling Stockholder's Contingent Earn Outs shall remain in effect pursuant to the terms of Section 3.4, and it shall be a condition of any transaction constituting such a Liquidity Event, to be included in any agreement of sale or other transfer entered into by the Purchaser or a U.S. Stockholder, that the acquiror or successor agrees to be bound by the Selling Stockholder's Contingent Earn Outs.

(d)     In the event that a Permitted Minority Sale has occurred prior to a Liquidity Event described in clauses (ii), (iii) or (iv) of the definition thereof, the amount otherwise payable under Section 3.3(a) shall be reduced to an amount equal to the product of (i) the Liquidity Event Earn Out Payment before adjustment and (ii) the Post Dilution Percentage.

(e)     Prior to June 30, 2012, no U.S. Stockholder shall sell or otherwise transfer any Initial Purchaser Stock, except (i) for sales or other transfers after December 31, 2009 that constitute, or are part of a transaction that constitutes, a Liquidity Event, (ii) in connection with their put rights provided in Section 11.1 upon the sale of the Unsecured Promissory Note, or (iii) (A) a sale of less than 5% of the Initial Purchaser Common Stock to one or more U.S. Stockholders, or (B) transfers of the Initial Purchaser Common Stock by the U.S. Stockholder to members of his or her immediate family (i.e., parent, spouse or lineal (natural or adopted) descendant) or a trust for the benefit of such family members, provided that such family members or trust agree(s), in form and substance satisfactory to the Selling Stockholder, to be bound by the terms of this Agreement as if such transferee were a "U.S. Stockholder" hereunder.

3.4     Selling Stockholder's Contingent Earn Out.

(a)     Subject to the priority payments to Selling Stockholder in Section 3.4(b), and except as provided in Sections 3.4(d) and 8.16, the Purchaser will pay to the Selling Stockholder an amount equal to a portion of the Company's Net After Tax

13

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Income for each period listed in the table below (the "**Selling Stockholder's Contingent Earn Outs**") equal to the product of (i) 53%, (ii) the Company's Net After Tax Income for such period, and (iii) if a Permitted Minority Sale has occurred during such period, the Post Dilution Percentage;

Period
Closing Date through 12/31/2007
Fiscal Year Ending 12/31/2008
Fiscal Year Ending 12/31/2009
Fiscal Year Ending 12/31/2010
Fiscal Year Ending 12/31/2011
1/1/2012 through fifth anniversary of Closing Date

(b)     For calendar years 2008 through 2011, inclusive, unless there has been a Liquidity Event (other than a Waived Liquidity Event) or a sale and conversion of the Unsecured Promissory Note as provided in this Agreement, the initial $9,400,000 in the Company's Net After Tax Profits shall be allocated among the parties as follows: (i) the first $2,500,000 of the Company's Net After Tax Income shall be paid to Selling Stockholder; (ii) the next $2,200,000 of the Company's Net After Tax Income shall be retained by Purchaser; (iii) the next $2,500,000 of the Company's Net After Tax Income shall be paid to Selling Stockholder; (iv) the next $2,200,000 of the Company's Net After Tax Income shall be retained by Purchaser; and (v) the remaining Net After Tax Income shall be allocated as provided in Section 3.4(a).

(c)     <u>Selling Stockholder's Contingent Earn Out Payment Date</u>.  Selling Stockholder's Contingent Earn Out shall be payable within thirty (30) days following the completion of the Purchaser's consolidated financial statement audit for the relevant fiscal year; provided, however, that no Selling Stockholder's Contingent Earn Out payment shall be made later than April 1 of the succeeding year; provided, further, that Purchaser will not pay any bonuses to its employees in any year when Selling Stockholder's Contingent Earn Out is payable until such Selling Stockholder's Contingent Earn Out has been paid in full.  If Purchaser's consolidated financial statement is not complete by April 1 of any year, payment shall be made on or before that date based upon the reasonable estimate then prepared by the Purchaser's board of directors, and any over- or underpayment shall be resolved as soon as practicable following completion of the audit.

(d)     <u>Selling Stockholder's Contingent Earn Out upon Liquidity Event</u>. Except in the event of a waiver pursuant to Section 3.3(c), upon a Liquidity Event, the Purchaser shall pay to Selling Stockholder an amount equal to the Selling Stockholder's Contingent Earn Out payable for the portion of the period identified in Section 3.4(a) ending on the date of such Liquidity Event and, following such payment Selling

14

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Stockholder shall not have a right to any Selling Stockholder's Contingent Earn Out following such Liquidity Event.

3.5 Earn Out on New Investment. If, prior to June 30, 2012, the Purchaser issues Purchaser Common Stock or Common Stock Equivalents or the Company issues Common Stock or Common Stock Equivalents, other than in connection with a Liquidity Event, then the aggregate consideration received in such transactions shall be applied in the following manner:

(a) the first $6,000,000 shall be retained by the Company and Purchaser, as applicable; and

(b) 50% of any amounts above $6,000,000 shall be paid upon receipt to the Selling Stockholder (the "New Investment Earn Out").

ARTICLE IV

CLOSING AND TERMINATION

4.1 Closing Date. The closing of the sale and purchase of the Shares provided for in Section 2.1 hereof (the "Closing") shall take place at the offices of Sutherland Asbill & Brennan LLP, 1275 Pennsylvania Avenue, NW, Washington, D.C. (or at such other place as the Parties may designate in writing) at 10:00 a.m. (Eastern standard time) on a date to be specified by the Parties (the "Closing Date", which date shall be no later than the third Business Day after the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), unless another time, date or place is agreed to in writing by the Parties hereto.

4.2 Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a) At the election of the Selling Stockholder or Purchaser on the date that is forty-five (45) days following the date the Parties apply in writing to CFIUS for approval of the Stock Sale (such date, as it may be extended under this Section 4.2(a), the "Termination Date"), if the Closing shall not have occurred by the close of business on such date, provided that the terminating Party is not in breach in any material respect of any of its obligations hereunder; and provided further, that either the Selling Stockholder or Purchaser shall have the option to extend, from time to time, the Termination Date for additional periods of time not to exceed ten (10) days in the aggregate if all other conditions to the Closing are satisfied or capable of then being satisfied and the sole reason that the Closing has not been consummated is that such Party has been unable to obtain the necessary consents and approvals under applicable Laws and such Party is still attempting to obtain such necessary consents and approvals under applicable Laws, or is

15

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

contesting the refusal of the relevant Governmental Body to give such consents or approvals, in court or through other applicable proceedings;

(b)     by mutual written consent of the Selling Stockholder and Purchaser; or

(c)     by the Selling Stockholder or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; provided, however, that the right to terminate this Agreement under this Section 4.2(b) shall not be available to a Party if such Order was primarily due to the failure of such Party to perform any of its obligations under this Agreement.

4.3     Procedure Upon Termination.  In the event of termination and abandonment by Purchaser or the Selling Stockholder, or both, pursuant to Section 4.2 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Shares hereunder shall be abandoned, without further action by Purchaser or the Selling Stockholder.

4.4     Effect of Termination.  In the event that this Agreement is validly terminated in accordance with Section 4.2 and 4.3, then each of the Parties shall be relieved of their duties and obligations arising under this Agreement and each of the Ancillary Agreements after the date of such termination and such termination shall be without liability to Purchaser, the Company, the U.S. Stockholders or the Selling Stockholder.


ARTICLE V

REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

The Company hereby represents and warrants to Purchaser that, except as set forth in a disclosure schedule delivered to Purchaser at or prior to the date hereof (the **"Disclosure Schedule"**):

5.1     Organization and Good Standing; Subsidiaries.

(a)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  The Company is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its

16

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect. The Company is a "C" corporation under the Code.

(b)     The Company does not have any Subsidiaries.

(c)      The Company has not, at any time, been a general partner or managing member of any general partnership, limited partnership or other entity.

(d)      The Company has made available to the Purchaser complete and accurate copies of the certificate of incorporation, the stock record book, the minute book and other corporate records of the Company. The corporate records and minute books of the Company made available to the Purchaser reflect all material actions taken and authorizations made at meetings of its board of directors or any committees thereof and at any stockholders' meetings thereof of the Company. The books of account and other records of the Company made available to the Purchaser have been maintained in accordance with sound business practices.

(e)      The Common Stock constitutes all of the issued and outstanding stock of the Company of any class. Selling Stockholder owns 100% of Common Stock, and no other Person has any legal, equitable or beneficial ownership interest in the Company or the Common Stock.

5.2     Authorization of Agreement.   The Company has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Company in connection with the consummation of the transactions contemplated by this Agreement (the "**Company Documents**"), and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Company Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Company. This Agreement has been, and each of the Company Documents will be at or prior to the Closing, duly and validly executed and delivered by the Company and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

5.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by the Company of this Agreement or the Company Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by the Company with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and bylaws or comparable organizational documents of the Company; (ii) any Contract or Permit to which the Company is a party or by which any of the properties or assets of the Company are bound; (iii) any Order of any Governmental Body applicable to the Company or by which any of the properties or assets of the Company are bound; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations, that would not have a Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Company in connection with the execution and delivery of this Agreement or the Company Documents or the compliance by the Company with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the Sale and Security Agreement and (ii) such other consents, waivers, approvals, Orders, Permits or authorizations the failure of which to obtain would not have a Material Adverse Effect.

5.4    Capitalization.

(a)    The authorized capital stock of the Company consists of 2,000 shares of common stock having a par value of $0.001 (the "**Common Stock**"). As of the date hereof, the Shares represent all of the issued and outstanding shares of Common Stock. All of the issued and outstanding shares of Common Stock were duly authorized for issuance and are validly issued, fully paid and non-assessable.

(b)    There is no existing option, warrant, call, right, or Contract of any character to which the Company or Selling Stockholder is a party requiring, and there are no securities of the Company outstanding which upon conversion or exchange would require, the issuance, of any shares of capital stock of the Company or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of capital stock of the Company. Neither the Company nor Selling Stockholder is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Common Stock of the Company.

5.5    Financial Statements.    The Company has made available to Purchaser copies of (i) the audited balance sheets of the Company as of December 31,

18

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

2005 and 2006 and the related statements of income of the Company for the years then ended and (ii) the unaudited balance sheet of the Company as of August 31, 2007 and the related statements of income of the Company for the three month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the **"Financial Statements"**). Except as set forth in the notes thereto, each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods indicated, consistent with the books and records of the Company. For the purposes hereof, the unaudited balance sheet of the Company as of August 31, 2007 is referred to as the **"Balance Sheet"** and August 31, 2007 is referred to as the **"Balance Sheet Date"**.

5.6    No Undisclosed Liabilities. To the Knowledge of the Company, the Company does not have any material Liabilities of any kind that would be required to be reflected on, reserved against or otherwise described on the Balance Sheet or in the notes thereto in accordance with GAAP and were not so reflected, reserved against or described, other than (i) Liabilities incurred in the Ordinary Course of Business after the Balance Sheet Date, (ii) Liabilities incurred in connection with the transactions contemplated hereby and (iii) Liabilities that would not have a Material Adverse Effect.

5.7    Absence of Certain Developments. Except as contemplated by this Agreement, since the Balance Sheet Date (i) the Company has conducted its business only in the Ordinary Course of Business and (ii) there has not been any event, change, occurrence or circumstance that has had a Material Adverse Effect.

5.8    Taxes. The Company has timely filed all Federal, state, local and foreign Tax Returns and all material reports required to be filed by it, and all Taxes required to be paid by it have either been paid by it or are reflected in accordance with GAAP as a reserve for Taxes on the Financial Statements, and all such returns and reports are correct and complete in all respects, or requests for extensions to file such returns or reports have been timely filed, granted and have not expired, except to the extent that such failures to file, to pay or to have extensions granted that remain in effect individually or in the aggregate have not had and would not reasonably be expected to have a Material Adverse Effect, and the Financial Statements reflect an adequate reserve for all Taxes payable by the Company for all taxable periods and portions thereof through the date of such financial statements. All material Taxes required to be withheld by the Company have been withheld and have been (or will be) duly and timely paid to the proper Taxing Authority. No deficiencies for any Taxes have been proposed, asserted, threatened or assessed against the Company that are still pending and the Company has not made any requests for waivers of the time to assess any such Taxes that are still pending. No income Tax Return of the Company is under current examination by a Taxing Authority. All assessments for Taxes due with respect to any pending, threatened

19

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

or concluded litigation of the Company have been fully paid or have been adequately reserved on the Financial Statements in accordance with GAAP. The Company is not liable for the Taxes of any other Person as a result of any indemnification provision or other contractual obligation This Section 5.8 represents the sole and exclusive representation and warranty of the Company the regarding Company Tax matters.

