# **EXHIBIT F**

# NOTE PURCHASE AGREEMENT

## BY AND AMONG

## SMARTMATIC CORPORATION

## SVS HOLDINGS, INC.,

## AND

## THE U.S. STOCKHOLDERS

7898115.5

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................... 2

   1.1   Certain Definitions.................................................................................. 2

   1.2   Terms Defined Elsewhere in this Agreement ...................................... 7

   1.3   Other Definitional and Interpretive Matters ...................................... 7

ARTICLE II SALE AND PURCHASE OF THE NOTE ......................................... 9

   2.1   Sale and Purchase of the Note .............................................................. 9

ARTICLE III PURCHASE CONSIDERATION ...................................................... 9

   3.1   Purchase Consideration......................................................................... 9

   3.2   Payment of Purchase Consideration .................................................... 9

   3.4   Liquidity Event Earn Out Payment...................................................... 9

   3.3   Revenue Earn Out Payment

   3.5   Audit; Earn Out Payment Calculations; Disputes................................ 11

ARTICLE IV CLOSING AND TERMINATION ................................................... 11

   4.1   Closing Date........................................................................................... 11

   4.2   Termination of Agreement.................................................................... 11

   4.3   Procedure Upon Termination................................................................ 11

   4.4   Effect of Termination............................................................................ 12

ARTICLE V REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER ....................................................................................................... 12

   5.1   Organization and Good Standing.......................................................... 12

   5.2   Authorization of Agreement ................................................................. 12

   5.3   Conflicts; Consents of Third Parties..................................................... 12

   5.4   Ownership and Transfer of the Note.....................................................

   5.5   Financial Advisors ................................................................................ 13

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE PURCHASER AND THE COMPANY.................................................... 13

   6.1   Organization and Good Standing.......................................................... 14

   6.2   Authorization of Agreement ................................................................. 14

   6.3   Conflicts; Consents of Third Parties..................................................... 14

   6.4   Availability of Funds ............................................................................

   6.5   Financial Advisors ................................................................................ 15

7898115.5

## TABLE OF CONTENTS
### (Continued)

|  |  | **Page** |
|---|---|---|
| ARTICLE VII | COVENANTS | 16 |
| 7.1 | Consents | 17 |
| 7.2 | CFIUS Review of Supplemental Agreement | 17 |
| 7.3 | Further Assurances | 18 |
| 7.4 | Publicity | 18 |
| 7.5 | [Intentionally omitted] | 19 |
| 7.6 | Covenants of Purchaser | 20 |
| 7.7 | No Adverse Actions | 20 |
| ARTICLE XIII | CONDITIONS TO CLOSING | 22 |
| 8.1 | Conditions Precedent to Obligations of Purchaser | 22 |
| 8.2 | Conditions Precedent to Obligations of the Seller | 22 |
| 8.3 | Frustration of Closing Conditions | 23 |
| ARTICLE IX | INDEMNIFICATION | 23 |
| 9.1 | Survival of Representations and Warranties | 24 |
| 9.2 | Indemnification by Seller | 24 |
| 9.3 | Indemnification by Purchaser | 24 |
| 9.4 | Indemnification Procedures | 25 |
| 9.5 | Certain Limitations on Indemnification | 25 |
| 9.6 | Tax Treatment of Indemnity Payments | 26 |
| 9.7 | Exclusive Remedy | 27 |
| ARTICLE X | MISCELLANEOUS | 27 |
| 10.1 | Payment of Sales, Use or Similar Taxes | 27 |
| 10.2 | Expenses | 27 |
| 10.3 | Submission to Jurisdiction; Consent to Service of Process | 27 |
| 10.4 | Entire Agreement; Amendments and Waivers | 27 |
| 10.5 | Governing Law | 27 |
| 10.6 | Notices | 28 |
| 10.7 | Severability | 29 |
| 10.8 | Binding Effect; Assignment | 29 |
| 10.9 | Counterparts | 29 |
| 10.10 | U.S. Stockholders' Representative | 29 |

7898115.5

NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT (the "**Agreement**"), dated as of May 28, 2008, by and among Smartmatic Corporation, a Delaware corporation (the "**Seller**"), SVS Holdings, Inc., a Delaware corporation ("**Purchaser**"), and, solely for purposes of Section 3.5 and (in the case of Blaine only) Section 7.6 of this Agreement, Jack Blaine ("**Blaine**"), Peter McManemy ("**McManemy**"), Howard Cramer ("**Cramer**"), Phil Foster ("**Foster**"), Douglas H. Weinel ("**Weinel**"), Waldeep Singh ("**Singh**"), Brian G. Lierman ("**Lierman**"), Lawrence W. Korb ("**Korb**"), Edwin Smith, III ("**Smith**"), Michelle Shafer ("**Shafer**"), Randall Elder ("**Elder**"), Kevin Hurst ("**Hurst**") and Thomas E. Keeling ("**Keeling**" and, collectively with Blaine, McManemy, Cramer, Foster, Weinel, Singh, Lierman, Korb, Smith, Shafer, Elder and Hurst, the "**U.S. Stockholders**," and, collectively with the Seller and the Purchaser, the "**Parties**" and each, a "**Party**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in Section 1.1.

W I T N E S S E T H:

WHEREAS, pursuant to the terms of the Stock Purchase Agreement dated September 18, 2007, by and among the Seller, the Purchaser, Sequoia Voting Systems, Inc. (the "**Company**"), and the U.S. Stockholders named therein (the "**Stock Purchase Agreement**"), Seller sold all of the issued and outstanding shares of capital stock of the Company to Purchaser in exchange for an Unsecured Promissory Note dated November 5, 2007 in the amount of $2 million (the "**Note**") and rights to future earn outs (the "**Sequoia Sale**");

WHEREAS, Seller delivered to Purchaser a copy of a Letter of Intent setting forth the bona fide written offer of Hart InterCivic, Inc. ("**Hart**") to purchase the Note on February 15, 2008, as amended on February 26, 2008 (collectively, the "**Hart Offer**");

WHEREAS, although Purchaser sought to exercise its right of first refusal on April 15, 2008 to purchase the Note on the terms and conditions of the Hart Offer pursuant to Section 8.16 of the Stock Purchase Agreement ("**Purchaser Match Letter**"), the Parties disagreed as to whether Purchaser had matched the Hart Offer;

WHEREAS, Seller has filed suit against Purchaser in the Court of Chancery of the State of Delaware (Civil Action No. 3693-VCL) pursuant to which, among other things, Seller sought declaratory judgment that Purchaser had not matched the Hart Offer and challenging the legality of the change of control agreements entered into by the Company and Purchaser (the "**Pending Litigation**").

WHEREAS, on April 21, 2008, counsel for Seller received a letter from counsel for Purchaser (the "**April 21, 2008 Letter**" and, together with the Holdings Match Letter, "**Purchaser's Offer**");

WHEREAS, the Seller, in an effort to avoid the expense of litigation to judicially determine whether the Purchaser's Offer is a match to the Hart Offer, agreed to accept Purchaser's Offer in settlement of such issue by letter to Purchaser on April 25, 2008; and

1

WHEREAS, the Seller desires to sell to Purchaser, and Purchaser desires to purchase from the Seller, the Note for the purchase price and upon the terms and conditions hereinafter set forth (the "**Note Sale**").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1   <u>Certain Definitions</u>.   For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Stock**" means all of the issued and outstanding shares of common stock having a par value of $0.001 of the Company.

"**Common Stock Equivalent**" means any evidences of indebtedness, shares of stock or other securities that are convertible into or exchangeable for, with or without payment of additional consideration in cash or property, shares of Common Stock or Purchaser Common Stock, as applicable, and any options, warrants or other securities or rights to subscribe for, purchase or otherwise acquire shares of Common Stock or Purchaser Common Stock, as applicable, or any of the foregoing, in each case whether or not immediately exercisable.

"**Contract**" means any written contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, or license.

"**CPI Index**" means the U.S. city average consumer price index for all urban consumers and for all items most currently reported by the U.S. Bureau of Labor Statistics as of the end of each calendar year or such other date as may be specified in this Agreement.

"**Distribution Agreement**" means the Distribution Agreement dated effective as of November 5, 2007 by and among Smartmatic International Corporation, a Barbados company, and the Company.

