# **EXHIBIT G**

*Execution Copy*

ASSET PURCHASE AGREEMENT

Dated July 15, 2009

between

DOMINION VOTING SYSTEMS CORPORATION

and

SEQUOIA VOTING SYSTEMS, INC.

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of July 15, 2009 by and between **DOMINION VOTING SYSTEMS CORPORATION**, a corporation formed under the laws of Ontario, Canada ("Dominion") and **SEQUOIA VOTING SYSTEMS, INC.**, a Delaware corporation ("Sequoia").

This Agreement contemplates a transaction in which Dominion will acquire certain contracts and related assets from Sequoia. Capitalized terms used in this Agreement shall have the meanings ascribed to them in Article IX. In consideration of the mutual agreements herein contained, the Parties agree as follows.

### ARTICLE I

### THE CONTRACT AND ASSET PURCHASES

1.1   Purchase and Sale of Assets.

(a)   Accounts Receivable Closing.  Upon and subject to the terms and conditions of this Agreement, Dominion hereby purchases from Sequoia, and Sequoia hereby sells, transfers, conveys, assigns and delivers to Dominion on the date hereof (the "Accounts Receivable Closing") for the consideration specified below in Section 1.3(a) all right, title and interest in, to and under the accounts receivable and other assets described in subsection (b) of the definition of Acquired Assets (i) existing as of the date of this Agreement and (ii) constitute Acquired Assets arising between the Accounts Receivable Closing and the earlier of the Contract Closing or the termination of the Parties' obligation to conduct the Contract Closing in accordance with Section 8.1.

(b)   Contract Closing.  Upon and subject to the terms and conditions of this Agreement, Dominion (itself or through its designated Subsidiary) shall purchase from Sequoia, and Sequoia shall sell, transfer, convey, assign and deliver to Dominion (or its designated Subsidiary as directed by Dominion), at the Contract Closing (as defined in Section 1.4(c) below)(the Contract Closing and the Accounts Receivable Closing are each referred to herein as a "Closing"), for the consideration specified below in this Article I, a portion of Sequoia's business consisting of, for greater certainty, all right, title and interest in, to and under the Acquired Assets.

(c)   Excluded Assets.  Notwithstanding the provisions of Section 1.1(b), the Acquired Assets shall not include the Excluded Assets.

1.2   Assumption of Liabilities at the Contract Closing.

(a)   Upon and subject to the terms and conditions of this Agreement, Dominion (itself or through its designated Subsidiary) shall assume and become responsible for, from and after the Contract Closing, the Assumed Liabilities.

(b)     Notwithstanding the terms of Section 1.2(a) or any other provision of this Agreement to the contrary, Dominion shall not assume or become responsible for, and Sequoia shall remain liable for, the Retained Liabilities.

1.3     Purchase Price.  Contingent upon the Contract Closing (except for the payment described in Section 1.3(a) below which is being made on the date hereof and is not refundable if the Contract Closing does not occur), the Purchase Price to be paid by Dominion for the Acquired Assets, as applicable, shall be as follows:

(a)     The sum of **Three Hundred Sixty-Six Thousand Dollars ($366,000)** to be paid in cash simultaneously with the execution of this Agreement (by confirmed wire transfer to the account designated by Sequoia);

(b)     The sum of **One Million Six Hundred Thirty-Four Thousand Dollars ($1,634,000)** to be paid in cash at, and contingent upon, the Contract Closing (by confirmed wire transfer to the account designated by Sequoia);

(c)     The sum of **Three Hundred Sixty-Six Thousand Dollars ($366,000)** to be paid in cash, contingent upon, the Contract Closing (by confirmed wire transfer to the account designated by Sequoia) of which (i) $183,000 is payable on August 21, 2009, and (ii) $183,000 is payable on August 28, 2009;

(d)     if an order of the ImageCast Precinct optical scan voting system machines ("ICP systems") is received from Nassau county, New York in 2009 or 2010 (the "Qualified NYS Order") and Sequoia and Mr. Jack Blaine have complied with their obligations under Section 6.5 below, then within three (3) business days of receipt of each and any partial or total payment for such Qualified NYS Order, Dominion shall pay in cash (in accordance with this Section 1.3) to Sequoia an amount equal to **twenty-three and one-half percent (23.5%)** of such payment for ICP systems; and

(e)     if an order or orders for ICP systems is received from New York City, New York in 2009 or 2010 (the "NYC Order") and Sequoia and Mr. Jack Blaine have complied with their obligations under Section 6.5 below, then within three (3) business days of receipt of any partial or total payment for any such order or orders, Dominion shall pay in cash (in accordance with this Section 1.3) to Sequoia a fraction of such partial or total payment equal to (x) Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) divided by (y) the Net Contract Price (as defined below) for ICP systems ordered pursuant to the NYC Order.  As used herein "Net Contract Price" means the gross price of the ICP systems less (i) any product discounts or (ii) buy-back costs or credits offered to New York City in connection with the NYC Order.

(f)     In the event Dominion fails to pay to Sequoia when due any amount payable by Dominion to Sequoia under Section 1.3 of this Agreement, the amount due shall (i) accrue interest daily based on an annual interest rate of 12%, and (ii) be subject to a late charge of four percent (4%).  In addition to the foregoing interest and late charge, Dominion shall pay a second late charge of two percent (2%) of the amount payable if not paid within thirty (30) days of the due date.  Dominion acknowledges Dominion's obligation to make prompt payment of all

- 2 -

sums payable to Sequoia under this Agreement, and agrees that the above late charge is fair and reasonable under the totality of circumstances surrounding this transaction and was included at Dominion's request in lieu of an escrow arrangement demanded by Sequoia.

(g)     For the purpose of confirming that Sequoia is paid all sums owing to Sequoia under this Section 1.3, Sequoia or its designated representatives shall have the right to audit all books and records of Dominion pertaining or relating to the payments to be made to Sequoia under this Agreement.  Dominion shall make all such books and records available to Sequoia or its representatives on not less than twenty (20) business days prior notice during normal business hours of Dominion.  In the event such audit discloses an underpayment by Dominion, the parties shall work in good faith for a period of not less than sixty (60) days to resolve such alleged underpayment.  If the parties have not resolved such alleged underpayment, Sequoia shall have the right to initiate litigation.  Upon the earlier of (i) agreement by the parties on the amount of any underpayment, or (ii) a final non-appealable determination by a court of competent jurisdiction of the amount of any underpayment, Dominion shall pay the amount of such underpayment to Sequoia upon demand.  Such audit shall be at Sequoia's expense unless an underpayment by Dominion exceeds the greater of (i) $35,000 or (ii) three (3%) percent of the amount that was payable pursuant to the applicable subsection of this Section 1.3, in which case Dominion shall reimburse Sequoia upon demand for the reasonable costs of such audit.  Sequoia may not exercise its audit rights more frequently than once in every six (6) month period.

(h)     Following the Accounts Receivable Closing, Dominion shall have the right to set off and apply to the payments described in this Section 1.3: (i) the amount of any payment for accounts receivable that are Acquired Assets that have been delivered or paid to Sequoia and have not been delivered to Dominion, and (ii) any amounts due Dominion or subject to an outstanding Claim Notice under Article VII (provided that if the claims set forth in such Claim Notice are finally determined to be invalid in accordance with Article VII, the amounts that were set off relating to such Claim Notice shall be immediately delivered to Sequoia).

1.4     The Closings.

(a)     The Accounts Receivable Closing shall take place simultaneously with the execution of this Agreement, and remotely or at a location mutually acceptable to the parties.

(b)     At the Accounts Receivable Closing:

(i)     Sequoia shall execute and deliver to Dominion a bill of sale in a form reasonably acceptable to Dominion, and such other instruments of conveyance as Dominion may reasonably request in order to effect the sale, transfer, conveyance and assignment to Dominion of valid ownership of the Acquired Assets being transferred at the Accounts Receivable Closing;

(ii)     Dominion shall pay to Sequoia, by wire transfer or other delivery of immediately available funds to an account designated by Sequoia, the applicable Purchase Price set forth in Section 1.3(a);

(iii)     Sequoia shall deliver to Dominion a list of (A) all accounts receivables (and any other assets) constituting part of the assets described in subsection (b) of the

- 3 -

definition of Acquired Assets, (B) all invoices issued to, and purchase orders issued by, any Governmental Entity of the State of New York, and (C) an accounting of all amounts paid to Sequoia by any Governmental Entity of the State of New York; and

        (iv)     Sequoia shall deliver to Dominion a copy of the irrevocable direction set forth in Section 4.2(a) below.

       (c)     The Contract Closing shall take place commencing at 9:00 a.m. local time on the second business day following Comptroller Approval (the "Contract Closing")  All transactions at the Contract Closing shall be deemed to take place simultaneously, and no transaction shall be deemed to have been completed and no documents or certificates shall be deemed to have been delivered until all other transactions are completed and all other documents and certificates are delivered.  The Contract Closing shall take place remotely or at a location mutually acceptable to the parties.

