# EXHIBIT H

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of the lst day of October, 2009, by and between Sequoia Voting Systems, Inc., a corporation organized and existing under the laws of the State of Delaware ("**Seller**"), and ProDocument**Solutions**, Inc., a corporation organized and existing under the laws of the State of California ("**Buyer**"). This Agreement is made with specific reference to the following facts:

### RECITALS

A.      Seller is an international election technology provider, including voting solutions, equipment and election support products. Seller's Print Division designs, produces, prints and mails voting ballots, sample ballot booklets, voter pamphlets, voter registration materials and ballot packets, and provides full service ballot mailing services (the "Business").

B.      Buyer is a government certified printing facility and a preferred printing provider utilized by Seller to conduct its Business.

C.      Seller and Buyer wish to enter into this Agreement, pursuant to which Buyer shall purchase the Business and certain specified assets relating to the Business from Seller (as described herein). Buyer intends to operate the Business as a division of Buyer to be known as ProVote**Solutions**.

NOW, THEREFORE, Seller and Buyer, in consideration of the mutual representations, warranties and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and subject to the terms and conditions to this Agreement, and intending to be legally bound, do hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1      <u>Construction of Terms</u>. As used in this Agreement, the Corresponding Schedules, Exhibits and the Related Agreements and as required by the context: the singular and plural shall be deemed to include each other and each gender, to include all genders; words importing persons shall include partnerships, associations, corporations, trusts and other Entities; the terms "herein," "hereof" and "hereunder" or other similar terms refer to this Agreement or the Related Agreement in which they appear as a whole and not only to the particular sentence, paragraph, subsection or section in which any such term is used except as expressly more specifically limited; and words and phrases defined in this Agreement have the same meaning in the Corresponding Schedules,

1

DH 0000322

Exhibits and Related Agreements unless specifically provided to the contrary in any provision thereof.

1.2    Other Definitions.   Unless elsewhere defined herein, any term the first letter of which is capitalized shall have the meaning set forth on Annex A attached hereto and made a part hereof.

## ARTICLE 2

## SALE AND PURCHASE OF ASSETS

2.1    Purchased Assets.   Subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase, pay for and accept from Seller, the Purchased Assets. The sale, assignment, transfer and delivery of the Purchased Assets shall be free and clear of all Liens, except for Permitted Liens and any Liens expressly assumed in Section 3.1. The Purchased Assets consist of the following:

    2.1.1   The Personal Property;

    2.1.2   The Accounts Receivable;

    2.1.3   The Inventory;

    2.1.4   The Business Intellectual Property;

    2.1.5   All rights and benefits of Seller under all Material Contracts; and

    2.1.6   The Miscellaneous Property.

2.2    Disagreement on Calculations.   The parties agree that should they disagree on the calculation of any sum owing or adjustment between the parties, such sum or adjustment shall be determined by an independent accounting firm jointly selected by each of Buyer and Seller and shall be conclusive and binding on all parties. At any time during the appraisal process, and prior to final determination (i) a party may accept the other party's value, or (ii) the parties may negotiate a mutually agreeable value, whereupon the appraisal process shall terminate. Each party shall bear the cost of their respective appraisers.

2.3    Excluded Assets.   Notwithstanding anything contained herein to the contrary, Seller shall not sell, assign, convey, transfer or deliver any of the Excluded Assets to Buyer. "Excluded Assets" means any tangible or intangible property which is not expressly listed on Schedules 2.1.1 through 2.1.6 to this Agreement.

DH 0000323

2.4   <u>Software Licenses</u>.  Seller and Buyer shall at Closing enter into a mutually satisfactory software license agreement (the "License Agreement") pursuant to which Seller will grant to Buyer a license to use certain of Seller's software on the terms set forth in such license agreement.

## ARTICLE 3

## LIABILITIES

3.1   <u>Assumed Liabilities</u>.   Subject to the terms and conditions of this Agreement, Buyer hereby assumes as of the Effective Date and shall thereafter pay, perform and discharge as and when due only the Assumed Liabilities.  Buyer shall not assume or be responsible in any way for any other liabilities or obligations whatsoever of Seller.  The Assumed Liabilities are only the liabilities and obligations listed on Schedule 3.1 to this Agreement.

3.2   <u>Retained Liabilities</u>.  Except to the extent listed as an Assumed Liability, Seller shall retain and be solely responsible for, and acknowledges that Buyer has not agreed to pay, is not assuming and shall not have any liability or obligation with respect to, the following liabilities or obligations (the **"Retained Liabilities"**) :

3.2.1   Subject to Section 13.18, all liabilities and obligations for Taxes, including, without limitation, all liabilities and obligations of Seller for any Taxes due or becoming due by reason of (i) the conduct of the Business prior to the Effective Date including, without limitation, any Taxes that may become due as a result of any examination of Seller's Tax filings by any taxing authority for the period prior to but not after the Effective Date; (ii) the ownership, possession, use, operation, purchase, acquisition, sale or disposition of the Purchased Assets (excluding sales and transfer tax on the Purchased Assets); (iii) Taxes imposed on, or accruing as a result of, the purchase and sale of the Purchased Assets (excluding sales and transfer tax on the Purchased Assets); or (iv) Taxes payable to Seller for the period prior to the Effective Date attributable to, or resulting from, recapture of depreciation, other Tax benefit items, or otherwise arising from the transactions contemplated by this Agreement;

3.2.2   All liabilities and obligations to the extent arising out of circumstances or events occurring or existing on or prior to the Effective Date without regard to when claims or Actions with respect thereto are made, presented or filed; and

3.2.3   All liabilities and obligations of Seller, whether fixed, absolute or contingent, matured or unmatured, known or unknown, existing on or prior to the Closing Date, which are not Assumed Liabilities.

## ARTICLE 4

## PRICE

3

DH 0000324

4.1     <u>Purchase Price</u>.  The purchase price to be paid by Buyer to Seller pursuant to this Agreement shall be an amount calculated, due and payable in three (3) phases as hereinafter defined not to exceed the sum of Two Million Dollars and no/100 ($2,000,000.00) (the **"Purchase Price"**).  The parties agree that the Purchase Price shall be determined based upon the financial conditions set forth below, using Generally Accepted Accounting Principles ("GAAP") applied in all material respects.

(a)  <u>Phase 1 – Closing Payment Amount</u>.  An amount equal to the sum of Five Hundred Thousand Dollars and no/100 ($500,000.00), plus an additional sum equal to Seventeen Thousand Dollars and no/100 ($17,000.00) representing reimbursement for accrued employee vacation paid by Seller, for a total amount of Five Hundred Seventeen Thousand Dollars and no/100 ($517,000.00) (the "Closing Payment Amount").  The Closing Payment Amount shall be paid on the Closing Date as follows:

(i)  the sum of Four Hundred Sixty Seven Thousand Dollars and no/100 ($467,000.00), which represents the amount of all outstanding accounts receivable payable by Seller to Buyer, by the forgiveness of such indebtedness and execution of a release in the form of Schedule 4.1(a) hereto (the "Buyer's Release");

(ii)  the sum of Thirty Three Thousand Dollars and no/100 ($33,000.00) in cash; and

(iii)  on a date which is thirty (30) days after the Closing Date, the additional sum of Seventeen Thousand Dollars and no/100 ($17,000.00).

(b)  <u>Phase 2 – 2009 Gross Profits</u>.  Commencing on the Effective Date, one-half percent (0.50%) Gross Profits received by Buyer for print sales to Seller's Customers listed on Schedule 4.1(b) for the 2009 UDEL and Fall 2009 election (the "2009 Elections") shall be paid by Buyer to Seller no later than January 31, 2010.  All prepayments by Seller's Customers for the Fall 2009 election shall be paid to Buyer pursuant to Section 4.5.

(c)  <u>Phase 3 – Annual Earnout Payments</u>.  The balance of the Purchase Price shall consist of annual earnout payments which shall be calculated in accordance with this Section 4.1(c) and paid by Buyer to Seller upon receipt of each payment from Seller's Customers for each election cycle occurring in 2010, 2011 and 2012 (the "Earnout Payment").  The Earnout Payment for each of the listed years shall consist of thirteen percent (13%) of the Gross Profit received by Buyer from sales to Seller's Customers for each election cycle contracted during that year.  Earnout Payments shall be payable on January 31 in each of 2011, 2012 and 2013 with respect to Earnout Payments payable with respect to the preceding year provided, however, that if any additional sums are payable by reason of the Earnout Payment for the prior year after January 31 of the following year, such payments will be made to Sequoia within thirty (30) days of receipt by Buyer of payment from Seller's Customer.

4

DH 0000325

The Purchase Price shall be calculated by adding the Closing Payment Amount (Phase 1), the 2009 Gross Profits (Phase 2) and the total of the Three Year Annual Earnout Payments (Phase 3). The Purchase Price shall be less than or capped at Two Million Dollars and no/100 ($2,000,000.00) (the "Purchase Price Maximum"). Should the Purchase Price Maximum be reached prior to the 2011 and/or 2012 election cycles, all obligations of Buyer to pay Seller additional sums ceases.

4.2    Payment.    The party owing payment to the other at Closing, after calculation of the net amount owing, shall wire transfer or deliver the cash portion of the Closing Payment Amount to a bank account designated by the receiving party, in immediately available funds in United States Dollars.

4.3    Casualty Loss. The risk of any Casualty Loss is assumed by Buyer.

4.4    Allocation of Purchase Price.    Buyer and Seller hereby agree that the allocation of the Purchase Price shall be in the amount set forth on Schedule 4.4 (the **"Purchase Price Allocation"**).

4.5    2009 Election Payments.    At Closing, Seller shall pay by wire transfer to Buyer the sum of Seventy Two Thousand Three Hundred Eighty and no/100 Dollars ($72,380.00), representing prepayments received by Seller from Seller's Customers for the 2009 Elections. As Seller receives additional prepayments or payments from Seller's Customers for the 2009 Elections, Seller shall remit such payments to Buyer within four (4) business days of receipt.

4.6    [Intentionally Omitted]

4.7    Collection Costs.    In the event that Seller undertakes any action to collect any sums then owing under this Agreement, Buyer shall reimburse Seller for all of Seller's costs incurred in such collection efforts including, without limitation, attorney fees and costs of suit.

4.8    Audit Rights.    Seller and its designated representatives shall have the right, upon ten (10) days prior written notice to Buyer from time to time, and at Buyer's principal place of business, to conduct an audit of all books and records of ProVote**Solutions** Print Division of Buyer, together with any other records of Buyer required to determine and verify the amounts payable by Buyer to Seller hereunder for the previous twelve (12) months. Buyer shall make all such books and records available to Seller or Seller's representatives. If Seller's audit discloses an underpayment by Buyer, Buyer shall pay the additional amounts owing to Seller, Seller shall furnish a copy of the audit report to Buyer. Buyer shall, within fifteen (15) days of receipt of the audit report, either (i) pay to Seller the amounts owing to Seller in accordance with the audit report or, (ii) provide Seller with a detailed explanation of Buyer's response to the audit report specifying with particularity why Buyer believes that the audit report is in error. If the parties cannot resolve any disagreement concerning amounts payable to Seller within fifteen (15) days of Buyer's response to the audit, the parties may proceed to arbitration in

5

DH 0000326

accordance with Section 13.11 hereof.  If Seller's audit discloses that Buyer has underpaid by more than three percent (3%), Buyer shall, in addition, reimburse Seller for all costs incurred in connection with such audit.  Buyer's obligation to refund any sums to Seller as a result of any audit shall, absent fraud, be limited to amounts payable by Buyer during the twelve (12) months preceding the audit in question.  Seller's rights under this Section 4.8 shall terminate once Seller has received payment in full of the Purchase Price Maximum.

4.9    <u>Labor Costs Payment</u>.  In addition to any other sums payable by Buyer to Seller under this Agreement, Buyer shall pay to Seller thirty (30) days after the Closing Date by wire transfer the sum of Forty Three Thousand Dollars and no/100 ($43,000.00), which represents an estimate of costs incurred by Seller for payroll and other employee expenses for the Business from September 1, 2009 through the date of termination by Seller and hire by Buyer of the employees of the Business, together with the payment to Seller under Section 4.1(a)(iii) for a total payment of Sixty Thousand Dollars and no/100 ($60,000.00).   After Closing, Seller's actual labor costs for such period shall be calculated and the foregoing payment adjusted to Seller's actual labor costs for such period.

4.10    <u>Cobra Costs</u>.  Buyer shall reimburse Seller for all Cobra costs incurred by Seller after the Closing Date with respect to employees of the Business.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes the following representations and warranties to Buyer, each of which is true and correct on the date hereof, and shall survive after the Closing in accordance with the provisions of this Agreement.

Disclosure of a matter in a schedule shall, should the existence of the matter be relevant to any other schedule, be deemed to be disclosed in response to that other schedule only if an explicit cross-reference appears in that other schedule to the schedule where the matter in fact is disclosed.

5.1    <u>Organization; Power and Authority</u>.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has all requisite power and authority to own or lease the Purchased Assets, to carry on the Business as it is now being conducted, to execute, deliver and perform the obligations of Seller under this Agreement and to consummate the transactions contemplated hereby.   The execution and delivery of this Agreement and all related documents has been duly authorized by all requisite corporate action, approved and ratified by Seller's Board of Directors.

5.2    <u>Due Authorization and Execution – Effect of Agreement</u>.  The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of

543384_I\009603

DH 0000327

the transactions contemplated hereby have been duly authorized by all necessary corporate action required to be taken on the part of the Seller. This Agreement has been duly and validly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms.

    5.3   <u>Business Financial Statements</u>. Seller has delivered or shall deliver to Buyer the Business Financial Statements. The Business Financial Statements fairly present the financial position and results of operations of Seller at the dates shown and for the periods indicated in all material respects (subject, in the case of interim statements, to normal year-end audit adjustments that either individually or in the aggregate are not material in amount or effect).