5.9    Real Property. Section 5.9 of the Disclosure Schedule sets forth a complete list of (i) all real property and interests in real property owned in fee by the Company (individually, an "**Owned Property**" and collectively, the "**Owned Properties**"), and (ii) all leases of real property by the Company involving annual payments in excess of $100,000 (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**" and, together with the Owned Properties, being referred to herein individually as a "**Company Property**" and collectively as the "**Company Properties**") as lessee or lessor. The Company has fee title to all Owned Property, free and clear of all Liens of any nature whatsoever except Permitted Exceptions. To the Knowledge of Selling Stockholder, the Company has not received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Company under any of the Real Property Leases.

5.10    Tangible Personal Property. Schedule 5.10 sets forth all leases of personal property by the Company ("**Personal Property Leases**") involving annual payments in excess of $100,000. To the Knowledge of the Company, the Company has not received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default by the Company under any of the Personal Property Leases.

5.11    Intellectual Property. The Company owns or has valid licenses to use all Company Intellectual Property used by it in the Ordinary Course of Business, except to the extent the failure to be the owner or the valid licensee would not have a Material Adverse Effect. The Company Intellectual Property (i) is not the subject of any challenge received by the Company in writing or, to the Knowledge of the Company, threatened, and (ii) the Company has not received written notice of any default and, to the Knowledge of the Company, no event exists that with notice or lapse of time, or both, would constitute a default under any material Company Intellectual Property license to which the Company is a party or by which it is bound.

5.12    Material Contracts.

(a)    Section 5.12(a) of the Disclosure Schedule sets forth all of the Contracts to which the Company is a party or by which it is bound of any kind or amount not otherwise disclosed which neither Blaine nor McManemy executed on behalf of the Company (collectively, the "**Material Contracts**").

20

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(b)     The Company has not received written notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Company under any Material Contract, except for defaults that would not have a Material Adverse Effect.

5.13    Employee Benefits Plans.

(a)     Section 5.13(a) of the Disclosure Schedule lists each material "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and any other material employee plan or agreement maintained by the Company (each, a "Company Benefit Plan").   The Company has made available to Purchaser correct and complete copies of (i) each Company Benefit Plan (or, in the case of any such Company Benefit Plan that is unwritten, descriptions thereof), (ii) the most recent annual reports on Form 5500 required to be filed with the IRS with respect to each Company Benefit Plan (if any such report was required), (iii) the most recent summary plan description for each Company Benefit Plan for which such summary plan description is required and (iv) each trust agreement and insurance or group annuity contract relating to any Company Benefit Plan. Each Company Benefit Plan maintained, contributed to or required to be contributed to by the Company has been administered in all material respects in accordance with its terms.   The Company and all the Company Benefit Plans are all in compliance in all material respects with the applicable provisions of ERISA, the Code and all other applicable Laws.

(b)     (i) all Company Benefit Plans that are "employee pension plans" (as defined in Section 3(3) of ERISA) that are intended to be tax qualified under Section 401(a) of the Code (each, a "Company Pension Plan") that is maintained, contributed to or required to be contributed to by the Company are so qualified and (ii) to the Knowledge of the Company, no event has occurred since the date of the most recent determination letter or application therefor relating to any such Company Pension Plan that would adversely affect the qualification of such Company Pension Plan.   The Company has made available to Purchaser a correct and complete copy of the most recent determination letter received with respect to each Company Pension Plan maintained, contributed to or required to be contributed to by the Company, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)     All contributions, premiums and benefit payments under or in connection with the Company Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Company Benefit Plans have been timely made or have been reflected on the Balance Sheet.  No Company Pension Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

21

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(d)     This Section 5.13 represents the sole and exclusive representation and warranty of the Company regarding Company employee benefit matters.

(e)     The Company is in compliance in all material respects with all applicable wage and hour Laws and has not misclassified any employee or independent contractor.

5.14     Labor.

(a)     The Company is not a party to any labor or collective bargaining agreement.

(b)     There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Company, threatened against or involving the Company, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Selling Stockholder, threatened by or on behalf of any employee or group of employees of the Company, except in each case as would not have a Material Adverse Effect.

5.15     Litigation.   There are no Legal Proceedings pending or, to the Knowledge of the Company, threatened against the Company before any Governmental Body, which, if adversely determined, would have a Material Adverse Effect.   The Company is not subject to any Order of any Governmental Body except the Sale and Security Agreement.

5.16     Compliance with Laws; Permits.

(a)     The Company is in compliance with all Laws of any Governmental Body applicable to its respective businesses or operations, except where the failure to be in compliance would not have a Material Adverse Effect. The Company has not received any written notice of or been charged with the violation of any Laws.

(b)     The Company currently has all Permits required for the operation of its business as presently conducted, other than those the failure of which to possess would not have a Material Adverse Effect. The Company is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not have a Material Adverse Effect.

5.17     Environmental Matters.

(a)     Except in each case as would not have a Material Adverse Effect:

22

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

        (i)     the operations of the Company are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Permits required under all applicable Environmental Laws necessary to operate its respective businesses ("**Environmental Permits**");

        (ii)    the Company is not subject to any pending, or to the Knowledge of the Company, threatened claim alleging that the Company may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law; and

        (iii)    to the Knowledge of the Company, there are no pending or threatened investigations of the business of the Company, or any currently or previously owned or leased property of the Company under Environmental Laws, which would reasonably be expected to result in the Company incurring any material liability pursuant to any Environmental Law.

        Selling Stockholder is party to a Stock Purchase Agreement by and among De La Rue Inc ("De La Rue"), Selling Stockholder and Smartmatic Holding Corporation B.V., pursuant to which De La Rue agreed to indemnify Selling Stockholder for certain environmental liabilities specified in Section 7.2(e) thereof (the "**Existing Environmental Indemnification**"). Selling Stockholder shall either: (a) assign the Existing Environmental Indemnification to Purchaser, if such assignment is permitted; or (b) from time to time for so long as it remains in effect by its terms, at Purchaser's request and expense, enforce Selling Stockholder's rights under the Existing Environmental Indemnification for the benefit of Purchaser.

        (b)    The representations and warranties contained in this Section 5.17 are the sole and exclusive representations and warranties of the Company pertaining or relating to any Company environmental, health or safety matters, including any arising under any Environmental Laws.

        5.18    Financial Advisors.  With the exception of Iridium Partners and Eureka Capital Markets, which have a contract solely with Selling Stockholder and the fees and the expenses of which incurred on or after September 1, 2007 will be paid by the Selling Stockholder, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Company in connection with the transactions contemplated by this Agreement and no such Person is entitled to any fee or commission or like payment in respect thereof.

        5.19    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Disclosure Schedule) or Article VI, neither the Selling Stockholder nor any other Person

23

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

makes any other express or implied representation or warranty with respect the Company or the transactions contemplated by this Agreement, and the Selling Stockholder disclaims any other representations or warranties, whether made by the Selling Stockholder or any of its Affiliates, officers, directors, employees, agents or representatives. The disclosure of any matter or item in the Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE SELLING STOCKHOLDER

The Selling Stockholder hereby represents to Purchaser that except as set forth in the Disclosure Schedule:

6.1     Organization and Good Standing.  The Selling Stockholder is a Delaware corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation as set forth above and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business.

6.2     Authorization of Agreement.  The Selling Stockholder has all requisite corporate power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by the Selling Stockholder in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "**Selling Stockholder Documents**"), and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Selling Stockholder Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all required corporate action on the part of the Selling Stockholder.  This Agreement has been, and each of the Selling Stockholder Documents will be at or prior to the Closing, duly and validly executed and delivered by the Selling Stockholder, and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Selling Stockholder Document, when so executed and delivered will constitute, the legal, valid and binding obligation of the Selling Stockholder, enforceable against the Selling Stockholder in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

24

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

6.3     Conflicts; Consents of Third Parties.

(a)     None of the execution and delivery by the Selling Stockholder of this Agreement or the Selling Stockholder Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by the Selling Stockholder with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and bylaws (or other organizational and governing documents) of the Selling Stockholder; (ii) any Contract, or Permit to which the Selling Stockholder is a party or by which any of the properties or assets of the Selling Stockholder is bound; (iii) any Order of any Governmental Body applicable to the Selling Stockholder or by which any of the properties or assets of the Selling Stockholder are bound; or (iv) any applicable Law; subject, in the case of clauses (ii)-(iv) of this Section 6.3(a), to compliance with the applicable requirements of the Sale and Security Agreement.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Selling Stockholder in connection with the execution and delivery of this Agreement or the Selling Stockholder Documents, or the compliance by the Selling Stockholder with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, except for (A) compliance with the applicable requirements of the Sale and Security Agreement, and (B) for such other consents, waivers, approvals, Orders, permits or authorizations the failure of which to obtain would not have a material adverse effect on the Selling Stockholder's ability to consummate the transactions contemplated hereby.

6.4     Ownership and Transfer of Shares.   The Selling Stockholder is the record and beneficial owner of the Shares, free and clear of any and all Liens.   The Selling Stockholder has the corporate power and authority to sell, transfer, assign and deliver such Shares as provided in this Agreement, and such delivery will convey to Purchaser good and marketable title to such Shares, free and clear of any and all Liens.

6.5     Litigation.   There are no Legal Proceedings pending or, to the knowledge of the Selling Stockholder, threatened that are reasonably likely to prohibit or restrain the ability of the Selling Stockholder to enter into this Agreement or consummate the transactions contemplated hereby.

6.6     Financial Advisors.   With the exception of Iridium Partners and Eureka Capital Markets, the fees and the expenses of which incurred on or after September 1, 2007 will be paid by the Selling Stockholder, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Selling Stockholder in

25

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.7    No Post-Closing Ownership Interest.    Immediately upon Closing, Selling Stockholder will have no further legal, equitable or beneficial ownership interest in the Company, and Selling Stockholder's sole rights will be to receive the economic benefit of the bargain set out in this Agreement.

6.8    No Other Relationships.    Except as set forth in this Agreement, no U.S. Stockholder has any contractual obligation, monetary obligation or connection of any kind with Selling Stockholder or any of its Affiliates other than the Company after giving effect to the Closing.

6.9    Accuracy of Company Representations.    As of the date hereof, the Selling Stockholder has no Knowledge of any facts, events or circumstances that would cause any of the representations or warranties of the Company set forth in Article V to be untrue or misleading in any material respect.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES OF PURCHASER AND U.S. STOCKHOLDERS

Purchaser, and solely for the purposes of Sections 7.10, 7.11 and 7.12, the U.S. Stockholders severally, each on behalf of himself, hereby represent and warrant to the Selling Stockholder that except as set forth in a disclosure schedule delivered to the Selling Stockholder at or prior to the date hereof (the **"Purchaser Disclosure Schedule"**):

7.1    Organization and Good Standing.    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate properties and carry on its business.

7.2    Authorization of Agreement.    Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the **"Purchaser Documents"**), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other

26

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

       7.3    <u>Conflicts; Consents of Third Parties</u>.

       (a)    The execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and by-laws of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound; (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound; or (iv) any applicable Law.

       (b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Purchaser of any other action contemplated hereby, except as required under the Sale and Security Agreement.

       7.4    <u>Litigation</u>.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby.

       7.5    <u>Investment Intention</u>.  Purchaser is acquiring the Shares for its own account, for investment purposes only and not with a view to the distribution (as such term is used in Section 2(a)(11) of the Securities Act of 1933, as amended (the "**Securities Act**") thereof.  Purchaser understands that the Shares have not been registered under the Securities Act and cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

       7.6    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

7.7    [Intentionally Omitted].

7.8    [Intentionally Omitted].

7.9    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that the Selling Stockholder is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Selling Stockholder in Article VI (as modified by the Schedules hereto as supplemented or amended).  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of the Company set forth in Article V and/or of Selling Stockholder set forth in Article VI (as modified by the Schedules hereto as supplemented or amended).  As of the date hereof, Purchaser has no Knowledge of any facts, events or circumstances that would cause any of the representations or warranties of the Company set forth in Article V to be untrue or misleading in any material respect.