"**Earn Out Payments**" means, collectively, the Revenue Earn Out Payments, the Minimum Payments and the Liquidity Event Earn Out Payment.

"**EBITDA**" means with respect to any Person for any period, (a) Net After Tax Income; plus, (b) in each case, to the extent deducted in determining net income for such period (i) taxes, (ii) interest expenses and (iii) amortization and depreciation, all calculated on a consolidated basis in accordance with GAAP.

"**Excluded Matter**" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Company operates; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to the Company; or (v) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement.

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof, as same from time to time hereafter may be modified.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Indebtedness**" of any Person means, without duplication, (i) the principal of and, accreted value and accrued and unpaid interest in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities); (iii) all obligations of the type referred to in clauses (i) through (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Initial Purchaser Common Stock**" means, at any time, the aggregate shares of Purchaser Common Stock issued at or prior to such time to the U.S. Stockholders (whether or not then held by the U.S. Stockholders).

7898115.5

"**Intellectual Property**" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "**Patents**"), (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (collectively, "**Marks**"), (iii) copyrights and registrations and applications therefor, works of authorship and mask work rights (collectively, "**Copyrights**") and (iv) all Software and Technology.

"**IRS**" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

"**Knowledge of the Purchaser**" means the actual knowledge of those Persons identified on Exhibit 1, without independent investigation.

"**Knowledge of the Seller**" means the actual knowledge of Antonio Mugica and Roger Pinate, without independent investigation.

"**Law**" means any foreign, federal, state, local law, statute, code, ordinance, rule or regulation.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"**Liability**" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim of any kind (whether legal, equitable, beneficial or otherwise), lease, charge, option, right of first refusal, easement, servitude or transfer restriction.

"**Liquidity Event**" means the occurrence of any of the following after the Closing and prior to June 30, 2012: (i) the sale by the U.S. Stockholders (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Initial Purchaser Common Stock, (ii) the sale by Purchaser (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Common Stock, (iii) the sale of all or substantially all of the assets of the Company by any Person, or (iv) the dissolution or liquidation of the Purchaser.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, results of operations or financial condition of the Company or (b) the ability of the Company to consummate the transactions contemplated by this Agreement, in each case, other than an effect resulting from an Excluded Matter.

4

"**Net After Tax Income**" means with respect to any Person for any period, such Person's consolidated net income after taxes, as determined in accordance with GAAP, for such period.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of a Person, which shall be consistent with past practice unless otherwise specified in this Agreement; for the avoidance of doubt, the Parties agree that for purposes of determining the Ordinary Course of Business in the case of severance arrangements, past practice is that bonuses are excluded from the calculation of any severance payments, and aggregate severance payments to an employee are limited to the greater of (i) three months of base salary or (ii) one week of base salary for each year of employment with such Person. Without limiting the foregoing, if in any fiscal year compensation and benefits of employees are not increased, or are increased to a lesser extent than would be consistent with past practice, or if bonuses are not paid, or are paid to a lesser extent than would be consistent with past practice, up to 50% of the difference between increases or payments, as the case may be, consistent with past practice and the reduced amount for that fiscal year may be carried forward and, in the discretion of the Person, may be allocated to future years as a supplement to any increases or payments the Person might otherwise then make for such future fiscal years.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Purchaser Common Stock**" means shares of common stock of the Purchaser having a par value of $0.001.

"**Release**" means the Release substantially in the form attached hereto as Exhibit 4, to be entered into by and among the Purchaser, the Company and the Seller on or prior to the Closing pursuant to which each of the Purchaser and the Company, on the one hand, and the Seller, on the other hand, shall agree to the termination and the dismissal with prejudice of the Pending Litigation.

"**Sale and Security Agreement**" means the Sale and Security Agreement dated December 15, 2006, as amended on October 24, 2007, by and among Smartmatic International Holding, B.V., a Netherlands company, its shareholders, the Company, the United States Department of Justice, the United States Department of Homeland Security and the United States Department of Treasury.

"**Severance Agreements**" means, collectively, the agreements listed on Exhibit 2 hereto.

5

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any other Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by the Person first referred to.

"**Supplemental Agreement**" means the Supplemental Agreement to be entered into by and among the Purchaser, the Company and the Seller on or prior to the Closing pursuant to which Seller and its Affiliates shall assign to the Company co-ownership of all Intellectual Property owned or developed by the Seller or any of its Affiliates (other than the Company), limited to all intellectual property arising from or in respect of the Edge II Plus, Advantage Plus, Hybrid Activator, Accumulator & Transmitter (HAAT) and HAAT Listener and all peripherals pertaining to the foregoing, in exchange for the Company's agreement not to compete in Belgium, the Philippines and the countries in Central and South America.

"**Tax**" or "**Taxes**" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs, duties, fees, assessments and charges of any kind whatsoever, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"**Taxing Authority**" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"**Tax Return**" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes the Seller or any of their Affiliates.

"**Technology**" means, collectively, all information, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form, and all related technology.

"**Transition Services Agreement**" means the Transition Services Agreement dated November 5, 2007 by and between Purchaser and Smartmatic Services Corporation, a Barbados company.

6

1.2   Terms Defined Elsewhere in this Agreement.   For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| Agreement | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Recitals |
| Consents | 8.3(b) |
| Copyrights | 1.1 (in Intellectual Property definition) |
| ERISA | 6.8 |
| Excess Proceeds | 3.4(a) |
| Financial Statements | 6.4 |
| Indemnification Claim | 9.4 |
| Liquidity Event Earn Out Payment | 3.4(a) |
| Losses | 9.2(a) |
| Marks | 1.1 (in Intellectual Property definition) |
| Note | Recitals |
| Patents | 1.1 (in Intellectual Property definition) |
| Purchase Consideration | 3.1 |
| Purchaser | Recitals |
| Purchaser Documents | 6.2 |
| Purchaser Indemnified Parties | 9.2(a) |
| Seller | Recitals |
| Seller Documents | 5.2 |
| Seller Indemnified Parties | 9.3(a) |
| Stock Incentive Plan | 8.10(c) |
| Survival Period | 9.1 |
| U.S. Stockholders | Recitals |

1.3   Other Definitional and Interpretive Matters.

(a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.   Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits.   The Exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

7

Disclosure of any item on any Exhibit shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## SALE AND PURCHASE OF THE NOTE

2.1    Sale and Purchase of the Note.  Upon the terms and subject to the conditions contained herein, on the Closing Date, the Seller agrees to sell and transfer to Purchaser, and Purchaser agrees to purchase and acquire from the Seller, the Note.

## ARTICLE III

## PURCHASE CONSIDERATION

3.1    Purchase Consideration.  The aggregate consideration to be paid by the Purchaser to the Seller for the Note shall consist of (a) the Closing Date Payments, (b) the Minimum Payments, (c) the Revenue Earn Out Payments and (d) the Liquidity Earn Out Payment (collectively, the "**Purchase Consideration**").

3.2    Payment of Closing Date Payments.

(a)     On the Closing Date, the $2,000,000 (the "**Escrow Cash**") held in escrow by Zions First National Bank (the "**Escrow Agent**") pursuant to that certain Escrow Agreement dated as of April 15, 2008 between Purchaser and the Escrow Agent, shall be paid to Seller.

(b)     On the Closing Date, the Purchaser shall pay by one or more wire transfers of immediately available funds $5,000,000 to the Seller (to the account or accounts designated in Exhibit 3) (the "**Cash Payment**" and, together with the Escrow Cash, the "**Closing Date Payments**").

(c)     The Earn Out Payments shall be payable as set forth in Sections 3.3, 3.4 and 3.5.

3.3     Minimum Payments.     (a) Pursuant to the terms herein, on or prior to February 15 of the year following the year end set forth below, the Purchaser will pay to the Seller the following minimum payments for each period listed in the table below ("**Minimum Payments**"):

| Amount | Period |
|--------|--------|
| $1,000,000 | Fiscal Year Ending 12/31/2008 |
| $3,000,000 | Fiscal Year Ending 12/31/2009 |
| $3,000,000 | Fiscal Year Ending 12/31/2010 |
| $2,000,000 | Fiscal Year Ending 12/31/2011. |

(b)     In the event of a Liquidity Event on or before December 31, 2011, the Minimum Payments shall be accelerated and Purchaser will pay to the Seller an amount equal to all Minimum Payments payable pursuant to Section 3.3(a) but not yet paid to Seller.