       (d)     At the Contract Closing:

        (i)     Sequoia shall deliver to Dominion (i) a copy of the Comptroller Approval and (ii) unless waived by Dominion, a copy of the consent to the assignment of the Lease and (iii) the various consents, certificates, instruments and documents deliverable by it pursuant to Article V;

        (ii)     The parties shall execute and deliver the Transfer Documents (provided that Dominion may designate a Subsidiary to become party to the Lease), and such other instruments of conveyance as Dominion may reasonably request in order to effect the sale, transfer, conveyance and assignment to Dominion of valid ownership of the Acquired Assets;

        (iii)     Dominion shall pay to Sequoia, by wire transfer or other delivery of immediately available funds to an account designated by Sequoia, the portion of the Purchase Price set forth in Section 1.3(b);

        (iv)     Sequoia shall deliver to Dominion, or otherwise put Dominion in possession and control of, all of the Acquired Assets of a tangible nature; and

        (v)     Sequoia shall deliver to Dominion a list of (A) all accounts receivables (and any other assets) constituting part of the assets described in subsection (b) of the definition of Acquired Assets, (B) all invoices issued to, and purchase orders issued by, any Governmental Entity of the State of New York, and (C) an accounting of all amounts paid to Sequoia by any Governmental Entity of the State of New York.

     1.5    Allocation.  Dominion and Sequoia shall allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets for tax reporting purposes in accordance with the allocation attached hereto as Schedule 1.5.

     1.6    Withholding.  To the knowledge of Dominion, as of the date hereof, there are no expected withholdings to made pursuant to this section.  That notwithstanding, Dominion or its agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the

- 4 -

making of such payment under the Internal Revenue Code of 1986, as amended (the "Code"), or any other applicable law. To the extent that amounts are so withheld and paid over to the appropriate taxing authority by Dominion or its agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sequoia.

    1.7    <u>Further Assurances</u>. At any time and from time to time after a Closing, at the request of Dominion or Sequoia, and without further consideration, each party shall execute and deliver such other instruments of sale, transfer, conveyance and assignment and take such actions as may be reasonably required (provided that neither party shall be required to incur any material out of pocket expenses unless advanced by the other Party) in order to afford the other party the full benefit of this Agreement and the Ancillary Documents, including without limitation the transfer, conveyance and assignment of the Acquired Assets subject to such applicable Closing and to place Dominion in actual possession and operating control thereof.

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF SEQUOIA**

    Sequoia represents and warrants to Dominion that the statements contained in this Article II are true and correct as of the date of each of the Closings.

    2.1    <u>Organization, Qualification and Corporate Power</u>. Sequoia is a corporation duly organized, validly existing and in corporate and tax good standing under the laws of the State of Delaware. Sequoia is duly qualified to conduct business and is in (i) corporate good standing under the laws of each jurisdiction in which the nature of Sequoia's businesses or the ownership or leasing of its properties requires such qualification, and (ii) in tax good standing in the State of New York, except in each case, where failure to do so would not have a material adverse effect on the Acquired Assets or Sequoia's ability to complete the transactions contemplated by this Agreement. Sequoia has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

    2.2    <u>Authorization of Transaction</u>. Sequoia has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by Sequoia of this Agreement and the performance by Sequoia of this Agreement and the Ancillary Agreements and the consummation by Sequoia of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Sequoia. This Agreement has been duly and validly executed and delivered by Sequoia and constitutes, and each of the Ancillary Agreements, upon its execution and delivery by Sequoia, will constitute, a valid and binding obligation of Sequoia, enforceable against Sequoia in accordance with its terms.

    2.3    <u>Noncontravention</u>. Neither the execution and delivery by Sequoia of this Agreement or the Ancillary Agreements, nor the consummation by Sequoia of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the Certificate of Incorporation or by-laws of Sequoia, (b) except as disclosed in this Agreement, require on the part of Sequoia any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in a breach of, constitute (with or without due

- 5 -

notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any person the right to terminate, modify or cancel, or require any notice, consent or waiver under, any Assumed Contracts or any agreement, contract or instrument to which any of the Acquired Assets is subject, (d) result in the imposition of any Security Interest upon any of the Acquired Assets, or (e) violate any order, writ, injunction, decree, statute, rule or regulation that may have a material adverse effect on Sequoia's ability to consummate the transactions contemplated by this Agreement, or that is applicable to the Acquired Assets.

2.4    Subsidiaries.  Sequoia has no Subsidiaries.

2.5    Tax Matters.  Sequoia has filed all Tax Returns related to the Acquired Assets that it was required to file and all such Tax Returns were correct and complete in all material respects, subject to legally permitted extensions.  Sequoia has paid all Taxes due related to the Acquired Assets.  Sequoia does not have any actual or potential liability for any Tax obligation of any taxpayer (including without limitation any affiliated group of corporations or other entities that included Sequoia during a prior period) other than itself.  All Taxes related to the Acquired Assets that Sequoia is or was required by law to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Entity.  There are no liens for Taxes (other than for current Taxes not yet due and payable) on the Acquired Assets.

2.6    Ownership and Condition of Assets.

(a)    Sequoia is the true and lawful owner, and has good title to, all of the Acquired Assets, free and clear of all Security Interests.  Upon the applicable Closing, Dominion will become the true and lawful owner of, and will receive good title to, the Acquired Assets transferred at such applicable Closing, free and clear of all Security Interests.

(b)    Each tangible Acquired Asset (other than inventory) that is on the premises of, or otherwise in the control of, Sequoia has been maintained in accordance with normal industry practice and is in good operating condition and repair (subject to normal wear and tear).

(c)    Sequoia has paid all amounts required to be paid by it through May 30, 2009 relating to certification costs to independent test labs associated with any of the Acquired Assets.

2.7    Inventory.  All inventory that is part of the Acquired Assets and that is on the premises of, or otherwise under the control of, Sequoia is in good and saleable condition.

2.8    Contracts.  Sequoia has delivered to Dominion a complete and accurate copy of the Assumed Contracts.  With respect to each such Assumed Contract  (i) the agreement is legal, valid, binding and enforceable and in full force and effect; (ii) the agreement is assignable by Sequoia to Dominion without the consent or approval of any person (or if consent is required, such consent has been received or will be received as of Contract Closing) and will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Contract Closing; and (iii) neither Sequoia nor, to the knowledge of Sequoia, any other party thereto, is in

- 6 -

breach or violation of, or default under, any such agreement, and no event has occurred, is pending or, to the knowledge of Sequoia, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by Sequoia or, to the knowledge of Sequoia, any other party under such agreement.

2.9   Accounts Receivable.  All accounts receivable that are part of the Acquired Assets are valid receivables subject to no setoffs or counterclaims.  Sequoia has not received any written notice from an account debtor stating that any account receivable is subject to any contest, claim or setoff by such account debtor.

2.10   Litigation.  With the exception of the Avante Litigation, there is no Legal Proceeding which is pending or has been threatened in writing against Sequoia which (a) relates to any of the Acquired Assets, or (b) in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by this Agreement.  There are no judgments, orders or decrees outstanding relating to, or which would affect, any of the Acquired Assets.

2.11   Real Property Lease.

(a)   The Lease is legal, valid, binding, enforceable and in full force and effect;

(b)   neither Sequoia nor, to the knowledge of Sequoia, any other party, is in material breach or violation of, or default under, the Lease, and no event has occurred, is pending or, to the knowledge of Sequoia, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by Sequoia or, to the knowledge of Sequoia, any other party under such Lease;

(c)   there are no disputes, oral agreements or forbearance programs in effect as to such Lease of which Sequoia is aware;

(d)   Sequoia has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the leasehold described in the Lease;

(e)   all facilities leased or subleased under the Lease are supplied with utilities adequate for the operation of said facilities; and

(f)   Sequoia is not aware of any Security Interest, easement, covenant or other restriction applicable to the real property subject to the Lease which would reasonably be expected to materially impair the current uses or the occupancy by Sequoia or a Subsidiary of the property subject thereto.

2.12   Environmental Matters.  Sequoia has complied with all applicable Environmental Laws relating to all properties and premises (the "Leased Premises") subject to each lease that is an Assigned Contract.  There is no pending or, to the knowledge of Sequoia, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request by any Governmental Entity, relating to any Environmental Law involving or relating to the Leased Premises.  Sequoia has no liabilities or obligations arising from the release of any Materials of Environmental Concern into the environment from, involving or relating to the Leased Premises.  Sequoia is not a party to or bound by any court

- 7 -

order, administrative order, consent order or other agreement with any Governmental Entity entered into in connection with any legal obligation or liability arising under any Environmental Law involving or relating to the Leased Premises. Sequoia has provided Dominion with a complete and accurate copy of each document (whether in hard copy or electronic form) that contains any environmental reports, investigations and audits relating to the Leased Premises.