    5.4   <u>Purchased Assets</u>. Except as set forth on the Corresponding Schedules, Seller has good title and the Purchased Assets are free and clear of all Liens, except for Permitted Liens.

    5.5   <u>Contracts</u>. The Corresponding Schedule sets forth as of the date hereof a list of the following Contracts (each of which is referred to herein as a **"Material Contract"**) which includes:

    5.5.1  All notes, indentures, letters of credit, guarantees and other obligations and agreements for, or relating to, any lending, borrowing or other similar obligation constituting an Assumed Liability;

    5.5.2  Any other contracts, agreements or commitments Related to the Business which constitute Assumed Liabilities and (i) involve payments or receipts in excess of the Threshold Contract Amount in cash or property value, (ii) have a term greater than twelve (12) months, or (iii) are material to the Business or the operations or financial condition of the Business, including, but not limited to:

    (i)    contracts or agreements with distributors and agents of the Business,

    (ii)   sales agreements between Seller and its customers

    (iii)  service, maintenance or supply agreements, and

    (iv)  contracts or agreements whereby the Business purchases goods or services.

Except as set forth on the Corresponding Schedule and to Seller's Knowledge, as of the date hereof, all Material Contracts which constitute Assumed Liabilities are valid and binding and in full force and effect and neither Seller, nor any other party to such Material Contracts which constitute Assumed Liabilities, is in breach of any of its obligations thereunder. No event, occurrence or condition exists which, with the lapse of time, the giving of notice or both, would become a default under any Material Contract

7

DH 0000328

which constitutes an Assumed Liability. True and correct copies of all Material Contracts which constitute Assumed Liabilities and any amendments thereto have been delivered to Buyer.

5.6    Leases. The only Real Property Lease is Seller's facility in Portersville, California, a portion of which has been leased by Buyer to Seller pursuant to a lease agreement between Buyer, as landlord, and Seller, as tenant, dated April 11, 2003. This lease will be terminated by execution of the Surrender Agreement at Closing.

5.7    Employees. The Corresponding Schedule contains a correct and complete list of the employees of the Business who were employed by Seller as of any date within thirty (30) days prior to the date of this Agreement, including each such person's (i) name, (ii) total periods of employment, (iii) current position or job classification, (iv) business unit, (v) union affiliation (if any, on a group basis), (vi) location of employment, (vii) current job status (e.g., active, workers' compensation leave, short-term or long-term disability leave, military leave, laid off with recall rights, personal leave, etc.), (viii) wage or salary and bonus information, and (ix) the existence of any employment, severance, confidentiality, non-competition, or consulting agreements between the employee and Seller.

5.8    Taxes. All Tax Returns required to be filed by Seller on or before the Closing Date with respect to periods or transactions occurring prior to the Closing Date have been accurately prepared and timely filed showing the correct amount of Taxes due, except to the extent that failure to file would not have a material adverse effect on the transaction contemplated by this Agreement.

5.9    Compliance with Laws. To Seller's Knowledge, Seller is in material compliance with all federal, state, territorial, local and foreign laws, statutes, rules, regulations, judgments, orders, writs, injunctions and decrees, except to the extent that non-compliance would not have a material adverse effect on the transaction contemplated by this Agreement.

5.10    Actions. There are no judgments, orders, writs, injunctions, decrees, investigations, arbitration decisions or administrative charges, determinations or decisions of any court or other governmental agency to which Seller is a party that are in effect and otherwise would impair the ability of Seller to consummate the transaction contemplated by this Agreement, and no Actions which are Related to the Business or the Purchased Assets are pending or, to Seller's Knowledge, threatened against Seller or any officer, director, or shareholder of Seller.

5.11    Governmental Licenses. To Seller's Knowledge, Seller has obtained all Governmental Licenses required by any federal, state, territorial, local or foreign law, rule or regulation, which Governmental Licenses are listed, along with their expiration dates, if any, on the Corresponding Schedule.

8

DH 0000329

5.12   Employee Benefits.   The Corresponding Schedule lists each Employee Benefit Plan applicable to employees of the Business.

5.13   No Conflict.   Except as set forth on the Corresponding Schedule, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby: (a) to Seller's Knowledge, will not result in a violation by Seller of any provision of any law, rule or regulation, order, judgment or decree applicable to Seller; (b) will not violate any provisions of the certificate of incorporation or by-laws or comparable documents of Seller; and (c) to Seller's Knowledge, will not require any consent, approval or notice under, and will not conflict with, or result in the breach or termination of, or constitute a default under, or result in the acceleration of the performance by Seller under any Material Contract or any Material Lease or Governmental License required to be listed on the Corresponding Schedules to Section 5.11.

5.14   Condition of Assets.   The Personal Property (other than inventory Related to the Business) included in the Purchased Assets and currently used in the operation of the Business and the equipment, improvements and structures located on the Leased Real Property and the fixtures and appurtenances thereto, are, to Seller's Knowledge, in working order, reasonable wear and tear excepted.

5.15   Insurance.   All insurance policies owned or held by Seller on the date hereof which cover the Business or the Purchased Assets are in full force and effect, all premiums with respect thereto have been paid to the extent due, no notice of cancellation or termination has been received with respect to any such policy (other than those policies which Seller has replaced or intends to replace prior to the expiration thereof by policies providing substantially the same types and amounts of coverage) and no claim is currently reserved under any such policy involving an amount in excess of Ten Thousand Dollars ($10,000).   Buyer acknowledges that copies of such insurance policies have been delivered to Buyer.

5.16   No Broker.   Seller represents that it has not retained the services of a finder, broker or other Third Person or Entity in connection with this Agreement.   Seller acknowledges that it has been advised by Buyer and its attorney to seek a legal advisor to review the terms of this Agreement and Seller's obligations hereunder.

5.17   Limitation on Warranties.   Buyer acknowledges and agrees that the individual having the most comprehensive knowledge of the Business and its affairs is Brian Lierman, who will be employed by Buyer following Closing.   Notwithstanding any other term or provision of this Agreement, Seller shall have no liability for any breach of or inaccuracy in any warranty or representation under this Agreement (including, without limitation, any obligation to indemnify Buyer under Section 12.1) to the extent that such matter was within the knowledge of Brian Lierman, irrespective of whether such matter would otherwise constitute a matter within Seller's Knowledge.

9

DH 0000330

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties to Seller, each of which is true and correct on the date hereof, and shall survive after the Closing in accordance with the provisions of this Agreement.

6.1 <u>Organization; Power and Authority</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California. Buyer has all requisite power and authority to acquire and own the Purchased Assets, to carry on the Business as it is now being conducted, to execute, deliver and perform the obligations of Buyer under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and all related documents has been duly authorized by all requisite corporate action, approved and ratified by Buyer's Board of Directors.

6.2 <u>Due Authorization and Execution – Effect of Agreement</u>. The execution, delivery and performance by Seller of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action required to be taken on the part of the Buyer. This Agreement has been duly and validly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

6.3 <u>No Conflict</u>. Except as set forth on the Corresponding Schedule, the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby will not result in a violation by Buyer of any provision of any law, rule or regulation, order, judgment or decree applicable to Buyer.

6.4 <u>No Broker</u>. Buyer has not retained the services of a finder, broker or other Third Person or Entity in connection with this Agreement and Buyer agrees to indemnify and hold Seller harmless from and against any claims, losses or Damages (including Attorney Fees) suffered by Seller as a result of its breach of this representation.

6.5 <u>Compliance with Laws</u>. To Buyer's Knowledge, Buyer is in material compliance with all federal, state, territorial, local and foreign laws, statutes, rules, regulations, judgments, orders, writs, injunctions and decrees, except to the extent that non-compliance would not have a material adverse effect on the transaction contemplated by this Agreement.

6.6 <u>Actions</u>. There are no judgments, orders, writs, injunctions, decrees, investigations, arbitration decisions or administrative charges, determinations or decisions of any court or other governmental agency to which Buyer is a party that are in effect and otherwise would impair the ability of Buyer to consummate the transaction contemplated by this Agreement, and no Actions which are Related to the Business or the

10

DH 0000331

Purchased Assets are pending or, to Buyer's Knowledge, threatened against Buyer or any officer, director, or shareholder of Buyer.

## ARTICLE 7

## COVENANTS OF SELLER

Seller hereby covenants and agrees with Buyer as follows:

7.1    <u>No Change in Assets</u>.  Up to the Closing Date, Seller shall not knowingly cause a material adverse change in the Assets or Business from that reflected in the most recent financial statements provided to Buyer.  There shall be no material diminution in Assets by sale or other disposition.

7.2    <u>Conduct of Business</u>.  From the date hereof through the Closing Date, Seller acknowledges that it is in control of the day to day operations of Seller and it shall carry on the Business only in the ordinary and regular course consistent with past practices and in material compliance with all applicable laws.  Seller agrees to fully record all revenues, expenses, assets, liabilities and all other matters consistent with standard accounting practices.

7.3    <u>Use of Corporate Name</u>.  For a period not to exceed five (5) years after the Closing Date, Buyer may identify the Business as "ProVoteSolutions, formerly the Print Division of Sequoia".  Buyer shall not otherwise use the corporate name of the Seller, any confusingly similar name, or Seller's trade names, trademarks or service marks without the prior written consent of Seller in each instance.

7.4    <u>Non-Competition Agreement</u>.  For a period of five (5) years beginning on the Closing Date, Seller shall not, and shall cause their affiliates, directors and officers not to, in any capacity, either separately, jointly, or in association with others, directly or indirectly, as an officer, director, consultant, agent, employee, owner, partner, joint venture, distributor, dealer, representative, stockholder (excepting only the ownership of not more than 3% of the outstanding securities of any class listed on an exchange or regularly traded in the over-the-counter market), investor, lender or otherwise, engage in any manner, or have a financial interest in any entity engaged in, the sale of printed ballots or related printed materials to Seller's Customers and Target Accounts in California and Nevada that Buyer is pursuing for ballot sales for use in connection with Existing Systems. "Existing Systems" shall mean only those voting systems and equipment in use as of September 1, 2009, and any system directly derived therefrom. "Target Accounts in California and Nevada" is a list of potential customers that Buyer is pursuing for Ballots and related printed products as listed in Schedule 7.4(B) by the Closing Date. Seller is not restricted in any manner from (i) selling products which are not Existing Systems and related ballots to any party (including Seller's Customers as identified in Schedule 7.4(A) and the Target Accounts in California and Nevada listed on Schedule 7.4(B) that Buyer is actively pursuing) or (ii) engaging in commissioned sales to Seller's Customers in accordance with Section 9.10 hereof. Seller agrees not to sell

11

DH 0000332

voting booklets and related voting materials as of the date of closing within California, Colorado, Florida, Washington DC, State of Washington, Oregon and Nevada unless the account has been assigned to Seller as specified in Section 9.9 of this Agreement.

7.5    Nontransferability.

7.5.1    This Agreement shall not constitute a sale, assignment, transfer, delivery, lease or sublease of any Non-Assignable Asset.

7.5.2    Notwithstanding anything in this Agreement to the contrary, with respect to any Non-Assignable Asset, Seller shall not be obligated to sell, assign, transfer, deliver or sublease to Buyer (and Buyer shall not be required to accept) such Non-Assignable Asset without first having obtained all necessary consents or waivers.  Seller shall use all reasonable efforts, and Buyer shall cooperate with Seller, to obtain said consents and waivers and to resolve the impediments to the sale, assignment, transfer, delivery or subleases required by this Agreement, except that Seller shall not be obligated to pay any consideration in order to obtain any consent or waiver.

7.5.3    To the extent that the consents or waivers referred to in Section 7.5.2 are not obtained by Seller, or until the impediments to the sale, assignment, transfer, delivery or sublease referred to therein are resolved, Seller shall use all reasonable efforts to (a) provide to Buyer the benefits of any Non-Assignable Asset, (b) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer without incurring any financial obligation to Buyer, and (c) enforce, at the request of and for the account of Buyer, any rights of Seller arising from any Non-Assignable Asset against any Third Person, including the right to elect to terminate in accordance with the terms thereof upon the advice of Buyer.  Nothing in this section shall affect the condition to Buyer's obligations set forth in Section 10.2.4.

7.5.4    To the extent that Buyer is provided the benefits of any Non-Assignable Asset (whether from Seller or otherwise) in accordance with Section 7.5.3, Buyer shall perform at the direction of Seller any obligations of Seller thereunder or in connection therewith.

7.5.5    Seller shall not be obligated to expend any funds in performing Seller's obligation under this Section 7.5 other than reasonable, necessary and ordinary expenses incident to conduct of Seller's business.

7.5.6    Seller shall execute such assignment and transfer documents as are reasonably necessary to transfer all of the Material Contracts to Buyer.

7.6    Compensation and Non Solicitation of Employees.  Seller shall pay all wages, salaries, employee benefits (including accrued sick leave and vacation time) and employment taxes relating to the operation of the Business prior to the Effective Date. Seller shall pay all wages, salaries, employee benefits and employment taxes relating to the operation of the Business after the Effective Date, subject to reimbursement by Buyer

DH 0000333

in accordance with Section 4.9. There shall be no further increases in compensation for key employees since the date of the most recent financial statement provided to Buyer, other than in the ordinary course of business. Seller agrees that any increases in employee compensation shall not exceed Seller's current wage scale or predate normal review time periods for any individual and shall be consistent with past practices. All New Business Employees as listed on Schedule 7.6 shall be terminated by Seller on the Closing Date, including the cancellation of any pre-existing employment agreements. Seller shall not, without the prior written consent of Buyer, for a period of three (3) years after the Closing Date, hire or offer to hire as an employee, retain or offer to retain as a consultant, or otherwise agree to pay for services rendered or to be rendered, any persons who were employees of, or full-time consultants to, the Business, or induce or attempt to induce any such employee to terminate his or her employment (which shall include, after the Closing, former employees of Seller who are hired by Buyer) who were so employed on the Closing, who were employed by Seller at any time during the twelve-month period ending on the Closing Date, or who may become employed by Buyer following the Closing.