7.10    Sale and Security Agreement.  Purchaser and each of the U.S. Stockholders is (i) a Third Party (as defined in the Sale and Security Agreement), (ii) not a stockholder, Affiliate or agent of Smartmatic (as defined in the Sale and Security Agreement) and (iii) not Personnel (as defined in the Sale and Security Agreement) of Smartmatic (as defined in the Sale and Security Agreement).

7.11    U.S. Stockholders.  The U.S. Stockholders collectively own all of the outstanding Purchaser Common Stock.  Each of Blaine, McManemy, Cramer, Foster, Weinel, Singh, Lierman, Korb, Smith, Shafer, Elder and Keeling are citizens of the United States and are not foreign persons as defined in 31 C.F.R. Section 800.213.

7.12    No Undisclosed Principal.  No U.S. Stockholder in his capacity as such is acting as an agent for or otherwise on behalf of any other Person in connection with the transactions contemplated by this Agreement.

ARTICLE VIII

COVENANTS

8.1    Access to Information.  (a)  For a period not to exceed twenty (20) days following the date of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Company and such examination of the books and records of the Company as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and

28

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. The Company shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Company to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with the Company and its representatives and shall use their reasonable efforts to minimize any disruption to the business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require the Company to disclose information subject to attorney-client privilege.

(b)     Without limiting the provisions of Section 8.8, for a period of two (2) years after the Closing, Purchaser will give the Selling Stockholder reasonable access during Purchaser's regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law to books and records transferred to Purchaser to the extent necessary for the preparation of financial statements, regulatory filings or Tax returns of the Selling Stockholder or its Affiliates in respect of periods ending on or prior to Closing, or in connection with any Legal Proceedings. The Selling Stockholder shall be entitled, at its sole cost and expense, to make copies of the books and records to which it is entitled to access pursuant to this Section 8.1(b).

(c)     Notwithstanding anything to the contrary herein, prior to a sale of the Unsecured Promissory Note pursuant to Section 8.16 and for so long after such sale as the Unsecured Promissory Note is potentially convertible in accordance with Article IV thereof, any prospective purchaser of the Unsecured Promissory Note identified by Selling Stockholder, or the holder of the Unsecured Promissory Note after such sale, shall be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Company and the Purchaser and such examination of the books and records of the Company and the Purchaser as it reasonably requests and to make extracts and copies of such books and records and Purchaser shall permit such prospective purchaser or holder access to, and examination of, the properties, businesses, operations and personnel of the Company and the Purchaser, including the opportunity to meet with their independent auditors and customers, all for the purpose of conducting a comprehensive due diligence investigation of the Purchaser and the Company of a scope customary in the acquisition context, subject to (i) customary restrictions on and procedures for staged access to information, personnel and customers in an acquisition context to protect confidential and proprietary information and so as not to be disruptive to the Company, the Purchaser or its customers, and (ii) such prospective purchaser or holder entering into a customary nondisclosure agreement with the Company.

29

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

8.2     Conduct of the Business Pending the Closing.

(a)     Prior to the Closing, except (I) as set forth on Schedule 8.2, (II) as required by applicable Law, (III) as otherwise contemplated by this Agreement or (IV) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), the Selling Stockholder shall, and shall cause the Company to:

(i)      conduct the business of the Company only in the Ordinary Course of Business; and

(ii)     use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Company and (B) preserve the present relationships with customers and suppliers of the Company.

(b)     Prior to the Closing, except (I) as set forth on Schedule 8.2, (II) as required by applicable Law, (III) as otherwise contemplated by this Agreement or (IV) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), the Selling Stockholder shall not and shall not permit the Company to:

(i)      declare, set aside, make or pay any dividend or other distribution in respect of the capital stock of the Company or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock or other securities of, or other ownership interests in, the Company;

(ii)     transfer, issue, sell or dispose of any shares of capital stock or other securities of the Company or grant options, warrants, calls or other rights to purchase or otherwise acquire shares of the capital stock or other securities of the Company;

(iii)    effect any recapitalization, reclassification or like change in the capitalization of the Company;

(iv)     amend the certificate of incorporation or bylaws or comparable organizational documents of the Company;

(v)      other than in the Ordinary Course of Business or as required by Law or Contract, (A) materially increase the annual level of compensation of any director or executive officer of the Company, (B) materially increase the annual level of compensation payable or to become payable by the Company to any of its respective directors or executive officers, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director or executive officer of the Company, (D) materially increase the coverage or benefits available under any (or create any new)

30

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Company Benefit Plan or (E) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which the Company is a party or which involves a director or executive officer of the Company, except, in each case, as required by applicable Law from time to time in effect or by the terms of any Company Benefit Plans;

(vi)    subject to any Lien, any of the properties or assets (whether tangible or intangible) of the Company, except for Permitted Exceptions;

(vii)    acquire any material properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the material properties or assets of the Company;

(viii)    other than in the Ordinary Course of Business, cancel or compromise any material debt or claim or waive or release any material right of the Company;

(ix)    enter into any commitment for capital expenditures of the Company in excess of $10,000 for any individual commitment and $25,000 for all commitments in the aggregate;

(x)    enter into, modify or terminate any labor or collective bargaining agreement of the Company;

(xi)    discuss, negotiate, respond to any inquiries regarding, enter into or agree to enter into, or permit the Company to discuss, negotiate, respond to any inquiries regarding, enter into or agree to enter into, any stock sale, asset sale, merger, joint venture or consolidation with any Person, provided that this clause (xi) shall not prohibit discussions, negotiations or responses to inquiries with or to the Persons listed on Schedule 8.2(b)(xi);

(xii)    pay any obligation of (i) Selling Stockholder or any Affiliate of Selling Stockholder other than the Company, (ii) any principal of Selling Stockholder or any Affiliate of Selling Stockholder, nor distribute or otherwise transfer any cash or assets of the Company to Selling Stockholder, any Affiliate of Selling Stockholder, or any principal of Selling Stockholder or any Affiliate of Selling Stockholder, except in each case in connection with expenses incurred prior to September 1, 2007.

(xiii)    comply in all respects with the Sale and Security Agreement and all other Laws applicable to the Company and to the transaction contemplated by this Agreement.

31

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(xiv)   make or rescind any election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit controversy relating to Taxes, or except as required by applicable law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent Tax Return; or

(xv)   agree to do anything prohibited by this Section 8.2.

8.3   Consents.  The Purchaser, Selling Stockholder and the Company shall use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in 6.3(b) and 7.3(b) hereof (collectively, the "Consents"), provided, however, that, no Party shall be obligated to pay any consideration other than filing fees or other sums required by Law to any third party from whom consent or approval is requested.

8.4   Regulatory Approvals.

(a)   Each of Purchaser, the Company and the Selling Stockholder (if necessary) shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates as requested by CFIUS pursuant to the Sale and Security Agreement with respect to the transactions contemplated hereby as promptly as practicable, (b) comply at the earliest practicable date with any request under the Sale and Security Agreement for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or Affiliates from CFIUS and (c) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of CFIUS under the Sale and Security Agreement with respect to any such filing or any such transaction. Each such Party shall use its best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such Party shall promptly inform the other Parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No Party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other Parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the Parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made

32

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

or submitted by or on behalf of any Party hereto relating to proceedings under the Sale and Security Agreement. Any Party may, as it deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other Parties under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(b)    Each of Purchaser, Selling Stockholder and the Company shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the Sale and Security Agreement.

8.5    Further Assurances.    Subject to, and not in limitation of, Section 8.4, each of Purchaser, the Selling Stockholder and the Company shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.6    [Intentionally Omitted].

8.7    [Intentionally Omitted].

8.8    Preservation of Records.    The Selling Stockholder and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the business of the Company for a period of seven years from the Closing Date or, if longer, until the date that is six (6) months after the expiration of the applicable statute of limitation with respect to Federal and state income taxes, and shall make such records and personnel available to the other as may be reasonably required by such Party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of the Selling Stockholder or Purchaser or any of their Affiliates or in order to enable the Selling Stockholder or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event the Selling Stockholder or Purchaser wishes to destroy such records after that time, such Party shall first give ninety (90) days prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that ninety (90) day period, to take possession of the records within one hundred eighty (180) days after the date of such notice.

33

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

8.9     Publicity.

(a)     None of the Selling Stockholder, the Company or Purchaser or any of their Affiliates shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party hereto unless such disclosure is otherwise required by applicable Law or CFIUS, provided that, to the extent required by applicable Law or CFIUS, the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or CFIUS to consult with each other Party with respect to the timing and content thereof.

(b)     Each of Purchaser, the Company and the Selling Stockholder agree that the terms of this Agreement shall not be disclosed or otherwise made available to the public and that copies of this Agreement shall not be publicly filed or otherwise made available to the public, except where such disclosure, availability or filing is required by applicable Law or CFIUS and only to the extent required by such Law or CFIUS.  In the event that such disclosure, availability or filing is required by applicable Law or CFIUS, each of Purchaser, the Company and the Selling Stockholder (as applicable agrees to use its commercially reasonable efforts to obtain "confidential treatment" of this Agreement with the requesting Governmental Body or CFIUS and to redact such terms of this Agreement as the other Party shall request.

8.10    [Intentionally Omitted].

8.11    Insurance.   The Selling Stockholder shall maintain in effect existing directors' and officers' liability insurance coverage for Jack Blaine and Peter McManemy in the currently applicable coverage amounts for any claims that occurred at any time prior to or on the Closing Date, such coverage to remain in effect through the date that is one (1) month after the expiration of the applicable statute of limitation with respect to such claims.

8.12    Disclosure Schedules; Supplementation and Amendment of Schedules.  The Company and the Selling Stockholder may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section.  Each of the Selling Stockholder or the Company may, at any time, and from time to time, from the date hereof until the Closing Date, supplement or amend the Disclosure Schedule or any other schedule hereto with respect to any matter arising after

34

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

the date hereof which, if existing or occurring at or prior to the date hereof, would have been required to be set forth or described in such schedules. No supplement or amendment to such schedules shall have any effect for the purpose of determining the satisfaction or fulfillment of the conditions set forth in Article IX hereof; provided, however, that any matter arising after the date hereof and disclosed accurately in a supplemented or amended schedule pursuant to this Section, while it may give Purchaser the right to terminate this Agreement if, in Purchaser's reasonable judgment, the new disclosure would have a Material Adverse Effect, it shall not form the basis for a claim for breach of any representation or warranty that survives the Closing if the transactions contemplated hereby are consummated.

8.13   Non-Solicitation.

(a)   For a period of three (3) years from and after the Closing Date, the Selling Stockholder shall not directly or indirectly, through any Affiliate, officer, director, agent or otherwise, cause, solicit, induce or encourage any employee of the Company as of the date hereof or at any time during such period to leave such employment, or hire, employ or otherwise engage such individual. For a period of three (3) years from and after the Closing Date, the Purchaser shall not directly or indirectly, through any Affiliate, officer, director, agent or otherwise, cause, solicit, induce or encourage any employee of Selling Stockholder or its Affiliates (other than the Company) as of the date hereof or at any time during such period to leave such employment, or hire, employ or otherwise engage such individual.

(b)   The covenants and undertakings contained in this Section 8.13 relate to matters which are of a special, unique and extraordinary character and the Parties acknowledge and agree that a violation of any of the terms of this Section 8.13 will cause irreparable injury to Purchaser and the Selling Stockholder, as the case may be, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Accordingly, the remedy at law for any breach of this Section 8.13 will be inadequate. Therefore, each of Purchaser and Selling Stockholder, as applicable, will be entitled, without the necessity of proving actual damage or posting any bond whatsoever, to an amount of damages equal to twenty (20) times the total annual compensation of any employee who is hired by Purchaser or Selling Stockholder, as applicable, in breach of this Section 8.13, subject to such breaching Party's ability to cure the breach by terminating the applicable employee or paying such damages within thirty (30) days following written notice of such breach by the non-breaching Party. Each of the Purchaser and Selling Stockholder agree that the amount of damages recoverable for a breach of this Section 8.13 represents a reasonable estimation of damages. The rights and remedies provided by this Section 8.13 are cumulative and in addition to any other rights and remedies which Purchaser or the Selling Stockholder may have hereunder or at law or in equity.

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(c)    The Parties hereto agree that, if any court of competent jurisdiction determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 8.13 is unreasonable, arbitrary or against public policy, then a lesser period of time, geographical area, business limitation or other relevant feature which is determined by such court to be reasonable, not arbitrary and not against public policy may be enforced against the applicable Party.