3.4     Revenue Earn Out Payments.

(a)     Annual Earn Out Payments.     For each of Fiscal Years ending 2008 through 2011, the Purchaser shall pay the Seller an amount, if any, equal to (A) the product of (i) 53% and (ii) the Company's Net After Tax Income for such Fiscal Year less (B) the amount of the Minimum Payment for such Fiscal Year (each, an "**Annual Earn Out Payment**").  Solely for determining the amount of the Annual Earn Out Payment payable for Fiscal Year ending 2008, such amount shall be reduced by $2,000,000.

(b)     Final Earn Out Payment.  For Fiscal Year ending 2012, the Purchaser shall pay the Seller an amount equal to the product of (i) 53% and (ii) the Company's Net After Tax Income for 2012 (the "**Final Earn Out Payment**" and, together with the Annual Earn Out Payments, the "**Revenue Earn Out Payments**").

3.5     Liquidity Event Earn Out Payment.

(a)     Upon a Liquidity Event on or prior to June 30, 2012, the Purchaser or, upon a sale by the U.S. Stockholders of all of the Initial Purchaser Common Stock (as described in clause (i) of the definition of Liquidity Event), the U.S. Stockholders, as applicable, will pay to Seller within ten (10) days following such Liquidity Event an earn out payment (the "**Liquidity Event Earn Out Payment**") equal to the product of (i) the applicable percentage set

7898115.5

forth opposite the period listed in the table in Section 3.4(b) during which the date of such Liquidity Event falls and (ii) the Sale Proceeds. The term "**Sale Proceeds**" means, with respect to a Liquidity Event, the aggregate consideration received (or liquidation proceeds available, as applicable) by Purchaser or the U.S. Stockholders, as applicable, net of all customary and commercially reasonable transaction related expenses, costs and fees (including also reasonable attorneys and other professional fees) other than Taxes. After any transaction described in clause (iii) of the definition of Liquidity Event, such transaction shall be deemed to be followed by a liquidation of the Company for purposes of determining the amount of proceeds available for distribution after such Liquidity Event. In addition to the Liquidity Event Earn Out Payment, all Minimum Payments payable but not yet paid to Seller shall be accelerated and be paid to Seller pursuant to Section 3.3(b).

To the extent the consideration received by the Purchaser or the U.S. Stockholders, as applicable, upon a Liquidity Event includes consideration in a form other than cash, then Purchaser or the U.S. Stockholders, as applicable, may at their option distribute to Seller (i) a combination of such non-cash consideration (to the extent permitted by applicable Law) and cash having an aggregate value equal to the amount to which Seller is entitled, so long as the amount of such cash is sufficient to pay Seller's tax liabilities with respect to the entire amount of the Liquidity Event Earn Out Payment, or (ii) pay to Seller an amount of cash equal to the fair market value of the Seller's share of the non-cash consideration. For purposes of the preceding sentence, unless in the case of clause (i) of such sentence the value is established by the terms of the transaction constituting the Liquidity Event, the board of directors of the Purchaser shall in good faith determine the fair market value of the non-cash consideration received and the Purchaser or the U.S. Stockholders, as applicable, shall pay to Seller an amount of cash equal to its share of such non-cash consideration; provided, however, that in the event of a dispute over the fair market value so determined by the board, the Purchaser and the Seller shall each select an appraiser, who shall determine the fair market value of such non-cash consideration. If the fair market value of such non-cash consideration as determined by the two appraisers so chosen varies by less than five percent 5%, then the fair market value shall be the average of the two appraisals; if however, the two determinations are more than 5% apart, then the two appraisers shall select a third appraiser to provide an appraisal of the fair market value of such non-cash consideration. The third appraisal shall be prepared in a manner consistent with the other two appraisals and the two (2) appraisals separated by the fewest dollars shall be averaged to determine the fair market value. The determination of the fair market value of such non-cash consideration shall be binding on the parties hereto. The Purchaser and the Seller shall each bear the costs of their appraiser and shall share equally the costs of any third appraiser.

(b)    The following percentages shall apply to the periods set forth below in determining any Liquidity Event Earn Out Payment:

| Period | Percentage |
|---|---|
| Closing to 12/31/2008 | 87.4% |
| 1/1/2009 – 6/30/2009 | 80.8% |
| 7/1/2009 – 12/31/2009 | 74.2% |
| 1/1/2010 – 6/30/2010 | 67.7% |
| 7/1/2010 – 12/31/2010 | 47.6% |
| 1/1/2011 – 6/30/2011 | 41.1% |

7898115.5

|                        |        |
|------------------------|--------|
| 7/1/2011 – 12/31/2011  | 34.5%  |
| 1/1/2012 – 6/30/2012   | 27.7%  |

(c)    Seller's Revenue Earn Out Payment upon Liquidity Event.    Upon a Liquidity Event, in addition to the Liquidity Event Earn Out Payment, the Purchaser shall pay to the Seller that portion of the estimated Revenue Earn Out Payment otherwise payable pursuant to Section 3.4 in the absence of such Liquidity Event, for the period beginning January 1 of such year and ending on the date of the Liquidity Event. Concurrently with the completion of the Purchaser's financial audit for the calendar year following such Liquidity Event, but in no event later than April 15, Purchaser shall provide Seller with the Actual Earn Out Statement (as defined in Section 3.6(b)) and the provisions of Section 3.6 shall apply to any disputes. Following a Liquidity Event, Seller shall have no future rights to Earn Out Payments; provided, however, that Purchaser shall pay to Seller the full amount of any Earn Out Payment payable for the Fiscal Year prior to such Liquidity Event.  For avoidance of doubt, upon a Liquidity Event, Seller shall have no right to any Revenue Earn Out Payments attributable to any period after the date of such Liquidity Event.

(d)    Prior to June 30, 2012, no U.S. Stockholder shall sell or otherwise transfer any Initial Purchaser Stock, except (i) for sales or other transfers that constitute, or are part of a transaction that constitutes, a Liquidity Event, or (ii) (A) a sale of less than 5% of the Initial Purchaser Common Stock to one or more U.S. Stockholders, or (B) transfers of the Initial Purchaser Common Stock by the U.S. Stockholder to members of his or her immediate family (i.e., parent, spouse or lineal (natural or adopted) descendant) or a trust for the benefit of such family members, provided that such family members or trust agree(s), in form and substance satisfactory to the Seller, to be bound by the terms of this Agreement as if such transferee were a "U.S. Stockholder" hereunder.

(e)    Each U.S. Stockholder's liability to Seller under this Section 3.5 shall be several, with each U.S. Stockholder liable only for his or her own actions in violation of this Section 3.5.

3.6    Payment Date; Earn Out Payment Calculations; Adjustments; Disputes.

(a)    Payment Date.    On or prior to February 15 in any year in which a Revenue Earn Out Payment is payable, the Purchaser shall: (i) notify the Seller in writing setting forth the estimated amount of the Revenue Earn Out Payment (each, an "**Estimated Earn Out Statement**"); and (ii) pay to Seller in cash the greater of (A) the Minimum Payment or (B) the amount reflected on such Estimated Earn Out Statement.

(b)    Earn Out Payment Calculations; Adjustments.    Upon the completion of the Purchaser's financial audit for the prior calendar year, but in no event later than April 15, the Purchaser shall use commercially reasonable efforts to cause its outside auditors to prepare and deliver to the Seller audited financial statements for the Purchaser and its Subsidiaries as of December 31 for such prior calendar year.  Based on the audited financial statements, the Purchaser shall notify the Seller in writing setting forth the actual amount of the Revenue Earn Out Payments if different from the estimated amount set forth on the Estimated Payment Statement for such year (the "**Actual Earn Out Statement**").  The Purchaser shall provide the

11

Seller with access to review the computations and work papers provided by the Purchaser to its outside auditors (including access to accountants' work papers, subject to such confidentiality restrictions as such accountants may reasonably request), and underlying books and records used in connection with the preparation of the financial statements prepared pursuant to this Section 3.6(b), provided, however, that the Purchaser may redact names and any other sensitive information from any documents provided or made accessible to the Seller. For avoidance of doubt, while Seller shall have access to the relevant financial information under "(b)" in the prior sentence, Seller shall not be entitled to review specific contracts or other documents pursuant to which the work was done that gave rise to the revenues, expenses and other financial information that is provided. Within 15 days following receipt by Seller of the Actual Earn Out Statement, (i) if the amount reflected on the Actual Earn Out Statement is in excess of the Estimated Payment Statement for such period, the Purchaser shall pay the amount of such excess to the Seller, and (ii) if the Actual Earn Out Statement is less than the Estimated Payment Statement for such period, the Seller shall pay the difference to the Purchaser.