2.13    Disclosure. No representation or warranty by Sequoia contained in this Agreement, and no statement contained in any other document, certificate or other instrument delivered or to be delivered by or on behalf of Sequoia relating to the Acquired Assets or the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading. Sequoia has disclosed to Dominion all material information relating to any of (i) the Acquired Assets and (ii) the transactions contemplated by this Agreement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF DOMINION

Dominion represents and warrants to Sequoia that the statements contained in this Article III are true and correct as of the date of each of the Closings:

3.1    Organization, Qualification and Corporate Power. Dominion is a corporation duly organized, validly existing and in corporate and tax good standing under the laws of Canada. Dominion is duly qualified to conduct business and is in corporate good standing under the laws of each jurisdiction in which the nature of Dominion's businesses or the ownership or leasing of its properties requires such qualification, except where failure to do so would not have a material adverse effect on Dominion's ability to complete the transactions contemplated by this Agreement. Dominion has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

3.2    Authorization of Transaction. Dominion has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by Dominion of this Agreement and the performance by Dominion of this Agreement and the Ancillary Agreements and the consummation by Dominion of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Dominion. This Agreement has been duly and validly executed and delivered by Dominion and constitutes, and each of the Ancillary Agreements, upon its execution and delivery by Dominion, will constitute, a valid and binding obligation of Dominion, enforceable against Dominion in accordance with its terms.

3.3    Noncontravention. Neither the execution and delivery by Dominion of this Agreement or the Ancillary Agreements, nor the consummation by Dominion of the transactions contemplated hereby or thereby, will conflict with or violate any provision of the Certificate of Incorporation or by-laws of Dominion or violate any order, writ, injunction, decree, statute, rule

- 8 -

or regulation that may have a material adverse effect on Dominion's ability to consummate the transactions contemplated by this Agreement.

3.4    Litigation.  There is no Legal Proceeding which is pending or has been threatened in writing against Dominion which in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by this Agreement.

3.5    New York Contract.  Dominion has received no written notice of, and to the knowledge of Dominion no event has occurred, is pending, or is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a material breach or material default of Sequoia under the New York Contract.

## ARTICLE IV

## COVENANTS

4.1    Closing Efforts.  Each of the Parties shall use its Reasonable Best Efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including using its Reasonable Best Efforts to cause (i) its representations and warranties to remain true and correct in all material respects through the date of the Contract Closing and (ii) the conditions to the obligations of the other Party to consummate the transactions contemplated by this Agreement to be satisfied.

4.2    Matters Relating to the State of New York.

(a)    At the Accounts Receivable Closing, Sequoia shall deliver to each obligor of any account receivable constituting part of the Acquired Assets being transferred at the Accounts Receivable Closing (and provide Dominion with a copy) documentation satisfactory to Dominion whereby Sequoia irrevocably directs such obligor to make payment of such account receivable to an account designated by Dominion.

(b)    Effective upon the Accounts Receivable Closing, Sequoia shall (i) immediately cease invoicing all Governmental Entities of, or located within, the State of New York with respect to (A) any of the Acquired Assets purchased at the Accounts Receivable Closing or (B) any Acquired Assets arising between the Accounts Receivable Closing and the earlier of the Contract Closing or the termination of the Parties' obligation to conduct the Contract Closing in accordance with Section 8.1, and (ii) invoice such persons at the direction of, and on behalf of, Dominion.

4.3    Exclusivity.

(a)    Sequoia shall not, and Sequoia shall require each of its officers, directors, employees, representatives and agents not to, directly or indirectly, (i) initiate, solicit, encourage or otherwise facilitate any inquiry, proposal, offer or discussion with any other person or entity (other than Dominion) concerning any sale or transfer of the Acquired Assets (whether via merger, stock sale, asset sale or license), (ii) engage in discussions or negotiations with any person or entity (other than Dominion) concerning any transaction involving the Acquired Assets, or (iii) enter in any agreement with any person or entity (other than Dominion)

- 9 -

concerning any such transaction involving the Acquired Assets; without limiting the foregoing, for the sake of clarity, the foregoing shall not restrict Sequoia from discussing, negotiating or selling assets or shares of the Company not involving the Acquired Assets.

(b)    Sequoia shall immediately notify any person or entity with which discussions or negotiations of the nature described in paragraph (a) above were pending that Sequoia is terminating such discussions or negotiations. If Sequoia receives any inquiry, proposal or offer of the nature described in paragraph (a) above, Sequoia shall, within one business day after such receipt, notify Dominion of such inquiry, proposal or offer, including the identity of the other person or entity and the terms of such inquiry, proposal or offer.

4.4    <u>Billing Assistance</u>. Sequoia shall make available to Dominion an employee of Sequoia for up to four (4) hours per week for a period of six (6) months following the date of this Agreement to assist Dominion with administration of existing invoices issued pursuant to, and accounts receivable payable under, the New York Contract.

4.5    <u>Certification Costs.</u> Prior to execution of this Agreement, Dominion has paid to the New York State Board of Elections the sum of Three Hundred Fifty Thousand ($350,000) Dollars, representing an installment of certification costs payable under the New York Contract on July 6, 2009. Additionally, prior to the Contract Closing, Dominion may pay to the New York State Board of Elections additional monthly sums (expected to be approximately the same size as that paid with respect to the above-referenced payment), representing further installments of certification costs payable under the New York Contract due in subsequent months. If either (i) any of the parties has been definitively informed by a New York Government Entity in writing that the Office of the State Comptroller of the State of New York will not consent to the assignment of the New York Contract, or (ii) any termination right under Article VIII shall have been exercised, Sequoia shall within five (5) business days thereof re-pay one-half of the amount of all amounts paid by Dominion pursuant to this Section 4.5. In the event Sequoia shall fail to pay such amount when due, the amount owing will bear interest at the rate stated in Section 1.3(f) and Sequoia shall pay a four percent (4%) late charge (but not the two percent (2%) late charge) substantially in accordance with the terms of Section 1.3(f) on a reciprocal basis.

4.6    <u>State of New York Consent to Transfer</u>.

The Parties acknowledge and agree that under Section 138 of the New York State Finance Law, the New York Contract may not be assigned by Sequoia to Dominion until approval of the assignment by agencies of the State of New York whose consent is required by law including, the New York Office of General Services and the New York State Board of Elections, and subsequently by the Office of State Comptroller (approval by the Office of the State Comptroller being referred to herein as "<u>Comptroller Approval</u>"). The Parties do not intend, and nothing herein shall be interpreted, to constitute a shift in control or performance under the New York Contract by Sequoia as to constitute an assignment, transfer or conveyance which is inpermissible absent Comptroller Approval. Until the Contract Closing or the earlier termination of the parties' obligation to conduct the Contract Closing in accordance with Article VIII, the parties will proceed as follows:

- 10 -

(a)    Dominion shall, as a subcontractor to Sequoia, continue to perform Dominion's obligations under that certain Agreement between Dominion and Sequoia dated April 27, 2007 and under the Memorandum of Understanding Number One dated on or about March 15, 2008 (the "Prior Agreement"), and the Prior Agreement is hereby modified during such period so as to provide that Dominion will also undertake and perform at Dominion's sole cost and expense, those obligations under Sections 1B, 2 and 5 of the Prior Agreement.   Upon the Contract Closing, the Prior Agreement shall be deemed terminated and of no further effect except with respect to any provisions deemed a Non-Released Matter;

(b)    Dominion will be solely responsible and entitled to direct the preparation and content of the invoices to the State of New York relating to the New York Contract which are to be sent by Sequoia pursuant to Section 4.2(b) above; and

(c)    If the Parties receive notice from the Office of State Comptroller that Comptroller Approval has been rejected then (i) the Parties will work together in good faith for a period of no less than ten (10) days to try to reach agreement on an alternative arrangement (whether via a pass-through mechanism or otherwise) that has substantially the same economic effect as would have resulted had Comptroller Approval been received and that does not cause the termination of, or a right to terminate, the New York Contract, and (ii) if the parties are unable to reach agreement pursuant to subsection "(i)" above, then the Parties will take the steps set forth in Section 8.2 below.

4.7    Real Property Lease.  Promptly upon execution of this Agreement, the Parties shall use Reasonable Best Efforts to obtain the consent of the landlord of the Jamestown, New York facility to assignment of the Lease to Dominion or its designated Subsidiary.  At the last to occur of the Parties obtaining the consent of the landlord to assignment, effective and contingent upon the Contract Closing Date, the Parties shall execute and deliver a lease assignment and assumption agreement in the form attached as Exhibit C (the "Lease Assignment and Assumption Agreement").

4.8    FIRPTA Certificate.  Within 10 days prior to the Contract Closing, Sequoia shall deliver or cause to be delivered to Dominion a certification that Sequoia is not a foreign person, in accordance with the Treasury Regulations under Section 1445 of the Code, in a form reasonably satisfactory to Dominion.  If Sequoia has not provided such certificate, the Buyer, in accordance with Section 1.6 of this Agreement, shall be permitted to withhold from the Purchase Price an amount equal to any required withholding Tax under Section 1445 of the Code.