7.7   <u>Termination of Leases</u>. Excluding the copier and vehicle leases which are Assumed Liabilities, Seller shall be responsible for any and all equipment and other leases entered into by and between Seller and any third parties, including the (i) Optech 400c and Optech Insight optical read devices, and (ii) the software license for the CARS and CABL software, if any. The office lease between Seller and Buyer of Seller's offices located in Porterville, California shall be cancelled by execution of a surrender and cancellation agreement to be executed at Closing (the "Surrender Agreement").

7.8   <u>Advise of Changes</u>. Seller will promptly advise Buyer (subject to Buyer's actual knowledge) in writing of (a) any event which becomes known to Seller which would render any representation or warranty of Seller contained in this Agreement (including any information contained on any Corresponding Schedule), if made on or as of the date of such event or the Closing Date, untrue or inaccurate in any material respect, (b) any change, condition or event known to Seller that has or could reasonably be expected to have a Material Adverse Effect on the Business or (c) any failure of Seller to materially comply with or satisfy any covenant, condition or agreement to be complied with or satisfied hereunder.

## ARTICLE 8

## COVENANTS OF BUYER

In addition to the covenants contained in ARTICLE 7 above, Buyer agrees as follows:

8.1   <u>Governmental Approvals</u>. Buyer shall comply with any laws which are applicable to the Sale, as contemplated hereby, and pursuant to which government

notification or approval of such transaction is necessary. Buyer shall cooperate with Seller in any manner reasonably requested by Seller in providing any information about Buyer which is required for this purpose and in promptly filing, separately or jointly with Seller, any applications for such government notification or approval. Buyer shall use all reasonable efforts to resolve such objections, if any, as may be asserted by any governmental agency with respect to the transactions contemplated hereby; provided, however, that notwithstanding anything in this Agreement to the contrary, neither Buyer nor any of its Affiliates shall be required to divest or hold separate assets or product lines or to do anything which would have a Material Adverse Effect on the value to Buyer of the transaction contemplated by this Agreement.

## ARTICLE 9

## MUTUAL COVENANTS

9.1    Employees.

9.1.1    Employment.

(a)    All New Business Employees shall be paid by Seller through the Closing Date and shall be paid by Buyer thereafter, subject to adjustment between the parties pursuant to Section 4 and Section 7.6. It is the present intention of Buyer to employ all or substantially all of the New Business Employees on an "at will" employment arrangement.

(b)    In the event any notice is required under the Worker Adjustment Retraining Notification Act, any other state or local law, any collective bargaining agreement, or any other employment agreement in connection with the Sale, such notice shall be the sole responsibility of Buyer.

(c)    Buyer shall be responsible for all requirements under ERISA § 601 et seq. and IRC § 4980B that arise (i) prior to or on the Closing Date with respect to New Business Employees and (ii) prior to, on or after the Closing Date with respect to all other Business Employees.

9.2    Employee Benefit Plans.

9.2.1    Seller's Savings Plans.

(a)    On the Closing Date or as soon thereafter as practicable, and at the option of each New Business Employee, Seller shall liquidate into cash the account balances of Seller's Savings Plans attributable to the Business Employees who become New Business Employees and shall thereafter immediately transfer such cash to Buyer's Savings Plan, as applicable. On and after the Closing Date, Seller shall not accept from New Business Employees any contributions to Seller's Savings Plans. To receive such transfer Buyer shall either establish and adopt one or more new defined

14

DH 0000335

contribution plans, or shall amend one or more Buyer's Savings Plans. Buyer shall designate in writing to Seller the transfers which are to be made to each Buyer Savings Plan.

(b)     As soon as practicable after the Closing Date, Seller shall cause the trust for Seller's Savings Plans to liquidate into cash the account balances of Seller's Business Employees who become New Business Employees, including the employer matching accounts whether or not fully vested as of the Closing Date, with such account balances credited with appropriate earnings attributable to the period from the Closing Date to the date of transfer and immediately thereafter transfer such cash to Buyer's Savings Plans. Such account balances, and the assets attributable thereto, shall be transferred to Buyer's Savings Plans in accordance with the applicable terms and conditions of those Plans and the determination of Buyer. After the transfer date, the New Business Employees shall only be eligible to receive benefits from, and in accordance with, Buyer's Savings Plans. In the event any New Business Employee has a loan outstanding from Seller's Savings Plans at the time of transfer, all rights and obligations concerning that loan shall be assigned to Buyer's Savings Plans. During the period commencing on the Closing Date and ending on the transfer date, any New Business Employee who has an outstanding loan under Seller's Savings Plans on the Closing Date shall continue the scheduled loan repayments directly to Seller's Savings Plans. All New Business Employee loan repayments due and payable after the transfer date shall be made to Buyer's Savings Plans in accordance with their applicable loan provisions.

9.2.2   Buyer's Savings Plan. To facilitate the proper and orderly transfer of assets to Buyer's Savings Plans as contemplated by the preceding section, as soon as practicable after the Closing Date, Buyer shall provide Seller with either (a) a letter from Buyer representing that Buyer intends to submit Buyer's Savings Plans to the Internal Revenue Service for a determination of such Plans' qualified status under Code Sections 401(a) and 501(a), or (b) a copy of the most recent Internal Revenue Service favorable determination letter with respect to Buyer's Savings Plan and a letter from Buyer representing that there have been no amendments or other events since the issuance of that favorable determination letter which, to Buyer's knowledge, would adversely affect the qualification of those Plans. In addition, Seller shall provide Buyer with a copy of the most recent Internal Revenue Service favorable determination letter with respect to Seller's Savings Plans and a letter from Seller representing that there have been no amendments or other events which would adversely affect the qualification of those Plans. Each of the Parties shall be responsible for its respective governmental filings, including, without limitation, Internal Revenue Service Form 5310.

9.3   Governmental Approvals. Seller and Buyer shall comply with any laws which are applicable to the transactions contemplated by this Agreement or any Related Agreements and pursuant to which government notification or approval of such transaction is necessary. Seller shall cooperate with Buyer in any manner reasonably requested by Buyer in providing any information about Seller which is required for this

DH 0000336

purpose and in promptly filing, separately or jointly with Buyer, any applications for such government notification or approval.

9.4     Cooperation.  Prior to the Closing, Buyer and Seller will use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement and to cooperate with others in connection with the foregoing, including using reasonable efforts to (a) secure all applicable consents, waivers, approvals, authorizations, Tax exemptions, Governmental Licenses and other governmental benefits from governmental agencies or Third Persons as shall be required in order to enable Buyer and Seller to complete the transactions contemplated by this Agreement, (b) lift or rescind any injunction or restraining order against the transactions, (c) effect any necessary registrations and filings, and (d) fulfill the conditions to Closing set forth in this Agreement.

9.5     Cooperation on Claims, Litigation, Governmental Investigations and Audits.  On and after the Closing, Buyer and Seller shall cooperate with, and fully assist each other in regard thereto, as to (i) collection of any revenue due for the 2009 Elections from Seller's Customers and (ii) any claims, litigation, arbitrations, governmental investigations or audits of any sort Related to the Business for periods prior to the Closing Date, including, without limitation, making any and all Records (or copies thereof) which are related to such claims, litigation, arbitrations, government investigations and audits, freely available for such time periods and purposes as the other may reasonably request.   The Party requesting assistance under this covenant shall reimburse the other Party for all out-of-pocket expenses and the per diem cost of the salaries and fringe benefits of the employees of the other Party for the period of time such employees spend in providing such cooperation and assistance.

9.6     Seller's Post-Closing Access to Employees.  Buyer shall use all reasonable efforts to provide Seller with access without charge to administrative personnel who are New Business Employees in connection with the Seller's performance of its post-Closing obligations, including providing for and paying the Retained Liabilities and the winding up of its Print Division operations.

9.7     Seller's Post-Closing Inventory.  The parties agree that at no charge for a period of one (1) year commencing as of September 1, 2009, Buyer shall store Seller's post-closing inventory, which comprises a portion of the Excluded Assets, in the premises located in Porterville, California (currently leased to Seller from Buyer prior to the Closing).  Seller shall pay to Buyer a Ten Dollar and no/100 ($10.00) release charge when items are withdrawn from storage.

9.8     Buyer's Right of First Offer. During the five (5) year period commencing on the Closing Date, if Seller elects to outsource production of printed ballots for any voting system or equipment of Seller which is not an Existing System, Seller shall first advise the Buyer by email and fax of the price, quantity and delivery terms of such

16

DH 0000337

outsourced production and afford Buyer a period of five (5) business days in which to accept such outsourced work on the terms presented. If Buyer does not accept such work on the terms presented within such five (5) business day period, Seller may contract with third parties to perform such work. Buyer's failure to respond by email and fax with a written acceptance within such five (5) business day period of receiving such price, quantity and delivery information shall be deemed a failure to accept.

9.9     Seller's Compensation for Colorado, District of Columbia and Other Sales. After Closing, Buyer has the option to use Seller to provide sales support services in part or in total for those jurisdictions in the State of Colorado, the District of Columbia and such other jurisdictions as may be mutually agreed by the parties from time to time. In addition to amounts payable to Seller under the earnout provisions of Section 4.1(c) above, Buyer shall also pay to Seller for sales support a commission equal to 8.9% of the Gross Profit for such sales support. If at any time that Buyer is not satisfied with the sales support provided by Seller, Buyer reserves the right to terminate services for convenience and all earned commissions will be prorated accordingly.

9.10     Seller's Print Sales Commission. Seller may, in Seller's discretion, elect to outsource print work to Buyer after Closing. In the event Seller elects to refer print work to Buyer and Buyer agrees to accept the terms of the outsourcing, Seller shall be paid a commission of up to twenty percent (20%) of the Gross Sales, the precise amount of the commission to be mutually agreed between the parties at that time. "Gross Sales" shall mean Sales Revenue less taxes, freight, allowances, adjustments, postage, performance bonds, returns, reprints and insurances. Seller and Buyer will mutually agree upon the commission to be paid to Seller for a specific transaction at the time Seller elects to outsource such print work to Buyer.

# ARTICLE 10

## CONDITIONS PRECEDENT TO CLOSING

10.1     Conditions Precedent to Obligations of Buyer and Seller. The respective obligations of Buyer and Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver of the following conditions:

10.1.1 Approvals.     All required Third Person, approvals and authorizations of, filings with and notifications to, all regulatory authorities required for the consummation of the transactions contemplated hereby shall have been obtained or made and shall be in full force and effect, and all applicable statutory waiting periods shall have expired or been terminated.

10.1.2 Compliance with Law. No statute, rule or regulation shall have been enacted, promulgated or enforced which prohibits, restricts or makes unlawful the consummation of the transactions contemplated by this Agreement. All requirements

543384_1\009603

DH 0000338

prescribed by law, rule or regulation which are necessary to the consummation of the transactions contemplated by this Agreement shall have been satisfied.

   10.1.3 <u>Litigation</u>.  No injunction or restraining order or other order shall be in effect forbidding or enjoining the consummation of the transactions contemplated hereby and no judicial or administrative Action or investigation shall be pending or threatened which, if adversely determined, would reasonably be expected to result in any such injunction or order or in a Damage remedy resulting from the consummation of such transactions.

  10.2 <u>Conditions Precedent to Buyer's Obligations</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions, any or all of which conditions may be waived by Buyer, in its sole discretion:

   10.2.1 <u>Truth of Representations and Warranties</u>.  Each of the representations and warranties made by Seller in this Agreement shall be materially true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except for any representations or warranties made as of a specified date, which shall be true and correct in all respects as of the specified date).

   10.2.2 <u>Covenants</u>.  Seller shall have performed and complied with all covenants and agreements required by this Agreement to be performed by Seller prior to or at the Closing.

   10.2.3 <u>Deliveries</u>.  Seller shall have made at the Closing the deliveries to Buyer required to be delivered by Seller pursuant to Section 11.2.

   10.2.4 <u>Consents</u>.  Seller shall have obtained written consents to the transfer or assignment to Buyer of the Material Contracts, Material Leases and Governmental Licenses, where the consent of any other party to such Contract, lease or License is required for such assignment or transfer.

  10.3 <u>Conditions Precedent to Seller's Obligations</u>.  The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions, any or all of which conditions may be waived by Seller, in its sole discretion.

   10.3.1 <u>Truth of Representations and Warranties</u>.  Each of the representations and warranties made by Buyer in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (except for any representations or warranties made as of a specified date, which shall be true and correct in all respects as of the specified date).

18

DH 0000339

10.3.2 <u>Covenants</u>.  Buyer shall have performed and complied with all covenants and agreements required by this Agreement to be performed by Buyer prior to or at the Closing, including the cancellation of the lease between Buyer and Seller for the premises located in Porterville, California.

10.3.3 <u>Deliveries</u>.  Buyer shall have made at the Closing the deliveries to Seller required to be delivered by Buyer pursuant to Section 11.3.

10.4   <u>Effect of Waiver of Conditions</u>.  The waiver by Buyer or Seller of any of the conditions to which its obligations hereunder are subject shall not constitute a release by the Party waiving such condition in favor of the other Party, except where a representation or warranty was true and correct on the date hereof, is no longer true and correct on the Closing Date because of matters occurring after the date hereof, and such matters did not result from the non-performance by Seller of a covenant or agreement contained herein.  Where there is no such release, the waiving Party shall be entitled to pursue all rights and remedies in respect thereof which are available hereunder (including indemnification) or otherwise.