8.14    Proprietary Intellectual Property.    The Parties agree and acknowledge that the Company does not have any right, title or interest in or to the Proprietary Intellectual Property, without limiting the terms of the Distribution Agreement.

8.15    Sale and Security Agreement.    The Parties agree and acknowledge that on the Closing Date, pursuant to the terms of the Sale and Security Agreement, all of Selling Stockholder's ownership interest, including outstanding shares, in the Company and its assets, shall be completely and irrevocably severed and none of Selling Stockholder or any of its Affiliates shall have any Control over the Company.

8.16    Sale of Note of Unsecured Promissory Note; Right of First Refusal.    Selling Stockholder may, subject to this Section 8.16 and Section 11.1, sell or assign the Unsecured Promissory Note to a Third Party (as defined in the Sale and Security Agreement) (the "**Third Party Purchaser**"). If Selling Stockholder elects to sell or assign the Unsecured Promissory Note, Selling Stockholder shall obtain from such Third Party Purchaser a bona fide written offer to purchase the Unsecured Promissory Note stating the terms and conditions upon which the purchase is to be made and the consideration offered (the "**Sale Notice**") and shall provide such Sale Notice to the Purchaser. The Purchaser or its designee(s), which may include, without limitation, the U.S. Stockholders, shall have a right of first refusal to purchase the Unsecured Promissory Note on the terms and for the consideration set forth in the Sale Notice by notifying Selling Stockholder of its intention to exercise its right of first refusal within sixty (60) days after receiving the Sale Notice. If and to the extent that Purchaser fails to exercise in full its rights of first refusal to purchase the Unsecured Promissory Note pursuant to the terms of this Section 8.16, then Selling Stockholder shall have one hundred twenty (120) days to complete the sale to the previously identified Third Party Purchaser on the terms and for the consideration set forth in the Sale Notice. If and to the extent that Selling Stockholder fails to sell the Unsecured Promissory Note to such Third Party Purchaser within such one hundred twenty (120) day period, Selling Stockholder shall not thereafter sell the Unsecured Promissory Note without first offering such Unsecured Promissory Note to the Purchaser in the manner provided in this Section 8.16. In the event of any transfer or sale of the Unsecured Promissory Note as provided in this Section 8.16, the Selling Stockholder's rights to any Earn Out Payments or Selling Stockholder's Contingent Earn Out payment, as applicable, shall terminate. Selling Stockholder shall provide to Purchaser full disclosure of all terms and conditions of any

36

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

sale of the Unsecured Promissory Note.

8.17   Covenants of Purchaser.

(a)   Covenants of Purchaser.   Purchaser agrees with Selling Stockholder that, for as long as Selling Stockholder has rights to Earn Out Payments and Selling Stockholder's Contingent Earn Out payments hereunder, Purchaser will perform the following obligations:

(i)   Purchaser shall use commercially reasonable efforts to deliver to Selling Stockholder, not later than 120 days after the last day of each fiscal year of Purchaser, audited consolidated financial statements for Purchaser and its Subsidiaries, in each case for the preceding fiscal year, which financial statements shall be audited by an accounting firm selected by Purchaser and reasonably acceptable to the Selling Stockholder;

(ii)   Purchaser shall deliver to Selling Stockholder, not later than 45 days after the last day of each of the first three fiscal quarters of each fiscal year of Purchaser, unaudited consolidated financial statements for Purchaser and its Subsidiaries, in each case for the portion of the then current fiscal year ended on the last day of such fiscal quarter, which financial statements shall be the same financial statements relied upon by the management of Purchaser in the conduct of its business;

(iii)   Purchaser will cause the board of directors of Purchaser and each of its Subsidiaries to include at least one independent director, subject to the approval of such director by the USG Parties (as defined in the Sale and Security Agreement), who shall be responsible for verifying compliance with any post-Closing obligations of the Company under the Sale and Security Agreement.  Until such time as such independent director is approved by the USG Parties, Mr. Harris Miller shall serve as a director; and

(iv)   Purchaser shall provide to Selling Stockholder full disclosure of all terms and conditions of any Earn Out Payment or Selling Stockholder's Contingent Earn Out.

(b)   Negative Covenants. Purchaser agrees with Selling Stockholder that, for as long as Selling Stockholder has rights to Earn Out Payments and Selling Stockholder's Contingent Earn Out payments hereunder, Purchaser hereby covenants that it will not do any of the following:

(i)   Debt.   Create or suffer to exist, or permit any of its Subsidiaries to create or suffer to exist, any Debt other than (i) Debt in respect of the Unsecured Promissory Note, (ii) up to $7,000,000 in Debt constituting a revolving line of credit owing by Purchaser or the Company to any lender or (iii) obligations in respect of

37

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

letters of credit or performance bonds posted in connection with contracts of the Company (the Debt referred to in the foregoing clauses (ii) and (iii), the "Permitted Senior Debt"). For purposes of this Agreement, "Debt" means (i) indebtedness for borrowed money; (ii) obligations evidenced by bonds, debentures, notes, letters of credit or other similar instruments; (iii) obligations as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases; (iv) obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iii) above; and (v) liabilities in respect of unfunded vested benefits under plans covered by Title IV of the Employee Retirement Security Act of 1974, as amended, which first accrues on or after the Closing Date.

(ii)   Dividends, Etc. Until such time as Selling Stockholder and its Affiliates have received, in the aggregate (i) payments of principal of the Unsecured Promissory Note (ii) Earn Out Payments and (iii) Selling Stockholder's Contingent Earn Out payments totaling at least $16,000,000, declare or make any distribution of assets, properties, cash, rights, obligations or securities on account of any equity interest in Purchaser, or purchase, redeem or otherwise acquire for value (or permit any of its Subsidiaries to do so) any equity interest in Purchaser or any warrants, rights or options to acquire any such equity interests.

(iii)   Transactions with Affiliates. Permit to exist or enter into, or allow the Company or any of its Subsidiaries to permit to exist or enter into, any transaction (including the purchase, sale lease or exchange of any property or the rendering of any service) with any Affiliate of Purchaser or with any director, officer or employee of Purchaser, any of its Subsidiaries or any other Affiliate of Purchaser or any parent, spouse or lineal descendant of any such individual, except payment of compensation and benefits to employees in the Ordinary Course of Business of, and pursuant to the reasonable requirements of, the business of Purchaser or any of its Subsidiaries and upon fair and reasonable terms.

(iv)   Director Compensation. Pay or permit the Company to pay, or permit any of its Subsidiaries to pay, any compensation to any director of the Purchaser or the Company, other than reimbursement of out-of-pocket expenses reasonably incurred in the performance of their duties as director, provided that these restrictions shall apply only to the U.S. Stockholders who from time to time serve as directors and not to any other directors.

(v)   Executive Compensation. So long as Blaine is an employee, officer, director or shareholder of the Company or the Purchaser, and until either a Liquidity Event or a sale of the Unsecured Promissory Note takes place, the chief executive officer of the Purchaser and the Company shall be the same individual and:

38

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(I) Such chief executive officer shall not receive a bonus for any year in which the Company EBITDA is less than $5,000,000 and in which the initial $2,500,000 payable to Selling Stockholder under Section 3.4(b) has not been paid (the "**Threshhold Bonus Events**"). In any year during which the Threshhold Bonus Events occur, such chief executive officer shall be entitled to receive salary, bonus and increases thereto as follows:

(a) If the Company's EBITDA is at least $5,000,000 and less than $10,000,000, such chief executive officer shall receive base salary and bonus in the amounts set out in **Schedule 8.17(b)(v)(B)**, plus an increase in those amounts equal to the cumulative change in the CPI Index over the CPI Index as of April 1, 2007.

(b) If (i) the Company's EBITDA is at least $10,000,000 and less than $20,000,000, and (ii) Selling Stockholder has received at least $5,000,000 pursuant to Section 3.4(b), such chief executive officer shall receive base salary and bonus in the amounts set out in **Schedule 8.17(b)(v)(B)**, plus an increase in those amounts equal to twice the cumulative change in the CPI Index over the CPI Index as of April 1, 2007.

(c) If (i) the Company's EBITDA is at least $20,000,000, and (ii) Selling Stockholder has received at least $5,000,000 pursuant to Section 3.4(b), such chief executive officer shall receive base salary in the amount set out in **Schedule 8.17(b)(v)(B)**, increased by twice the cumulative change in the CPI Index over the CPI Index as of April 1, 2007 plus a bonus equal to twice the prior year's base salary; and

(II) Such chief executive officer shall not receive reimbursement for business related expenses in an amount greater than $60,000 per year as the chief executive officer(s) of Purchaser and its Subsidiaries plus a car allowance consistent with past practice. Such amounts shall be increased by the cumulative change in the CPI Index each year.

(c) Termination of Covenants. The provisions of this Section 8.17 shall terminate and be of no further force or effect immediately upon the earliest of (i) the occurrence of a Liquidity Event (other than a Waived Liquidity Event), (ii) the sale or other transfer of the Unsecured Promissory Note to a Third Party Purchaser or (iii) June 30, 2012.

8.18 Blaine Non-competition and Nonsolicitation.

(a) Non-competition. Blaine agrees that he will not, directly or indirectly, during his employment with the Purchaser or its Subsidiaries and for the period of three (3) years from the date on which his employment with Purchaser terminates for any reason, be employed by, consult with or otherwise perform services for, own, manage, operate, join, control or participate in the ownership, management,

39

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

operation or control of a Competitor of Selling Stockholder. For purposes of this Agreement, "**Competitor**" means any entity that competes with Selling Stockholder, including, without limitation, any entity that designs, manufactures or sells electoral automation products to the extent that any of Blaine's activities with or for such an entity involve the design, manufacturing or sale of electoral automation products, the management, control or direction of others involved in such activities, or the provision of consulting services related to such activities, unless Blaine is released from such obligation in writing by Selling Stockholder. Blaine shall be deemed to be related to or connected with a Competitor if such Competitor is (i) a partnership in which he is a general or limited partner or employee, (ii) a corporation, association or company of which he is a shareholder, officer, employee, director or sole proprietor, or (iii) a partnership, corporation or association of which he is a member, consultant or agent; provided, however, that nothing herein shall prevent the purchase or ownership by Blaine of shares which constitute less than five percent (5%) of the outstanding equity securities of a publicly held entity, if Blaine had no other relationship with such entity.

(b)     <u>Nonsolicitation</u>. Blaine shall not employ or directly or indirectly solicit, influence or entice, or attempt to solicit, influence or entice, any employee or consultant of Selling Stockholder to cease his relationship with Selling Stockholder or solicit, influence, entice or in any way divert any customer, distributor, partner, joint venturer or supplier of Selling Stockholder to do business or in any way become associated with any Competitor. This Section 8.18(b) shall apply during the time period and geographical area described in Section 8.18(a) hereof. This Section 8.18(b) shall not apply to or prohibit general solicitations and advertisements that are not targeted at Selling Stockholder's employees, consultants, customers, distributors, partners, joint venturers or suppliers.

(c)     <u>Termination of Covenants</u>. The provisions of this <u>Section 8.18</u> shall terminate and be of no further force or effect immediately upon the earliest of (i) the occurrence of a Liquidity Event, (ii) the sale or other transfer of the Unsecured Promissory Note to a Third Party Purchaser or (iii) June 30, 2012.

40

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

8.19 <u>No Adverse Actions</u>.  The Parties agree that, until the earlier of June 30, 2012 or a sale of the Unsecured Promissory Note to a Third Party Purchaser, no Party or any of such Party's Affiliates shall enter into any agreement with another Person to deprive or otherwise interfere with any other Party's rights under this Agreement or the related transactions.

8.20 <u>No Control</u>.  The Selling Stockholder covenants and confirm that, after closing, it shall not have any power, direct or indirect, whether or not exercised, to determine, direct or decide material matters affecting the Company, including, to determine, direct, take or cause decisions regarding:

(a)     The sale, lease, mortgage, pledge or other transfer of any or all to the principal assets of the Company, whether or not in the ordinary course of business;

(b)     The dissolution of the Company;

(c)     The closing and/or relocation of the production or research and development facilities of the Company;

(d)     The termination or non-fulfillment of contracts of the Company; or

(e)     The amendment of the Articles of Incorporation with respect to the matters described herein.