(c)     Disputes.  Within sixty (60) days after receipt of any Actual Earn Out Statement, the Seller may deliver to the Purchaser a written statement (the "**Adjustment Statement**") setting forth any disagreement with the Purchaser's calculation of the Actual Earn Out Statement. If the Seller does not submit the Adjustment Statement within such sixty-day (60) period, then the amount of the Revenue Earn Out Payment set forth in the Actual Earn Out Statement shall be final and binding on the Seller.

The Purchaser and the Seller shall expeditiously seek to resolve any disagreements specified in the Adjustment Statement. If the Purchaser and the Seller do not resolve the disagreements specified in the Adjustment Statement within seven (7) days of the Purchaser's receipt of the Adjustment Statement, then the Purchaser and the Seller hereby designate BDO Seidman, LLP as the independent accountant for the purposes of this Section 3.6(c) (the "**Independent Accountant**"). Each of the Seller and the Purchaser hereby represents, warrants and covenants that neither it nor any of its respective Affiliates (i) has engaged BDO Seidman, LLP for any matter, whether as auditor, tax preparer, consultant or otherwise, during the five (5) years prior to the date hereof, or (ii) will engage BDO Seidman, LLP for any matter during the term of this Agreement. The Independent Accountant shall, within fifteen (15) days after notification by a Party of a dispute hereunder that cannot be resolved by the Parties, make a final and binding resolution of the disagreements specified in the Adjustment Statement and, based on such resolution, deliver a final and binding determination of any disputed Earn Out Payment.

All fees and expenses associated with obtaining and utilizing the services of the Independent Accountant shall be paid by (i) Purchaser, in the event the Earn Out Payment as proposed by Purchaser is understated by more than five percent (5%), or (ii) by Seller in any other event. Each party shall bear its own expenses of preparing for and participating in the resolution of any dispute as to the determination of such Earn Out Payment, including attorney and witness fees and discovery costs. The Parties agree that, notwithstanding anything to the contrary herein, Purchaser shall pay to Seller the full amount of each Minimum Payment and shall not dispute the amount or payment of each such Minimum Payment.

7898115.5

To the extent an Earn Out Payment due and payable to Seller pursuant to this Agreement is not actually paid to Seller as of the payment date required herein, the amount of such Earn Out Payment shall incur interest at a rate of twelve (12) percent per annum from the date due until fully paid. In the event of any dispute over the amount of an Earn Out Payment due under this Agreement, such Earn Out Payment shall be deemed to be due and payable (i) in the case of any Minimum Payment, as provided in Section 3.3(a), and (ii) in the case of any Earn Out Payment other than a Minimum Payment, within thirty (30 days from the date of a final determination by the Independent Accountant of the amount due pursuant to this Section 3.6. Notwithstanding anything to the contrary herein, in the event Purchaser fails to make any Earn Out Payment when due and Seller takes action to enforce its rights to payment of such amounts, the Purchaser agrees to pay the Seller's expenses, including reasonable attorneys fees, incurred by Seller in successfully collecting any such past due Earn Out Payments payable hereunder but not paid as of the required payment date.

3.7     Upon a Liquidity Event or the payment of all Earn Out Payments due under this Agreement, all rights and obligations of the Parties hereunder shall end except: (a) the provisions of Section 7.7, which shall survive through and including December 31, 2009; and (b) any claims or indemnification obligations under Article IX, which shall survive as set out therein.

3.8     The Revenue Earn Out Payment and the Minimum Payment, in each case, due under this Agreement for 2008, shall be paid for all of fiscal year 2008. For the avoidance of doubt, from and after the Closing Date, none of the Purchaser, the Company or any of the U.S. Stockholders shall have any continuing obligations to pay, and Seller shall not have any right to receive, any Earn Out Payments or Selling Stockholder's Contingent Earn Out (as each of those terms is defined in the Stock Purchase Agreement) in respect of fiscal year 2008 and thereafter, as such payments are being replaced by, and superseded by, the provisions of this Agreement.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     Closing Date.  The closing of the sale and purchase of the Note provided for in Section 2.1 hereof (the "**Closing**") shall take place at the offices of Sutherland Asbill & Brennan LLP, 1275 Pennsylvania Avenue, NW, Washington, D.C. (or at such other place as the Parties may designate in writing) at 2:00 p.m. (Eastern standard time) one (1) Business Day after the final execution and delivery of this Agreement (the "**Closing Date**"), unless another time, date or place is agreed to in writing by the Parties hereto, which date shall be no later than the first Business Day after the satisfaction or waiver of the conditions set forth in Article VIII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents to Purchaser that:

13

5.1     Organization and Good Standing.  The Seller is a Delaware corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation as set forth above and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business.

5.2     Authorization of Agreement.  The Seller has all requisite corporate power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by the Seller in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Seller Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all required corporate action on the part of the Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by the Seller, and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Seller Document, when so executed and delivered will constitute, the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity), provided that no representation or warranty is provided as to whether the Supplemental Agreement is valid or effective.

5.3     Conflicts; Consents of Third Parties.

(a)     None of the execution and delivery by the Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by the Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and bylaws (or other organizational and governing documents) of the Seller; (ii) any Contract, or Permit to which the Seller is a party or by which any of the properties or assets of the Seller is bound; (iii) any Order of any Governmental Body applicable to the Seller or by which any of the properties or assets of the Seller are bound; or (iv) any applicable Law; subject, in the case of clauses (ii)-(iv) of this Section 5.3(a), to compliance with the applicable requirements of the Sale and Security Agreement.

(b)     Subject to the provisions of Section 7.2, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Seller in connection with the execution and delivery of this Agreement or the Seller Documents, or the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, except for (A) compliance with the applicable requirements of the Sale and Security Agreement, and (B) for such other consents, waivers, approvals, Orders, permits or authorizations the failure

14

of which to obtain would not have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby.

5.4    **Ownership and Transfer of the Note**.  The Seller is the sole record and beneficial owner of the Note, free and clear of any and all Liens, and no Person other than the Purchaser (as the Maker of the Note) has any legal or beneficial right, title or interest in or to the Note.  The Seller has the corporate power and authority to sell, transfer, assign and deliver the Note as provided in this Agreement, and such delivery will convey to Purchaser good and marketable title to such Note, free and clear of any and all Liens.

5.5    **Financial Advisors**.  With the exception of Eureka Capital Markets, the fees and the expenses of which will be paid by the Seller, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER AND THE COMPANY

Purchaser and the Company hereby represent and warrant to the Seller that:

6.1    **Organization and Good Standing**.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate properties and carry on its business.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    **Authorization of Agreement**.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "**Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) , provided that no representation or warranty is provided as to whether the Supplemental Agreement is valid or effective.

15

6.3     Conflicts; Consents of Third Parties.

(a)     The execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser or the Company with any of the provisions hereof or thereof will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the organizational documents of Purchaser and the Company; (ii) any Contract or Permit to which Purchaser or the Company is a party or by which Purchaser or the Company or any of their respective properties or assets are bound; (iii) any Order of any Governmental Body applicable to Purchaser or the Company or by which any of the properties or assets of Purchaser or the Company are bound; or (iv) any applicable Law.

(b)     Subject to the provisions of Section 7.2, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser or the Company in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser or the Company with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Purchaser or the Company of any other action contemplated hereby, except (A) as required under the Sale and Security Agreement and (B) for such other consents, waivers, approvals, Orders, permits or authorizations the failure of which to obtain would not have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby.

6.4     Availability of Funds.  The Purchaser shall, or shall cause the Company to, have available sufficient funds to pay the Cash Payment at the Closing.