4.9    Limited Release.  Effective upon the Accounts Receivable Closing, each Party, on behalf of itself and its successors and assigns and all representatives of the foregoing, intending to be legally bound hereby, irrevocably and unconditionally remises, waives, releases, acquits and forever discharges the other Party, and each of its former, present and future owners, stockholders, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, counsel, agents and representatives, and all persons acting by, through, under or in concert with any of them (together the "Released Parties"), from each of the defaults claimed by it, (a) in the case of Dominion, under that certain notice of default sent on its behalf to Sequoia dated June 1, 2009, and (b) in the case of Sequoia, under that certain notice of default sent to Dominion dated June 5, 2009.

- 11 -

4.10    Non-disparagement.  Neither Party, any employee or person under control of that Party, nor Mr. Jack Blaine nor Mr. John Poulos, will make any false, disparaging or derogatory statements to any third party, including without limitation, any media outlet, industry group, financial institution or current or former employee, consultant, client or customer of any other Party regarding such other Party or any of such Party's directors, officers, employees, agents or representatives or about such Party's business affairs or financial condition; provided that the foregoing shall not in any way restrict a Party from enforcing its rights against the other Party in connection with a claim, suit or dispute involving the Parties..

## ARTICLE V

## CONDITIONS TO CONTRACT CLOSING

5.1    Conditions to Obligations of Both Parties.  The obligation of the parties to consummate the transactions contemplated by this Agreement to be consummated at the Contract Closing is subject to the satisfaction of the following conditions (provided that if a Party has not acted in good faith to satisfy one of the below conditions applicable to it, it shall be barred from relying on the non-satisfaction of such condition to justify its failure to consummate the Contract Closing):

(a)    The parties shall have executed and delivered the Transfer Documents; and

(b)    The New York Contract shall have been validly assigned (including all required third party consents, such as any required consents from Governmental Entities of the State of New York and including without limitation the New York State Board of Elections and the Office of General Services); and

(c)    no Legal Proceeding shall be pending or threatened wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement to occur at the Contract Closing, (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation or (iii) affect adversely the right of Dominion to own, operate or control any of the Acquired Assets, and no such judgment, order, decree, stipulation or injunction shall be in effect.

5.2    Additional Conditions to Obligations of Dominion.  The obligation of Dominion to consummate the transactions contemplated by this Agreement to be consummated at the Contract Closing is subject to the satisfaction of the following additional conditions:

(a)    the representations and warranties of Sequoia shall be true and correct in all respects;

(b)    Sequoia shall have performed or complied with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Contract Closing;

(c)    Sequoia shall have delivered to Dominion documents evidencing the release or termination of all Security Interests on the Acquired Assets, and copies of filed UCC

- 12 -

US1DOCS 7199709v16

termination statements with respect to all UCC financing statements evidencing Security Interests;

(d)     Sequoia shall have delivered to Dominion a list of all accounts receivable constituting part of the Acquired Assets as of the date of the Contract Closing; and

(e)     Sequoia shall have delivered to Dominion documentation satisfactory to Dominion of the termination of the Source Code Escrow Agreement relating to certain course code of Dominion of which Sequoia is the beneficiary, unless as a requirement of the transfer of the New York Contract, the State of New York requires Sequoia to remain liable therefore, in which case such Source Code Escrow Agreement may remain in effect provided that Sequoia shall be individually responsible for all costs related thereto.; and

(f)     The Lease shall have been validly assigned or the Parties shall proceed under Section 6.1(a).

5.3     <u>Additional Conditions to Obligations of Sequoia.</u>  The obligation of Sequoia to consummate the transactions contemplated by this Agreement to be consummated at the Contract Closing is subject to the satisfaction of the following additional conditions:

(a)     the representations and warranties of Dominion shall be true and correct in all respects; and

(b)     Dominion shall have performed or complied with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Contract Closing.

**ARTICLE VI**

**POST-CONTRACT CLOSING COVENANTS**

6.1     <u>Lease; Offer to Employ Certain Specified Employees.</u>

(a)     If the Contract Closing occurs and the consent of the landlord to assignment of the Lease to Dominion or its designated Affiliate has not yet been obtained, Sequoia shall make reasonable accommodations to permit use of such facility by Dominion in connection with performance of the New York Contract.  In the event that such consent of the landlord is not obtained within 30 days following the Contract Closing despite the use of Reasonable Best Efforts by the Parties, the Parties agree to confer and work in good faith reach mutual agreement upon an alternative plan for use of such facility.

(b)     Each of Dominion and its designated Subsidiary may offer employment effective and contingent upon the Contract Closing, terminable at the will of Dominion or such Subsidiary, to the Specified Employees.  Sequoia hereby consents to the hiring of any such employees by each of Dominion or its Subsidiary and waives, with respect to the employment by each of Dominion or such Subsidiary of such employees, any claims or rights Sequoia may have against Dominion, such Subsidiary or any such employee under any non-competition, confidentiality or employment agreement.  On a case-by-case basis, each of Dominion and its

- 13 -

Subsidiary may negotiate with the Specified Employees for the forgiveness of vacation pay otherwise owed by Sequoia to such Specified Employees, and Dominion shall be responsible for the amount of the accrued vacation pay of the Specified Employees that it hires up to an aggregate of $26,000 (which amount shall be reimbursed to Sequoia within three (3) business days after receipt by Dominion of reasonable proof of payment by Sequoia of such accrued vacation pay to such hired Specified Employees). In the event Dominion shall fail to pay such reimbursement when due, the amount owing will bear interest at the rate stated in Section 1.3(f) and Dominion shall pay the four percent (4%) late charge (but not the two percent (2%) late charge) stated in Section 1.3(f).

      6.2.   Non-solicitation; non-hire. For a period of two (2) years after the Contract Closing Date, (i) neither Party shall solicit any person who was an employee of the other Party as of July 1, 2009 to terminate his or her employment with the other Party, and (ii) neither Party will hire, contract with, or retain in any capacity any person who is or was an employee of the other Party as of July 1, 2009 prior to the expiration of a period of three (3) months after such employee terminates his or her employment with the other Party provided, however, that such three (3) month restriction will not be applicable (x) in the event such employee was involuntarily terminated by the other Party, or (y) the other Party permanently ceases business operations; and further provided, that notwithstanding the foregoing, any solicitation or hiring by Dominion of the Specified Employees shall be excepted from the foregoing restrictions. The Parties recognize that a violation of Section 6.2(ii) by a Party would subject the other Party to substantial economic harm, the amount of which is not susceptible to precise determination, and accordingly, as liquidated damages, and not as a penalty, the Parties agree that a Party violating the provisions of Section 6.2(ii) shall pay to the other Party liquidated damages in the amount of One Hundred Thousand Dollars ($100,000) per violation. Notwithstanding the foregoing, in the event that Dominion violates Section 6.2(ii) with respect to Waldeep Singh or Eric Coomer, current employees of Sequoia, Dominion shall pay liquidated damages of Two Hundred Thousand Dollars ($200,000). This Section 6.2 shall immediately terminate if either Party permanently ceases business operations prior to the expiration of the two (2) year period described above.

      6.3   Non-Competition.

      (a)   For a period of five (5) years after the Contract Closing Date, Sequoia shall not, either directly or indirectly as a stockholder, investor, partner, consultant or otherwise, compete with Dominion for the provision of voting systems, products or services to any Governmental Entity of, or located within, the State of New York, except that notwithstanding the foregoing, Sequoia may, commencing three (3) years after the Contract Closing Date, respond to requests for proposals, and enter into and perform any resulting contract, to provide voting systems (other than optical scan and ballot marking device voting systems and/or voting systems that compete with the ICP systems) under any other or successor contract with any Governmental Entity of, or located within, the State of New York. Notwithstanding the foregoing, Sequoia may continue to provide printing services relating to ballots used on the current generation of NCS machines until January 31, 2010, and Sequoia may continue to provide printing services relating to ballots used on the current generation of NCS machines after January 31, 2010 provided it pays Dominion the New York State Print Revenue Share. Also notwithstanding the foregoing, Sequoia may continue to promote, provide and sell

- 14 -

all current and future products of Robis Elections, Inc. and its successor companies ("Robis"), provided, however, that during the five (5) year restrictive period Sequoia shall not promote, provide or sell within the State of New York any future product of Robis which records or tabulates votes and/or competes with the ICP systems.