## ARTICLE 11

## CLOSING

11.1   <u>Time and Place</u>.  Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Adamski Moroski Madden & Green LLP in Paso Robles, California, at 10:00 a.m., October 1, 2009, or by mutually agreed remote transmission of documents with electronic signatures, as of 12:00 a.m., Paso Robles, California local time, or, if the conditions specified in ARTICLE 10 have not been fulfilled or waived by such date, on the last business day of the month in which the fulfillment or waiver of such conditions occurs or at such other place or on such other day as Buyer and Seller shall agree upon in writing.   Such date is referred to in this Agreement as the **"Closing Date"** (but the ownership transfer shall be effective as of the Effective Date). In no event shall the Closing Date occur later than December 31, 2009.

11.2   <u>Items to be Delivered by Seller</u>.  At the Closing, Seller shall deliver to Buyer the following:

11.2.1 Bills of sale, certificates of title and such other certificates and assignments in form and substance reasonably satisfactory to Buyer which have been executed by Seller for the Purchased Assets as appropriate depending upon the particular Purchased Asset involved.

11.2.2 Certified copies of the duly adopted resolutions of the Board of Directors of Seller authorizing the transactions contemplated by this Agreement, copies of certified articles and by-laws of Seller, a certificate of incumbency of Seller and a certificate of good standing from the State of Delaware.

19

DH 0000340

11.2.3 Supplemental assignments of the Personal Property Leases and Contracts (if required) executed by Seller in form and substance reasonably satisfactory to Buyer, together with any necessary consents to such Assignments in form and substance reasonably satisfactory to Buyer.

11.2.4 Duly executed copies of the following agreements:

      (a)     The Surrender Agreement;

      (b)     The License Agreement; and

      (c)     Such other agreements to be executed and delivered at Closing as required by this Agreement.

11.2.5 [Intentionally Omitted]

11.2.6 [Intentionally Omitted]

11.2.7 [Intentionally Omitted]

11.2.8 The payment to be made by Seller at Closing pursuant to Section 4.5.

11.2.9 Such other documents, instruments and certificates as Buyer may reasonably request in connection with the transactions contemplated by this Agreement.

11.3    <u>Items to be Delivered by Buyer</u>.  At the Closing, Buyer shall deliver to Seller the following:

11.3.1 Duly executed copies of the following agreements:

      (a)     the Surrender Agreement;

      (b)     Buyer's Release;

      (c)     the License Agreement; and

      (d)     such other agreements to be executed and delivered at Closing as required by this Agreement.

11.3.2 Certified copies of the duly adopted resolutions of the Board of Directors of Seller authorizing the transactions contemplated by this Agreement, copies of certified articles and by-laws of Seller, a certificate of incumbency of Seller and a certificate of good standing from the State of California;

DH 0000341

11.3.3 [Intentionally Omitted]

11.3.4 Such other documents, instruments and certificates as Seller may reasonably request in connection with the transactions contemplated by this Agreement.

## ARTICLE 12

## INDEMNIFICATION AND PROCEDURES

12.1   <u>Indemnification by Seller</u>.   Subject to the other provisions of this ARTICLE 12, Seller shall indemnify and hold Buyer and its employees, representatives, officers, directors, and agents (**"Buyer Group"**) harmless from and against any and all Damages suffered by Buyer or any other member of the Buyer Group resulting from, arising out of, or incurred with respect to, or (in the case of claims asserted against Buyer or any other member of the Buyer Group by a Third Person) alleged to result from, arise out of or have been incurred with respect to:

(a)   the inaccuracy or breach of any representation or warranty made by Seller in this Agreement or in any certificate delivered by Seller at the Closing pursuant hereto or thereto;

(b)   the breach of any covenant by Seller or the nonperformance of any obligation to be performed by Seller under this Agreement or in any certificate delivered by Seller at the Closing pursuant hereto or thereto; and

(c)   the failure of Seller fully to pay or satisfy or cause to be paid or satisfied any of the Retained Liabilities.

12.2   <u>Indemnification by Buyer</u>.   Subject to the other provisions of this ARTICLE 12, Buyer shall indemnify and hold Seller and its employees, representatives, officers, shareholders, directors and agents (**"Seller Group"**) harmless from and against any Damages suffered by Seller or any other member of the Seller Group resulting from, arising out of, or incurred with respect to, or (in the case of claims asserted against Seller or any other member of the Seller Group by a Third Person) alleged to result from, arise out of or have been incurred with respect to:

(a)   the inaccuracy or breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by him at the Closing pursuant hereto or thereto;

(b)   the breach of any covenant by Buyer or the nonperformance of any obligation to be performed by Buyer under this Agreement or in any certificate delivered by him at the Closing pursuant hereto or thereto; and

21

DH 0000342

(c)     the failure of Buyer fully to pay or satisfy or cause to be paid or satisfied any of the Assumed Liabilities.

(d)     the failure of Buyer to transfer or obtain or cause to be transferred or obtained any required Governmental Licenses.

**12.3**     <u>Notice and Resolution of Claim.</u>

12.3.1 An indemnified party shall promptly (and in any event within a time period sufficient to avoid prejudice to the indemnifying party's defense of the matter) give written notice to the indemnifying party after obtaining knowledge of (a) any claim the indemnified party has against the indemnifying party not involving a third-party claim or litigation or (b) any third-party claim or litigation against the indemnified party as to which recovery may be sought against the indemnifying party because of the indemnity set forth in Sections 12.1 or 12.2, specifying in reasonable detail the claim or litigation and the basis for indemnification.  If such claim for indemnity shall arise from the claim or litigation of a Third Person, the indemnified party shall permit the indemnifying party to assume the defense of any such claim, litigation or any litigation resulting from such claim.

12.3.2 If the indemnifying party assumes the defense of any such third-party claim or litigation, the obligations of the indemnifying party shall include taking all steps reasonably necessary in the investigation, defense or settlement of such claim or litigation (including the retention of legal counsel) and holding the indemnified party harmless from and against any and all Damages caused by or arising out of any settlement approved by the indemnifying party or any judgment in connection with such claim or litigation.  In the defense of such claim or litigation, the indemnifying party shall not (except with the written consent of the indemnified party) consent to entry of any judgment or enter into any settlement (a) which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnified party a complete release from all liability in respect of such claim or litigation or (b) the effect of which is to permit any injunction, declaratory judgment, other order or other nonmonetary relief to be entered, directly or indirectly, against any indemnified party.  The indemnifying party shall permit the indemnified party to participate in such defense or settlement through counsel chosen by the indemnified party, with the fees and expenses of such counsel borne by the indemnified party.

12.3.3 Failure by the indemnifying party to notify the indemnified party of its election to assume the defense of any such claim or litigation by a Third Person within twenty (20) days after notice thereof shall have been given to the indemnifying party shall be deemed a waiver by the indemnifying party of its right to assume the defense of such claim or litigation.  If the indemnifying party shall not assume the defense of any such claim by a Third Person or litigation resulting therefrom, the indemnified party may defend against such claim or litigation in such commercially reasonable manner as it may deem appropriate and may settle such claim or litigation on such commercially reasonable terms as it may deem appropriate; provided, however, that

22

DH 0000343

in settling any Action in respect of which indemnification is payable under this ARTICLE 12, it shall act reasonably and in good faith.  The indemnifying party shall not be entitled to require that any Action be brought against any other Entity before Action is brought against it hereunder by the indemnified party but shall be subrogated to any right of Action to the extent that it has paid or successfully defended against any third-party claim.

12.4   Non-Third-Party Claims.  With respect to any claim not involving a third-party claim or litigation which the indemnifying party fails to pay within thirty (30) days of the date notice is received from the indemnified party, the indemnifying party shall, if it is determined to have been obligated to indemnify the indemnified party for such claim, pay the indemnified party for any Damages resulting from the indemnifying party's failure to satisfy promptly such claim.

12.5   Payment and Assignment of Claims.  Upon final determination by the Parties or by a court of competent jurisdiction that a Party is entitled to indemnification under this ARTICLE 12, the indemnifying party shall promptly pay or reimburse, as appropriate, the indemnified party for any Damages to which the indemnified party is entitled to be indemnified under this ARTICLE 12.

12.6   Limits on Indemnification.

12.6.1 Limitation on Indemnification by Seller.  Seller will have no liability (for indemnification or otherwise) with respect to the matters described in Section 12.1 until the total of all Damages with respect to such matters exceeds Fifty Thousand ($50,000) Dollars, in which case Seller will have liability for all Damages in excess of this amount.  In no event and under no circumstances shall Seller's aggregate liability for all claims for indemnification under this Section 12.1 exceed the lesser of (i) Five Hundred Thousand Dollars and no/100 ($500,000.00), or (ii) the portion of the Purchase Price actually paid to Seller at the date of the claim.  Nothing in this Section 12.6.1 shall limit Seller's obligations to pay any sums owing to Buyer under Section 4.5 above.

12.6.2 Survival.   The representations and warranties made in this Agreement or in any certificate or other agreement or document delivered pursuant hereto or in connection herewith shall survive the Closing Date for a period of one (1) year provided, however, that the warranty of Section 5.8 (Taxes) shall survive Closing for a period of two (2) years (the **"Survival Period"**).  Neither Party shall have an obligation to indemnify the other pursuant to this ARTICLE 12 for any breach of any representation or warranty unless a notice has been submitted to the indemnifying Party in accordance with Section 12.3.1 prior to the end of the Survival Period.

12.7   Indemnity Payments.  The Parties agree that any payments by one Party to the other Party made pursuant to this ARTICLE 12 will be treated by the Parties on all applicable Tax returns as an adjustment to the Purchase Price.

23

DH 0000344

12.8    Exclusive Remedy.   Following the Closing, the right to indemnification pursuant to this ARTICLE 12 above shall be the exclusive remedy of Seller and Buyer for breach of this Agreement, except (i) in the event of fraud, or (ii) Seller may exercise all remedies available to Seller under this Agreement or otherwise to collect any portion of the Purchase Price.

# ARTICLE 13

## MISCELLANEOUS

13.1    Notices.   Any notice, request, instruction, consent or other document to be given hereunder by either Party hereto to the other Party shall be in writing and delivered personally, by telecopy or sent by registered, certified, express or priority mail, postage prepaid, as follows:

If to Buyer:

ProDocument**Solutions**, Inc.
Attn:  George Phillips, President and CEO
1760 Commerce Way
Paso Robles, CA  93446

With a copy to:

Adamski Moroski Madden & Green LLP
Attn:  Thomas J. Madden, Esq.
1948 Spring Street
Paso Robles, CA  93446

If to Seller:

Sequoia Voting Systems, Inc.
Attn:  Jack Blaine, President and CEO
717 17th Street, #310
Denver, CO  80202

With a copy to:

Beattie Padovano LLC
Attn:  Adolph A. Romei, Esq.
50 Chestnut Ridge Road
Montvale, NJ 07645

or at such other address for a Party as shall be specified in writing by that Party.  Any notice which is delivered personally or by telecopy to the addresses provided herein shall be deemed to have been duly given to the Party to whom it is directed upon actual receipt by such Party (or its agent for notices hereunder).  Any notice which is addressed and mailed in the manner herein provided shall be deemed given to the Party to which it is addressed when received.

24

DH 0000345

13.2   Expenses.  Except as set forth in this Agreement, each of Buyer and Seller shall pay its own costs and expenses (including, without limitation, Attorneys Fees and other professional fees and expenses) incurred in connection with the negotiation, preparation, execution and delivery of this Agreement and all related documents and the consummation of the transactions contemplated hereby.

13.3   Waiver.  Any of the terms or conditions of this Agreement may be waived in writing at any time by the Party which is entitled to the benefits thereof.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of such provision at any time in the future or a waiver of any other provision hereof.

13.4   Further Assurances.  After the Closing, Seller shall, at Buyer's request from time to time and without further cost or expense to Buyer, prepare, execute and deliver to Buyer such other instruments of conveyance and transfer and take such other actions as Buyer may reasonably request or as to more effectively sell, transfer, assign, deliver and invest in Buyer title and possession of the Purchased Assets and otherwise document and conclude the transactions contemplated by this Agreement.

13.5   Captions.  The captions set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement, nor affect in any way the meaning of the terms and provisions hereof.

13.6   Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties hereto; provided, however, that this Agreement may not be assigned by any Party without the express written consent of the other Party hereto, except that either Party may assign all or part of its rights and obligations under this Agreement to one or more direct or indirect Subsidiaries of such Party, but any such assignment will not release such Party of any of its obligations.

13.7   Enforceability.  If any provision of this Agreement as applied to any Party or to any circumstance shall be adjudged by a court to be invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. The Parties intend this Agreement to be enforced as written.  If any such provision, or part thereof, however, is held to be unenforceable because of the duration thereof or the area covered thereby, Seller and Buyer agree that the court making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete the specific words or phrases, and in its amended form such provision shall then be enforceable and shall be enforced.  If any provision of this Agreement shall otherwise finally be determined to be unlawful, then such provision shall be deemed to be severed from this Agreement and other provision of this Agreement shall remain in full force and effect.

25

DH 0000346

13.8    <u>No Third-Party Beneficiaries or Right to Rely</u>.  Notwithstanding anything to the contrary in this Agreement, (a) nothing in this Agreement is intended to or shall create for or grant to any Third Person (including, without limitation, to any former, current or future employees or officers of any Party, or any labor union) any rights whatsoever, as a third-party beneficiary or otherwise; (b) no Third Person is entitled to rely on any of the representations, warranties, covenants or agreements contained herein; and (c) no Party hereto shall incur any liability or obligation to any Third Person because of any reliance by such Third Person on any representation, warranty, covenant or agreement herein.