## ARTICLE IX

## CONDITIONS TO CLOSING

9.1 <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of the Company and the Selling Stockholder set forth in this Agreement and qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of the Company and of Selling Stockholder, dated the Closing Date, to the foregoing effect;

41

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(b)     the Company and the Selling Stockholder shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of the Company and of Selling Stockholder, dated the Closing Date, to the foregoing effect;

(c).     There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)     the Closing shall be in compliance with the Sale and Security Agreement;

(e)     the Selling Stockholder shall have delivered, or caused to be delivered, to Purchaser stock certificates representing all of the Shares, free of all Liens and duly endorsed in blank or accompanied by stock transfer powers;

(f)     each of the Consents set forth on Schedule 5.3(b) shall have been obtained;

(g)     the Selling Stockholder shall have executed and delivered to Purchaser the Distribution Agreement; and

(h)     the Selling Stockholder shall have executed and delivered to Purchaser the Temporary Services Agreement, substantially in the form attached hereto as Exhibit A.

9.2     Conditions Precedent to Obligations of the Selling Stockholder. The obligations of the Selling Stockholder to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Selling Stockholder in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and the Selling Stockholder shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material

42

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Selling Stockholder shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)     Purchaser shall have executed and delivered, or caused to be delivered, to the Selling Stockholder the Unsecured Promissory Note;

(e)     Selling Stockholder shall have received from each employee of the Company set forth on **Schedule 9.2(e)** a release and waiver of any claim by such employee to any compensation or to acquire any shares of stock of "Smartmatic" (as defined in the Sale and Security Agreement) or any options, warrants or other securities or rights to subscribe for, purchase or otherwise acquire such shares, and each U.S. Stockholder holding shares in Smartmatic International Group, N.V., a Curacao company, shall have surrendered such shares by delivering to the Selling Stockholder the certificates therefor together with stock powers duly executed in blank;

(f)     Purchaser shall have executed and delivered, or caused to be delivered, to the Selling Stockholder the Distribution Agreement; and

(g)     the Purchaser shall have executed and delivered to Selling Stockholder the Temporary Services Agreement, substantially in the form attached hereto as Exhibit A.

9.3     Frustration of Closing Conditions.     None of the Company, Purchaser or the Selling Stockholder may rely on the failure of any condition set forth in Sections 9.1 or 9.2, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE X

## INDEMNIFICATION

10.1     Survival of Representations and Warranties and Covenants.

(a)     Except as set forth in Section 10.7, the representations and warranties of the Parties contained in this Agreement shall not survive and shall terminate upon the Closing.

(b)     All of the covenants or other agreements of the Parties contained in

43

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

this Agreement shall survive until fully performed or fulfilled, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the Party entitled to such performance.  No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed by or prior to Closing (the "**Pre-Closing Covenants**") may be made or brought by any Party hereto after the Closing Date and (ii) by their nature are required to be performed after Closing (the "**Post-Closing Covenants**") may be made or brought by any Party hereto after the one year anniversary of the last date on which each such Post-Closing Covenant was required to be performed (in each case, a "**Survival Period**"); provided, however, that any obligation to indemnify and hold harmless shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor to the indemnifying Party in accordance with this Article X and Section 12.6 before the termination of the applicable Survival Period.

10.2    Indemnification by Selling Stockholder.

(a)    Subject to Section 10.5 hereof, the Selling Stockholder hereby agrees to indemnify and hold Purchaser and its directors, officers, employees, Affiliates, stockholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Purchaser Indemnified Parties**") harmless from and against any and all losses, liabilities, claims, demands, judgments, damages (excluding incidental and consequential damages), fines, suits, actions, costs and expenses (individually, a "**Loss**" and, collectively, "**Losses**"):

(i)    resulting from the breach of any Post-Closing Covenant on the part of the Selling Stockholder; and

(ii)    resulting from any Indemnified Matter.

(b)    Except for Losses relating to Indemnified Matters, Purchaser acknowledges and agrees that the Selling Stockholder shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to actions taken, or failed to be taken, by Purchaser or any other Person (other than the Selling Stockholder and its Affiliates in breach of this Agreement) after the Closing Date. Purchaser shall take and shall cause its Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

10.3    Indemnification by Purchaser.

(a)    Subject to Section 10.5, Purchaser hereby agrees to indemnify and hold the Selling Stockholder and its respective directors, officers, employees, Affiliates, stockholders, agents, attorneys, representatives, successors and permitted assigns

44

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(collectively, the "**Selling Stockholder Indemnified Parties**") harmless from and against, and pay to the applicable Selling Stockholder Indemnified Parties the amount of, (i) any and all Losses resulting from any breach of any Post-Closing Covenant on the part of Purchaser and (ii) without duplication of any indemnification for Losses actually recovered from a U.S. Stockholder, any breach by U.S. Stockholder of his obligations under Section 3.3(a) or (e).   For avoidance of doubt, no U.S. Stockholder shall be personally liable to any of the Selling Stockholder Indemnified Parties, except for the limited several liability set out in Section 3.3(a) or for breach of such U.S. Stockholder's individual obligations under Section 3.3(e), or, in the case of Blaine individually, with respect to his obligations under Section 8.18.

(b)      Selling Stockholder acknowledges and agrees that the Purchaser shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to actions taken, or failed to be taken, by Selling Stockholder or any other Person (other than the Purchaser and its Affiliates in breach of this Agreement) after the Closing Date.   The Selling Stockholder shall take and cause its Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

10.4    Indemnification Procedures.

(a)      A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the Party from whom indemnification is sought.

(b)      In the event that any Legal Proceedings shall be instituted, or that any Claim shall be asserted, by any third party in respect of which payment may be sought under Sections 10.2 or 10.3 hereof (regardless of the limitations set forth in Section 10.5) ( an "**Indemnification Claim**"), the indemnified Party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party; provided, however, that an Indemnification Claim for any Indemnified Matter shall not be subject to the notification procedures of this Section 10.4.   The failure of the indemnified Party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying Party's obligations with respect thereto except to the extent that the indemnifying Party is prejudiced as a result of such failure.

(c)      [intentionally omitted]

(d)      The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder.   If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified

45

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified Party of its intent to do so. If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the indemnifying Party shall assume the defense of any Indemnification Claim, the indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if, (i) so requested by the indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the indemnified Party, a conflict or potential conflict exists between the indemnified Party and the indemnifying Party that would make such separate representation advisable; and provided, further, that the indemnifying Party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all indemnified Parties in connection with any Indemnification Claim. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 10.4 to the contrary, neither the indemnifying Party nor the indemnified Party shall, without the written consent of the other Party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such Party provide to such other Party an unqualified release from all liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying Party notifies the indemnified Party in writing of the indemnifying Party's willingness to accept the settlement offer and, subject to the applicable limitations of Section 10.5, pay the amount called for by such offer, and the indemnified Party declines to accept such offer, the indemnified Party may continue to contest such Indemnification Claim, free of any participation by the indemnifying Party, and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified Party declined to accept plus the Losses of the indemnified Party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified Party with respect to such Indemnification Claim. If the indemnifying Party makes any payment on any Indemnification Claim, the indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified Party to any insurance benefits or other claims of the indemnified Party with respect to such Indemnification Claim. In connection with the response to any subpoena described in the definition of "Indemnified Matters," Selling Stockholder shall have the right to approve the Purchaser's selection of counsel, which approval shall not be unreasonably withheld.

46

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(e)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified Party and the indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified Party shall forward to the indemnifying Party notice of any amounts due and owing by the indemnifying Party pursuant to this Agreement with respect to such matter.

10.5    Certain Limitations on Indemnification.

(a)     If a Purchaser Indemnified Party is entitled to indemnification pursuant to Section 10.4(e), the Purchaser Indemnified Party's sole recourse for payment of such amounts due and owing to it shall be by set off against the aggregate from time to time of (i) amounts owing under the Unsecured Promissory Note to it to the extent the Selling Stockholder is the holder of the Unsecured Promissory Note, (ii) earned but unpaid Earn Out Payments or (iii) earned but unpaid Selling Stockholder's Contingent Earn Out.

(b)     Neither a Purchaser Indemnified Party nor a Selling Stockholder Indemnified Party shall be entitled to indemnification pursuant to Section 10.2(a)(i) or Section 10.3(a) with respect to any matter of which Purchaser or the Selling Stockholder, respectively, had knowledge or waived prior to the Closing. The Selling Stockholder shall not be required to indemnify any Purchaser Indemnified Party and Purchaser shall not be required to indemnify the Selling Stockholder Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the Party seeking indemnification pursuant to Section 10.2(a)(i) or Section 10.3(a).

10.6    Tax Treatment of Indemnity Payments. To the extent permitted by law, the Selling Stockholder and Purchaser agree to treat any indemnity payment made pursuant to this Article X as an adjustment to the Purchase Consideration for federal, state, local and foreign income tax purposes; provided, however, that if a Party determines it is not able to treat such payment as an adjustment to the Purchase Consideration, it shall notify the other Parties in writing of its intent to treat such payment differently at least 30 days prior to filing any Tax Return reflecting such change in characterization if such information has then been provided to the Party by its auditors, and otherwise within three Business Days after such information is so provided.

10.7    [Intentionally omitted]

10.8    Exclusive Remedy. From and after the Closing, except in the event of fraud or willful misconduct (in which case the Parties shall be entitled to exercise all of their rights, and seek all Damages available to them, under law or equity) the sole and exclusive remedy for any breach or failure to be true and correct, or alleged

47

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement, shall be indemnification in accordance with this Article X. In furtherance of the foregoing, the Parties hereby waive, to the fullest extent permitted by applicable Law, any and all other rights, claims and causes of action (including rights of contributions, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against the Selling Stockholder or Purchaser, as the case may be, arising under or based upon any federal, state or local Law (including any such Law relating to environmental matters or arising under or based upon any securities Law, common Law or otherwise). Notwithstanding the foregoing, this Section 10.8 shall not operate to limit the rights of the Parties to seek equitable remedies (including specific performance or injunctive relief).

## ARTICLE XI

## PUT RIGHT

**11.1    Put Right.**    Upon a sale or other transfer of the Unsecured Promissory Note to a Third Party Purchaser and the conversion of the Unsecured Promissory Note pursuant to the terms therein, each holder of stock in the Company has the option to sell all, but not less than all, of such holder's Stock to the Third Party Purchaser at the price per share implied by the applicable conversion price determined pursuant to the Unsecured Promissory Note by notifying the Selling Stockholder in writing within fifteen (15) days after the expiration of the Company's right of first refusal pursuant to Section 8.16, and the Selling Stockholder hereby agrees that a condition of any such sale, to be included in any agreement of sale, assignment or other transfer entered into by Selling Stockholder, its successors or assigns with a Third Party Purchaser, shall be the requirement and obligation that the Third Party Purchaser purchase any such shares as provided in this Section.

## ARTICLE XII

## MISCELLANEOUS

**12.1    Payment of Sales, Use or Similar Taxes.**    All sales, use, transfer, intangible, recordation, documentary stamp or similar Taxes or charges, of any nature whatsoever, applicable to, or resulting from, the transactions contemplated by this Agreement shall be borne by Purchaser.

**12.2    Expenses.**    Except as otherwise provided in this Agreement, each of the Selling Stockholder and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

48

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

12.3   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)   The Parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within New York over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.   Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of <u>Section 12.6</u>.