6.5     Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser, the Company or the U.S. Stockholders in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

ARTICLE VII

COVENANTS

7.1     Consents.  The Seller, Purchaser, and the Company shall use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in 5.3(b) and 6.3(b) hereof (collectively, the "Consents"), provided, however, that, no Party shall be obligated to pay any consideration other than filing fees or other sums required by Law to any third party from whom consent or approval is requested.

7.2     CFIUS Review of Supplemental Agreement.  Within three (3) Business Days after Closing, Seller shall deliver the executed Supplemental Agreement to CFIUS for its review.  Seller, on one hand, and Purchaser and the Company, on the other, disagree as to

16

whether the Supplemental Agreement is permitted under the Sale and Security Agreement, and each has reserved its right to assert its respective position before CFIUS. Nothing in this Agreement shall be deemed to modify or limit the Company's Security Officer from taking any action(s) as may be provided under the Sale and Security Agreement or by Law. On the earlier to occur of (A) CFIUS's notification to the Parties in writing or (B) a final determination by an Applicable Federal Court, in either case, that the Supplemental Agreement (including both the co-ownership of the Intellectual Property and the non-competition provisions thereof) does not violate the terms of the Sale and Security Agreement, the Parties agree that the Supplemental Agreement shall then be valid and effective as of the date of CFIUS's notification or the court's determination, as applicable, of such decision; provided, however, that upon the earlier to occur of (Y) a determination by CFIUS, which determination is not appealed by Seller within the legally prescribed time limit, or an Applicable Federal Court that the Supplemental Agreement does violate the Sale and Security Agreement or (Z) 365 days after the Closing Date, the Parties agree that such agreement shall be null and void. For purposes of this Agreement, "**Applicable Federal Court**" means the United States District Court for the District of Columbia or the United States Court of Federal Claims, including any U.S. federal courts with appellate jurisdiction thereover. Each of the Purchaser, the Company and the Seller agree to submit the Supplemental Agreement to CFIUS and to take all appropriate steps to seek a final determination by CFIUS. Neither Purchaser nor the Company will take any actions, directly or indirectly, to indicate to CFIUS that they would prefer to have no resolution of or a deferral of the matter set forth in the Supplemental Agreement; provided, however, that each Party reserves its right to assert to CFIUS its respective position on the matter. No Party will participate in any meetings or communications with CFIUS or the members thereof without prior notice of such meetings or communications to the other Parties.

       7.3     <u>Further Assurances</u>. Subject to, and not in limitation of, <u>Section 7.2</u>, each of Seller, Purchaser and the Company shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

       7.4     Publicity.

       (a)     No Party shall make any public disparaging statements concerning any other Party or any other Party's shareholders, officers, directors, employees, attorneys, agents, or contracting parties, or their business or operations. None of the Seller, the Company or Purchaser or any of their Affiliates shall issue any press release or public announcement concerning the financial terms of this Agreement or the transactions contemplated hereby <u>without obtaining the prior written approval of the other Party</u> hereto unless disclosure is otherwise required by applicable Law or CFIUS, provided that, to the extent required by applicable Law or CFIUS, the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or CFIUS to consult with each other Party with respect to the timing and content thereof.

       (b)     Each of Purchaser, the Company and the Seller agree that the terms of this Agreement shall not be disclosed or otherwise made available to the public and that copies of this Agreement shall not be publicly filed or otherwise made available to the public, except

7898115.5

where such disclosure, availability or filing is required by applicable Law or CFIUS and only to the extent required by such Law or CFIUS.  In the event that such disclosure, availability or filing is required by applicable Law or CFIUS, each of Purchaser, the Company and the Seller (as applicable) agrees to use its commercially reasonable efforts to obtain "confidential treatment" of this Agreement with the requesting Governmental Body or CFIUS and to redact such terms of this Agreement as the other Party shall request.  Notwithstanding the foregoing, each Party may disclose to (i) its customers and, if inquiry is made by them, any governmental authorities, the acquisition of the Note by Purchaser and, in general terms, the provisions of this Agreement, provided that detailed financial information is not provided, and (ii) subject to an appropriate confidentiality agreement, any existing or prospective lenders or investors.

7.5     [Intentionally omitted].

7.6     Covenants of Purchaser.

(a)     Covenants of Purchaser.

(i)     The Purchaser shall, or shall cause the Company to, have available sufficient funds to pay on the terms and subject to the conditions set forth in this Agreement the Earn Out Payments on the date such payments shall be due.

(ii)     Purchaser agrees with Seller that, until the final Revenue Earn Out Payment payable hereunder is determined and paid in full to Seller, in addition to the requirements of Section 3.5(b), Purchaser shall provide to Seller not later than 45 days after the last day of each of the first three fiscal quarters of each fiscal year commencing with the fiscal quarter ending September 30, 2008, unaudited consolidated financial statements for Purchaser and its Subsidiaries, in each case for the portion of the then current fiscal year ended on the last day of such fiscal quarter, which financial statements shall be the same financial statements relied upon by the management of Purchaser in the conduct of its business.

(b)     Negative Covenants.  Purchaser agrees with Seller that, for as long as Seller has rights to Earn Out Payments hereunder, Purchaser hereby covenants that it will not do any of the following:

(i)     Bonuses.  Purchaser shall not pay any bonuses to its employees and shall not permit the Company to pay any bonuses to its employees except in the Ordinary Course of Business.  Payment of any bonus amount authorized hereunder shall be subordinate to and shall not be distributed, unless and until Seller shall have received in full the greater of the Minimum Payment or the amount specified in the Estimated Earn Out Statement due on February 15 following the end of that fiscal year as provided under Sections 3.3(a) and 3.6(a).

(ii)     Dividends, Etc.  Until such time as Seller has received, in the aggregate, Earn Out Payments totaling at least $9,000,000, (a) declare or make any distribution of dividends, assets, properties, cash, rights, obligations or securities on account of any equity interest in Purchaser or the Company, or (b) purchase, redeem or otherwise acquire for value (or permit any of its Subsidiaries to do so) any equity interest in Purchaser or any warrants, rights or options to acquire any such equity interests.

18

(iii)    <u>Transactions with Affiliates</u>.  Permit to exist or enter into, or allow the Company or any of its Subsidiaries to permit to exist or enter into, any transaction (including the purchase, sale lease or exchange of any property or the rendering of any service) with any Affiliate of Purchaser or with any director, officer or employee of Purchaser, any of its Subsidiaries or any other Affiliate of Purchaser or any parent, spouse or lineal descendant of any such individual.  Further, payment of compensation and benefits to employees shall be in the Ordinary Course of Business and upon fair and reasonable terms.   Notwithstanding the foregoing, the Parties agree that one or more short term unsecured loans made to the Company or the Purchaser by one or more stockholders (each a "**Shareholder Loan**") on commercially reasonable terms comparable to those made by unaffiliated third parties shall not be prohibited by this Section 7.6(b)(iii).  In the event any Earn Out Payments are then past due, no Shareholder Loan shall be repaid until the Earn Out Payments are brought current and any claims under such Shareholder Loans shall be subordinate to the claims of Seller for past due Earn Out Payments. Notwithstanding the foregoing the Company or the Purchaser, at their respective option, may establish a commercially reasonable equity incentive plan using stock, stock options, restricted stock units, warrants or similar awards.  Stock incentives issued pursuant to such equity incentive plan shall apply only to eligible plan participants holding less than 10% of the total outstanding shares of the Company or the Purchase, as applicable.  For as long as Seller has rights to Earn Out Payments hereunder, the Company or the Purchaser, as applicable, may, in the aggregate during such period, issue new stock or stock options under any such equity incentive plan in an aggregate amount of 10% of the total outstanding shares of common stock of the Company or the Purchaser, as applicable. The Company or Purchaser, as applicable, may award stock incentives in excess of the 10% cap established by this Section provided such awards are not chargeable against, and do not otherwise adversely affect, any of the Earn Out Payments.  For avoidance of doubt, if any awards in excess of the 10% cap would be charged against the Earn Out Payments under GAAP, an adjustment shall be made to the affected Earn Out Payments so that Seller receives the full amount of the affected Earn Out Payments as if no excess award had been made.