(b)     For a period of five (5) years after the Contract Closing Date, Dominion shall not sell or promote any current or future products of Robis Elections, Inc. in the State of New York, except through Sequoia as Dominion's exclusive subcontractor, irrespective of whether the products of Robis Elections, Inc. have been included in or added as available products under the New York Contract. In the event Dominion receives purchase order(s) or other requests for any such products for use in the State of New York during said five (5) year period (the "Robis products"), Dominion will promptly transmit the same to Sequoia. Sequoia shall be exclusively entitled to all proceeds from the sale of such Robis products, and Dominion shall, upon Sequoia's request, invoice the State of New York or the purchaser on a pass-through basis for the purchase price of such Robis products. Upon receipt of the purchase price by Dominion, Dominion will pay the same to Sequoia within three (3) business days of receipt.

(c)     The Parties agree that the duration and geographic scope of the restrictive provision set forth in this Section are reasonable. In the event that any court determines that the duration or the geographic scope, or both, are unreasonable and that such provision is to that extent unenforceable, the Parties agree that the provision shall remain in full force and effect for the greatest time period and in the greatest area that would not render it unenforceable.

6.4     Tax Matters. All transfer taxes, deed excise stamps and similar charges related to the sale of the Acquired Assets contemplated by this Agreement shall be borne equally by the Parties. Dominion and Sequoia (or any successor or assignee of Sequoia) and their respective Affiliates shall cooperate in the preparation of all Tax Returns for any Tax periods for which one Party could reasonably require the assistance of the other Party in obtaining any necessary information. Dominion and Sequoia and their respective Affiliates shall make their respective employees and facilities available on a mutually convenient basis to explain any documents or information provided hereunder.

6.5     Cooperation in Sales. From and after the Contract Closing Date until the date when orders satisfying the conditions of Sections 1.3(d) and 1.3(e) have been issued to Dominion or a third party, Sequoia and Mr. Jack Blaine shall reasonably cooperate with Dominion, and provide assistance as reasonably requested by Dominion, with respect to prospective sales by Dominion to any Governmental Entity of or located within the State of New York or City of New York.

6.6     Collection of Accounts Receivable. Sequoia agrees that it shall forward promptly to Dominion any monies, checks or instruments received by Sequoia after the Accounts Receivable Closing with respect to the accounts receivable constituting part of the Acquired Assets (including any accounts receivable that constitute Acquired Assets arising between the Accounts Receivable Closing and the Contract Closing). Sequoia shall provide to Dominion such reasonable assistance (but shall not be required to incur any out-of-pocket costs) as Dominion may request with respect to the collection of any such accounts receivable. Sequoia hereby grants to Dominion a power of attorney to endorse and cash any checks or instruments

- 15 -

payable or endorsed to Sequoia or its order which are received by Dominion and which are solely from accounts receivable constituting part of the Acquired Assets (including any accounts receivable that constitute Acquired Assets arising between the Accounts Receivable Closing and the Contract Closing).

6.7     Cooperation in Litigation.  From and after the Contract Closing Date, each Party shall fully cooperate with the other in the defense or prosecution of any litigation or proceeding already instituted or which may be instituted hereafter against or by such other Party relating to or arising out of the conduct of the business of Sequoia or Dominion prior to or after the Contract Closing Date (other than litigation among the Parties and/or their Affiliates arising out the transactions contemplated by this Agreement).  The Party requesting such cooperation shall pay the reasonable out-of-pocket expenses incurred in providing such cooperation (including legal fees and disbursements) by the Party providing such cooperation and by its officers, directors, employees and agents, but shall not be responsible for reimbursing such Party or its officers, directors, employees and agents, for their time spent in such cooperation.  Any conflict between this Section 6.7 and that certain letter agreement related to the Joint Limited Representation of Sequoia and Dominion dated December 30, 2008 shall be governed by such letter agreement.

6.8     New York State Print Revenue Share.  Effective as of and contingent upon the Contract Closing, following January 31, 2010, Sequoia shall pay Dominion fifty percent (50%) of the New York State Print Revenue.  Sequoia will pay amounts owed to Dominion from time to time under this Section 6.8 by wire transfer of immediately available funds within three (3) business days of the date actually received by Sequoia.  In the event Sequoia becomes obligated to refund any New York State Print Revenue, Dominion shall, within thirty (30) days of demand by Sequoia, refund to Sequoia Dominion's proportionate share of refundable amounts paid to Dominion arising from the purchase order(s) as to which the refund is made.  Dominion shall have the right to audit Sequoia's books and records to verify the payments made to Dominion with respect to New York Print Revenue, which audit rights of Dominion shall be reciprocal to the audit rights of Sequoia pursuant to Section 1.3(g) above.   In the event Sequoia shall fail to pay such amount when due, the amount owing will bear interest at the rate stated in Section 1.3(f) and Sequoia shall pay a four percent (4%) late charge (but not the two percent (2%) late charge) substantially in accordance with the terms of Section 1.3(f) on a reciprocal basis.

6.9     Phoenix and Michael Frontera.  Effective as of and contingent upon the Contract Closing, Dominion will negotiate in good faith with Phoenix Graphics and Michael Frontera to reach agreement with such person for the performance of services on behalf of Dominion similar to those currently provided by such person on behalf of Sequoia.

6.10    Escrow.  Effective as of and contingent upon the Contract Closing, if Sequoia fails to pay all escrow agent fees associated with the Source Code Escrow Agreement to which the Parties are party relating to escrow of source code and other materials of Dominion of which Sequoia is the beneficiary, Sequoia shall at the request of Dominion, deliver to Dominion documentation satisfactory to Dominion of the termination of the Source Code Escrow Agreement.

6.11    Release.  Effective as of and contingent upon the Contract Closing, each Party, on behalf of itself and its successors and assigns and all representatives of the foregoing, intending

- 16 -

to be legally bound hereby, irrevocably and unconditionally remises, waives, releases, acquits and forever discharges the other Party, and each of its former, present and future owners, stockholders, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, counsel, agents and representatives, and all persons acting by, through, under or in concert with any of them (together the "Released Parties"), from any and all charges, complaints, transactions, payment obligations, claims, liabilities, obligations, promises, reckonings, accounts, bonds, bills, specialties, covenants, contracts, agreements (including without limitation under (i) the Agreement of April 27, 2007 between the Parties, (ii) the Memorandum of Understanding Number One dated March 15, 2008 between the Parties, and (iii) the Settlement Agreement dated December 2008 between the Parties, in each case, except for the Non-Released Matters), variances, trespasses, agreements, controversies, damages, actions, causes of action, suits, rights, judgment, extent, execution, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown, express or implied that such Party now has, owns, or holds, or claims to have, own, or hold, or that such Party at any time heretofore had, owned, or held, or claimed to have had, owned, or held, either in law, in equity or otherwise, against the Released Parties, other than with respect to the Non-Released Matters.

## ARTICLE VII

## INDEMNIFICATION

7.1   <u>Indemnification by Sequoia</u>.  Sequoia shall indemnify Dominion in respect of, and hold Dominion harmless against, any and all Damages incurred or suffered by Dominion or any Affiliate thereof resulting from, relating to or constituting:

(a)   any breach, as of the date of this Agreement or as of the applicable Closing Date, of any representation or warranty of Sequoia contained in this Agreement, any Ancillary Agreement or any other agreement or instrument furnished by Sequoia to Dominion pursuant to this Agreement provided that any such claim must be made, if at all, on or before October 31, 2010; or

(b)   any failure to perform any covenant or agreement of Sequoia contained in this Agreement, any Ancillary Agreement or any agreement or instrument furnished by Sequoia to Dominion pursuant to this Agreement; or

(c)   following the Contract Closing, any Retained Liabilities; or

(d)   the failure, in connection with the sale of the Acquired Assets by Sequoia to Dominion pursuant to this Agreement, of any person or entity to comply with, and obtain for Dominion the benefits afforded by compliance with, any applicable bulk transfers laws, including, without limitation, as provided under New York State Consolidated Laws, Ch. 60, Art. 28, Part IV, Section 1141(c) and related regulations; or

(e)   without limiting its other indemnification obligations under this Agreement, any act or omission of Sequoia with respect to any of the Acquired Assets purchased

- 17 -

at the Accounts Receivable Closing from the date of the Accounts Receivable Closing to the date
of the Contract Closing; or

        (f)     an obligation of such party with respect to the Avante Litigation arising
under subsection (vi) of the definition of the Non-Released Matter.

    7.2    <u>Indemnification by Dominion</u>.  Dominion shall indemnify Sequoia in respect of,
and hold Sequoia harmless against, any and all Damages incurred or suffered by Sequoia or any
Affiliate thereof resulting from, relating to or constituting:

        (a)     any breach, as of the date of this Agreement or as of the applicable
Closing Date, of any representation or warranty of Dominion contained in this Agreement, any
Ancillary Agreement or any other agreement or instrument furnished by Dominion to Sequoia
pursuant to this Agreement provided that any such claim must be made, if at all, on or before
October 31, 2010; or

        (b)     any failure to perform any covenant or agreement of Dominion contained
in this Agreement, any Ancillary Agreement or any agreement or instrument furnished by
Dominion to Sequoia pursuant to this Agreement (including without limitation Dominion's
obligations to perform those certain obligations of Sequoia (relating to the New York Contract)
under the Prior Agreement as modified by Section 4.6(a) above); or

        (c)     following the Contract Closing, any Assumed Liabilities; or

        (d)     without limiting its other indemnification obligations under this
Agreement, any acts or omissions of Dominion with respect to (A) any of the Acquired Assets
purchased at the Accounts Receivable Closing and (B) any inventory or equipment listed on
Schedule 2.8 that is controlled by Dominion, in each case from the date of the Accounts
Receivable Closing to the date of the Contract Closing; or

        (e)     an obligation of such party with respect to the Avante Litigation arising
under subsection (vi) of the definition of the Non-Released Matter.