13.9    <u>Counterparts</u>.   This Agreement will be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

13.10    <u>Arbitration</u>.  Any disputes between the parties hereto arising out of or relating to the interpretation or performance of this Agreement, including, without limitation, any alleged breach hereof, shall be submitted to and settled by arbitration in accordance with the rules of the American Arbitration Association relating to commercial arbitration then in effect (the "AAA Rules").  The arbitration shall be conducted by a panel of three (3) arbitrators appointed in accordance with such AAA Rules.  Such arbitral tribunal shall apply the substantive (not the conflicts) law of the State of California as provided in Section 13.11.  The seat of the arbitration shall be in, Paso Robles, California and all proceedings of the arbitration, including arguments and briefs, shall be conducted in the English language.  Any award of the arbitral tribunal shall be rendered in writing and shall be final and binding on the parties to it.  Judgment on such award may be entered in any court of competent jurisdiction. The costs of arbitration shall be borne by the parties as the arbitral tribunal may award.

13.11    <u>Governing Law</u>.   This Agreement shall in all respects be interpreted, construed and governed by and in accordance with the local laws of the State of California, without regard to its provisions concerning conflicts of law.  Subject to the arbitration provision of Section 13.10 above, the jurisdiction and venue for the trial of any action arising out of this Agreement shall be the Superior Court of the State of California in and for the County of San Luis Obispo, California.

13.12    <u>Time of Essence</u>.   Time shall be of the essence with respect to this Agreement.

13.13    <u>No Strict Construction</u>.   The language used in this Agreement will be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction will be applied against either Party.

13.14    <u>Bulk Sales Laws</u>.  Buyer hereby waives compliance by Seller with the requirements of any applicable laws relating to sales in bulk.  Except for Assumed Liabilities, Seller agrees to pay and discharge when due, and to indemnify and hold

543384_1\009603

DH 0000347

harmless Buyer from and against, all claims of creditors which could be asserted against Buyer by reason of such noncompliance.

13.15  <u>Public Announcements</u>.  Buyer and Seller shall agree on the terms of the press releases to be issued upon the execution of this Agreement and shall consult with each other before issuing any other press release or making any other public announcement with respect to this Agreement and the transactions contemplated hereby, including, without limitation, any termination of this Agreement for any reason.

13.16  <u>Currency/Method of Payment</u>.  Unless otherwise specifically provided herein, (a) all references to amounts of money shall be to lawful money of the United States, and (b) all payments of money to be made by Buyer or Seller, as the case may be, shall be made in immediately available funds.

13.17  <u>Subsequent Legal Fees</u>.  In the event any Action or proceeding is initiated to enforce the terms and provisions of this Agreement, the Party prevailing in said Action shall be entitled to reasonable Attorneys Fees.

13.18  <u>Sales and Transfer Taxes</u>.  Buyer shall be responsible for and shall pay all sales, transfer, deed, duties, stamp, notary public and other similar Taxes, duties and transfer fees applicable to the transaction contemplated by this Agreement, including fees to record assignments and transfer fees for Governmental Licenses.  Buyer shall file all applicable returns in connection with such Taxes.

13.19  <u>Corresponding Schedules and Exhibits</u>.  Attached hereto are the following Corresponding Schedules and Exhibits, each of which is incorporated into this Agreement in full by this reference:

| SCHEDULES: | |
|---|---|
| SCHEDULE 2.1.1 | Personal Property |
| SCHEDULE 2.1.2 | Accounts Receivable |
| SCHEDULE 2.1.3 | Inventory |
| SCHEDULE 2.1.4 | Intellectual Property and Intellectual Property Licenses Owned by Seller; Intellectual Property Licenses from a Third Party to Seller |
| SCHEDULE 2.1.6 | Miscellaneous Property |
| SCHEDULE 2.3 | Excluded Assets |
| SCHEDULE 3.1 | Assumed Liabilities |
| SCHEDULE 4.1(b) | Seller's Customers |
| SCHEDULE 4.4 | Purchase Price Allocation |
| SCHEDULE 5.3 | Business Financial Statements |
| SCHEDULE 5.5 | Material Contracts |
| SCHEDULE 5.6 | Leases |
| SCHEDULE 5.7 | List of Employees |
| SCHEDULE 5.11 | Governmental/Regulatory Licenses |

DH 0000348

| | |
|---|---|
| SCHEDULE 5.12 | Employee Benefit Plans |
| SCHEDULE 5.13 | Conflicts |
| SCHEDULE 5.15 | Insurance Policies |
| SCHEDULE 7.4(A) | List of Customers |
| SCHEDULE 7.4(B) | Target Accounts |
| SCHEDULE 7.6 | List of New Business Employees |

EXHIBITS:

| | |
|---|---|
| EXHIBIT 7.7 | Cancellation of Porterville, CA Lease |
| EXHIBIT 11.2.1; 11.2.3 | Seller's Bills of Sale, Certificate of Title and/or Assignments for Purchased Assets, Leases and Contracts |
| EXHIBIT 11.2.2; 11.3.4 | Certified copy of Corporate Resolutions Authorizing Agreement, Articles and Bylaws, Corporate Certificates (Buyer and Seller) |
| EXHIBIT 11.2.6; 11.3.5 | Seller's Certificate/Buyer's Certificate |

13.20  <u>Entire Agreement; Amendment</u>.  This Agreement, including all schedules and exhibits hereto, constitutes the sole understanding of the Parties with respect to the matters contemplated hereby and thereby and supersedes and renders null and void all prior agreements and understandings between the Parties with respect to such matters. No amendment, modification or alteration of the terms or provisions of this Agreement, including all schedules and exhibits hereto, shall be binding unless the same shall be in writing and duly executed by the Party against whom such would apply.

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**"SELLER"**                              **"BUYER"**

**SEQUOIA VOTING SYSTEMS, INC.,**        **PRO DOCUMENT SOLUTIONS, INC.,**
a Delaware corporation                   a California corporation


By: _Jack A Blaine_                      By: _____
JACK BLAINE                              NOAL PHILLIPS
President and CEO                        Vice President

28

DH 0000349

## ANNEX A

## Defined Terms

**"Accounts Receivable"** means those accounts receivable listed on Schedule 2.1.2 hereto.

**"Action"** means any action, claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or other tribunal.

**"Agreement"** means this Asset Purchase Agreement.

**"Assumed Liabilities"** has the meaning set forth in Section 3.1.

**"Attorneys Fees"** means all reasonable attorneys fees and out-of-pocket expenses.

**"Business"** means the Print Division of Seller engaged in the business of designing, producing, printing and mailing voting ballots, sample ballot booklets, voter pamphlets, voter registration materials and ballot packets and providing full service ballot mailing services.

**"Business Employees"** means all employees of the Business.

**"Business Financial Statements"** means the balance sheets of Seller as of December 31, 2007 and 2008; the statements of income and cash flows for each of the years ended on the date of each of such balance sheets, and an interim balance sheet of the Business as of July 31, 2009, and the income statement and statement of cash flows of the Business for the interim period then ended, attached as Schedule 5.3.

**"Business Intellectual Property"** means the intellectual property rights listed on Schedule 2.1.4 hereto.

**"Business Technology"** means all Business and technical information, trade secrets and know-how Related to the Business, including, without limitation, (a) conceptions of inventions, Records of invention disclosures software and firmware (computer programs) and sales and marketing information.

**"Buyer"** has the meaning set forth in the first paragraph of this Agreement.

**"Buyer Group"** has the meaning set forth in Section 12.1.

29

DH 0000350

**"Buyer's Knowledge"** means the knowledge of any one or more officers or employees of Buyer having supervisory responsibility, after reasonable investigation and due diligence.

**"Buyer's Release"** has the meaning stated in Section 4.1(a).

**"Buyer's Savings Plan"** means a defined contribution Plan of Buyer.

**"Casualty Loss"** means any material loss, destruction or other physical damage to any Leased Real Property (together with any related assets located on such property) resulting from a fire, accident or other casualty, whether or not insured, or any taking or threat of taking of such property by condemnation.

**"Closing"** means the closing of the transaction contemplated by the Agreement.

**"Closing Date"** has the meaning set forth in Section 11.1.

**"Closing Payment Amount"** has the meaning set forth in Section 4.1 above.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Contracts"** means the Material Contracts.

**"Corresponding Schedule and Exhibit"** means a schedule and/or exhibit which is numbered, captioned or named to correspond to the number, caption or name of the section of this Agreement which refers to that schedule.

**"Cost of Goods Sold"** means the actual out-of-pocket costs paid by Buyer during the year in question for products furnished to Seller's Customers.

**"Current Products"** means the Products within the product categories that are currently manufactured or sold by the Business.

**"Damages"** means any and all debts, losses, claims, damages, consequential damages, costs, fines, judgments, penalties, obligations, payments, expenses and liabilities of every type and nature (including, without limitation, those arising out of any Action), together with all reasonable costs and expenses (including, without limitation, Attorneys Fees) incurred in connection with any of the foregoing and including, without limitation, the reasonable cost of (a) the investigation, preparation or defense of any Action in connection therewith, and (b) the assertion of any claims under this Agreement.

**"Effective Date"** means September 1, 2009.

**"Employee Benefit Plan"** means each Plan to which Seller, or any Related Person contributes or is or has been obligated to contribute or is or has been a party or is or has been bound or under which Seller, or any Related Person may have any liability.

30

DH 0000351

**"Employee Pension Benefit Plans"** has the meaning set forth in Section 3(2) of ERISA, whether or not such Plans are subject to ERISA.

**"Employee Welfare Benefit Plans"** has the meaning set forth in Section 3(1) of ERISA, whether or not such Plans are subject to ERISA.

**"Entity"** means any individual, corporation, partnership, association, estate, limited liability company, trust, unincorporated organization, governmental or quasi-governmental agency or body or any other entity whatsoever.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, including the rules and regulations promulgated thereunder.

**"ERISA Plan"** has the meaning set forth in Section 3(3) of ERISA with respect to Employee Benefit Plans which are subject to ERISA.

**"Excluded Assets"** has the meaning set forth in Section 2.3.

**"Existing Customers"** means all customers specifically described on the Corresponding Schedule as "List of Customers."

**"GAAP"** means generally accepted accounting principles in the United States of America.

**"Governmental Licenses"** means the permits, licenses, certificates, orders, consents, authorizations, franchises and other approvals from, or required by, any governmental authority or regulatory entity duly designated by any governmental authority that are used by, or are necessary to own and to operate, the Business or lawfully to own, operate, construct or use any of the Purchased Assets, as currently configured and operated (or as proposed or required to be configured and operated), together with any applications for the issuance, renewal, modification, extension or expansion thereof and all supporting information and analyses.

**"Gross Profit"** means the gross revenues received from Seller's Customers less the Cost of Goods Sold, discounts, returns, allowances, postage, and shipping costs.

**"Indemnitee"** has the meaning set forth in Section 12.3.1.

**"Indemnitor"** has the meaning set forth in Section 12.3.1.

**"Inventory"** means those items of inventory listed on Schedule 2.1.3 hereto.

**"License Agreement"** has the meaning set forth in Section 2.4.

543384_1\009603

DH 0000352

**"Lien"** means any lien, mortgage, security interest, charge, pledge, retention of title agreement, easement, encroachment or other encumbrance of any sort whatsoever affecting title to any property of any sort.

**"Material Adverse Effect"** means (a) any effect that is materially adverse to the value of the Purchased Assets taken as a whole or materially adverse to the Business, the condition (financial or otherwise), or results of operations of the Business in each case taken as a whole, or (b) any effect that would, individually or in the aggregate, materially impair, hinder or otherwise materially and adversely affect the ability of Seller or Buyer, as the case may be, to effect the Closing, to perform any of their material obligations under this Agreement or any of the Related Agreements, or to receive all material benefits of the transactions contemplated by this Agreement.

**"Material Contracts"** has the meaning set forth in Section 5.5.

**"Material Lease"** means any lease or sublease, Related to the Business, of (a) real property or (b) personal property or sales offices involving a term of more than three (3) years or rental obligations exceeding Fifty Thousand Dollars and no/100 ($50,000.00) in any single case.

**"Miscellaneous Property"** means those items of property pertaining to the Business and listed on Schedule 2.1.6 hereto.

**"New Business Employee"** means each Business Employee who is employed by Buyer as of the Closing Date.

**"Non-Assignable Asset"** means any Purchased Asset which is not capable of being sold, assigned, transferred, delivered or subleased without the consent or waiver of any Third Person, or which would result in a breach of any obligation or a violation of any law, decree, order, regulation or other governmental edict if any such action or attempted action were taken.

**"Noncompetition Agreement"** has the meaning set forth in Section 11.2.4.

**"Party"** means Buyer or Seller, referred to individually, and "Parties" means Buyer and Seller, referred to collectively.

**"PBGC"** means the Pension Benefit Guaranty Corporation.

**"Permitted Liens"** means (a) Liens for Taxes not yet due and payable, (b) workers', repairers' or other similar Liens imposed by law arising or incurred in the ordinary course of business in respect of obligations which are not overdue, (c) easements, encroachments or encumbrances which do not, individually or in the aggregate, materially impair the continued use of the specific property for the operation of the Business to which each relates, (d) retention of title agreements with suppliers entered into in the ordinary course

DH 0000353

of business consistent with past practices and (e) Liens listed on the Corresponding Schedule.

**"Personal Property"** means the personal property listed on Schedule 2.1.1 hereto.

**"Personal Property Leases"** means all leases covering any Personal Property.

**"Plan"** means each pension, multi-employer, retirement, profit-sharing, deferred compensation, bonus, incentive, performance, stock option, stock appreciation, phantom stock, stock purchase, restricted stock, medical, hospitalization, vision, dental, health, life, disability, insurance, severance, fringe benefit, termination or other employee benefit or compensation plan, program, arrangement, agreement, policy or understanding (including, without limitation, each ERISA plan).

**"Products"** means the Current Products and all previous generations or models of the Current Products that were manufactured or sold by the Business or any predecessor operation thereof, whether or not then owned by Seller.

**"Punitive Damages"** means any and all punitive Damages awarded in any Action or which are agreed to in any settlement of any claim.