12.4   <u>Entire Agreement; Amendments and Waivers</u>.   This Agreement (including the schedules and exhibits hereto) and the Confidentiality Agreement represent the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof and thereof.   This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.5   <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

12.6   <u>Notices</u>.   All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written

49

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Selling Stockholder, to:

Smartmatic Corporation
1001 Broken Sound Parkway
Boca Raton FL 33487, USA
Facsimile: 561-862-0749
Attention: Antonio Mugica

With a copy (which shall not constitute notice) to:

Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Facsimile: (202) 637-3593
Attention: Jeffrey P. Bialos

If to Purchaser, to:

Sequoia Voting Systems, Inc.
717 17th Street, Suite 310
Denver, CO 80202, USA
Facsimile: 303-446-3047
Attention: Jack Blaine

With a copy to:

Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C.  20006
Facsimile:  (202) 828-5393
Attention:  Robert L. Bodansky

      12.7   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall

50

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.8    Binding Effect; Assignment.    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Purchaser or the Company, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void.  No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9    Non-Recourse.    No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of the Selling Stockholder or the Company or any of their respective Affiliates shall have any liability for any obligations or liabilities of the Selling Stockholder or the Company under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.  Selling Stockholder hereby acknowledges and agrees that, in the event of an indemnified Loss pursuant to Section 10.3(a), neither Selling Stockholder nor its Affiliates have recourse to any specific asset of Purchaser for payment of any Claims, including, but not limited to, the Common Stock.  Further, except with respect to the limited several liability set out in Section 3.3(a), and liability for breach of such U.S. Stockholder's individual obligations under Section 3.3(e) or, in the case of Blaine individually, with respect to his obligations under Section 8.18, no U.S. Stockholder and no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of the Purchaser, the Company or any of their respective Affiliates shall have any liability for any obligations or liabilities of Purchaser or the Company under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.10    Counterparts.    This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

51

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

### 12.11   U.S. Stockholders' Representative.

(a)   Appointment.   Each U.S. Stockholder hereby irrevocably constitutes and appoints Jack Blaine as their Representative for the purpose of performing and consummating the transactions contemplated by this Agreement and the Ancillary Agreements. The appointment of Jack Blaine as the Representative is coupled with an interest and all authority hereby conferred shall be irrevocable and shall not be terminated by any or all of the U.S. Stockholders without the consent of the Purchaser, which consent may be withheld for any reason, and the Representative is hereby authorized and directed to perform and consummate on behalf of the U.S. Stockholders all of the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)   Authority and Limitation of Liability.   Not by way of limiting the authority of the Representative, each and all of the U.S. Stockholders, for themselves and their respective heirs, executors, administrators, successors and assigns, hereby authorize the Representative to:

(i)   Waive any provision of this Agreement or any of the Ancillary Agreements which the Representative deems necessary or desirable;

(ii)   Execute and deliver on the U.S. Stockholders' behalf all documents and instruments which may be executed and delivered pursuant to this Agreement or any of the Ancillary Agreements;

(iii)   Calculate, negotiate and agree to any adjustments to the Purchase Consideration;

(iv)   Make and receive notices and other communications pursuant to this Agreement or any of the Ancillary Agreements and service of process in any legal action or other proceeding arising out of or related to this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereunder or thereunder;

(v)   Appoint or provide for successor agents;

(vi)   Select, retain, hire and consult with legal counsel, independent public accountants and other experts, solely at the cost and expense of the U.S. Stockholders;

(vii)   Pay expenses incurred or which may be incurred by or on behalf of the U.S. Stockholders in connection with this Agreement; and

(viii)   Take or forego any or all actions permitted or required of any U.S. Stockholder or necessary in the judgment of the Representative for the

52

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement or any of the Ancillary Agreements.

Each Seller agrees that the Representative shall have no liability to U.S. Stockholders, jointly or severally, for any act or omission by the Representative as permitted under this Section, excepting only actions taken in bad faith, and each U.S. Stockholder hereby irrevocably waives and releases any claims it may have against the Representative for his acts and omissions hereunder other than any actions taken in bad faith.

**EACH U.S. STOCKHOLDER UNDERSTANDS AND ACKNOWLEDGES THAT HE IS: (a) AUTHORIZING THE REPRESENTATIVE TO ACT FOR THE U.S. STOCKHOLDERS, COLLECTIVELY AND INDIVIDUALLY, WITH BROAD POWERS; AND (b) AGREEING THAT THE REPRESENTATIVE WILL NOT BE LIABLE TO U.S. STOCKHOLDERS, COLLECTIVELY OR INDIVIDUALLY, UNLESS THE REPRESENTATIVE ACTS IN BAD FAITH.**

**EACH U.S. STOCKHOLDER FURTHER ACKNOWLEDGES THAT HE HAS BEEN ADVISED TO SEEK INDEPENDENT AND SEPARATE COUNSEL PRIOR TO SIGNING THIS AGREEMENT AND HAS HAD THE OPPORTUNITY TO DO SO.**

12.12  <u>Conditions Subsequent.</u>  This Agreement is final and binding upon the Parties upon execution by Selling Stockholder, the Company, Purchaser and Blaine, conditioned upon and subject only to: (a) approval of the Agreement by CFIUS; and (b) execution of the Agreement by the remaining U.S. Stockholders within fifteen (15) days of the date of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

53

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

SVS HOLDINGS, INC.

By: _____
    Name: JACK BLAINE
    Title: CEO

SEQUOIA VOTING SYSTEMS, INC.

By: _____
    Name: JACK BLAINE
    Title: CEO

SMARTMATIC CORPORATION

By: _____
    Name: Antonio Mugica
    Title: CEO

*[signatures continue on following page]*

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.

Solely for purposes of Sections 3.3, 7.10, 7.11, 7.12 and (in the case of Blaine only) Section 8.18 of this Agreement:

_____
Jack Blaine

_____
Peter McManemy

_____
Howard Cramer

_____
Phil Foster

_____
Douglas H. Weinel

_____
Waldeep Singh

_____
Brian G. Lierman

_____
Lawrence W. Korb

_____
Edwin Smith, III

_____
Michelle Shafer

_____
Randall Elder

_____
Thomas E. Keeling

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.

Schedule 1.1(a)

Knowledge of the Company

1. Jack Blaine

2. Peter McManemy

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

## Schedule 8.2(b)(X)

### Existing Discussion Parties

1. Mark Lieberman/Joe Andrews

2. Cerberus

3. Ed Granski

4. Skip Stein

5. Blue Wolf/Monomoy

6. Sun Capital

7. Black Canyon Capital

8. Warburg Pincus

9. Hart

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

### Schedule 8.17(b)(v)(B)

Base Salary:  $350,000

Bonus:        $350,000

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

# EXHIBIT C

EXECUTION COPY

## UNSECURED PROMISSORY NOTE

$2,000,000                                          Dated:  November 5, 2007

     **FOR VALUE RECEIVED**, the undersigned, SVS HOLDINGS, INC., a Delaware corporation (the "Maker"), HEREBY PROMISES TO PAY to the order of SMARTMATIC CORPORATION, a Delaware corporation (the "Holder"), the principal sum of TWO MILLION DOLLARS ($2,000,000) on the dates herein provided, together with interest as herein provided on any and all principal amounts outstanding from time to time.

## ARTICLE I
## TERMS OF PAYMENT

    **SECTION 1.1**   **Deferred Purchase Price.**  This Note evidences the deferred purchase price for the Shares, as defined in that certain Stock Purchase Agreement between the Holder and the Maker, dated as of September 18, 2007 (the "Stock Purchase Agreement").   All capitalized terms not otherwise defined in this Note shall have the meanings provided in the Stock Purchase Agreement.

    (i)   **Interest, Etc.**  Interest on this Note shall accrue at the rate of 6% per annum for each day during the period from and including the date hereof to and including November 15, 2008, and for each day thereafter at the rate of 9% per annum, provided that after the occurrence and during the continuance of any Event of Default, or any event which, with notice or lapse of time or both, would constitute an Event of Default, interest shall accrue at the rate of 13% per annum.

    (ii)   **Scheduled Payments**. (a) Accrued interest shall be due and payable in arrears on December 31, March 31, June 30 and September 30 of each year, commencing December 31, 2007.  Accrued interest shall also be due and payable, in cash, upon conversion of this Note pursuant to Article IV.

    (b)   On December 31, 2009 (the "Maturity Date"), the entire outstanding principal of and accrued interest on this Note shall be paid in full.

    (c)   In the event any payment hereunder is stated to be due on a day that is not a Business Day, it shall instead become due and payable on the next succeeding Business Day, and interest shall accrue and be payable for such extension of time.

    (iii)   **Mandatory Prepayments**.  On the date of any Liquidity Event (unless waived by the Holder in accordance with Section 3.3 of the Stock Purchase Agreement, or unless the Holder waives the application of the

proceeds of such Liquidity Event to prepayment of this Note), the Maker shall pay the entire outstanding principal of and accrued interest on this Note.

**SECTION 1.2    Optional Prepayments.**  Except as provided in Section 1.1(iii) and except for Permitted Prepayments, the Maker shall not prepay all or any part of the principal of this Note at any time.  The term "Permitted Prepayments" shall mean, in any calendar month, the excess, if any, of (i) the product of $25,000 and the number of calendar months in the period commencing with the first full calendar month after the Closing Date through and including the month in which such Permitted Prepayment is proposed to be made and (ii) the aggregate amount  of all prepayments of principal of this Note previously made (excluding prepayments pursuant to Section 1.1(iii)).

**SECTION 1.3    Payment Terms.**  All payments of principal and interest on this Note shall be made by the Maker to the Holder in immediately available funds not later than 5:00 P.M. (Eastern Standard Time) on the date when due.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

**SECTION 2.1    Representations and Warranties of the Maker.**  The Maker represents and warrants to the Holder, as of the date hereof, as follows:

(a)    The Maker has full authority to enter into, deliver and perform its obligations under this Note;

(b)    The execution, delivery and performance of this Note by the Maker and the consummation of the transactions contemplated herein, do not and will not (i) require the Maker to obtain any consent, approval, authorization or order of, or to make any filing, registration or qualification with, any court, governmental authority or third person; (ii) conflict with or result in the violation of, or default under, any provision of any mortgage, indenture, lease, agreement or other instrument, judgment, order or permit to which the Maker is a party or by which it or its properties are bound; (iii) violate any laws applicable to the Maker; or (iv) result in the creation of any pledge, interest, claim, lien, charge or encumbrance upon any of the Maker's properties or assets;

(c)    This Note is the legal, valid and binding obligation of the Maker enforceable against the Maker in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, and subject the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law); and

(d)    The Maker has, independently and based upon such documents and information as it has deemed appropriate, made its own decision to enter into this Note.

2

## ARTICLE III

## COVENANTS OF THE MAKER

**SECTION 3.1      Covenants**.  The Maker agrees with the Holder that, until the principal and interest owing pursuant to this Note is paid in full, the Maker will perform the following obligations:

(a)      The Maker shall use commercially reasonable efforts to deliver to the Holder, not later than 120 days after the last day of each fiscal year of the Maker, audited consolidated financial statements for the Maker and its Subsidiaries, in each case for the preceding fiscal year, which financial statements shall be audited by an accounting firm selected by the Maker and reasonably acceptable to the Holder;

(b)      The Maker shall deliver to the Holder, not later than 45 days after the last day of each of the first three fiscal quarters of each fiscal year of the Maker, unaudited consolidated financial statements for the Maker and its Subsidiaries, in each case for the portion of the then current fiscal year ended on the last day of such fiscal quarter, which financial statements shall be the same as management relies on in the conduct of the Maker's business;

(c)      The Maker shall pay when due all property and other material taxes, assessments and other governmental charges of which it has knowledge that are owing, except for such taxes which the Maker is contesting in good faith and has maintained reasonably adequate reserves for payment; and

(d)      The Maker will cause the board of directors of the Maker and each of its Subsidiaries to include at least one independent director.  Until such time as Purchaser appoints an independent director pursuant to Section 8.17(a)(iii) of the Stock Purchase Agreement, the initial independent director shall be Mr. Harris Miller.  As used in this Section, an independent director may include an outside investor.

**SECTION 3.2 Negative Covenants.** So long as any principal or interest on this Note and all other amounts payable hereunder have been paid in full in cash, the Maker will not do any of the following:

(a)      Liens, etc. Create or suffer to exist, or permit any of its Subsidiaries to create or suffer to exist, any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any of its properties, whether now owned or hereafter acquired, or assign, or permit any of its Subsidiaries to assign, any right to receive income, other than (i) liens in existence on the Closing Date and identified on Schedule 3.2(a)(i); (ii) liens securing Permitted Senior Debt (as defined below); (iii) liens or security interests existing on such property at the time of its acquisition (other than any such lien or security interest created in contemplation of such acquisition) and incurred in the ordinary course of business; (iv) liens for taxes, assessments or other governmental charges or levies not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; (v) liens of carriers, warehousemen, mechanics, materialmen

3

and landlords incurred in the ordinary course of business for sums not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; (vi) liens incurred in the ordinary course of business in connection with workmen's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, leases and contracts (other than for, Debt) entered into in the ordinary course of business or to secure obligations on surety or appeal bonds; and (vii) judgment liens in existence less than 15 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies.