(iv)    <u>Director Compensation</u>.  Pay or permit the Company to pay, or permit any of its Subsidiaries to pay, any compensation to any director of the Purchaser or the Company, other than reimbursement of out-of-pocket expenses reasonably incurred in the performance of their duties as director, provided that these restrictions shall apply only to the U.S. Stockholders who from time to time serve as directors and not to any other directors.

(v)    <u>Executive Compensation</u>.  So long as Blaine is an employee, officer, or director of the Company or the Purchaser, Blaine's salary and bonuses shall not exceed:

(a)  For the current fiscal year, the base salary set out in <u>Exhibit 5</u>, plus an increase in that amount equal to the cumulative change in the CPI Index over the CPI Index as of April 1, 2007, plus a bonus not to exceed the amount computed as set out in Section 7.6(b)(iv)(b).

(b)  For purposes of calculating Blaine's bonus for 2008-2011, if the Seller is paid at least the Minimum Payment payable hereunder for the year in which Blaine's bonus is being calculated, Blaine shall be entitled to a maximum annual bonus for such year equal to the greater of (i) the amount of Blaine's base salary or (ii) twelve (12) percent times the

19

aggregate Earn Out Payment actually paid to Seller in such year. For purposes of calculating Blaine's bonus for 2012, Blaine shall be entitled to a maximum annual bonus equal to twelve (12) percent times the aggregate Earn Out Payment actually paid to Seller in such year. Notwithstanding anything to the contrary herein, for purposes of calculating Blaine's bonus for 2008, the amount of the Annual Earn Out Payment determined for 2008 pursuant to Section 3.4(a) shall be deemed to include the $2,000,000 subtracted from the amount of such Annual Earn Out Payment in 2008.

(c)   Payment of Blaine's bonus in any year shall not be paid to Blaine until the Earn Out Payments due on February 15 for such year shall have been paid to Seller and Blaine shall subordinate any right to a bonus payment for a given fiscal year, and same shall not be distributed to Blaine, unless and until Seller shall have received in full the greater of the Minimum Payment or the amount specified in the Estimated Earn Out Statement due on February 15 following the end of that fiscal year as provided under Sections 3.3(a) and 3.6(a).

(d)   Blaine shall not receive reimbursement for business related expenses in an amount greater than $85,000 per year as the chief executive officer(s) of Purchaser and its Subsidiaries, plus a car allowance in the Ordinary Course of Business. Such amounts shall be increased by the cumulative change in the CPI Index each year.

7.7   <u>Seller Non-competition</u>.  Seller agrees that, until December 31, 2009, neither Seller, nor any of its principals shareholders or Affiliates, collectively or individually, shall, directly or indirectly, engage in a Competitive Business Activity in the United States. As used in this Agreement, a **"Competitive Business Activity"** means the marketing or selling of voting machines for use in any public election; <u>provided</u>, <u>however</u>, that any sales or services by Seller or its Affiliates to the Company or its Affiliates pursuant to the terms of the Distribution Agreement or the Transition Services Agreement shall not constitute a Competitive Business Activity for purposes of this Section 7.7.

7.8   <u>No Adverse Actions</u>.  The Parties agree that, until June 30, 2012, no Party or any of such Party's Affiliates shall enter into any agreement with another Person to deprive or otherwise interfere with any other Party's rights under this Agreement or the related transactions.

ARTICLE VIII

CONDITIONS TO CLOSING

8.1   <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)   the representations and warranties of the Seller set forth in this Agreement and qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such

representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(b) the Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of the Seller, dated the Closing Date, to the foregoing effect;

(c) There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d) the Seller shall have delivered, or caused to be delivered, to Purchaser the Note, free of all Liens;

(e) the Seller shall have executed and delivered to Purchaser the Supplemental Agreement; and

(f) the Seller shall have executed and delivered to Purchaser the Release.

8.2   Conditions Precedent to Obligations of the Seller.  The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Seller in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Purchaser and the Company set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and the Seller shall have received a certificate signed by an authorized officer of Purchaser and of the Company, dated the Closing Date, to the foregoing effect;

(b) Purchaser and the Company shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser or the Company on or prior to the Closing Date, and the Seller shall have received a certificate signed by an authorized officer of Purchaser and of the Company, dated the Closing Date, to the foregoing effect;

(c) The Severance Agreements shall have been rescinded and the Seller shall have received a certificate signed by an authorized officer of Purchaser and of the Company, dated the Closing Date, to the foregoing effect;

21

(d)    The Purchaser shall have executed and delivered to Seller the Supplemental Agreement;

(e)    the Purchaser and the Company shall have executed and delivered to the Seller the Release; and

(f)    There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

8.3    <u>Frustration of Closing Conditions</u>.  None of the Company, Purchaser or the Seller may rely on the failure of any condition set forth in <u>Sections 8.1</u> or <u>8.2</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

ARTICLE IX

INDEMNIFICATION

9.1    <u>Survival of Representations and Warranties and Covenants</u>.

(a)    The representations and warranties of the Parties contained in this Agreement shall survive the Closing hereunder, and shall not merge in the performance of any obligation by any Party hereto.  All such representations and warranties with respect to which written notice of a claim has not been given pursuant to Section 9.4 will terminate and expire on the date that is thirty (30) days past the date of the expiration of the statute of limitations for such claim.  In the event written notice of a claim shall have been given within the applicable survival period and such claim has not been finally resolved by the expiration of such survival period, the representations and warranties that are the subject of such claim shall survive the end of the survival period for such representations and warranties until such claim is finally resolved, but such representations and warranties shall only survive with respect to the claim asserted.

(b)    All of the covenants or other agreements of the Parties contained in this Agreement shall survive:  (i) until Closing, to the extent such covenant or other agreement is required to be performed by or prior to the Closing, and (ii) until fully performed or fulfilled, to the extent such covenant or other agreement is to be performed after the Closing, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the Party entitled to such performance.  No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed on or prior to Closing (the "**Pre-Closing Covenants**") may be made or brought by any Party hereto after the Closing Date and (ii) by their nature are required to be performed after Closing (the "**Post-Closing Covenants**") may be made or brought by any Party hereto with respect to which written notice of a claim has not been given pursuant to Section 9.4 on or prior to the earlier of (in each case, a "**Survival Period**"):  (A) the one year anniversary of the last date on which each such Post-Closing Covenant was required to be performed; (B) the payment of the Final Earn Out Payment; or (C) following a Liquidity Event, the payment in full of all Earn Out Payments, including payment of all Minimum Payments, Revenue Earn Out Payments and Liquidity Event

22

Earn Out Payment; provided, however, that any obligation to indemnify and hold harmless shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor to the indemnifying Party in accordance with this Article IX and Section 10.6 before the termination of the applicable Survival Period.

9.2   Indemnification by Seller.

(a)   Subject to Section 9.5 hereof, the Seller hereby agrees to indemnify and hold Purchaser and its directors, officers, employees, Affiliates, stockholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Purchaser Indemnified Parties**") harmless from and against any and all losses, liabilities, claims, demands, judgments, damages (excluding incidental and consequential damages), fines, suits, actions, costs and expenses (individually, a "**Loss**" and, collectively, "**Losses**") resulting from:

(i)   the breach of any representation or warranty made by the Seller pursuant to this Agreement; and

(ii)   the breach of any Post-Closing Covenant on the part of the Seller.

(b)   Purchaser acknowledges and agrees that the Seller shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to actions taken, or failed to be taken, by Purchaser or any other Person (other than the Seller and its Affiliates in breach of this Agreement) after the Closing Date. Purchaser shall take and shall cause its Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

9.3   Indemnification by Purchaser.

(a)   Subject to Section 9.5, Purchaser hereby agrees to indemnify and hold the Seller and its respective directors, officers, employees, Affiliates, stockholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Seller Indemnified Parties**") harmless from and against, and pay to the applicable Seller Indemnified Parties the amount of:

(i)   any and all Losses resulting from the breach of any representation or warranty made by the Purchaser pursuant to this Agreement;

(ii)   any and all Losses resulting from any breach of any Post-Closing Covenant on the part of Purchaser; and

(iii)   without duplication of any indemnification for Losses actually recovered from a U.S. Stockholder, any breach by U.S. Stockholder of his obligations under Section 3.5. For avoidance of doubt, no U.S. Stockholder shall be personally liable to any of the Seller Indemnified Parties, except for the limited several liability set out in Section 3.5(e).