    7.3    <u>Indemnification Claims</u>.

        (a)     The party seeking indemnification (an "<u>Indemnified Party</u>") shall give
written notification to the indemnifying party (the "<u>Indemnitor</u>") of the commencement of any
Third Party Action.  Such notification shall be given within twenty (20) days after receipt by the
Indemnified Party of notice of such Third Party Action, and shall describe in reasonable detail
(to the extent known by the Indemnified Party) the facts constituting the basis for such Third
Party Action and the amount of the claimed damages; provided, however, that no delay or failure
on the part of the Indemnified Party in so notifying Indemnitor shall relieve Indemnitor of any
liability or obligation hereunder except to the extent of any damage or liability caused by or
arising out of such failure.  Within twenty (20) days after delivery of such notification,
Indemnitor may, upon written notice thereof to the Indemnifying Party, assume control of the
defense of such Third Party Action with counsel satisfactory to the Indemnifying Party; provided
that (i) Indemnitor may only assume control of such defense if it acknowledges in writing to the
Indemnified Party that any damages, fines, costs or other liabilities that may be assessed against

- 18 -

the Indemnified Party in connection with such Third Party Action constitute Damages for which the Indemnified Party shall be indemnified pursuant to this Article VII and (ii) Indemnitor may not assume control of the defense of Third Party Action involving criminal liability or in which equitable relief is sought against the Indemnified Party. If Indemnitor does not, or is not permitted under the terms hereof to, so assume control of the defense of a Third Party Action, the Indemnified Party shall control such defense. The Non-Controlling Party may participate in such defense at its own expense. The Controlling Party shall keep the Non-Controlling Party advised of the status of such Third Party Action and the defense thereof and shall consider in good faith recommendations made by the Non-Controlling Party with respect thereto. The Non-Controlling Party shall furnish the Controlling Party with such information as it may have with respect to such Third Party Action (including copies of any summons, complaint or other pleading which may have been served on such Party and any written claim, demand, invoice, billing or other document evidencing or asserting the same) and shall otherwise cooperate with and assist the Controlling Party in the defense of such Third Party Action. The fees and expenses of counsel to the Indemnified Party with respect to a Third Party Action shall be considered Damages for purposes of this Agreement if (i) the Indemnified Party controls the defense of such Third Party Action pursuant to the terms of this Section 7.3(a) or (ii) Indemnitor assumes control of such defense and the Indemnified Party reasonably concludes that Indemnitor and the Indemnified Party have conflicting interests or different defenses available with respect to such Third Party Action. The Indemnitor shall not agree to any settlement of, or the entry of any judgment arising from, any Third Party Action without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed. The Indemnitor shall not agree to any settlement of, or the entry of any judgment arising from, any such Third Party Action without the prior written consent of Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed.

(b)     In order to seek indemnification under this Article VII, the Indemnified Party shall deliver a Claim Notice to Indemnitor.

(c)     Within 20 days after delivery of a Claim Notice, Indemnitor shall deliver to the Indemnified Party a Response, in which Indemnitor shall:  (i) agree that the Indemnified Party is entitled to receive all of the Claimed Amount (in which case the Response shall be accompanied by a payment by Indemnitor to the Indemnified Party of the Claimed Amount, by check or by wire transfer), (ii) agree that the Indemnified Party is entitled to receive the Agreed Amount (in which case the Response shall be accompanied by a payment by Indemnitor to the Indemnified Party of the Agreed Amount, by check or by wire transfer), or (iii) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount.

(d)     Notwithstanding the other provisions of this Section 7.3, if a third party asserts (other than by means of a lawsuit) that the Indemnified Party is liable to such third party for a monetary or other obligation which may constitute or result in Damages for which such Indemnified Party may be entitled to indemnification pursuant to this Article VII, and the Indemnified Party reasonably determines that it has a valid business reason to fulfill such obligation, then (i) the Indemnified Party shall be entitled to satisfy such obligation, without prior notice to or consent from Indemnitor, (ii) the Indemnified Party may subsequently make a claim for indemnification in accordance with the provisions of this Article VII, and (iii) the Indemnified Party shall be reimbursed, in accordance with the provisions of this Article VII, for

- 19 -

any such Damages for which it is entitled to indemnification pursuant to this Article VII (subject to the right of Indemnitor to dispute the Indemnified Party's entitlement to indemnification, or the amount for which it is entitled to indemnification, under the terms of this Article VII).

      7.4    <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties set forth in this Agreement shall survive the Closings until October 31, 2010. Except for matters constituting a breach by Dominion of Section 3.5 with respect to the New York Contract, the rights to indemnification set forth in this Article VII shall not be affected by (i) any investigation conducted by or on behalf of Dominion or any knowledge acquired (or capable of being acquired) by Dominion with respect to the inaccuracy or noncompliance with any representation, warranty, covenant or obligation which is the subject of indemnification hereunder or (ii) any waiver by Dominion of any closing condition relating to the accuracy of any representations and warranties or the performance of or compliance with agreements and covenants.

      7.5    <u>Treatment of Indemnity Payments</u>.  Any payments made pursuant to this Article VII shall be treated as an adjustment to the Purchase Price for tax purposes.

## ARTICLE VIII

## TERMINATION

      8.1    <u>Termination of Agreement with Respect to Contract Closing</u>.  The Parties may terminate their obligations to complete the Contract Closing, as provided below:

          (a)    the Parties may by mutual written consent agree not to effect the Contract Closing;

          (b)    Dominion may terminate its obligations to conduct the Contract Closing by giving written notice to Sequoia:

          (i)    in the event Sequoia is in material breach of any representation, warranty or covenant contained in this Agreement, and such breach (1) individually or in combination with any other such breach, would cause the conditions set forth in clauses (a) or (b) of  Section 5.2 not to be satisfied and (2) is not cured within 10 days following delivery by Dominion to Sequoia of written notice of such breach; or

          (ii)    if the Contract Closing shall not have occurred on or before the later of (i) September 15, 2009 or (ii) if, prior to September 15, 2009, the ten (10) day discussion period under Section 4.6(c) has been triggered, such ten (10) day period; and

          (c)    Sequoia may terminate its obligations to conduct the Contract Closing by giving written notice to Dominion:

          (i)    in the event Dominion is in material breach of any representation, warranty or covenant contained in this Agreement, and such breach (1) individually or in combination with any other such breach, would cause the conditions set forth in clauses (a) or (b)

- 20 -

of Section 5.3 not to be satisfied and (2) is not cured within 10 days following delivery by Sequoia to Dominion of written notice of such breach; or

             (ii)    if the Contract Closing shall not have occurred on or before the later of (i) September 15, 2009 or (ii) if, prior to September 15, 2009, the ten (10) day discussion period under Section 4.6(c) has been triggered, such ten (10) day period.

    8.2   <u>Effect of Termination</u>.  If the obligation to complete the Contract Closing is terminated pursuant to Section 8.1, then:

          (a)    all obligations of the Parties hereunder to complete the Contract Closing shall terminate without any liability of either Party to the other Party (except for any liability of a Party for breaches of this Agreement prior to such termination);

          (b)    the Parties will take commercially reasonable steps, as necessary, to cancel the transfer to Dominion of, or re-transfer to Sequoia, the New York Contract;

          (c)    the Parties will take commercially reasonable steps to direct obligors under the New York Contract to make payment of accounts receivable arising after the date of such termination to an account designated by Sequoia; (For the avoidance of doubt, "accounts receivable arising after the date of such termination" shall relate to products or services that are provided after such date.  Any products or services provided before such date shall be invoiced by Sequoia at the direction of Dominion, and remain, the property of Dominion whether they have been invoiced or not as of such termination date);

          (d)    Sequoia may invoice all Governmental Entities of, or located within, the State of New York with respect to the New York Contract without direction from Dominion (except as provided in subsection "(c)" above;

          (e)    Sections 4.3 (exclusivity) and 4.4 (billing assistance) shall be of no further force or effect;

          (f)    Sequoia shall within five (5) business days pay the amounts for certification costs described in Section 4.5, and Dominion shall have no obligation to pay the full amounts thereof for any future period;

          (g)    The Prior Agreement shall continue in full force and effect without the modifications described in Section 4.6(a) above;

          (h)    Sections 4.7 (negotiations with landlord) shall be of no further force or effect; and

          (i)    <u>At</u> the request of Dominion or Sequoia, and without further consideration, each party shall execute and deliver such other instruments of sale, transfer, conveyance and assignment and take such actions as may be reasonably required (provided that neither party shall be required to incur any material out of pocket expenses unless advanced by the other Party) in order to effect the foregoing, provided that nothing herein shall result in the Acquired

- 21 -

Assets transferred to Dominion at the Accounts Receivable Closing or arising thereafter prior to the termination of the obligations under Section 8.1 to be re-transferred to Sequoia.