**"Purchase Price"** has the meaning set forth in Section 4.1.

**"Purchase Price Allocation"** has the meaning set forth in Section 4.4.

**"Purchased Assets"** has the meaning set forth in Section 2.1.

**"Real Property Leases"** means Leased Real Property leases and subleases listed on the Corresponding Schedule to Section 5.6, together with all rights and privileges of Seller thereunder, whenever accruing.

**"Receivables"** means accounts receivable Related to the Print Division Business.

**"Records"** means business papers, books and records in whatsoever form (e.g., computerized information, audio recordings and written information), including, without limitation, sales records, invoices, credit records, customer lists and records, distributor records, research and development records, supplier lists and records, price lists, purchasing materials and records, personnel, labor relations and payroll records, manufacturing, maintenance and quality control records and procedures, warranty and service records, blueprints, accounting and financial records, inventory records, accounts receivable and accounts payable records and files, Tax records and litigation files, each of which is Related to the Business.

**"Related Agreements"** means the related agreements contemplated by this Agreement, including those attached to this Agreement as Corresponding Schedules.

33

DH 0000354

**"Related Person"** means Seller, and any trade or business whether or not incorporated, which, together with Seller would, as of any date of determination, be required to be aggregated with Seller under Section 414 of the Code.

**"Related to the Business"** means used by Seller in, arising from, applicable to, related to, or otherwise affecting the Business.

**"Retained Liabilities"** has the meaning set forth in Section 3.2.

**"Sale"** means the purchase of the Purchased Assets and the assumption of the Assumed Liabilities by Buyer at the Closing.

**"Seller"** has the meaning set forth in the first paragraph of this Agreement.

**"Seller's Customers"** has the meaning set forth in Schedule 4.1(b).

**"Seller Group"** has the meaning set forth in Section 12.2.

**"Seller's Knowledge"** means only the actual knowledge of the following individuals: Jack Blaine, Peter McManemy and Waldeep Singh, excluding, however, any matters within the knowledge of Brian Lierman.

**"Seller's Savings Plan"** means the Plan identified as such on the Corresponding Schedule to Section 5.12.1.

**"Surrender Agreement"** has the meaning stated in Section 7.7.

**"Survival Period"** shall have the meaning set forth in Section 12.6.2.

**"Tax"** or **"Taxes"** means (a) all taxes, charges, fees, levies or other assessments, however denominated, and whether imposed by a taxing authority within or without the United States, including, without limitation, income, profits, franchise, gross receipts, capital, sales, use, withholding, municipal license, value added, ad valorem, transfer, employment, social security, disability, occupation, property, severance, production, excise and other taxes, duties and other similar governmental charges and assessments imposed by or on behalf of any government or taxing authority (including interest and penalties thereon and additions thereto), whether arising before, on or after the Closing Date, and (b) any obligations under any agreements or arrangements with respect to any Taxes described in clause (a) above.

**"Tax Laws"** means all federal (including, without limitation, the Internal Revenue Code), state, county, local, or foreign laws relating to Taxes and all rules, regulations or official administrative pronouncements promulgated thereunder.

**"Tax Returns"** means, collectively, all returns, declarations, reports, estimates, information returns and statements required to be filed under federal, state, local or any

34

DH 0000355

foreign Tax Laws and any returns, forms or other documents required to be retained by Seller in compliance with applicable Tax reporting and withholding laws.

**"Third Person"** means any Entity not a signatory to this Agreement.

**"2009 Elections"** has the meaning stated in Section 4.1(b).

**"Workers' Compensation Liabilities"** means all liabilities and obligations arising out of claims or Actions which are asserted pursuant to governmental workers' compensation or similar law, or on account of alleged occupational disease or injury, which are related, directly or indirectly, to the conduct of the Business on or prior to the Closing Date, including, without limitation, all Damages incurred in connection with the foregoing. Worker's Compensation Liabilities shall not include the cost of insuring for such risks after the Closing even if the cost of insurance is based on Seller's claims experience.

DH 0000356

**SCHEDULE 2.1.1**
**Personal Property**

**Porterville equipment inventory**          **9/25/2009**
**Manufacturing**

| Office | Description | Quantity | Serial number | Version | Location | Purpose |
|--------|-------------|----------|---------------|---------|----------|---------|
| Porterville | Insight w/keys and ballot box | 1 | 502894 | g | Press area | QC |
| CGX Frederic | Insight w/keys | 1 | 503245 | | QC office | QC |
| CGX Hayward | Insight w/keys | 1 | | | QC office | QC |
| Porterville | 400-C | 1 | 200211 | | Press area | QC |
| Porterville | Eagle ballot box | 1 | | | Press area | QC |
| Porterville | Documation Ballot counter | 1 | 7805468PR | | Press area | QC |
| Porterville | Accuvote ballot reader | 1 | 20557 | | QC office | QC |

DH 0000357

Schedule 2.1.1 Purchased assets Page 2 of 2

Office Hardware September 2009

| Name | Location | Dept | Type | MFG | Model | CPU | Serial No | User | Activity | Pu |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer, Richard | Porterville | Print | Laptop | Dell | D610 | 1.86GHz | C4V2FD1 | rkramer | Active | 1/ |
| Travis, Ross | Remote | Print | Laptop | Dell | D630 | 2GHz | 44V2FD1 | rtravis | Active | |
| Llerman, Brian | Porterville | Print | Laptop | Dell | D830 | 2.0GHz | HT8WZD1 | bllerman | Active | 8 |
| Rivera, Chuck | Porterville | Print | Laptop | Dell | D610 | 1.66GHz | JN78ZC1 | crivera | Active | |
| Alkema, Eric | Porterville | Print | Desktop | Dell | OPT-330 | 2.13GHz | 73MKTF1 | ealkema | Active | |
| Martin, Liz | Porterville | Print | Desktop | Dell | OPT-330 | PIV | 93MKTF1 | lmartin | Active | 3/ |
| Albert, Mary Kay | Porterville | Print | Laptop | Dell | D610 | 1.8GHz | H294771 | mcalbert | Active | 4 |
| Albert, Mary Kay | Porterville | Print | Laptop | Dell | D830 | 2.0GHz | D5V2FD1 | mcalbert | Active | 8 |
| Castillo, Maria | Porterville | Print | Desktop | HP | DC5100 | PIV | MXL6190YW4 | mcastillo | Active | ST |
| Cornwell, Rick | Porterville | Print | Desktop | HP | DC5100 | PIV | MXL6200G1B | rcornwell | Active | ST |
| Cornwell, Rick | Porterville | Print | Desktop | Dell | GX520 | PIV | 8J3K081 | rcornwell | Active | 7/ |
| Martin, Liz | Porterville | Print | Desktop | HP | DC5100 | PIV | MXL6100QFP | Assistant 1 | Active | ST |
| Schaffer, Beverly | Porterville | Print | Desktop | Dell | OPT-330 | PIV | 43MKTF1 | bshaffer | Addnl Coord | 3/ |
| | Porterville | Print | Desktop | HP | DC6100 | PIV | MXL6200FSO | CARS | Backup CARS | ST |
| | Porterville | Print | Desktop | Dell | GX150 | PIV | 5MFKP01 | cstaley | Consultant temp | |
| Phillips, Rayla | Porterville | Print | Desktop | Dell | OPT-330 | PIV | 63MKTF1 | rphillips | Addnl Coord | 3/ |
| PORT-8MFKP01 | Porterville | IT | Desktop | Dell | GX150 | PIV | 8MFKP01 | CARS Server | Server for CARS | 7/ |
| | Porterville | Print | Office equip | Var | | | Misc desks, chairs, file cabinets in 5 office areas | | | |

**Printers**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| bllerman | Porterville | Print | HP | 3330 | Print/Cop | SGM35C0871 | | | |
| coordinators | Porterville | Print | Xerox | 7400 | Color prin | WMY600648 | | | |
| coordinators | Porterville | Print | Brother | 4750e | FAX | U60283K6J548724 | | | |
| mcastillo | Porterville | Print | HP | LJ2300n | Printer | CNBFC7672C1 | | | |
| planners | Porterville | Print | Xerox | Work Cent | FAX | 248 899B A | | | |
| rkramer | Porterville | Print | HP | OJ6310 | Print/Cop | Q8071A | | | |
| sales | Porterville | Print | HP | LJ4000TN | Printer | USEF186698 | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PORTDC02 | Porterville | IT | Server | Dell | PE2900 | | H51LKH1 | PortDC02 | Server ** SVS network | 10/ |
| PORTERVILLEDC | Porterville | IT | Rack Server | Dell | PE350 | PIV | JJZMZ11 | PortervilleDC | Server ** SVS network | 10/ |
| PORTFILSRV | Porterville | IT | Rack Server | Dell | PE1550 | PIV | 22KNK01 | Portfilsrv | Server ** SVS network | 5/ |

** Temporary until Pro network

Purchased assets,2.1.1 P2Porter

**SCHEDULE 2.1.2**
**Accounts Receivable**

DH 0000359

Schedule 2.1.2
Invoices Issued as of 9/25/09

## Invoices by State by Customer

From 9/1/2009 to 9/25/2009

| State | Customer | | Document Number | Document Date | GL Post Date | Billings | Freight | Sales Tax |
|---|---|---|---|---|---|---|---|---|
| CA | USCATEHAMA | Tehama County, CA | 7008032 | 9/23/2009 | 9/23/2009 | 3,074.22 | | |
| CA | USCATEHAMA | Tehama County, CA | 7008036 | 9/23/2009 | 9/23/2009 | 1,425.72 | | |
| CA | USCANAPACO | Napa County | 7008037 | 9/23/2009 | 9/23/2009 | 541.63 | | |
| CA | USCAGLENNC | Glenn County, CA | 7008038 | 9/23/2009 | 9/23/2009 | 147.54 | | |
| CA | USCATULARE | Tulare County, CA | 7008039 | 9/24/2009 | 9/24/2009 | 4,136.84 | | |
| CA | USCABIGGSW | Biggs-West Gridley Water District,  CA | 7007895 | 9/10/2009 | 9/10/2009 | 221.39 | | |
| CA | USCABUTTEW | Butte Water District | 7007996 | 9/10/2009 | 9/10/2009 | 1,678.18 | | |
| CA | USCAPACIFI | Pacific Election Services | 7007997 | 9/10/2009 | 9/10/2009 | 35.75 | 11.92 | |
| | | | **CA Total Invoices** | | | **11,261.27** | **11.92** | |
| | | | | | | | | |
| CO | USCOARAPAH | Arapahoe County, CO | 7008023 | 9/17/2009 | 9/17/2009 | 21,239.18 | | |
| | | | **CO Total Invoices** | | | **21,239.18** | | |

All Invoices are for Postage which has
already been paid by Sequoia with the
exception of Pacific Elections 7007997

## SCHEDULE 2.1.3
### Inventory

[THERE IS NO INVENTORY BEING TRANSFERRED]

DH 0000361

**SCHEDULE 2.1.4**
**Intellectual Property and Intellectual**
**Property Licenses Owned by Seller;**
**Intellectual Property Licenses from a**
**Third Party to Seller**

CARS program (Computer Aided Runsheet Software)
CABL (Ballot Layout)

DH 0000362

## SCHEDULE 2.1.6
**Miscellaneous Property**

[NONE]

DH 0000363

## SCHEDULE 3.1
## Assumed Liabilities

All Material Contracts

All other non contract orders for Customers listed on Schedule 4.1(b)

All wages, salaries, employee benefits and employment taxes relating to the operation of the Business after the Effective Date.

DH 0000364

## SCHEDULE 4.1(b)
## Seller's Customers

**2009 sales**
Calendar year
VENTURA CA
KERN CA.
EL DORADO CA.
MADERA CA.
SONOMA CA.
IMPERIAL CA
INYO CA
MONO CA
Butte CA
TULARE CA.
CALAVERAS CA.
SANTA CRUZ CA.
AMADOR CA.
KINGS CA.
MARIPOSA CA.
Santa Rosa Rancheria
Westalnds Water
Butte Water
Jackson Mo
Los Angeles City CA
LOS ANGELES CO CA
Pacific elections
WELD CO.
CRS CO
Adams CO
CITY & CO. DENVER CO
ELBERT CO.
PUEBLO CO.
Arapahoe CO
HUMBOLDT CA
SISKIYOU CA
Acera
SUTTER CA
YUBA CA
DEL NORTE CA
GLENN CA
NAPA  CA
TEHAMA CA
Lane Ore
SAN FRANCISCO CA
SANTA CLARA CA
SHASTA CA

DH 0000365

## SCHEDULE 4.4
## Purchase Price Allocation

[TO BE AGREED]