(b)    Debt. Create or suffer to exist, or permit any of its Subsidiaries to create or suffer to exist, any Debt other than (i) Debt in respect of this Note, (ii) up to $7,000,000 in Debt constituting a revolving line of credit owing by the Maker or the Company to any lender or (iii) obligations in respect of letters of credit or performance bonds posted in connection with contracts of the Company (the Debt referred to in the foregoing clauses (ii) and (iii), the "Permitted Senior Debt"). For purposes of this Agreement, "Debt" means (i) indebtedness for borrowed money; (ii) obligations evidenced by bonds, debentures, notes, letters of credit or other similar instruments; (iii) obligations as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases; (iv) obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iii) above; and (v) liabilities in respect of unfunded vested benefits under plans covered by Title IV of the Employee Retirement Security Act of 1974, as amended, which first accrues on or after the Closing Date.

(c)    Dividends, Etc. Until such time as the Holder and its Affiliates have received, in the aggregate (i) payments of principal of this Note, (ii) Earn Out Payments and (iii) Selling Stockholder's Contingent Earn Out Payments totaling at least $16,000,000, declare or make any distribution of assets, properties, cash, rights, obligations or securities on account of any equity interest in the Maker, or purchase, redeem or otherwise acquire for value (or permit any of its Subsidiaries to do so) any equity interest in the Maker or any warrants, rights or options to acquire any such equity interests.

(d)    Transactions with Affiliates. Permit to exist or enter into, or allow the Company or any of its Subsidiaries to permit to exist or enter into, any transaction (including the purchase, sale lease or exchange of any property or the rendering of any service) with any Affiliate of the Maker or with any director, officer or employee of the Maker, any of its Subsidiaries or any other Affiliate of the Maker or any parent, spouse or lineal (natural or adopted) descendant of any such individual, except payment of compensation and benefits to employees in the Ordinary Course of Business of, and pursuant to the reasonable requirements of, the business of the Maker or any of its Subsidiaries and upon fair and reasonable terms.

(e)    Director Compensation. Pay or permit the Company to pay, or permit any of its Subsidiaries to pay, any compensation to any director of the Maker or the Company, other than reimbursement of out-of-pocket expenses reasonably incurred in the performance of

4

their duties as director, provided that these restrictions shall apply only to the U.S. Stockholders who from time to time serve as directors and not to any other directors.

(f) <u>Executive Compensation</u>. So long as Jack Blaine is an employee, officer, director or shareholder of the Company or the Maker, and until either a Liquidity Event or a sale of this Note takes place, the chief executive officer of the Maker and the Company shall be the same individual and:

(I) Such chief executive officer shall not receive a bonus for any year in which the Company EBITDA is less than $5,000,000 and in which the initial $2,500,000 payable to Holder under Section 3.4(b) of the Stock Purchase Agreement has not been paid (the "**Threshold Bonus Events**"). In any year during which the Threshold Bonus Events occur, such chief executive officer shall be entitled to receive salary, bonus and increases thereto as follows:

(a) If the Company's EBITDA is at least $5,000,000 and less than $10,000,000, such chief executive officer shall receive base salary and bonus in the amounts set out in Schedule 8.17(b)(v)(B) of the Stock Purchase Agreement, plus an increase in those amounts equal to the cumulative change in the CPI Index over the CPI Index as of April 1, 2007.

(b) If (i) the Company's EBITDA is at least $10,000,000 and less than $20,000,000, and (ii) the Holder has received at least $5,000,000 pursuant to Section 3.4(b) of the Stock Purchase Agreement, such chief executive officer shall receive base salary and bonus in the amounts set out in Schedule 8.17(b)(v)(B) of the Stock Purchase Agreement, plus an increase in those amounts equal to twice the cumulative change in the CPI Index over the CPI Index as of April 1, 2007.

(c) If (i) the Company's EBITDA is at least $20,000,000, and (ii) the Holder has received at least $5,000,000 pursuant to Section 3.4(b) of the Stock Purchase Agreement, such chief executive officer shall receive base salary in the amount set out in Schedule 8.17(b)(v)(B) of the Stock Purchase Agreement, increased by twice the cumulative change in the CPI Index over the CPI Index as of April 1, 2007 plus a bonus equal to twice the prior year's base salary; and

(II) Such chief executive officer shall not receive reimbursement for business related expenses in an amount greater than $85,000 per year as the chief executive officer(s) of the Maker and its Subsidiaries, plus a car allowance consistent with past practice. Such amounts shall be increased by the cumulative change in the CPI Index each year.

(g) <u>Disposition of Company Stock</u>. The Maker shall not sell or otherwise transfer any of the Company Stock except for sales or other transfers after December 31, 2009 that constitute, or are part of a transaction that constitutes, a Liquidity Event.

5

## ARTICLE IV

## CONVERSION

**SECTION 4.1   Conversion.**   If and only if this Note is sold to a Third Party, and either (i) the Company has had consolidated losses, determined in accordance with GAAP, for two consecutive fiscal years prior to such sale or (ii) such sale is for an aggregate purchase price of (A) at least $16,000,000, if such sale occurs during the period from the Closing Date to and including April 30, 2008, or (B) at least $25,000,000, if such sale occurs during the period from and including May 1, 2008 to and including December 31, 2009, such Third Party (the "Third Party Holder") shall have the right, exercisable on any Business Day on or after the date of such sale and so long as any portion of the principal hereof is outstanding (subject, in the case of a Third Party Holder that is a "foreign person," as defined in 31 C.F.R. 800.213, to the prior approval of the USG Parties and CIFIUS, as defined in the Sale and Security Agreement) to convert the outstanding principal of this Note, in whole but not in part, to shares of common stock of the Maker, par value $0.001 per share (the "Common Stock"), the number of such shares (the "Conversion Shares") to be determined based upon the then-outstanding principal amount of the Note and a conversion ratio of $25,000 for each 1% of the total Common Stock outstanding after giving effect to such conversion, assuming for this purpose the prior conversion or exercise of all Common Stock Equivalents, provided that if a Permitted Minority Sale has occurred prior to such conversion, in lieu of 1% in such conversion ratio the applicable percentage shall be equal to the product of 1% and the Post Dilution Percentage (the "Conversion Right"). Rights under this Section 4.1 are subject to Maker's right of first refusal under Section 8.16 and the put right under Section 11.1 of the Stock Purchase Agreement.

**SECTION 4.2   Manner of Conversion.**

(a)   Notice of Conversion. Exercise of the Conversion Right will be effective as of the date the Third Party Holder delivers to the Maker at its principal office (i) a duly executed written notice in the form of **Exhibit A** (a "Conversion Notice"), (ii) this Note and (iii), if the put right provided for in Section 11.1 of the Stock Purchase Agreement has been exercised, tender of the full amount payable for the Stock subject to such put right determined in accordance with such Section 11.1; and as of such date, a stock certificate or certificates will be deemed to have been issued and the Third Party Holder or any other Person so designated by the Third Party Holder in the Conversion Notice will be deemed to have become a holder of record, for all purposes, of the Conversion Shares, specifically including the right to vote such shares and to receive dividends thereon. The Maker will, as promptly as practicable after receipt thereof and in any event within five Business Days thereafter, execute and deliver or cause to be executed and delivered to the Third Party Holder such certificate or certificates representing the aggregate number of the Conversion Shares. The stock certificate or certificates so delivered will, to the extent possible, be in such denomination or denominations as the Third Party Holder will have requested in the Conversion Notice and will be registered in the name of the Third Party Holder or in such other name or names as will have been designated in the Conversion Notice.

(b)   Authorization of Underlying Shares. The Maker will furnish to the Holder, simultaneously with execution of this Note, a copy, certified as accurate and complete by the secretary of the Maker, of resolutions of the board of directors of the Maker that authorize the

6

issuance of and reserve for issuance the maximum number of Conversion Shares that may be issued upon exercise of the Conversion Right.  On the request of the Holder or the Third Party Holder from time to time, the Maker will furnish a calculation in reasonable detail of the number of the Conversion Shares based on the outstanding principal balance of this Note and the number of fully diluted shares of Common Stock outstanding as of the time of such request, certified by the Secretary of the Maker.

(c)     Payment of Expenses and Taxes.  The Maker will pay all expenses in connection with, and all issuance taxes and fees (but specifically excluding income, capital gain or similar taxes) that may be imposed by any governmental entity with respect to, the issue or delivery of the Conversion Shares and any certificates therefor, unless such tax or fee is imposed by law upon the Third Party Holder, in which case such taxes or fees will be paid by the Third Party Holder and the Maker will reimburse the Third Party Holder therefor promptly upon request; provided, however, that if the Conversion Shares are to be registered in a name or names other than the name of the Third Party Holder, such taxes and fees will be for the account of the Third Party Holder and funds sufficient to pay all transfer taxes payable as a result of such transfer must be paid by the Third Party Holder at the time of delivery of the notice of exercise or promptly upon receipt of a written request of the Maker for payment.

(d)     Regulatory Approvals.  If federal or state regulatory approvals, consents or clearances are required for, in connection with or prior to the exercise of the Conversion Right by the Third Party Holder, the Maker, at the Third Party Holder's expense, will cooperate fully with the Third Party Holder in providing such information to any regulatory agency as such agency may require and will use commercially reasonable efforts otherwise to assist the Third Party Holder in obtaining such approvals, consents and clearances.

(e)     Valid Issuance.  All Conversion Shares issuable upon the exercise of the Conversion Right pursuant to the terms hereof will be validly issued, fully paid and non-assessable, will be issued without violation of any preemptive or similar rights of any third parties, and will be free and clear of any and all liens, encumbrances, claims and restrictions whatsoever, other than restrictions on transfer pursuant to applicable federal and state securities laws.

(f)     Legend on Conversion Shares.  Each certificate for Conversion Shares issued upon exercise of the Conversion Right and each certificate issued to any subsequent transferee, unless at the time of exercise such Conversion Shares are registered under the Securities Act of 1933, as amended, or the two-year holding period under Rule 144(k) under such Securities Act has expired, will bear a legend substantially in the following form (and any additional legend or legends required by any securities exchange upon which such Conversion Shares may, at the time of such exercise, be listed) on the face thereof:

"The shares represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws. Such shares have been acquired for investment purposes and not with a view to distribution and may not be sold or offered for sale, in the absence of an effective registration statement under the Securities Act of 1933, as amended, and registration or qualification under applicable state securities laws or an opinion of counsel reasonably satisfactory to SVS Holdings,

7

Inc. that such registration and qualification are not required under applicable federal and state securities laws."

### Section 4.3   Protective Provisions.

(a)   Recapitalizations and Changes in Common Stock.  In the event of any stock split, stock dividend, reclassification or recapitalization that changes the character or amount of the Common Stock while the Conversion Right is outstanding but unexercised, the Board of Directors of the Maker will make such adjustments in the character and number of shares subject to the Conversion Right as will be reasonable, equitable and appropriate in order to make the Conversion Right, as nearly as maybe practicable, equivalent to the Conversion Right prior to such change, taking into account the entire capitalization of the Maker and such other matters as may be relevant.

(b)   Merger, Consolidation or Disposition of Assets.  If the Maker consolidates or merges with or into another corporation (where the Maker is not the surviving corporation or where there is any change whatsoever in, or distribution with respect to, the outstanding Common Stock of the Maker), or sells, transfers or otherwise disposes of all or a substantial portion of its property, assets or business to another corporation and, pursuant to the terms of such merger, consolidation or disposition of assets, (i) shares of common stock of the successor or acquiring corporation or of the Maker (if it is the surviving corporation) or (ii) shares of capital stock or other securities (including warrants or other subscription or purchase rights) in addition to or in lieu of common stock of the successor or acquiring corporation (collectively, "Other Property") are to be received by or distributed to the holders of Common Stock of the Maker who are holders immediately prior to such transaction, then the Holder will have the right thereafter to receive, upon exercise of the Conversion Right, the number of shares of common stock of the successor or acquiring corporation or of the Maker, if it is the surviving corporation, and Other Property receivable upon or as a result of such merger, consolidation or disposition of assets by a holder of the number of shares of Common Stock for which the Conversion Right is exercisable immediately prior to such event.  In case of any such merger, consolidation or disposition of assets, any successor or acquiring corporation (other than the Maker) will expressly assume the due and punctual observance and performance of each and every covenant and condition of this Note to be performed and observed by the Maker and all the obligations and liabilities of the Maker hereunder, subject to such modifications as may be reasonably deemed appropriate (as determined by resolution of the Board of Directors of the Maker) in order to provide for adjustments of any shares of the common stock of such successor or acquiring corporation for which the Conversion Right thus becomes exercisable, which modifications will be as equivalent as practicable to the adjustments provided for in this Article IV.  For purposes of this Section 4.3, "common stock of the successor or acquiring corporation" will include stock of such corporation of any class that is not preferred as to dividends or assets over any other class of stock of such corporation and that is not subject to redemption and will also include any evidences of indebtedness, shares of stock or other securities that are convertible into or exchangeable for any such stock, either immediately or upon the occurrence of a specified date or the happening of a specified event and any warrants or other rights to subscribe for or purchase any such stock.  The foregoing provisions of this

8

Section 4.3(b) will similarly apply to successive mergers, consolidations or dispositions of assets.