7898115.5

(b)     Seller acknowledges and agrees that the Purchaser shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to actions taken, or failed to be taken, by Seller or any other Person (other than the Purchaser and its Affiliates in breach of this Agreement) after the Closing Date. The Seller shall take and cause its Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

9.4     Indemnification Procedures.

(a)     A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the Party from whom indemnification is sought.

(b)     In the event that any Legal Proceeding shall be instituted, or that any Claim shall be asserted, by any third party in respect of which payment may be sought under Sections 9.2 or 9.3 hereof (regardless of the limitations set forth in Section 9.5) ( an "Indemnification Claim"), the indemnified Party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party; provided, however, that an Indemnification Claim for any Indemnified Matter shall not be subject to the notification procedures of this Section 9.4. The failure of the indemnified Party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying Party's obligations with respect thereto except to the extent that the indemnifying Party is prejudiced as a result of such failure.

(c)     The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder. If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified Party of its intent to do so. If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the indemnifying Party shall assume the defense of any Indemnification Claim, the indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if, (i) so requested by the indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the indemnified Party, a conflict or potential conflict exists between the indemnified Party and the indemnifying Party that would make such separate representation advisable; and provided, further, that the indemnifying Party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all indemnified Parties in connection with any Indemnification Claim. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 9.4 to the contrary, neither the indemnifying Party nor the indemnified Party shall, without the written consent of the other

24

Party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such Party provide to such other Party an unqualified release from all liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying Party notifies the indemnified Party in writing of the indemnifying Party's willingness to accept the settlement offer and, subject to the applicable limitations of Section 9.5, pay the amount called for by such offer, and the indemnified Party declines to accept such offer, the indemnified Party may continue to contest such Indemnification Claim, free of any participation by the indemnifying Party, and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified Party declined to accept plus the Losses of the indemnified Party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified Party with respect to such Indemnification Claim. If the indemnifying Party makes any payment on any Indemnification Claim, the indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified Party to any insurance benefits or other claims of the indemnified Party with respect to such Indemnification Claim. In connection with the response to any subpoena described in the definition of "Indemnified Matters," Seller shall have the right to approve the Purchaser's selection of counsel, which approval shall not be unreasonably withheld.

(d)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified Party and the indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified Party shall forward to the indemnifying Party notice of any amounts due and owing by the indemnifying Party pursuant to this Agreement with respect to such matter.

9.5     Certain Limitations on Indemnification.

(a)     If a Purchaser Indemnified Party is entitled to indemnification pursuant to Section 9.4(e), the Purchaser Indemnified Party's sole recourse for payment of such amounts due and owing to it shall be by set off against the aggregate from time to time of Earn Out Payments.

(b)     Neither a Purchaser Indemnified Party nor a Seller Indemnified Party shall be entitled to indemnification pursuant to Section 9.2(a)(i) or Section 9.3(a) with respect to any matter of which Purchaser or the Seller, respectively, had knowledge or waived prior to the Closing. The Seller shall not be required to indemnify any Purchaser Indemnified Party and Purchaser shall not be required to indemnify the Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the Party seeking indemnification pursuant to Section 9.2(a)(i) or Section 9.3(a).

9.6     Tax Treatment of Indemnity Payments. To the extent permitted by law, the Seller and Purchaser agree to treat any indemnity payment made pursuant to this Article IX as an adjustment to the Purchase Consideration for federal, state, local and foreign income tax

25

purposes; provided, however, that if a Party determines it is not able to treat such payment as an adjustment to the Purchase Consideration, it shall notify the other Parties in writing of its intent to treat such payment differently at least 30 days prior to filing any Tax Return reflecting such change in characterization if such information has then been provided to the Party by its auditors, and otherwise within three Business Days after such information is so provided.

9.7    Exclusive Remedy.  From and after the Closing, except in the event of fraud or willful misconduct (in which case the Parties shall be entitled to exercise all of their rights, and seek all Damages available to them, under law or equity) the sole and exclusive remedy for any breach or failure to be true and correct, or alleged breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement, shall be indemnification in accordance with this Article IX in accordance with the arbitration provisions set forth in Section 10.3 hereof.  In furtherance of the foregoing, the Parties hereby waive, to the fullest extent permitted by applicable Law, any and all other rights, claims and causes of action (including rights of contributions, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against the Seller or Purchaser, as the case may be, arising under or based upon any federal, state or local Law (including any such Law relating to environmental matters or arising under or based upon any securities Law, common Law or otherwise).  Notwithstanding the foregoing, this Section 9.7 shall not operate to limit the rights of the Parties to seek equitable remedies (including specific performance or injunctive relief).

ARTICLE X

MISCELLANEOUS

10.1    Payment of Sales, Use or Similar Taxes.  All sales, use, transfer, intangible, recordation, documentary stamp or similar Taxes or charges, of any nature whatsoever, applicable to, or resulting from, the transactions contemplated by this Agreement shall be borne by Purchaser.

10.2    Expenses.  Except as otherwise provided in this Agreement, each of the Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.3    Arbitration.  The Parties hereto hereby irrevocably submit any dispute arising under or pertaining to this Agreement (other than (i) a final and binding decision by the Independent Accountant pursuant to Section 3.6, (ii) a final and binding decision by CFIUS or an Applicable Federal Court pursuant to Section 7.2 hereof or (iii) any claim or proceeding in which a party seeks specific performance or an injunction pursuant to Section 9.7 hereof) to the office of the American Arbitration Association ("AAA") located in New York, New York, for binding arbitration by a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  In the event the Parties cannot agree on the choice of the arbitrator the Purchaser and Seller shall ask the AAA to chose an arbitrator from the list provided by the AAA and the arbitrator so chosen (by the Parties or the AAA, as applicable) (the "Impartial Arbitrator") shall preside at the hearing.  Within thirty calendar days after notice of

26

appointment of the Impartial Arbitrator, the Impartial Arbitrator shall determine a schedule for the conduct of the arbitration, including hearings. The Impartial Arbitrator shall interpret the Agreement based on its written language; provided, however, that to the extent the Agreement is not clear or the issue is not resolved by reference to the Agreement, the Impartial Arbitrator shall look to the laws of New York to resolve the dispute. The Impartial Arbitrator shall be relieved of all judicial formality and shall not be bound by the strict rules of procedure and evidence, provided, however, that the Impartial Arbitrator may permit limited discovery, but in no event shall a Party be entitled to more than five (5) depositions, including expert depositions in any such arbitration proceeding, in preparing its evidence and arguments. The arbitration shall take place in the Borough of Manhattan, New York, New York. Insofar as the Impartial Arbitrator looks to substantive law, the law of New York shall govern. The decision of the Impartial Arbitrator when rendered in writing shall be final and binding. The Impartial Arbitrator is empowered to grant interim relief as he/she may deem appropriate. The Impartial Arbitrator shall render his/her decision, which shall be in writing and state the reasons therefor, within sixty calendar days following the termination of hearings. Judgment upon the award may be entered in any court having jurisdiction thereof. Each Party shall jointly and equally bear with the other Party the cost of the Impartial Arbitrator. If warranted in the sole judgment of the Impartial Arbitrator, the losing Party in any such arbitration shall pay the reasonable costs and expenses, including reasonable attorneys' fees, of the winning Party and the winning Party's share of the cost of the Impartial Arbitrator. The Impartial Arbitrator shall not award punitive damages under any circumstances. The provisions of this Section shall not prevent any Party from filing an action in state or federal court to enforce its rights to arbitration under this Agreement or to enjoin each other from acting in violation of this Agreement.