# ARTICLE IX

## DEFINITIONS

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"Accounts Receivable Closing" has the meaning set forth in Section 1.1(a).

"Acquired Assets" shall mean:

(a)    all rights under the Assumed Contracts;

(b)    all trade and other accounts receivable and all rights to unbilled amounts for products delivered or services provided arising under the New York Contract, together with any security held by Sequoia for the payment thereof, whether (i) in existence on the date of any Closing, or (ii) arising after the date of the Accounts Receivable Closing through the earlier of the Contract Closing or the termination of the Parties' obligation to conduct the Contract Closing in accordance with Section 8.1 (including without limitation all amounts invoiced pursuant to Section 4.2(b) above), and in each case all proceeds thereof; (For the avoidance of doubt, including all of the foregoing regardless of whether or not Sequoia alone or jointly with Dominion has provided the goods or services underlying such receivables);

(c)    all amounts paid or prepaid as deposits on account of certification costs to independent test labs;

(d)    all inventories of samples, test units, raw materials, work in process, finished goods, supplies, packaging materials, spare parts and similar items, wherever located, including without limitation consignment inventory and inventory held on order or in transit, arising under the New York Contract, including without limitation those items jointly owned by the Parties and those items identified on Schedule 2.8;

(e)    copies of all material and relevant books, records, accounts, ledgers, files and documents related to the Acquired Assets; and

(f)    all goodwill associated with performance under the Assumed Contracts.

"Affiliate" shall mean any affiliate, as defined in Rule 12b-2 under the Securities Exchange Act of 1934.

"Agreed Amount" shall mean part, but not all, of the Claimed Amount.

- 22 -

"Ancillary Agreements" shall mean the Transfer Documents and other instruments of conveyance referred to in Section 1.4(d)(ii).

"Assumed Contracts" means:

1. that contract with the State of New York Executive Department, Office of General Services, titled "Group 22300 – VOTING SYSTEMS AND RELATED SERVICES AND BALLOT MARKING OR OTHER VOTING DEVICES ACCESSIBLE TO INDIVIDUALS WITH DISABILITIES (Statewide) with an original contract period running from January 23, 2008 to January 31, 2013 granting a concession or license to sell voting systems complying with the requirement of the Help America Vote Act and Ballot Marking or other Voting Device Accessible to Individuals with Disabilities within the State of New York, being New York Contract Number PC63813, as amended by amendment dated May 8, 2009 (the "New York Contract"); and

2. provided the landlord has consented to assignment of the Lease prior to the Contract Closing, the Lease.

"Assumed Liabilities" means:

1. following the Contract Closing, any and all liabilities or obligations (whether known or unknown, absolute or contingent, liquidated or unliquidated, due to or to become due and accrued and unaccrued and whether claims with respect hereto are asserted before or after the Contract Closing) which directly or indirectly arise from or relate to the ability of the machines provided under the New York Contract to properly function as required by such contract; and

2. following the Contract Closing, all performance required by, and obligations and liabilities arising under, the Assumed Contracts arising after the Contract Closing.

"Avante Litigation" means the matters captioned Avante Int'l Technology Corp. v. Premier Election Solutions, Inc. and Sequoia Voting Systems, Cases Nos. 4:06cv00978TCM and 4:08cv00587TCM.

"Claim Notice" shall mean written notification which contains (i) a description of the Damages incurred or reasonably expected to be incurred by an Indemnified Party and the Claimed Amount of such Damages, to the extent then known, (ii) a statement that an Indemnified Party is entitled to indemnification under Article VII for such Damages and a reasonable explanation of the basis therefor, and (iii) a demand for payment in the amount of such Damages.

"Claimed Amount" shall mean the amount of any Damages incurred or reasonably expected to be incurred by an Indemnified Party.

"Closing" has the meaning set forth in Section 1.1(b) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

- 23 -

"Comptroller Approval" shall mean the meaning set forth in Section 4.6.

"Controlling Party" shall mean the Party controlling the defense of any Third Party Action.

"Contract Closing" has the meaning set forth in Section 1.4(c).

"Contract Closing Date" shall mean the date of the Contract Closing.

"Damages" shall mean any and all debts, obligations and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), diminution in value, monetary damages, fines, fees, penalties, interest obligations, deficiencies, losses and expenses (including amounts paid in settlement, interest, court costs, costs of investigators, fees and expenses of attorneys, accountants, financial advisors and other experts, and other expenses of litigation and including, without limitation, any of the foregoing incurred in enforcing an Indemnified Party's right to indemnification).

"Dispute" shall mean the dispute resulting if an Indemnitor in a Response disputes its liability for all or part of the Claimed Amount.

"Environmental Law" shall mean any federal, state or local law, statute, rule, order, directive, judgment, permit or regulation or the common law relating to the environment, occupational health and safety, or exposure of persons or property to Materials of Environmental Concern, including any statute, regulation, administrative decision or order pertaining to:  (i) the presence of or the treatment, storage, disposal, generation, transportation, handling, distribution, manufacture, processing, use, import, export, labeling, recycling, registration, investigation or remediation of Materials of Environmental Concern or documentation related to the foregoing; (ii) air, water and noise pollution; (iii) groundwater and soil contamination; (iv) the release, threatened release, or accidental release into the environment, the workplace or other areas of Materials of Environmental Concern, including emissions, discharges, injections, spills, escapes or dumping of Materials of Environmental Concern; (v) transfer of interests in or control of real property which may be contaminated; (vi) community or worker right-to-know disclosures with respect to Materials of Environmental Concern; (vii) the protection of wild life, marine life and wetlands, and endangered and threatened species; (viii) storage tanks, vessels, containers, abandoned or discarded barrels and other closed receptacles; and (ix) health and safety of employees and other persons.  As used above, the term "release" shall have the meaning set forth in CERCLA.

"Excluded Assets" shall mean all assets of Sequoia other than the Acquired Assets (and for avoidance of doubt, the following assets, without limitation, shall be "Excluded Assets": (x) all agreements between Sequoia and Phoenix Graphics, Inc. including, but not limited to, (i) that certain Independent Contractor Agreement between Sequoia and Phoenix Graphics, Inc. dated June 30, 2006, and (ii) that certain Agreement between and Phoenix Graphics, Inc. dated July 7, 2006, and (iii) that certain Print Contract for New York City's Opscan Ballots between Sequoia and Phoenix Graphics, Inc. dated June 10, 2002, and (y) the Independent Contractor Agreement by and between Sequoia and Michael Frontera, and (z) all equipment and property of Sequoia not used in and related to the New York Contract.

- 24 -

"Governmental Entity" shall mean any administrative agency or commission, court, arbitrational tribunal, or other governmental or regulatory authority or agency.

"ICP systems" shall have the meaning set forth in Section 1.3(d).

"Lease" shall mean that lease dated October 10, 2005 by and between Community Development Association, LLC and Sequoia relating to the premises at 221 Hopkins Ave, Jamestown, New York, as amended by that certain letter agreement of October 24, 2008.

"Lease Assignment and Assumption Agreement" shall have the meaning set forth in Section 4.7.

"Legal Proceeding" shall mean any action, suit, proceeding, claim, arbitration or investigation before any Governmental Entity or before any arbitrator.

"Materials of Environmental Concern" shall mean any:  pollutants, contaminants or hazardous substances (as such terms are defined under CERCLA), pesticides (as such term is defined under the Federal Insecticide, Fungicide and Rodenticide Act), solid wastes and hazardous wastes (as such terms are defined under the Resource Conservation and Recovery Act), chemicals, other hazardous, radioactive or toxic materials, oil, petroleum and petroleum products (and fractions thereof), or any other material (or article containing such material) listed or subject to regulation under any law, statute, rule, regulation, order, permit, or directive due to its potential, directly or indirectly, to harm the environment or the health of humans or other living beings.

"Net Contract Price" shall have the meaning set forth in Section 1.3(e).

"New York Contract" has the meaning set forth in the first paragraph of the definition of Assumed Contracts above.

"New York State Print Revenue" shall mean amounts actually received by Sequoia arising solely from sale of paper ballots by Sequoia or any subcontractor of Sequoia to the State of New York or any political subdivision of the State of New York (excluding the five boroughs of New York City) from and after January 31, 2010 and for as long as Sequoia receives New York Print Revenue for ballots to be utilized in conjunction with the products supplied by Dominion, after deduction of any direct costs of manufacture, sales commission, freight and insurance.