## SCHEDULE 5.3
## Business Financial Statements

DH 0000367

Schedule 7.9 page 1 of 3
2006 financials

| GPYEAR | Item Type | ACTDESCR | 00-General | 21-Sales PRI | 30-Print | Grand Total | |
|---|---|---|---|---|---|---|---|
| 2006 | 4-Sales | PRINTING: ELECTION PRINTING | (20,543,296) | | | (20,543,296) | |
| | 4-Sales Total | | (20,543,296) | | | (20,543,296) | |
| 2006 | 5-COGS | COG MATL / PRINT | 13,476,591 | | | 13,476,591 | -65.60% |
| | 5-COGS Total | | 13,476,591 | - | - | 13,476,591 | |
| 2006 | 6-SGA | SALARIES & WAGES | | 182,160 | 627,496 | 809,657 | |
| 2006 | 6-SGA | WAGES - OT | | | 24,433 | 24,433 | |
| 2006 | 6-SGA | PAYROLL TAXES | | 26,606 | 44,149 | 70,755 | |
| 2006 | 6-SGA | WORKERS COMP PREMIUMS | | | | - | |
| 2006 | 6-SGA | EMPLOYEE INSURANCE BENEFITS | | 64,487 | 181,666 | 246,153 | |
| 2006 | 6-SGA | EMPLOYEE INSURNACE BENEFITS | | | | - | |
| 2006 | 6-SGA | 401K MATCH | | 18,264 | 33,643 | 51,907 | |
| 2006 | 6-SGA | UNEMPLOYMENT SALARY | | 1,798 | 4,196 | 5,994 | |
| 2006 | 6-SGA | ANNUAL BONUS | | | | - | Charged to Admin |
| 2006 | 6-SGA | AWARDS | | | 1,082 | 1,082 | |
| 2006 | 6-SGA | SALES COMMISSIONS | | 605,089 | | 605,089 | |
| 2006 | 6-SGA | CONTRACT LABOR | | | 103,363 | 103,363 | |
| 2006 | 6-SGA | EDUCATION - TUITION | | | | - | |
| 2006 | 6-SGA | SEMINARS | | | | - | |
| 2006 | 6-SGA | RELOCATION | | | | - | |
| 2006 | 6-SGA | US MANAGEMENT ALLOCATION | | | | - | |
| 2006 | 6-SGA | EMPLOYEE SCREENINGS | | | | - | |
| 2006 | 6-SGA | RECRUITING | | | | - | |
| 2006 | 6-SGA | T&E: MILEAGE EXPENSE | | 210 | 2,989 | 3,199 | |
| 2006 | 6-SGA | TRAVEL EXPENSES:MISCELLANEOUS TRAVEL EXPENSES | | 45,449 | (3,365) | 42,084 | |
| 2006 | 6-SGA | T & E NON DEDUCTABLE | | 4,288 | 1,784 | 6,072 | |
| 2006 | 6-SGA | OFFICE RENT | | | 15,416 | 15,416 | |
| 2006 | 6-SGA | OFFICE MAINTENANCE | | | | - | |
| 2006 | 6-SGA | AUTO MAINTENANCE | | | | - | |
| 2006 | 6-SGA | PROPERTY | | | | - | |
| 2006 | 6-SGA | UTILITIES:GAS AND ELECTRIC | | | 12,077 | 12,077 | |
| 2006 | 6-SGA | UTILITIES: WATER/SEWAGE | | | | - | |
| 2006 | 6-SGA | TELEPHONE | | 12,983 | 30,913 | 43,897 | |
| 2006 | 6-SGA | PROFESSIONAL FEES: CERTIFICATION | | | | - | |
| 2006 | 6-SGA | PROFESSIONAL FEES: IT MAINTENANCE | | | 639 | 639 | |
| 2006 | 6-SGA | OUTSIDE SERVICES | | | | - | |
| 2006 | 6-SGA | LOBBYIST | | | | - | |
| 2006 | 6-SGA | PARKING | | | 3,127 | 3,127 | |
| 2006 | 6-SGA | OFFICE EQUIPMENT RENTAL | | 908 | 35,228 | 36,137 | |
| 2006 | 6-SGA | OFFICE SUPPLIES | | 298 | 13,834 | 14,132 | |
| 2006 | 6-SGA | DELIVERY AND COURIER | | 28 | 26,268 | 26,296 | |
| 2006 | 6-SGA | SUPPLIES AND MATERIALS | | 4,090 | 5,877 | 9,967 | |
| 2006 | 6-SGA | temporary account for cc/must change on cc | (0) | | | (0) | |
| 2006 | 6-SGA | ADVERTISING | | | | - | |
| 2006 | 6-SGA | FORKLIFT RENTAL | | | | - | |
| 2006 | 6-SGA | VEHICLE EXPENSE | | 37,270 | | 37,270 | |
| 2006 | 6-SGA | MISCELLANEOUS EXPENSES | (0) | | | (0) | |
| 2006 | 6-SGA | ADVANTAGE FLOOD EXPENSE | | | | - | |
| 2006 | 6-SGA | BANK SERVICE CHARGES | | | | - | |
| 2006 | 6-SGA | MEMBERSHIPS | | | | - | |
| 2006 | 6-SGA | DUES AND SUBSCRIPTIONS | | | | - | |
| 2006 | 6-SGA | DUES NON DEDUCTIBLE | | | | - | |
| 2006 | 6-SGA | WATERTOWN TRANSIT | | | | - | |
| 2006 | 6-SGA | WATERTOWN TRANSIT-Election-Developemen-Project num | | | | - | |
| 2006 | 6-SGA | BUSINESS LICENSE / TAXES | | | | - | |
| 2006 | 6-SGA | CONVENTION EXPENSE | | | | - | |
| 2006 | 6-SGA | CHARGES OTHER DEPARTMENTS | | | 350,004 | 350,004 | |
| 2006 | 6-SGA | ANNUAL REPORT FEE | | | | - | |
| 2006 | 6-SGA | FINES & PENALTIES | | | | - | |
| 2006 | 6-SGA | COMPANY MEETINGS | | | 200 | 200 | |
| 2006 | 6-SGA | CHARITABLE CONTRIBUTIONS | | | | - | |
| | 6-SGA Total | | (0) | 1,004,129 | 1,614,921 | 2,618,950 | |
| | 7-Depr Total | | | - | - | | |
| | | PROFIT | | | | 4,547,764 | |

DH 0000368

Schedule 7.9 page 2 of 3
2007 financials

| GP YEAR | Acct Type | ACCT DESCR | 100-General | 211-Sales/PRI | 300-Print | Grand Total | |
|---|---|---|---|---|---|---|---|
| 2007 | 4-Sales | PRINTING: ELECTION PRINTING | (5,399,430) | | | (5,399,430) | |
| | 4-Sales Total | | (5,399,430) | - | - | (5,399,430) | |
| 2007 | 5-COGS | COG MATL / PRINT | 3,656,246 | | | 3,656,246 | -67.72% |
| | 5-COGS Total | | 3,656,246 | - | - | 3,656,246 | |
| 2007 | 6-SGA | SALARIES & WAGES | | 62,446 | 674,883 | 737,329 | Need to verify headcount |
| 2007 | 6-SGA | WAGES - OT | | | 5,833 | 5,833 | |
| 2007 | 6-SGA | PAYROLL TAXES | | 13,599 | 50,821 | 64,411 | |
| 2007 | 6-SGA | WORKERS COMP PREMIUMS | | | | - | |
| 2007 | 6-SGA | EMPLOYEE INSURANCE BENEFITS | | 11,705 | 136,323 | 148,029 | |
| 2007 | 6-SGA | EMPLOYEE INSURNACE BENEFITS | | | | - | |
| 2007 | 6-SGA | 401K MATCH | | 6,113 | 54,195 | 60,308 | |
| 2007 | 6-SGA | UNEMPLOYMENT SALARY | | 1,645 | 4,290 | 5,935 | |
| 2007 | 6-SGA | ANNUAL BONUS | | | | - | Charged to Admin |
| 2007 | 6-SGA | AWARDS | | | | - | |
| 2007 | 6-SGA | SALES COMMISSIONS | | 59,020 | | 59,020 | |
| 2007 | 6-SGA | CONTRACT LABOR | | | 7,089 | 7,089 | |
| 2007 | 6-SGA | EDUCATION - TUITION | | | | - | |
| 2007 | 6-SGA | SEMINARS | | | | - | |
| 2007 | 6-SGA | RELOCATION | | | | - | |
| 2007 | 6-SGA | US MANAGEMENT ALLOCATION | | | | - | |
| 2007 | 6-SGA | EMPLOYEE SCREENINGS | | | | - | |
| 2007 | 6-SGA | T&E: MILEAGE EXPENSE | | 76 | 7,189 | 7,264 | |
| 2007 | 6-SGA | TRAVEL EXPENSES:MISCELLANEOUS TRAVEL EXPENSES | | 31,764 | 42,762 | 74,515 | |
| 2007 | 6-SGA | T & E NON DEDUCTABLE | | 1,749 | 2,792 | 4,541 | |
| 2007 | 6-SGA | OFFICE RENT | | | 19,600 | 19,600 | |
| 2007 | 6-SGA | OFFICE MAINTENANCE | | | | - | |
| 2007 | 6-SGA | AUTO MAINTENANCE | | 0 | | 0 | |
| 2007 | 6-SGA | UTILITIES:GAS AND ELECTRIC | | | 14,071 | 14,071 | |
| 2007 | 6-SGA | UTILITIES: WATER/SEWAGE | | | | - | |
| 2007 | 6-SGA | TELEPHONE | | 7,600 | 62,921 | 70,521 | |
| 2007 | 6-SGA | PROFESSIONAL FEES: CERTIFICATION | | | | - | |
| 2007 | 6-SGA | PROFESSIONAL FEES: IT MAINTENANCE | | | | - | |
| 2007 | 6-SGA | PROFESSIONAL FEES: LEGAL SERVICES | | | | - | |
| 2007 | 6-SGA | OUTSIDE SERVICES | | 31 | 5,980 | 6,010 | |
| 2007 | 6-SGA | LOBBYIST | | | | - | |
| 2007 | 6-SGA | PARKING | | | 3,276 | 3,276 | |
| 2007 | 6-SGA | OFFICE EQUIPMENT RENTAL | | 864 | 33,338 | 34,202 | |
| 2007 | 6-SGA | OFFICE SUPPLIES | | 220 | 2,899 | 3,119 | |
| 2007 | 6-SGA | DELIVERY AND COURIER | | | 18,728 | 18,728 | |
| 2007 | 6-SGA | SUPPLIES AND MATERIALS | | | 971 | 971 | |
| 2007 | 6-SGA | temporary account for cc/must change on cc | 39 | | | 39 | |
| 2007 | 6-SGA | ADVERTISING | | | | - | |
| 2007 | 6-SGA | FORKLIFT RENTAL | | | | - | |
| 2007 | 6-SGA | VEHICLE EXPENSE | | 16,149 | | 16,149 | |
| 2007 | 6-SGA | RELEASE AR BAD DEBT | | | | - | |
| 2007 | 6-SGA | MISCELLANEOUS EXPENSES | | | | - | |
| 2007 | 6-SGA | ADVANTAGE FLOOD EXPENSE | | | | - | |
| 2007 | 6-SGA | BANK SERVICE CHARGES | | | | - | |
| 2007 | 6-SGA | MEMBERSHIPS | | | | - | |
| 2007 | 6-SGA | DUES AND SUBSCRIPTIONS | | | 3,450 | 3,450 | |
| 2007 | 6-SGA | BUSINESS LICENSE / TAXES | | | | - | |
| 2007 | 6-SGA | CONVENTION EXPENSE | | | | - | |
| 2007 | 6-SGA | ANNUAL REPORT FEE | | | | - | |
| 2007 | 6-SGA | FINES & PENALTIES | | | | - | |
| 2007 | 6-SGA | GAIN/LOSS F/A | | | | - | |
| 2007 | 6-SGA | CHARITABLE CONTRIBUTIONS | | 300 | | 300 | |
| 2007 | 6-SGA | CHARGEOUT OF EXPENSES TO COST OF GOODS | | | | - | |
| | 6-SGA Total | | 39 | 213,281 | 1,151,309 | 1,364,610 | |
| | 7-Depc Total | | - | - | - | - | |
| | 8-Other Inc Total | | | | - | - | |
| | | PROFIT | | | | 378,674 | |