(c)      Determination of Adjustments.   In each case of any event that will require any adjustment or readjustment pursuant to this Article IV in the number of Conversion Shares issuable on the exercise of the Conversion Right, the Maker will forthwith compute such adjustment or readjustment in accordance with the terms of this Article IV and prepare a certificate setting forth, in reasonable detail, such adjustment or readjustment, the method of calculation thereof and the facts upon which such adjustment or readjustment is based, including a statement of (i) the number of shares of Common Stock then outstanding and (ii) the number of shares of Common Stock to be received upon exercise of the Conversion Right, both as in effect immediately prior to such adjustment or readjustment and as adjusted and readjusted (if required) on account thereof.  The Maker will forthwith mail a copy of each such certificate to the Holder.  In the event that the Holder objects to the computation of such adjustment or readjustment prepared by the Maker within 10 Business Days after receipt thereof, the Maker will promptly cause a firm of independent certified public accountants reasonably acceptable to the Holder to compute such adjustment or readjustment and forthwith mail a copy of such computation to the Holder, and the computation of such accountants will be conclusive.  The Maker will keep at its principal office copies of all such certificates and cause the same to be available for inspection at such office during normal business hours by the Holder or any prospective transferee hereof designated by the Holder.

(d)      No Impairment.  The Maker will not seek to avoid the observance or performance of any of the terms of the Conversion Right, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such corporate actions as may be necessary or appropriate to protect the rights of the Holder and any Third Party Holder consistent with the terms of this Note.  Without limiting the generality of the foregoing, and notwithstanding any other provision of this Note, the Maker (i) will take all such action as may be necessary or appropriate in order that the Maker may validly and legally issue fully paid and non-assessable Conversion Shares upon the exercise of the Conversion Right from time to time, (ii) will not transfer all or substantially all of its properties and assets to any other Person, or consolidate with or merge into any other Person or permit any Person to consolidate with or merge into the Maker (if the Maker is not the surviving corporation), unless such other Person expressly assumes in writing and agrees to be bound by all the terms of this Note as provided herein, (iii) will use its reasonable efforts, on the Third Party Holder's request and at the Third Party Holder's expense, to obtain all such authorizations, exemptions or consents from any governmental or regulatory authority having jurisdiction thereof as may be necessary to enable the Maker to perform its obligations under the Conversion Right and (iv) will not reclassify or change the Common Stock or authorize or create any class of its capital stock other than the Common Stock without the prior written consent of the Holder (or, if there is a Third Party Holder, the prior written consent of such Third Party Holder).

(e)      Reservation of Shares.

The Maker will reserve and set apart and have at all times, free from preemptive rights, a number of shares of authorized but unissued Common Stock or other securities or property deliverable upon the exercise of the Conversion Right sufficient to permit the exercise in full of

9

the Conversion Right.  Before taking any action that would result in an adjustment in the number of shares of Common Stock for which the Conversion Right is exercisable, the Maker will obtain all such authorizations, exemptions and consents as may be necessary from any governmental or regulatory authority having jurisdiction over such action.

## ARTICLE V
## EVENTS OF DEFAULT; REMEDIES

**SECTION 5.1**    **Events of Default**.  If any of the following events (each an "Event of Default") shall occur and be continuing, subject to the cure period indicated, if any:

(a)    the Maker shall fail to pay any amount of principal of, or interest or other amounts on, this Note when due, subject to a 180-day cure period;

(b)    any representation or warranty made by the Maker in Section 2.1 or by the Maker in the Stock Purchase Agreement shall be incorrect in any material respect when made, subject, if such incorrectness is susceptible of cure,  to a cure period following delivery to the Maker by the Holder of written notice identifying the material inaccuracy, such cure period to continue for up to 180 days but only so long as Maker is diligently pursuing a cure;

(c)    the Maker fails to comply with any of its covenants contained herein, the Maker or the Company fails to comply with any of the covenants contained in the Stock Purchase Agreement or the Maker fails to provide the Holder prompt notice of any of the foregoing, subject, if such failure is susceptible of cure, to a cure period following delivery to the Maker by the Holder of written notice identifying the nonperformance or omission, such cure period to continue for up to 180 days but only so long as Maker is diligently pursuing a cure;

(d)    the Maker or the Company shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of its creditors, or any proceeding shall be instituted by or against the Maker or the Company seeking to adjudicate it a bankrupt, subject to a 30 day cure period in the case of any involuntary bankruptcy or insolvency proceeding; or

(e)    [Intentionally omitted.]

(f)    The Maker or any Subsidiary of the Maker shall merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or any substantial part of its assets (whether now owned or hereafter acquired) to, any person or entity, except for (i) the merger or consolidation of any Subsidiary of the Maker with or into, or the disposal by such Subsidiary of assets to, or the acquisition by such Subsidiary of assets of, any other Subsidiary of the Maker and (ii) the merger of any Subsidiary of the Maker  into, or the disposal of assets of such Subsidiary to, the Maker; then, and in any such event, the Holder may, by notice to the Maker, declare this Note and all interest hereon to be forthwith due and payable, whereupon this Note and all such interest shall become and be forthwith due and payable (without presentment, demand, protest, or further notice of any kind,

10

all of which are hereby expressly waived by the Maker), and the Holder shall, in addition, be entitled to exercise its rights pursuant to Section 6.1. Each cure period (except with respect to Section 5.1(d), which shall not require notice) shall commence by the giving of written notice of default by Holder.

## ARTICLE VI
## REMEDIES

**SECTION 6.1**     Remedies.

(a)     Limitations.  In the event the Holder exercises its rights pursuant to Section 5.1, the Holder may seek to compel a judicial sale of the Maker or its assets to a Third Party but in no event shall the Holder become the owner of any interest in the Maker or its assets through such process.

(b)     Liability for Deficiency. The Maker shall remain liable for any deficiency if the proceeds of any sale or disposition of the Maker or its assets are insufficient to pay all amounts to which the Holder is entitled, the Maker also being liable for all reasonable costs of the Holder, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder. The Maker hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Note.  For the avoidance of doubt, Holder or any Third Party Holder may seek to satisfy Maker's obligations under this Note solely from the sale of the assets of the Maker, and no shareholder, officer, director or employee of Maker shall be personally liable under this Note.

(c)     Application of Proceeds.   The proceeds of any sale, disposition or other realization upon all or any part of the Maker or its assets shall be applied and distributed by the Holder in the following order of priorities:

first, to the Holder in an amount sufficient to pay in full the reasonable expenses of the Holder in connection with such sale, disposition or other realization, including all reasonable expenses, liabilities and advances incurred or made by the Holder in connection therewith, including, without limitation, reasonable attorney's fees;

second, to the Holder in an amount equal to the then unpaid principal of and accrued interest on this Note; and

finally, upon payment in full of all of the foregoing, to pay to Maker, or its representatives or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

11

# ARTICLE VII
# MISCELLANEOUS

**SECTION 7.1    Amendments, etc.**  No amendment or waiver of any provision of this Note, nor consent to any departure by the Maker herefrom, shall in any event be effective unless the same shall be in writing and signed by the Maker and the Holder, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

**SECTION 7.2    Notices, etc.**  All notices hereunder shall be in writing and mailed or telecopied or delivered at the address specified below for the Maker and the Holder or, as to each party, at such other address as shall be designated by such party in a written notice to the other party:

To Holder:

Smartmatic Corporation
1001 Broken Sound Parkway
Boca Raton FL 33487, USA
Facsimile: 561-862-0749
Attention: Antonio Mugica

With a copy to:

Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Facsimile: (202) 637-3593
Attention:  Jeffrey P. Bialos

To Maker:

Sequoia Voting Systems, Inc.
717 17th Street, Suite 310
Denver, CO 80202, USA
Facsimile: 303-446-3047
Attention: Jack Blaine

With a copy to:

Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.

12

Suite 500
Washington, D.C.  20006
Facsimile:  (202) 828-5393
Attention:  Robert L. Bodansky

Notices shall be deemed received by the recipient thereof on delivery, if personally delivered, upon electronic confirmation of delivery, if set by facsimile, or five days after deposited in the mail, if mailed as provided in this Section.

      **SECTION 7.3**    <u>No Waiver; Remedies</u>.  No failure on the part of the Holder to exercise, and no delay in exercising, any right under this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

      **SECTION 7.4**    <u>Expenses</u>.  The Maker agrees to pay all of the Holder's reasonable costs and expenses, if any (including reasonable counsel fees and expenses), in connection with the enforcement of this Note.

      **SECTION 7.5**    <u>Successors and Assigns</u>.  This Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and assigns, <u>provided</u>, <u>however</u>, that the Maker may not assign or transfer its rights or obligations hereunder without the prior written consent of the Holder, except in accordance with a merger, consolidation or sale of substantially all assets in a transaction complying with the second sentence of Section 4.3(b), and further provided that Holder may assign this Note or any of its obligations hereunder only in compliance with Sections 8.16 and 11.1 of the Stock Purchase Agreement.

      **SECTION 7.6**    <u>Governing Law</u>.  **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAW.**

      **SECTION 7.7**    <u>**Forum Selection and Consent to Jurisdiction**</u>.  **ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY HEREIN, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS THAT ARE LOCATED IN  MANHATTAN, STATE OF NEW YORK.**

      **SECTION 7.8**    <u>**Waiver of Jury Trial, etc.**</u>  **EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS NOTE.**

**SECTION 7.9    Severability**.  If any provision hereof is determined to be invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law the other provisions remain in full force and effect and will be liberally construed in favor of the Holder in order to carry out the intentions of the parties hereto as nearly as may be possible.

**SECTION 7.10    Subordination.**    The Holder agrees to enter into a subordination agreement in a form reasonably requested by a lender to the Maker or the Company subordinating the amounts payable to Holder under this Note to amounts owing to such lender in respect of Permitted Senior Debt.

**SECTION 7.11    Entire Agreement**.  This Note and the Stock Purchase Agreement (including the schedules and exhibits thereto) represent the entire understanding and agreement between the Maker and the Holder with respect to the subject matter hereof and thereof.

14

WO 811577.1

**IN WITNESS WHEREOF**, the Maker has caused this Note to be executed on the date first above written.

SVS HOLDINGS, INC.

By: _Jack A. Blaine_

Name: Jack A. Blaine

itle:   President and CEO


ACCEPTED:

SMARTMATIC CORPORATION

By: _____

Name:

Title:

WO 811577.1

**IN WITNESS WHEREOF**, the Maker has caused this Note to be executed on the date first above written.

SVS HOLDINGS, INC.

By: _____
  Name:
  Title:

ACCEPTED:

SMARTMATIC CORPORATION

By: _____
  Name:
  Title:

WO 813577.1

<u>EXHIBIT A</u>

<u>Form of Election to Exercise the Conversion Right</u>

     The undersigned hereby irrevocably elects to exercise the Conversion Right under the Unsecured Promissory Note dated _____, 2007 in the original principal amount of $2,000,000, executed by SVS Holdings, Inc. ("Maker"), in favor of Smartmatic Corporation. The undersigned hereby requests that certificates for the shares of Maker into which this Note is converted be issued and delivered as follows:

ISSUED TO: _____
(NAME)

_____
(ADDRESS, INCLUDING ZIP CODE)

DELIVER TO: _____
(NAME)

_____
(ADDRESS, INCLUDING ZIP CODE)

Dated: _____, _____.    [NAME OF THIRD PARTY HOLDER]

                                    By: _____

                                    Name: _____

                                    Title: _____

_____ and agreed:

Smartmatic Corporation

By:_____
Name:
Title:

2

WO 811577.1