10.4   _Entire Agreement; No Integration; Amendments and Waivers_.   This Agreement (including the exhibits hereto) represent the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof and thereof. Except as otherwise may be specifically provided herein, the Parties agree that nothing in this Agreement shall be deemed to effect or change any provision of the Stock Purchase Agreement, the Distribution Agreement or the Transition Services Agreement, each of which continues in effect or terminates in accordance with its terms, subject to any and all existing rights, defenses or claims of the parties thereto. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.5   _Governing Law_. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed

27

in such State without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

    10.6    Notices.    All notices and other communications under this Agreement shall be in writing and shall be given by electronic transmission (with written confirmation of transmission) and one of the other following methods of delivery:  (i) delivered personally by hand or by facsimile, which shall be deemed given upon written confirmation of receipt, and (ii) sent by overnight courier, which shall be deemed given one Business Day following written confirmation of receipt. All notices and other communications under this Agreement shall be given in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

> If to the Seller, to:
>
> Smartmatic Corporation
> Piso 17. Torre Banvenez.
> Av Solano.
> Caracas - Venezuela
> Facsimile: +58-212-762-6716
> Email:  Chandler.Molina@Smartmatic.com
> Attention: Antonio Mugica
>
> With a copy (which shall not constitute notice) to:
>
> Sutherland Asbill & Brennan LLP
> 1275 Pennsylvania Avenue, NW
> Washington, DC 20004
> Facsimile: (202) 637-3593
> Email: Jeff.Bialos@Sutherland.com
> Attention:  Jeffrey P. Bialos
>
> If to Purchaser, to:
>
> Sequoia Voting Systems, Inc.
> 717 17th Street, Suite 310
> Denver, CO 80202, USA
> Facsimile: 303-446-3047
> Email:  jblaine@sequoiavote.com
> Attention: Jack Blaine
>
> With a copy (which shall not constitute notice) to:
>
> Seyfarth Shaw LLP
> 815 Connecticut Avenue, N.W.
> Suite 500
> Washington, D.C.  20006

7898115.5

Facsimile:  (202) 828-5393
Email: rbodansky@seyfarth.com
Attention:  Robert L. Bodansky

Any notices or other communications given (i) other than on a Business Day, or (ii) after 5:00 p.m. Eastern time (standard or daylight savings, as may then be in effect) on a Business Day, shall be deemed given on the next Business Day.

10.7   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

10.8   <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Purchaser or the Company, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void.  No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

10.9   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

10.10  <u>U.S. Stockholders' Representative</u>.

(a)   <u>Appointment.</u>  Each U.S. Stockholder hereby irrevocably constitutes and appoints Jack Blaine as their Representative for the purpose of performing and consummating the transactions contemplated by this Agreement.   The appointment of Jack Blaine as the Representative is coupled with an interest and all authority hereby conferred shall be irrevocable and shall not be terminated by any or all of the U.S. Stockholders without the consent of the Purchaser, which consent may be withheld for any reason, and the Representative is hereby authorized and directed to perform and consummate on behalf of the U.S. Stockholders all of the transactions contemplated by this Agreement.

(b)   <u>Authority and Limitation of Liability.</u>   Not by way of limiting the authority of the Representative, each and all of the U.S. Stockholders, for themselves and their

respective heirs, executors, administrators, successors and assigns, hereby authorize the Representative to:

      (i)    Waive any provision of this Agreement which the Representative deems necessary or desirable;

      (ii)    Execute and deliver on the U.S. Stockholders' behalf all documents and instruments which may be executed and delivered pursuant to this Agreement;

      (iii)    Calculate, negotiate and agree to any adjustments to the Purchase Consideration;

      (iv)    Make and receive notices and other communications pursuant to this Agreement and service of process in any legal action or other proceeding arising out of or related to this Agreement or any of the transactions contemplated hereunder or thereunder;

      (v)    Appoint or provide for successor agents;

      (vi)    Select, retain, hire and consult with legal counsel, independent public accountants and other experts, solely at the cost and expense of the U.S. Stockholders;

      (vii)    Pay expenses incurred or which may be incurred by or on behalf of the U.S. Stockholders in connection with this Agreement; and

      (viii)    Take or forego any or all actions permitted or required of any U.S. Stockholder or necessary in the judgment of the Representative for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement.

      Each U.S. Stockholder agrees that the Representative shall have no liability to U.S. Stockholders, jointly or severally, for any act or omission by the Representative as permitted under this Section, excepting only actions taken in bad faith, and each U.S. Stockholder hereby irrevocably waives and releases any claims it may have against the Representative for his acts and omissions hereunder other than any actions taken in bad faith.

      **EACH U.S. STOCKHOLDER UNDERSTANDS AND ACKNOWLEDGES THAT HE IS: (a) AUTHORIZING THE REPRESENTATIVE TO ACT FOR THE U.S. STOCKHOLDERS, COLLECTIVELY AND INDIVIDUALLY, WITH BROAD POWERS; AND (b) AGREEING THAT THE REPRESENTATIVE WILL NOT BE LIABLE TO U.S. STOCKHOLDERS, COLLECTIVELY OR INDIVIDUALLY, UNLESS THE REPRESENTATIVE ACTS IN BAD FAITH.**

      **EACH U.S. STOCKHOLDER FURTHER ACKNOWLEDGES THAT HE HAS BEEN ADVISED TO SEEK INDEPENDENT AND SEPARATE COUNSEL PRIOR TO SIGNING THIS AGREEMENT AND HAS HAD THE OPPORTUNITY TO DO SO.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

7898115.5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

SVS HOLDINGS, INC.

By: _Jack Blaine_

Name: JACK BLAINE

Title: CEO

SMARTMATIC CORPORATION

By: _____

Name:

Title:

*[signatures continue on following page]*

7898115.5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

SVS HOLDINGS, INC.

By: _____
     Name:
     Title:

SMARTMATIC CORPORATION

By: _____
     Name: Antonio Mugica
     Title: CEO

*[signatures continue on following page]*

Solely for purposes of Section 3.5 and (in the case of Blaine only) Section 7.6:

_____
Jack Blaine

_____
Peter McManemy

_____
Howard Cramer

_____
Phil Foster

_____
Randall Elder

_____
Kevin Hurst

_____
Thomas E. Keeling

_____
Lawrence W. Korb

_____
Brian G. Lierman

_____
Michelle Shafer

_____
Waldeep Singh

_____
Edwin Smith, III

_____
Douglas H. Weinel

1

**Exhibit 1**

**Knowledge of the Company**

1. Jack Blaine

2. Peter McManemy

3. Waldeep Singh

4. Edwin Smith, III

5. Howard Cramer

6. Douglas H. Weinel

7. Lawrence Korb

## Exhibit 2

## Severance Agreements

| Type of Agreement | Party A | Party B | Agreement |
|---|---|---|---|
| Change in control severance agreement | Jack Blaine | SVS Holdings, Inc | December 12, 2007 |
| Change in control severance agreement | David Allen | Sequoia Voting Systems, Inc. | March 26, 2008 |
| Change in control severance agreement | Randall Elder | Sequoia Voting Systems, Inc. | March 13, 2008 |
| Change in control severance agreement | Phil Foster | Sequoia Voting Systems, Inc. | March 15, 2008 |
| Change in control severance agreement | Kevin Hurst | Sequoia Voting Systems, Inc. | March 11, 2008 |
| Change in control severance agreement | Thomas Keeling | Sequoia Voting Systems, Inc. | March 11, 2008 |
| Change in control severance agreement | Lawrence Korb | Sequoia Voting Systems, Inc. | March 13, 2008 |
| Change in control severance agreement | Brian Lierman | Sequoia Voting Systems, Inc. | March 13, 2008 |
| *Change in control severance agreement | Peter McManemy | Sequoia Voting Systems, Inc. | September 27, 2007 |
| Change in control severance agreement | Michelle Shafer | Sequoia Voting Systems, Inc. | March 12, 2008 |
| Change in control severance agreement | Waldeep Singh | Sequoia Voting Systems, Inc. | March 31, 2008 |
| Change in control severance agreement | Edwin Smith III | Sequoia Voting Systems, Inc. | March 12, 2008 |
| Change in control severance agreement | Douglas Weinel | Sequoia Voting Systems, Inc. | March 13, 2008 |

*While this Agreement is terminated, the prior Executive Employment Agreement dated October 21, 2005, which was amended by the Agreement, remains in effect, so that the Executive Employment Agreement continues as if the September 27, 2007, Agreement had never been executed.

1

7898115.5

# Exhibit 3

## Wiring Instructions

Smartmatic Corporation
Bank of America
acc # 003444774465
aba 026009593

1

**Exhibit 4**

**Form of Release**

**ATTACHED**

7898115.5

**Exhibit 5**

Base Salary:     $350,000*

*Subject to any permitted CPI increase under the Agreement.