"Non-Controlling Party" shall mean the Party not controlling the defense of any Third Party Action.

"Non-Released Matters" shall mean each of the following:

    (i)      all obligations under this Agreement;

    (ii)     the Mutual Confidentiality Agreement between the parties dated June 11, 2009;

    (iii)    breaches under the following sections of the Prior Agreement: 4.b. (license), 7A and 7B (intellectual property rights), and 11 (confidentiality);

    (iv)    Obligations under the following sections of the Prior Agreement: 6A and 6B (indemnity for third party claims) and 11;

    (v)    the Joint Limited Representation letter agreement dated December 30, 2008 to which the Parties are party; and

    (vi)    the obligations of the Parties under Section 2 of the Settlement Agreement dated December 30, 2008 with respect to the Avante Litigation.

"NYC Order" shall have the meaning set forth in Section 1.3(e).

"Parties" shall mean Dominion and Sequoia.

"Prior Agreement" shall have the meaning set forth in Section 4.6(a).

"Purchase Price" shall mean the purchase price to be paid by Dominion for the applicable Acquired Assets as set forth in Section 1.3.

"Qualified NYS Order" shall have the meaning set forth in Section 1.3(d).

"Reasonable Best Efforts" shall mean best efforts, to the extent commercially reasonable.

"Released Parties" shall have the meaning set forth in Section 4.9 and Section 6.11 for the purposes thereof.

"Response" shall mean a written response containing the information provided for in Section 7.3(c).

"Retained Liabilities" shall mean any and all liabilities or obligations (whether known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due and accrued or unaccrued, and whether claims with respect thereto are asserted before or after the Contract Closing) which are not Assumed Liabilities.

"Security Interest" shall mean any mortgage, pledge, security interest, encumbrance, charge or other lien (whether arising by contract or by operation of law).

"Specified Employees" shall have mean the following persons:

               Alexander, James

               Barker, Steven

               Bolger, Kathleen

               Giordano, Ingrid

Hogancamp, Michelle

Lees, Kenneth

Nicholas, Mike

Strother, Dawn

Tonelli, Lawrence.

"Subsidiary" shall mean any corporation, partnership, trust, limited liability company or other non-corporate business enterprise in which a Party (or another Subsidiary) holds stock or other ownership interests representing (a) more than 50% of the voting power of all outstanding stock or ownership interests of such entity or (b) the right to receive more than 50% of the net assets of such entity available for distribution to the holders of outstanding stock or ownership interests upon a liquidation or dissolution of such entity.

"Taxes" means all taxes, charges, fees, levies or other similar assessments or liabilities, including without limitation income, gross receipts, ad valorem, premium, value-added, excise, real property, personal property, sales, use, transfer, withholding, employment, payroll and franchise taxes imposed by the United States of America or any state, local or foreign government, or any agency thereof, or other political subdivision of the United States or any such government, and any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax or any contest or dispute thereof.

"Tax Returns" means all reports, returns, declarations, statements or other information required to be supplied to a taxing authority in connection with Taxes.

"Third Party Action" shall mean any suit or proceeding by a person or entity other than a Party for which indemnification may be sought by a Party under Article VII.

"Transfer Documents" means each of the following:

(a)    Assignment and Assumption Agreement by and among Sequoia, Dominion, the New York Office of General Services, the New York State Board of Elections, Comptroller of the State of New York and the New York Attorney General substantially in the form attached hereto as Exhibit A; and

(b)    the Bill of Sale substantially in the form attached hereto as Exhibit B; and

(c)    an Assignment and Assumption agreement relating to the Lease provided such Lease is an Assumed Contract (as defined therein).

- 27 -

# ARTICLE X

## MISCELLANEOUS

10.1   <u>Press Releases and Announcements</u>.  Neither Party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party; <u>provided,</u> <u>however,</u> that either Party may make any public disclosure it believes in good faith is required by applicable law (in which case the disclosing Party shall use reasonable efforts to advise the other Party and provide it with a copy of the proposed disclosure prior to making the disclosure).

10.2   <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

10.3   <u>Entire Agreement</u>.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, with respect to the subject matter hereof.

10.4   <u>Succession and Assignment</u>.

(a)   This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.

(b)   Either Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the consent of the other Party, provided that:

(i)   such Party shall remain responsible for performance of all of its obligations under this Agreement and the Ancillary Documents as a primary obligor notwithstanding such assignment, and

(ii)   such assignee's tangible net worth equals or exceeds that of the assigning Party as shown on their respective most recent yearly balance sheets, and

(iii)   and such assignee has agreed to assume the obligations hereunder.

(c)   Except as set forth in subsection (b) above, neither Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party which approval may not be unreasonably withheld, conditioned or delayed.  Any attempted assignment in contravention of this provision shall be void.

10.5   <u>Counterparts and Facsimile Signature</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement may be executed by facsimile signature.

- 28 -

10.6    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.7    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

(a)    If to Dominion:  Dominion Voting Systems Corporation, Attn: President, 215 Spadina Avenue, Suite 200, Toronto, Ontario, Canada; or

(b)    If to Sequoia:  Sequoia Voting Systems, Inc., Attn: President, 717 17th Street, Denver, Colorado 80202.

Either Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended.  Either Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

10.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule that would  cause the application of laws of any other jurisdictions.

10.9    Amendments and Waivers.  The Parties may mutually amend any provision of this Agreement at any time.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.  No waiver by either Party of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver.  No waiver by either Party with respect to any default, misrepresentation, or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

10.11    Expenses.  Each Party shall bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

10.12  <u>Submission to Jurisdiction</u>.  Each Party (a) submits to the jurisdiction of any state or federal court sitting in the State of New York in any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements (including any action or proceeding for the enforcement of any arbitral award made in connection with any arbitration of a dispute hereunder), (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) waives any claim of inconvenient forum or other challenge to venue in such court, (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements in any other court, and (e) waives any right it may have to a trial by jury with respect to any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements.  Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in Section 10.7, provided that nothing in this Section 10.12 shall affect the right of either Party to serve such summons, complaint or other initial pleading in any other manner permitted by law.

10.13  <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, each Party agrees that the other Party shall be entitled to an injunction or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter, in addition to any other remedy to which it may be entitled, at law or in equity.

10.14  <u>Construction</u>.

(a)     The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against either Party.

(b)     Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)     Any reference herein to "including" shall be interpreted as "including without limitation".

(d)     Any reference to any Article, Section or paragraph shall be deemed to refer to an Article, Section or paragraph of this Agreement, unless the context clearly indicates otherwise.

10.15  <u>Limitation on Liability.</u>  Neither Party shall be liable to the other for any special, incidental or consequential damages, excluding only damages sought in a Third Party Action as to which a Party has an indemnification obligation under Article VII above.

US1DOCS 7199709v16

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOMINION VOTING SYSTEMS CORPORATION


By:_____
Title:_____


SEQUOIA VOTING SYSTEMS, INC.


By: _____
Title: _____

**Schedule 1.5**
Purchase Price Allocation

| | |
|---|---|
| Accounts Receivable | $336,000 |
| Inventory | $131,237 |
| Capital Assets | $60,000 |
| Assumed Contract | $1,828,763 |
| Goodwill | $10,000 |
| | |
| **Purchase Price** | **$2,366,000** |

US1DOCS 7199709v16

**Schedule 2.8**
Inventory

Inventory includes (without limitation) the following:

**Sequoia Agreement Inventory Listing**
**Schedule 2.8**

| | BMD's | ADA Tables | ICP's | Plan A Ballot Box | EPS Copy Stations | External Batteries | Sip & Puff Devices |
|---|---|---|---|---|---|---|---|
| Phoenix Graphics | 2 | | | | | | |
| Harvard Manfg | 36 | 15 | 30 | | | | 100 |
| Sequioa - Jamestown | 2 | | | | | 80 | |
| Sequoia - Oakland | 5 | | | | | | |
| Sequoia - Salesperson | 1 | | 1 | | | | |
| New York City | 2 | | 1 | 1 | | | |
| NYS Counties | | | | | | | |
|     Franklin | | | 2 | | | | |
|     Oneida | | 2 | 2 | | | | |
|     Onondaga | | | 1 | | | | |
|     Oswego | | | 2 | | | | |
|     Saratoga | | | 1 | | | | |
|     Suffolk | | | 1 | | 1 | | |
|     Chemung | | | 1 | | | | |
| **Total** | **48** | **17** | **42** | **1** | **1** | **80** | **100** |

All ImageCast and NY related documentation

The full sized vintage lever voting machine from Sequoia's Denver office

– 33 –

EXHIBIT A

ASSIGNMENT AND ASSUMPTION AGREEMENT

US1DOCS 7199709v16

EXHIBIT B

BILL OF SALE

US1DOCS 7199709v16

EXHIBIT C

LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

US1DOCS 7199709v16