DH 0000369

Schedule 7.9 page 3 of 3
2008 financials

| GR YEAR | Acct Type | DESCRIPTION | #300 General | #21 Sales PR | #303 Print | GRAND TOTAL |
|---|---|---|---|---|---|---|
| 2008 | 4-Sales | PRINTING: ELECTION PRINTING | (28,743,673) | - | | (28,743,673) |
| | 4-Sales Total | | (28,743,673) | | | (28,743,673) |
| 2008 | 5-COGS | COG MATL / PRINT | 16,773,572 | | | 16,773,572 |
| | 5-COGS Total | | 16,773,572 | - | | 16,773,572 |
| 2008 | 6-SGA | SALARIES & WAGES | | | 680,140 | 680,140 |
| 2008 | 6-SGA | WAGES - OT | | | 30,279 | 30,279 |
| 2008 | 6-SGA | PAYROLL TAXES | | | 53,805 | 53,805 |
| 2008 | 6-SGA | WORKERS COMP PREMIUMS | | | | - |
| 2008 | 6-SGA | EMPLOYEE INSURANCE BENEFITS | | | 181,444 | 181,444 |
| 2008 | 6-SGA | EMPLOYEE INSURNACE BENEFITS | | | | - |
| 2008 | 6-SGA | 401K MATCH | | | 41,257 | 41,257 |
| 2008 | 6-SGA | UNEMPLOYMENT SALARY | | | 5,658 | 5,658 |
| 2008 | 6-SGA | ANNUAL BONUS | | | | - |
| 2008 | 6-SGA | ANNUAL BONUS | | | 88,550 | 88,550 |
| 2008 | 6-SGA | AWARDS | | | | - |
| 2008 | 6-SGA | SALES COMMISSIONS | | 662,310 | | 662,310 |
| 2008 | 6-SGA | CONTRACT LABOR | | | 69,817 | 69,817 |
| 2008 | 6-SGA | EDUCATION - TUITION | | | | - |
| 2008 | 6-SGA | SEMINARS | | | 135 | 135 |
| 2008 | 6-SGA | RELOCATION | | | | - |
| 2008 | 6-SGA | US MANAGEMENT ALLOCATION | | | | - |
| 2008 | 6-SGA | EMPLOYEE SCREENINGS | | | | - |
| 2008 | 6-SGA | RECRUITING | | | | - |
| 2008 | 6-SGA | T&E: MILEAGE EXPENSE | | | 3,499 | 3,499 |
| 2008 | 6-SGA | TRAVEL EXPENSES:MISCELLANEOUS TRAVEL EXPENSES | | 0 | 24,211 | 24,211 |
| 2008 | 6-SGA | T & E NON DEDUCTABLE | | (0) | 722 | 722 |
| 2008 | 6-SGA | T&E INTERNATIONAL-BLAINE | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL-HURST | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL-MORENO | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL- RONALD MORALES | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL-DAVID ALLEN | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL-ERIC COOMER | | | | - |
| 2008 | 6-SGA | T&E INTERNATIONAL-EDWIN SMITH | | | | - |
| 2008 | 6-SGA | OFFICE RENT | | | 28,800 | 28,800 |
| 2008 | 6-SGA | OFFICE MAINTENANCE | | | | - |
| 2008 | 6-SGA | AUTO MAINTENANCE | | | | - |
| 2008 | 6-SGA | UTILITIES:GAS AND ELECTRIC | | | 18,014 | 18,014 |
| 2008 | 6-SGA | UTILITIES: WATER/SEWAGE | | | 152 | 152 |
| 2008 | 6-SGA | TELEPHONE | | 0 | 55,191 | 55,191 |
| 2008 | 6-SGA | CELL PHONE CHARGE | | | | - |
| 2008 | 6-SGA | CELL PHONE CHARGES | | | 27,560 | 27,560 |
| 2008 | 6-SGA | PROFESSIONAL FEES: CERTIFICATION | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES - CERT INTERNAL SUPPORT | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES -CERT INTERNAL SUPPORT | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES-CERT INTERNAL SUPPORT | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES: IT MAINTENANCE | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES: LEGAL SERVICES | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES:LEGAL-DVS | | | | - |
| 2008 | 6-SGA | OUTSIDE SERVICES | | - | 23,798 | 23,798 |
| 2008 | 6-SGA | R&D-Election-Development | | | | - |
| 2008 | 6-SGA | LOBBYIST | | | | - |
| 2008 | 6-SGA | PROFESSIONAL FEES - AUDIT | | | | - |
| 2008 | 6-SGA | PARKING | | | - | - |
| 2008 | 6-SGA | STORAGE | | | 903 | 903 |
| 2008 | 6-SGA | OFFICE EQUIPMENT RENTAL | | | 33,368 | 33,368 |
| 2008 | 6-SGA | OFFICE SUPPLIES | | (0) | 10,683 | 10,683 |
| 2008 | 6-SGA | DELIVERY AND COURIER | | (18) | 48,743 | 48,725 |
| 2008 | 6-SGA | SUPPLIES AND MATERIALS | | | 2,085 | 2,085 |
| 2008 | 6-SGA | temporary account for co/must change on cc | 389 | | | 389 |
| 2008 | 6-SGA | ADVERTISING | | | | - |
| 2008 | 6-SGA | FORKLIFT RENTAL | | | | - |
| 2008 | 6-SGA | VEHICLE EXPENSE | | (1,523) | 50 | (1,473) |
| 2008 | 6-SGA | RELEASE AR BAD DEBT | | | | - |
| 2008 | 6-SGA | MISCELLANEOUS EXPENSES | | | | - |
| 2008 | 6-SGA | BANK SERVICE CHARGES | | | | - |
| 2008 | 6-SGA | MEMBERSHIPS | | | | - |
| 2008 | 6-SGA | DUES AND SUBSCRIPTIONS | | | | - |
| 2008 | 6-SGA | TAX EXPENSE (SALES) | | | | - |
| 2008 | 6-SGA | BUSINESS LICENSE / TAXES | | | | - |
| 2008 | 6-SGA | CONVENTION EXPENSE | | | | - |
| 2008 | 6-SGA | ANNUAL REPORT FEE | | | | - |
| 2008 | 6-SGA | FINES & PENALTIES | | | | - |
| 2008 | 6-SGA | CHARITABLE CONTRIBUTIONS | | | | - |
| 2008 | 6-SGA | CHARGEOUT OF EXPENSES TO COST OF GOODS | | | | - |
| | 6-SGA Total | | 389 | 660,769 | 1,428,855 | 2,289,713 |
| | 7-Depc Total | | - | - | 975 | 975 |
| | | | | | | 2,290,688 |
| | PROFIT | | | | | 9,675,413 |

-59.36%

Need to verify headcount

## SCHEDULE 5.5
## Material Contracts

**Print contracts to be
assigned**

Los Angeles
County
Los Angeles City
Denver Colorado
Arapahoe
Colorado
Adams Colorado
Tehama California
All other non contract orders for the customers listed on schedule 4.1 b

543187_2\009603

DH 0000371

Pro Purchase agreement

Date:   9/21/2009

Exhibit #

**Job numbers assigned as of 9/21/09**

**Fall elections**

| Customer | Job # assigned | | | | | | | Elec date |
|---|---|---|---|---|---|---|---|---|
| Adams | 109507 | 109510 | 109504 | 109501 | | | | 3-Nov |
| Arapahoe | 107707 | 107710 | 107704 | 107701 | | | | 3-Nov |
| Biggs West | 110304 | 110310 | 110307 | 110301 | 110308 | | | 3-Nov |
| Butte Water | 110004 | 110003 | 110007 | 110001 | 110008 | | | 3-Nov |
| CRS | 110707 | 110701 | 110710 | 110704 | | | | 3-Nov |
| Del Norte | 107616 | | | | | | | 3-Nov |
| Denver | 110107 | 110110 | 110117 | 110104 | 107701 | | | 3-Nov |
| El Dorado | 109205 | 109203 | | | | | | 3-Nov |
| Elbert | 107907 | 107904 | 107901 | 107914 | 107910 | | | 3-Nov |
| Glenn | 109301 | 109305 | 109314 | | | | | 3-Nov |
| Imperial | 108605 | 108608 | | | | | | 3-Nov |
| Inyo | 110201 | | | | | | | 3-Nov |
| Jackson | to come | | | | | | | 3-Nov |
| Kern | 108405 | | | | | | | 3-Nov |
| Kings | 109610 | 109608 | 109604 | 109601 | 109605 | 109607 | 109613 | 3-Nov |
| Los Angeles Co | 109001 | | | | | | | 3-Nov |
| Mariposa | 107707 | 108107 | | | | | | 3-Nov |
| Napa | 109403 | 109404 | 109401 | 109407 | | | | 3-Nov |
| Nye | to come | | | | | | | 3-Nov |
| Pueblo | 107807 | 107810 | 107804 | 107801 | | | | 3-Nov |
| Santa Clara | 108810 | 108804 | 108801 | | | | | 3-Nov |
| Shasta | 108708 | | | | | | | 3-Nov |
| Sonoma | 108501 | 108502 | | | | | | 3-Nov |
| Sonoma | to come | | | | | | | 17-Nov |
| Sutter | 109701 | | | | | | | 3-Nov |
| Tehama | 108907 | 108905 | 108904 | 108901 | 109810 | | | 3-Nov |
| Tulare | 109913 | 109907 | 109903 | 109904 | 109901 | 109910 | | 3-Nov |
| Weld | 107507 | 107510 | 107504 | 107501 | | | | 3-Nov |

## EQUIPMENT/SERVICE/MAINTENANCE LEASES (Porterville CA) - 9/22/09

| COMPANY | CONTRACT /LEASE NO. | $/MNTH + TAX | LEASE TERM | SERIAL NO. | MODEL NO. | NOTES | COMMENTS |
|---|---|---|---|---|---|---|---|
| **COPIER/FAX MACHINES** | | | | | | | |
| | | | | CQC825311 | C603T | Copier System - Porterville | |
| | | | | CQK723445 | C603T | Copier System - Porterville | |
| Zoom Imaging Solutions | | $  1,497.16 | 6/23/08-6/22/13; 60mnths | CRL717911 | C723 | Copier System - Porterville | Lease dated 6/11/08 |
| **COPIER/FAX MAINTENANCE** | | | | | | | |
| | | | | CQC825311 | C603T | Copier Maintanence – Porterville | |
| | | | | CQK723445 | C603T | Copier Maintanence – Porterville | |
| Zoom Imaging Solutions | | $   712.50 | 6/23/08-6/22/13; 60mnths | CRL717911 | C723 | Copier Maintanence – Porterville | |
| **POSTAGE METERS** | | | | | | | |
| Pitney Bowes (Purchase Power) | | $    34.49 | MTM | SN-9948328 | E707 | Postage meter - Porterville | |
| **PHONE EQUIPMENT/SERVICE** | | | | | | | |
| AT&T | | $   342.00 | 24 mnths; Start date: 7/23/08 | | | Internet Services - Porterville CA | Lease dated 6/10/08 |
| **VEHICLES** | | | | VIN | | | |
| | | $   513.34 | 50mnths; start 12/31/2005 | 2D4GP44L46R750840 | 2006 Dodge Grand Caravan | Ross Travis | |
| ARI FLEET | | $   515.21 | 50mnths; start 1/3/2006 | 2D4GP44L08R750835 | 2006 Dodge Grand Caravan | Charles Rivera | Lease dated 10/25/05 |

**SCHEDULE 5.6**
**Leases**

Lease Agreement for facility in Portersville, California dated April 11, 2003.

543187_2\009603

DH 0000374

**SCHEDULE 5.7**
**List of Employees**

DH 0000375

| | Base | | Base at 80% | | Bonus Target% | Bonus Target $$ (100%) | | Sales 07 | Comm 07 | Sales 08 | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B Llerman | $ | 117,610 | $ | 94,088 | 50.00% | $ | 58,805 | | | | |
| | | | | | | | | | | | |
| **Coordinator office** | | | | | | | | | | | |
| Eric Alkema | $ | 58,008 | $ | 46,406 | 5.00% | $ | 2,900 | | | | |
| Liz Martin | $ | 45,302 | $ | 36,242 | 5.00% | $ | 2,265 | | | | |
| MC Albert | $ | 53,463 | $ | 42,770 | 5.00% | $ | 2,673 | | | | |
| | | | | | | | | | | | |
| **Production** | | | | | | | | | | | |
| Richard Kramer | $ | 79,683 | $ | 63,746 | 10.00% | $ | 7,968 | | | | |
| Rick Cornwell | $ | 59,562 | $ | 47,650 | 5.00% | $ | 2,978 | | | | |
| | | | | | | | | | | | |
| **Accounting** | | | | | | | | | | | |
| Maria Castillo | $ | 30,680 | $ | 24,544 | 5.00% | $ | 1,534 | | | | |
| | | | | | | | | | | | |
| **Sales** | | | | | | | | | | | |
| Ross Travis | $ | 45,256 | $ | 36,205 | N/A | N/A | | $ 1,627,378 | $ 73,802 | $ 11,433,881 | $ |
| Chuck Rivera | $ | 39,573 | $ | 31,658 | N/A | N/A | | $ 769,954 | $ 43,729 | $ 5,878,395 | $ |
| | | | | | | | | | | | |
| Total | $ | 529,137 | $ | 423,310 | | $ | 79,124 | | $ 117,531 | | $ |

2009 print div staff9/30/2009Print Listing_S

## SCHEDULE 5.11
### Governmental/Regulatory Licenses

[THERE ARE NO GOVERNMENTAL LICENSES]

DH 0000377

## SCHEDULE 5.12
## Employee Benefit Plans

[TO BE PROVIDED]

DH 0000378

**SCHEDULE 5.13**
**Conflicts**

[NONE]

DH 0000379

**SCHEDULE 5.15**
**Insurance Policies**

[TO BE PROVIDED]

DH 0000380

## SCHEDULE 7.4(A)
### List of Customers

|     | 2009 sales          |    |
|-----|---------------------|----|
|     | Calendar year       |    |
| CR  | VENTURA CA          | O  |
| CR  | KERN CA.            | A  |
| CR  | EL DORADO CA.       | A  |
| CR  | MADERA CA.          | M  |
| CR  | SONOMA CA.          | M  |
| CR  | IMPERIAL CA         | O  |
| CR  | INYO CA             | O  |
| CR  | MONO CA             | O  |
| CR  | Butte CA            | O  |
| CR  | TULARE CA.          | O  |
| CR  | CALAVERAS CA.       | O  |
| CR  | SANTA CRUZ CA.      | O  |
| CR  | AMADOR CA.          | O  |
| CR  | KINGS CA.           | O  |
| CR  | MARIPOSA CA.        | O  |
| CR  | Santa Rosa Rancheria| O  |
| CR  | Westalnds Water     | P  |
| CR  | Butte Water         | P  |
| HST | Jackson Mo          | IV |
| HST | Los Angeles City CA | IV |
| HST | LOS ANGELES CO CA   | IV |
| HST | Pacific elections   | D  |
| JD  | WELD CO.            | A  |
| JD  | CRS CO              | A  |
| JD  | Adams CO            | A  |
| JD  | CITY & CO. DENVER CO| O  |
| JD  | ELBERT CO.          | O  |
| JD  | PUEBLO CO.          | O  |
| JD  | Arapahoe CO         | O  |
| RT  | HUMBOLDT CA         | A  |
| RT  | SISKIYOU CA         | A  |
| RT  | Acera               | O  |
| RT  | SUTTER CA           | O  |
| RT  | YUBA CA             | O  |
| RT  | DEL NORTE CA        | O  |
| RT  | GLENN CA            | O  |
| RT  | NAPA  CA            | O  |
| RT  | TEHAMA CA           | O  |
| RT  | Lane Ore            | O  |
| RT  | SAN FRANCISCO CA    | O  |
| RT  | SANTA CLARA CA      | O  |
| RT  | SHASTA CA           | O  |

DH 0000381

**SCHEDULE 7.4(B)**
**Target Accounts**

All Counties and Cities in the States of Nevada and California not listed on Schedule 7.4(A).

**SCHEDULE 7.6**
**List of New Business Employees**

1.     Brian Lierman
2.     Eric Alkema
3.     Liz Martin
4.     MC Albert
5.     Richard Kramer
6.     Rick Cornwell
7.     Maria Castillo
8.     Ross Travis
9.     Chuck Rivera

DH 0000383