# **EXHIBIT I**

ASSET PURCHASE AGREEMENT

dated June 3, 2010

between

Dominion Voting Systems, Inc.

and

Sequoia Voting Systems, Inc.

# TABLE OF CONTENTS

Page

ARTICLE 1  THE ASSET PURCHASE ............................................................. 1
1.1      Purchase and Sale of Assets................................................ 1
1.2      Assumption of Liabilities.................................................... 2
1.3      Purchase Price................................................................... 2
1.4      Escrow.............................................................................. 5
1.5      The Closing....................................................................... 6
1.6      Allocation......................................................................... 8
1.7      Further Assurances............................................................ 9
1.8      Withholding...................................................................... 9

ARTICLE II  REPRESENTATIONS AND WARRANTIES OF THE SELLER ....... 10
2.1      Organization, Qualification and Corporate Power................ 10
2.2      Intentionally Omitted........................................................ 11
2.3      Authorization of Transaction............................................. 11
2.4      Noncontravention.............................................................. 12
2.5      Subsidiaries...................................................................... 13
2.6      Financial Statements......................................................... 13
2.7      Absence of Certain Changes.............................................. 14
2.8      Undisclosed Liabilities...................................................... 14
2.9      Tax Matters....................................................................... 14
2.10     Ownership and Condition of Assets.................................... 16
2.11     Owned Real Property......................................................... 17
2.12     Real Property Leases......................................................... 17
2.13     Intellectual Property.......................................................... 18
2.14     Inventory.......................................................................... 26
2.15     Contracts.......................................................................... 26
2.16     Powers of Attorney........................................................... 30
2.17     Insurance.......................................................................... 30
2.18     Litigation.......................................................................... 31
2.19     Warranties........................................................................ 31
2.20     Employees........................................................................ 31
2.21     Employee Benefits............................................................ 34
2.22     Environmental Matters...................................................... 35
2.23     Legal Compliance............................................................. 36
2.24     Customers and Suppliers................................................... 37
2.25     Permits............................................................................. 37
2.26     Certain Business Relationships With Affiliates.................... 38
2.27     Brokers' Fees.................................................................... 38
2.28     Books and Records............................................................ 38
2.29     Government Contracts....................................................... 38
2.30     Payments to Creditors and Other Persons........................... 40
2.31     Accounts Receivable......................................................... 40

- i -

DH 0000415

| | | |
|---|---|---|
| 2.32 | Prepayments, Prebilled Invoices and Deposits. | 41 |
| 2.33 | Disclosure | 42 |

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE BUYER** .... 43
| | | |
|---|---|---|
| 3.1 | Organization and Corporate Power | 43 |
| 3.2 | Authorization of the Transaction | 43 |
| 3.3 | Noncontravention | 44 |
| 3.4 | Ability to Close | 44 |
| 3.5 | Financial Statements | 45 |

**ARTICLE IV PRE-CLOSING COVENANTS** .... 45
| | | |
|---|---|---|
| 4.1 | Closing Efforts | 45 |
| 4.2 | Governmental and Third-Party Notices and Consents | 46 |
| 4.3 | Stockholder Approval | 48 |
| 4.4 | Operation of Business | 48 |
| 4.5 | Access to Information | 52 |
| 4.6 | Notice of Breaches | 53 |
| 4.7 | Exclusivity | 54 |
| 4.8 | FIRPTA Tax Certificate | 55 |

**ARTICLE V CONDITIONS TO CLOSING** .... 55
| | | |
|---|---|---|
| 5.1 | Conditions to Obligations of each Party | 55 |
| 5.2 | Conditions to Obligations of the Buyer | 56 |
| 5.3 | Conditions to Obligations of the Seller | 58 |

**ARTICLE VI POST-CLOSING COVENANTS** .... 60
| | | |
|---|---|---|
| 6.1 | Proprietary Information | 60 |
| 6.2 | Solicitation and Hiring | 62 |
| 6.3 | Non-Competition | 62 |
| 6.4 | Tax Matters | 63 |
| 6.5 | Sharing of Data | 64 |
| 6.6 | Use of Name | 65 |
| 6.7 | Cooperation in Litigation | 66 |
| 6.8 | Restriction on Dividends and Distributions | 66 |
| 6.9 | COBRA Coverage | 67 |
| 6.10 | Undisclosed Contracts | 67 |
| 6.11 | Laptops and Blackberries | 68 |
| 6.12 | Accounts Receivable | 68 |

**ARTICLE VII INDEMNIFICATION** .... 69
| | | |
|---|---|---|
| 7.1 | Indemnification by the Seller | 69 |
| 7.2 | Indemnification by the Buyer | 70 |
| 7.3 | Indemnification Claims | 71 |
| 7.4 | Survival of Representations and Warranties | 76 |
| 7.5 | Limitations | 78 |
| 7.6 | Treatment of Indemnity Payments | 80 |

DH 0000416

ARTICLE VIII  TERMINATION ....................................................................81
    8.1    Termination of Agreement...............................................83
    8.2    Effect of Termination.....................................................83

ARTICLE IX  DEFINITIONS .....................................................................112

ARTICLE X  MISCELLANEOUS ...............................................................112
    10.1    Press Releases and Announcements ...............................113
    10.2    No Third Party Beneficiaries .........................................113
    10.3    Entire Agreement .........................................................113
    10.4    Succession and Assignment...........................................114
    10.5    Counterparts and Facsimile Signature ...........................114
    10.6    Headings ....................................................................114
    10.7    Notices .......................................................................115
    10.8    Governing Law ............................................................116
    10.9    Amendments and Waivers .............................................116
    10.10    Severability ................................................................117
    10.11    Expenses ...................................................................117
    10.12    Submission to Jurisdiction ...........................................118
    10.13    Specific Performance ...................................................119
    10.14    Construction...............................................................

Exhibits

Exhibit A -    Escrow Agreement
Exhibit B -    Bill of Sale
Exhibit C -    Trademark Assignment
Exhibit D -    Instrument of Assumption
Exhibit E -    Assignment Agreement
Exhibit F -    Release
Exhibit G -    Transition Services Agreement

Schedules

Schedule 1.1(a) -    Transferred Accounts Receivable for San Francisco
Schedule 1.1(b) -    Excluded Assets
Schedule 1.2 -    Assumed Liabilities
Schedule 1.3(b) -    May Adjustment
Schedule 1.3(c) -    Key Counterparties
Schedule 1.6 -    Allocation of Purchase Price
Schedule 5.2(a) -    Required Consents
Disclosure Schedule

DH 0000417

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of _____, 2010 by and between Dominion Voting Systems, Inc., a Delaware corporation (the "Buyer"), and Sequoia Voting Systems, Inc., a Delaware corporation (the "Seller").

This Agreement contemplates a transaction in which the Buyer will purchase certain of the assets and assume certain of the liabilities of the Seller.

Capitalized terms used in this Agreement shall have the meanings ascribed to them in Article IX.

In consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

## ARTICLE I

## THE ASSET PURCHASE

1.1   Purchase and Sale of Assets.

(a)   Upon and subject to the terms and conditions of this Agreement, the Buyer shall purchase from the Seller, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing, for the consideration specified below in this Article I, all right, title and interest in, to and under the Acquired Assets.

(b)   Notwithstanding the provisions of Section 1.1(a), the Acquired Assets shall not include the Excluded Assets.

1.2   Assumption of Liabilities.

(a)   Upon and subject to the terms and conditions of this Agreement, the Buyer shall assume and become responsible for, from and after the Closing, the Assumed Liabilities.

(b)   Notwithstanding the terms of Section 1.2(a) or any other provision of this Agreement to the contrary, the Buyer shall not assume or become responsible for, and the Seller shall remain liable for, the Retained Liabilities.

1.3   Purchase Price. The Purchase Price to be paid by the Buyer for the Acquired Assets at the Closing shall be up to $7,500,000, payable as follows:

(a)   $1,000,000 (the "Closing Payment") will be paid in cash at the Closing.

(b)   $ 500,000, less $136,000 for the May adjustment as set forth on Schedule 1.3(b) (such amount, the "Release Payment"), shall be paid in cash upon the Seller's delivery to the Buyer of a Release from Harvard Custom Manufacturing ("Harvard"), which Release Payment shall be paid within three (3) Business Days after the delivery of such Release. The

DH 0000418

Buyer shall use commercially reasonable efforts to cooperate in obtaining the release from Harvard.

(c)     Up to $1,500,000 in the aggregate, less the amount of any Transferred Accounts Receivable collected by the Seller and not remitted to the Buyer within three (3) Business Days after the collection thereof (such amount, the "Assignment Payments") shall be paid in cash upon the Seller's delivery to the Buyer of Assignment Agreements from each of the Key Counterparties set forth on Schedule 1.3(c). The Assignment Payment for the delivery of an Assignment Agreement for each Key Counterparty shall equal $214,285.71 and shall be paid within three (3) Business Days after the delivery of each such Assignment Agreement. The Buyer shall use commercially reasonable efforts to cooperate in obtaining the assignments. Any contract entered into directly between the Buyer and any Key Counterparty in lieu of such an assignment shall nevertheless constitute an Assignment Agreement for purposes of this Agreement.

(d)     Up to $4,500,000 in the aggregate (the "Commission Payments") shall be paid in cash in an amount equal to (i) 31% of the amount of any New York Payment received by the Buyer, which amount shall be paid within five (5) Business Days after the Buyer's receipt of such New York Payment or (ii) if no New York Payment has been paid to the Buyer, 90% of the amount payable to the Seller for sales to New York, New York and Nassau County, New York pursuant to Sections 1.3(d) and 1.3(c) of the Dominion Asset Purchase Agreement, which Commission Payments shall be paid as and when such amounts would otherwise have been payable to the Seller under the Dominion Asset Purchase Agreement. Notwithstanding any contrary provision in this Agreement or in any other agreement, the Buyer's obligations herein shall be in no way limited by (A) the date when Nassau County, New York, places an order under the 2009 RFP; (B) the date when New York City, New York, places an order under the 2009 RFP; (C) the date when the Buyer receives payment; or (D) the party from whom the Buyer receives payment on account of any such order.

(e)     $95,000 shall be paid directly to Harvard in the event that (a) a Release from Harvard has not been received by the Seller as of September 1, 2010, (b) the payment will become part of a release agreement between the Seller and Harvard for settlement of all amounts owing to Harvard by the Seller and (c) no payment has been paid to the Seller as a Commission Payment as described in Section 1.3(d) above.

Notwithstanding the foregoing, (i) if the Seller delivers the Release or any Assignment Agreements set forth on Schedule 1.3(c) at or prior to the Closing, the Release Payment and the applicable Assignment Payments, as the case may be, payable with respect thereto as described in Sections 1.3(b) and 1.3(c) above shall be paid by the Buyer at the Closing instead of when required under Sections 1.3(b) and 1.3(c) above, and (ii) in the event Harvard requires any portion of the Release Payment to be paid to it as a condition to the delivery of the Release, the Buyer shall at the written request of the Seller pay up to 100% of the Release Payment directly to Harvard simultaneously with the delivery of the Release.

1.4     Escrow. At the Closing, $400,000 of the Closing Payment payable by the Buyer at Closing shall be paid by the Buyer to the Escrow Agent for the purpose of securing the indemnification obligations of the Seller set forth in this Agreement. In addition, (a) one third

DH 0000419

(1/3) of each Assignment Payment and (b) ten percent (10%) of each Commission Payment shall be paid by the Buyer to the Escrow Agent for the purpose of securing the indemnification obligations of the Seller set forth in this Agreement; provided, however, that the total amount paid to the Escrow Agent shall not exceed $900,000. The Escrow Fund shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms thereof. The Escrow Fund shall be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party, and shall be held and disbursed solely for the purposes and in accordance with the terms of the Escrow Agreement. The Seller shall have no property rights or interest in the Escrow Fund or any amounts therein while any indemnification obligations of the Seller, contingent or actual, remain outstanding under this Agreement.

1.5    The Closing.

(a)    The Closing shall take place at the offices of WilmerHale in Boston, Massachusetts commencing at 9:00 a.m. local time on the Closing Date. All transactions at the Closing shall be deemed to take place simultaneously, and no transaction shall be deemed to have been completed and no documents or certificates shall be deemed to have been delivered until all other transactions are completed and all other documents and certificates are delivered.

(b)    At the Closing:

(i)    the Seller shall deliver to the Buyer the various certificates, instruments and documents referred to in Section 5.2;

(ii)    the Buyer shall deliver to the Seller the various certificates, instruments and documents referred to in Section 5.3;

(iii)    the Seller shall execute and deliver to the Buyer a bill of sale in substantially the form attached hereto as Exhibit B, one or more trademark assignments in substantially the form attached hereto as Exhibit C, and such other instruments of conveyance as the Buyer may reasonably request in order to effect the sale, transfer, conveyance and assignment to the Buyer of valid ownership of the Acquired Assets;

(iv)    the Buyer shall execute and deliver to the Seller an instrument of assumption in substantially the form attached hereto as Exhibit D and such other instruments as the Seller may reasonably request in order to effect the assumption by the Buyer of the Assumed Liabilities;

(v)    the Buyer shall pay to the Seller, payable by wire transfer or other delivery of immediately available funds to an account designated by the Seller, the Closing Payment set forth in Section 1.3(a), less the amount to be deposited in escrow pursuant to Section 1.4;

(vi)    the Buyer, the Seller and the Escrow Agent shall execute and deliver the Escrow Agreement and the Buyer shall deposit funds with the Escrow Agent in accordance with Section 1.4;

- 3 -

(vii)   the Seller shall deliver to the Buyer, or otherwise put the Buyer in possession and control of, all of the Acquired Assets of a tangible nature; and

(viii)   the Buyer and the Seller shall execute and deliver to each other a cross-receipt evidencing the transactions referred to above.

1.6   Allocation. The Buyer and the Seller agree to allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets and the non-solicitation and non-competition covenants set forth in Sections 6.2 and 6.3 for all purposes (including financial accounting and tax purposes) in accordance with the allocation schedule attached hereto as Schedule 1.6. The Buyer and the Seller agree that the allocation schedule attached as Schedule 1.6 shall be prepared and adjusted in accordance with the provisions of Section 1060 of the Code, the Treasury Regulations promulgated thereunder and any similar provisions of state, local or foreign Law, as applicable. The Buyer and the Seller further agree to file IRS Form 8594 (and any corresponding form required to be filed with a state or local taxing authority) in a manner that is consistent with the allocation on Schedule 1.6.

1.7   Further Assurances. At any time and from time to time after the Closing, at the request of the Buyer and without further consideration, the Seller shall execute and deliver such other instruments of sale, transfer, conveyance and assignment and take such actions as the Buyer may reasonably request to more effectively transfer, convey and assign to the Buyer, and to confirm the Buyer's rights to, title in and ownership of, the Acquired Assets and to place the Buyer in actual possession and operating control thereof.

1.8   Withholding. The Buyer or its agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required by Law to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Law. To the extent that amounts are so withheld and paid over to the appropriate taxing authority by the Buyer or its agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Seller.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer that, except as set forth in the Disclosure Schedule, the statements contained in this Article II are true and correct as of the date of this Agreement and will be true and correct as of the Closing as though made as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties will be true and correct as of such date). The Disclosure Schedule shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this Article II. The disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this Article II only to the extent it is clear from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

- 4 -

2.1    Organization, Qualification and Corporate Power. The Seller is a corporation duly organized, validly existing and in corporate and tax good standing under the Laws of the State of Delaware. The Seller is duly qualified to conduct business and is in corporate and tax good standing under the Laws of each jurisdiction listed in Section 2.1 of the Disclosure Schedule, which jurisdictions constitute the only jurisdictions in which the nature of the Seller's businesses or the ownership or leasing of its properties requires such qualification. The Seller has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. The Seller has furnished to the Buyer complete and accurate copies of its Certificate of Incorporation and by-laws. The Seller is not in default under or in violation of any provision of its Certificate of Incorporation or by-laws.

2.2    Intentionally Omitted.

2.3    Authorization of Transaction. The Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by the Seller of this Agreement and, subject to obtaining the Requisite Stockholder Approval, which is the only approval required from the Seller's stockholders, the performance by the Seller of this Agreement and the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Seller. Without limiting the generality of the foregoing, the Board of Directors of the Seller, at a meeting duly called and held, by the unanimous vote of all directors determined that the sale of assets contemplated by this Agreement is fair to and in the best interests of the Seller and its stockholders, approved this Agreement in accordance with the Delaware General Corporation Law, directed that such asset sale be submitted to the stockholders of the Seller for their approval, and resolved to recommend that the stockholders of the Seller vote in favor of the approval of such asset sale. This Agreement has been duly and validly executed and delivered by the Seller and constitutes, and each of the Ancillary Agreements, upon its execution and delivery by the Seller, will constitute, a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2.4    Noncontravention. Subject to compliance with the obligations to the Committee on Foreign Investment in the United States under the Defense Production Act ("CFIUS"), including notice of this Agreement, neither the execution and delivery by the Seller of this Agreement or the Ancillary Agreements, nor the consummation by the Seller of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the Certificate of Incorporation or by-laws of the Seller, (b) require on the part of the Seller any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Seller is a party or by which the Seller is bound or to which any of its assets is subject, (d) result in the imposition of any Lien upon any assets of the Seller or (e) violate any Law, including any bulk sale Law, applicable to the Seller or any of its properties or assets.

2.5    Subsidiaries. The Seller does not have and has never had any Subsidiaries.

- 5 -

DH 0000422

2.6    <u>Financial Statements</u>. The Seller has provided to the Buyer the Financial Statements. The Financial Statements (a) were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except as may be indicated in the notes to such financial statements) and (b) fairly present the financial position of the Seller as of the dates thereof and the results of its operations and cash flows for the periods indicated, consistent with the books and records of the Seller, except that the unaudited interim financial statements are subject to normal and recurring year-end adjustments and do not include footnotes.

2.7    <u>Absence of Certain Changes</u>. Since the Most Recent Balance Sheet Date, (a) there has occurred no event or development which, individually or in the aggregate, has had, or could reasonably be expected to have in the future, a Seller Material Adverse Effect, and (b) the Seller has not taken any of the actions set forth in paragraphs (a) through (n) of Section 4.4.

2.8    <u>Undisclosed Liabilities</u>. The Seller has no liability (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated and whether due or to become due), except for (a) liabilities shown on the Most Recent Balance Sheet, (b) liabilities which have arisen since the Most Recent Balance Sheet Date in the Ordinary Course of Business and (c) contractual and other liabilities incurred in the Ordinary Course of Business which are not required by GAAP to be reflected on a balance sheet (in each case, none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law).

2.9    <u>Tax Matters</u>.

(a)    The Seller has properly filed on a timely basis all Tax Returns that it was required to file, and all such Tax Returns were true, correct and complete. The Seller has never been a member of a group of corporations with which it has filed (or been required to file) consolidated, combined or unitary Tax Returns. The Seller has paid on a timely basis all Taxes that were due and payable. The Seller is not a party to or bound by any Tax indemnity, Tax sharing, Tax allocation or similar agreement. All Taxes that the Seller was required by Law to withhold or collect have been duly withheld or collected and, to the extent required, have been properly paid to the appropriate Governmental Entity.

(b)    No examination, audit, other administrative proceeding or court proceeding with regard to any Tax Return or Taxes of the Seller by any Governmental Entity is currently in progress or, to the Knowledge of the Seller, threatened or contemplated. The Seller has not been informed by any jurisdiction that the jurisdiction believes that the Seller may be subject to Tax or was required to file any Tax Return that was not filed in such jurisdiction. The Seller has not (i) waived any statute of limitations with respect to Taxes or agreed to extend the period for assessment or collection of any Taxes, (ii) requested any extension of time within which to file any Tax Return, which Tax Return has not yet been filed, or (iii) executed or filed any power of attorney with any taxing authority, which power of attorney remains in effect.

(c)    Section 2.9(c) of the Disclosure Schedule sets forth each jurisdiction (other than United States federal) in which the Seller files, is required to file or has been required to file a Tax Return or is or has been liable for any Taxes on a "nexus" basis and each

- 6 -

DH 0000423

jurisdiction that has sent notices or communications of any kind requesting information relating to the Seller's nexus with such jurisdiction.

(d)     There are no Liens with respect to Taxes upon any of the assets or properties of the Seller, other than with respect to Taxes not yet due and payable.

2.10     Ownership and Condition of Assets.

(a)     The Seller is the true and lawful owner, and has good title to, all of the Acquired Assets, free and clear of all Liens, except as set forth in Section 2.10(a)(i) of the Disclosure Schedule. Upon execution and delivery by the Seller to the Buyer of the instruments of conveyance referred to in Section 1.5(b)(iii), the Buyer will become the true and lawful owner of, and will receive good title to, the Acquired Assets, free and clear of all Liens other than those set forth in Section 2.10(a)(ii) of the Disclosure Schedule.

(b)     Except for the Excluded Assets, the Acquired Assets constitute all assets used by the Seller in its business. Except for the Acquired Assets that have been written down, depreciated, or used, each tangible Acquired Asset is free from material defects, has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it presently is used.

2.11     Owned Real Property. The Seller does not own any real property.

2.12     Real Property Leases. Section 2.12 of the Disclosure Schedule lists all Leases. The Seller has delivered to the Buyer complete and accurate copies of the Leases. With respect to each Lease:

(a)     such Lease is legal, valid, binding, enforceable and in full force and effect;

(b)     such Lease is assignable by the Seller to the Buyer without the consent or approval of any party (except as set forth in Section 2.4 of the Disclosure Schedule);

(c)     neither the Seller nor, to the Knowledge of the Seller, any other party, is in breach or violation of, or default under, any such Lease, and no event has occurred, is pending or, to the Knowledge of the Seller, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by the Seller or, to the Knowledge of the Seller, any other party under such Lease; and

(d)     there are no disputes, oral agreements or forbearance programs in effect as to such Lease.

2.13     Intellectual Property.

(a)     *Seller Registrations.* Section 2.13(a) of the Disclosure Schedule lists all Seller Registrations, in each case enumerating specifically the applicable filing or registration number, title, jurisdiction in which filing was made or from which registration issued, date of filing or issuance, names of all current applicant(s) and registered owners(s), as applicable. All

- 7 -

DH 0000424

assignments of Seller Registrations to the Seller have been properly executed and recorded. To the Knowledge of the Seller, all Seller Registrations are valid and enforceable and all issuance, renewal, maintenance and other payments that are or have become due with respect thereto have been timely paid by or on behalf of the Seller.

(b)    *Prosecution Matters.* There are no inventorship challenges, opposition or nullity proceedings or interferences declared, commenced or provoked, or to the Knowledge of the Seller threatened, with respect to any Patent Rights included in the Seller Registrations. The Seller has complied with its duty of candor and disclosure to the United States Patent and Trademark Office and any relevant foreign patent office with respect to all patent and trademark applications filed by or on behalf of the Seller and has made no material misrepresentation in such applications. The Seller has no Knowledge of any information that would preclude the Seller from having clear title to the Seller Registrations or affecting the patentability or enforceability of any Seller Registrations.

(c)    *Ownership: Sufficiency.* Each item of Seller Intellectual Property will be owned or available for use by the Buyer immediately following the Closing on substantially identical terms and conditions as it was immediately prior to the Closing. The Seller is the sole and exclusive owner of all Seller Owned Intellectual Property, free and clear of any Liens and all joint owners of the Seller Owned Intellectual Property are listed in Section 2.13(c) of the Disclosure Schedule. The Seller Intellectual Property constitutes all Intellectual Property necessary (i) to Exploit the Customer Offerings in the manner so done currently and contemplated to be done in the future by the Seller, (ii) to Exploit the Internal Systems as they are currently used and contemplated to be used in the future by the Seller, and (iii) otherwise to conduct the Seller's business in all material respects in the manner currently conducted and contemplated to be conducted in the future by the Seller.

(d)    *Protection Measures.* The Seller has taken reasonable measures to protect the proprietary nature of each item of Seller Owned Intellectual Property, and to maintain in confidence all trade secrets and confidential information comprising a part thereof. The Seller has complied with all applicable contractual and legal requirements pertaining to information privacy and security. No complaint relating to an improper use or disclosure of, or a breach in the security of, any such information has been made or, to the Knowledge of the Seller, threatened against the Seller. To the Knowledge of the Seller, there has been no: (i) unauthorized disclosure of any third party proprietary or confidential information in the possession, custody or control of the Seller or (ii) breach of the Seller's security procedures wherein confidential information has been disclosed to a third Person. The Seller has actively policed the quality of all goods and services sold, distributed or marketed under each of its Trademarks and has enforced adequate quality control measures to ensure that no Trademarks that it has licensed to others shall be deemed to be abandoned.

(e)    *Infringement by Seller.* None of the Customer Offerings, or the Exploitation thereof by the Seller or by any reseller, distributor, customer or user thereof, or any other activity of the Seller, infringes or violates, or constitutes a misappropriation of, any Intellectual Property rights of any third party. None of the Internal Systems, or the Seller's past, current or currently contemplated Exploitation thereof, or any other activity undertaken by the Seller in connection with its business, infringes or violates, or constitutes a misappropriation of,

- 8 -

DH 0000425

any Intellectual Property rights of any third party. Section 2.13(e) of the Disclosure Schedule lists any complaint, claim or notice, or threat of any of the foregoing (including any notification that a license under any patent is or may be required), received by the Seller alleging any such infringement, violation or misappropriation and any request or demand for indemnification or defense received by the Seller from any reseller, distributor, customer, user or any other third party; and the Seller has provided to the Buyer copies of all such complaints, claims, notices, requests, demands or threats, as well as any legal opinions, studies, market surveys and analyses relating to any alleged or potential infringement, violation or misappropriation.

(f)     *Infringement of Rights.* To the Knowledge of the Seller, no Person (including, without limitation, any current or former employee or consultant of the Seller) is infringing, violating or misappropriating any of the Seller Owned Intellectual Property or any Seller Licensed Intellectual Property which is exclusively licensed to the Seller. The Seller has provided to the Buyer copies of all correspondence, analyses, legal opinions, complaints, claims, notices or threats concerning the infringement, violation or misappropriation of any Seller Owned Intellectual Property.

(g)     *Outbound IP Agreements.* Section 2.13(g) of the Disclosure Schedule identifies each license, covenant or other agreement pursuant to which the Seller has assigned, transferred, licensed, distributed or otherwise granted any right or access to any Person, or covenanted not to assert any right, with respect to any past, existing or future Seller Intellectual Property. The Seller has not agreed to indemnify any Person against any infringement, violation or misappropriation of any Intellectual Property rights with respect to any Customer Offerings or any third party Intellectual Property rights. The Seller is not a member of or party to any patent pool, industry standards body, trade association or other organization pursuant to the rules of which it is obligated to license any existing or future Intellectual Property to any Person.

(h)     *Inbound IP Agreements.* Section 2.13(h) of the Disclosure Schedule identifies (i) each item of Seller Licensed Intellectual Property and the license or agreement pursuant to which the Seller Exploits it (excluding currently-available, off the shelf software programs that are part of the Internal Systems and are licensed by the Seller pursuant to "shrink wrap" licenses, the total fees associated with which are less than $2,500 in the aggregate for all such licenses) and (ii) each agreement, contract, assignment or other instrument pursuant to which the Seller has obtained any joint or sole ownership interest in or to each item of Seller Owned Intellectual Property. No third party inventions, methods, services, materials, processes or Software are included in or required to Exploit the Customer Offerings or Internal Systems. None of the Customer Offerings or Internal Systems includes "shareware," "freeware" or other Software or other material that was obtained by the Seller from third parties other than pursuant to the license agreements listed in Section 2.13(h) of the Disclosure Schedule.

(i)     *Source Code.* The Seller has not licensed, distributed or disclosed, and knows of no distribution or disclosure by others (including its employees and contractors) of, the Seller Source Code to any Person, except pursuant to the agreements listed in Section 2.13(i) of the Disclosure Schedule; and the Seller has taken all reasonable physical and electronic security measures to prevent disclosure of such Seller Source Code. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, nor will the consummation of the transactions contemplated

- 9 -

DH 0000426

hereby, result in the disclosure or release of such Seller Source Code by the Seller, its escrow agent(s) or any other Person to any third party.

(j)      *Authorship.* All of the Software and Documentation comprising, incorporated in or bundled with the Customer Offerings or Internal Systems have been designed, authored, tested and debugged by regular employees of the Seller within the scope of their employment or by independent contractors of the Seller who have executed valid and binding agreements expressly assigning all right, title and interest in such copyrightable materials to the Seller, waiving their non-assignable rights (including moral rights) in favor of the Seller and its permitted assigns and licensees, and have no residual claim to such materials.

(k)      *Open Source Code.* Section 2.13(k) of the Disclosure Schedule lists all Open Source Materials that the Seller have utilized in any way in the Exploitation of the Customer Offerings or Internal Systems and describes the manner in which such Open Source Materials have been utilized, including, without limitation, whether and how the Open Source Materials have been modified and/or distributed by the Seller. The Seller has not (i) incorporated Open Source Materials into, or combined Open Source Materials with the Customer Offerings; (ii) distributed Open Source Materials in conjunction with any other software developed or distributed by the Seller; or (iii) used Open Source Materials that create, or purport to create, obligations for the Seller with respect to the Customer Offerings or grant, or purport to grant, to any third party, any rights or immunities under Intellectual Property rights (including, but not limited to, using any Open Source Materials that require, as a condition of Exploitation of such Open Source Materials, that other Software incorporated into, derived from or distributed with such Open Source Materials be (x) disclosed or distributed in source code form, (y) licensed for the purpose of making derivative works, or (z) redistributable at no charge or minimal charge).

(l)      *Employee and Contractor Assignments.* Each employee of the Seller and each independent contractor of the Seller has executed a valid and binding written agreement expressly assigning to the Seller all right, title and interest in any inventions and works of authorship, whether or not patentable, invented, created, developed, conceived and/or reduced to practice during the term of such employee's employment or such independent contractor's work for the Seller, and all Intellectual Property rights therein, and has waived all moral rights therein to the extent legally permissible.

(m)      *Quality.* The Customer Offerings and the Internal Systems are free from significant defects in design, workmanship and materials and conform in all material respects to the written Documentation and specifications therefor. The Customer Offerings and the Internal Systems do not contain any disabling device, virus, worm, back door, Trojan horse or other disruptive or malicious code that may or are intended to impair their intended performance or otherwise permit unauthorized access to, hamper, delete or damage any computer system, software, network or data. The Seller has not received any warranty claims, contractual terminations or requests for settlement or refund due to the failure of the Customer Offerings to meet their specifications or otherwise to satisfy end user needs or for harm or damage to any third party.

- 10 -

DH 0000427

(n)     *Support and Funding.* The Seller has neither sought, applied for nor received any support, funding, resources or assistance from any federal, state, local or foreign governmental or quasi-governmental agency or funding source in connection with the Exploitation of the Customer Offerings, the Internal Systems or any facilities or equipment used in connection therewith.

2.14    Inventory. All inventory of the Seller, whether or not reflected on the Most Recent Balance Sheet, consists of a quality and quantity usable and saleable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written-off or written-down to net realizable value on the Most Recent Balance Sheet. All inventories not written-off have been priced at the lower of cost or [market] [net realizable value] on a first-in, first-out basis.

2.15    Contracts.

(a)     Section 2.15 of the Disclosure Schedule lists the following agreements (written or oral) to which the Seller is a party as of the date of this Agreement, each of which shall constitute an Assigned Contract:

(i)     any agreement (or group of related agreements) for the lease of personal property from or to third parties providing for lease payments in excess of $10,000 per annum or having a remaining term longer than six (6) months;

(ii)    any agreement (or group of related agreements) for the purchase or sale of products or for the furnishing or receipt of services (A) which calls for performance over a period of more than one (1) year, (B) which involves more than the sum of $10,000, or (C) in which the Seller has granted manufacturing rights, "most favored nation" pricing provisions or marketing or distribution rights relating to any products or territory or has agreed to purchase a minimum quantity of goods or services or has agreed to purchase goods or services exclusively from a certain party;

(iii)   any agreement concerning the establishment or operation of a partnership, joint venture or limited liability company;

(iv)    any agreement (or group of related agreements) under which it has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) indebtedness (including capitalized lease obligations) involving more than $25,000 or under which it has imposed (or may impose) a Lien on any of its assets, tangible or intangible;

(v)     any agreement for the disposition of any significant portion of the assets or business of the Seller (other than sales of products in the Ordinary Course of Business) or any agreement for the acquisition of the assets or business of any other entity (other than purchases of inventory or components in the Ordinary Course of Business);

(vi)    any agreement concerning exclusivity or confidentiality;

(vii)   any employment or consulting agreement;

- 11 -

DH 0000428

(viii)   any agreement involving any current or former officer, director or stockholder of the Seller or an Affiliate thereof;

(ix)   any agreement under which the consequences of a default or termination would reasonably be expected to have a Seller Material Adverse Effect;

(x)   any agreement which contains any provisions requiring the Seller to indemnify any other Person (excluding indemnities contained in agreements for the purchase, sale or license of products entered into in the Ordinary Course of Business);

(xi)   any agreement that could reasonably be expected to have the effect of prohibiting or impairing the conduct of the business of the Seller or the Buyer or any of its subsidiaries as currently conducted and as currently proposed to be conducted;

(xii)   any agreement under which the Seller is restricted from selling, licensing or otherwise distributing any of its technology or products, or providing services to, customers or potential customers or any class of customers, in any geographic area, during any period of time or any segment of the market or line of business;

(xiii)   any agreement which would entitle any third party to receive a license or any other right to intellectual property of the Buyer or any of the Buyer's Affiliates following the Closing; and

(xiv)   any other agreement (or group of related agreements) either involving more than $25,000 or not entered into in the Ordinary Course of Business.

(b)   The Seller has delivered to the Buyer a complete and accurate copy of each agreement listed in Section 2.13 or Section 2.15 of the Disclosure Schedule. With respect to each agreement so listed: (i) the agreement is legal, valid, binding and enforceable and in full force and effect; (ii) the agreement is assignable by the Seller to the Buyer without the consent or approval of any party (except as set forth in Section 2.4 of the Disclosure Schedule); and (iii) neither the Seller nor, to the Knowledge of the Seller, any other party, is in breach or violation of, or default under, any such agreement, and no event has occurred, is pending or, to the Knowledge of the Seller, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by the Seller or, to the Knowledge of the Seller, any other party under such agreement.

2.16   Powers of Attorney. There are no outstanding powers of attorney executed on behalf of the Seller.

2.17   Insurance. Section 2.17 of the Disclosure Schedule lists each insurance policy (including fire, theft, casualty, comprehensive general liability, workers compensation, business interruption, environmental, product liability and automobile insurance policies and bond and surety arrangements) to which the Seller is a party.

2.18   Litigation. There is no Legal Proceeding pending or threatened in writing against the Seller. There are no judgments, orders or decrees outstanding against the Seller.

- 12 -

2.19   Warranties. No product or service manufactured, sold, leased, licensed or
delivered by the Seller is subject to any guaranty, warranty, right of return, right of credit or
other indemnity other than (a) the applicable standard terms and conditions of sale or lease of the
Seller, which are set forth in Section 2.19 of the Disclosure Schedule, and (b) manufacturers'
warranties for which the Seller does not have any liability. Section 2.19 of the Disclosure
Schedule sets forth the aggregate expenses incurred by the Seller in fulfilling its obligations
under its guaranty, warranty, right of return and indemnity provisions during each of the fiscal
years and the interim period covered by the Financial Statements; and the Seller has no
Knowledge of any reason why such expenses should significantly increase as a percentage of
sales in the future.

2.20   Employees.

(a)   Section 2.20 of the Disclosure Schedule contains a list of all employees of
the Seller, along with the position and the annual rate of compensation of each such Person. 2.20
of the Disclosure Schedule also contains a list of all current or past employees of the Seller
during the prior five (5) years who have not entered into a [confidentiality/assignment of
inventions] agreement with the Seller.

(b)   The Seller has complied in all material respects with all Laws relating to
employment and employment practices, terms and conditions of employment and wages and
hours, including any such Laws respecting employment discrimination, employee classification,
overtime, workers' compensation, family and medical leave, the Immigration Reform and
Control Act, and occupational safety and health requirements; and no actions, controversies or
audits are pending or, to the Knowledge of the Seller, threatened, with respect to such Laws or
any employment or other individual compensatory contract, either by private individuals or by
Governmental Entities. The Seller has withheld and paid to the appropriate Governmental Entity
or is holding for payment not yet due to such Governmental Entity all amounts required to be
withheld from its employees and is not liable for any arrears of wages, Taxes, penalties or other
sums for failure to comply with any of the foregoing.

(c)   Section 2.20 of the Disclosure Schedule contains a true, correct and
complete list of all employees of the Seller who are not citizens or permanent residents of the
country in which they are employed by the Seller, and indicates immigration status and the date
work authorization is scheduled to expire. All other employees of the Seller are citizens of or
have valid work permits or visas enabling them to work lawfully in the countries in which they
are employed.

(d)   Except as set forth in Section 2.20 of the Disclosure Schedule, each
employee of the Seller is an "at-will" employee and there are no written employment agreements
between the Seller and any of such employees. To the Knowledge of the Seller, no Key
Employee has any plans to terminate employment with the Seller (other than for the purpose of
accepting employment with the Buyer following the Closing) or not to accept employment with
the Buyer. With respect to persons currently providing services to the Seller, the Seller has not
incurred, and no circumstances exist under which it could incur, any liability arising from the
misclassification of employees as consultants or independent contractors, or from the
misclassification of consultants or independent contractors as employees. All Persons who

- 13 -

DH 0000430

currently perform services for the Seller and have been classified as independent contractors have satisfied the requirements of Law to be so classified, and accurately reported their compensation on IRS Forms 1099 or other applicable tax forms for independent contractors when required to do so.

(e)     The Seller has not incurred any liability under the WARN Act, or any similar state or local Laws. The Seller has not caused (i) a plant closing as defined in the WARN Act affecting any site of employment or one or more operating units within any site of employment of the Seller or (ii) a mass layoff as defined in the WARN Act, nor has the Seller been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state or local Laws. No employee of the Seller has suffered an employment loss as defined in the WARN Act within the ninety (90) day period ending on the Closing Date.

(f)     The Seller will satisfy any obligations to its employees within one (1) week after the Closing Date with respect to accrued vacation, accrued sick time and earned time off.

2.21   Employee Benefits.

(a)     Section 2.21(a) of the Disclosure Schedule contains a complete and accurate list of all Seller Plans.

(b)     Each Seller Plan has been administered in all material respects in accordance with its terms and applicable Law, and each of the Seller and the ERISA Affiliates has met its obligations with respect to each Seller Plan and has made all required contributions thereto. The Seller, each ERISA Affiliate and each Seller Plan are in compliance with the currently applicable provisions of ERISA and the Code and the regulations thereunder.

(c)     No act or omission has occurred and no condition exists with respect to any Seller Plan that would subject the Seller or any ERISA Affiliate to (i) any material fine, penalty, Tax or liability of any kind imposed under ERISA or the Code or (ii) any contractual indemnification or contribution obligation protecting any fiduciary, insurer or service provider with respect to any Seller Plan.

(d)     Each Seller Plan is amendable and terminable unilaterally by the Seller at any time without liability or expense to the Seller or such Seller Plan as a result thereof (other than for benefits accrued through the date of termination or amendment and reasonable administrative expenses related thereto) and no Seller Plan, plan documentation or agreement, summary plan description or other written communication distributed generally to employees by its terms prohibits the Seller from amending or terminating any such Seller Plan.

2.22   Environmental Matters.

(a)     The Seller has complied with all applicable Environmental Laws. There is no pending or, to the Knowledge of the Seller, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request by any Governmental Entity, relating to any Environmental Law involving the Seller.

- 14 -

DH 0000431

(b)     The Seller has no any liabilities or obligations arising from the release of any Materials of Environmental Concern into the environment.

(c)     The Seller is not a party to or bound by any court order, administrative order, consent order or other agreement with any Governmental Entity entered into in connection with any legal obligation or liability arising under any Environmental Law.

(d)     The Seller has no Knowledge of any environmental liability of any solid or hazardous waste transporter or treatment, storage or disposal facility that has been used by the Seller.

2.23   Legal Compliance.  The Seller is currently conducting, and has at all times since inception conducted, its business in compliance with each applicable Law of any Governmental Entity.  The Seller has not received any notice or communication from any Governmental Entity alleging noncompliance with any applicable Law.

2.24   Customers and Suppliers.  Section 2.24 of the Disclosure Schedule sets forth a list of (a) each customer that accounted for more than one percent (1%) of the revenues of the Seller during the last full fiscal year or the interim period through the Most Recent Balance Sheet Date and the amount of revenues accounted for by such customer during each such period and (b) each supplier that is the sole supplier of any significant product or service to the Seller.  No such customer or supplier has indicated in writing within the past year that it will stop buying products or services or supplying products or services, as applicable, to the Seller.

2.25   Permits.  Section 2.25 of the Disclosure Schedule sets forth a list of all Permits issued to or held by the Seller.  Such listed Permits are the only Permits that are required for the Seller to conduct its business as presently conducted or as proposed to be conducted.  Each such Permit is in full force and effect; the Seller is in compliance with the terms of each such Permit; and, to the Knowledge of the Seller, no suspension or cancellation of such Permit is threatened and there is no basis for believing that such Permit will not be renewable upon expiration.  Each such Permit is assignable by the Seller to the Buyer without the consent or approval of any party and will continue in full force and effect immediately following the Closing.

2.26   Certain Business Relationships With Affiliates.  No Affiliate of the Seller (a) owns any property or right, tangible or intangible, which is used in the business of the Seller, (b) has any claim or cause of action against the Seller, or (c) owes any money to, or is owed any money by, the Seller.  Section 2.26 of the Disclosure Schedule describes any transactions or relationships between the Seller and any Affiliate thereof which occurred or have existed since the beginning of the time period covered by the Financial Statements.

2.27   Brokers' Fees.  The Seller does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

2.28   Books and Records.  The books and records of the Seller accurately reflect the assets, liabilities, business, financial condition and results of operations of the Seller and have been maintained in accordance with good business and bookkeeping practices.

- 15 -

DH 0000432

2.29    Government Contracts.

(a)    The Seller has not been suspended or debarred from bidding on contracts or subcontracts with any Governmental Entity; no such suspension or debarment has been threatened or initiated; and the consummation of the transactions contemplated by this Agreement will not result in any such suspension or debarment of the Seller or the Buyer (assuming that no such suspension or debarment will result solely from the identity of the Buyer). The Seller has not been and it not is now being audited or investigated by the United States Government Accounting Office, the United States Department of Defense or any of its agencies, the Defense Contract Audit Agency, the contracting or auditing function of any Governmental Entity with which it is contracting, the United States Department of Justice, the Inspector General of the United States Governmental Entity, or any prime contractor with a Governmental Entity; nor, to the Knowledge of the Seller, has any such audit or investigation been threatened. To the Knowledge of the Seller, there is no valid basis for (i) the suspension or debarment of the Seller from bidding on contracts or subcontracts with any Governmental Entity or (ii) any claim (including any claim for return of funds to the Government) pursuant to an audit or investigation by any of the entities named in the foregoing sentence. The Seller has no agreements, contracts or commitments which require it to obtain or maintain a security clearance with any Governmental Entity.

(b)    To the Knowledge of the Seller, no basis exists for any of the following with respect to any of its contracts or subcontracts with any Governmental Entity: (i) a Termination for Default (as provided in 48 C.F.R. Ch.1 §52.249-8, 52,249-9 or similar sections), (ii) a Termination for Convenience (as provided in 48 C.F.R. Ch.1 §52.241-1, 52.249-2 or similar sections), or a Stop Work Order (as provided in 48 C.F.R. Ch.1 §52.212-13 or similar sections); and the Seller has no reason to believe that funding may not be provided under any contract or subcontract with any Governmental Entity in the upcoming federal fiscal year.

2.30    Payments to Creditors and Other Persons. Section 2.30 of the Disclosure Schedule contains a true, correct and complete list of all payments and other transfers made by the Seller to (a) any creditor or other Person within 90 days prior to the date hereof and (b) any Affiliate or other insider of the Seller within one (1) year prior to the date hereof.

2.31    Accounts Receivable. All accounts receivable of the Seller reflected on the Most Recent Balance Sheet (other than those paid since such date) are valid receivables subject to no setoffs or counterclaims. A complete and accurate list of the accounts receivable reflected on the Most Recent Balance Sheet, showing the aging thereof, is included in Section 2.31 of the Disclosure Schedule. All Transferred Accounts Receivable are valid receivables subject to no offsets or counterclaims. To the Knowledge of the Seller, all other accounts receivable of the Seller that have arisen since the Most Recent Balance Sheet Date are valid receivables subject to no setoffs or counterclaims. The Seller has not received any written notice from an account debtor stating that any account receivable in an amount in excess of $25,000 is subject to any contest, claim or setoff by such account debtor.

2.32    Prepayments, Prebilled Invoices and Deposits.

- 16 -

DH 0000433

(a)     Section 2.32(a) of the Disclosure Schedule sets forth (i) all prepayments, prebilled invoices and deposits that have been received by the Seller as of the date of this Agreement from customers for products to be shipped, or services to be performed, after the Closing Date, and (ii) with respect to each such prepayment, prebilled invoice or deposit, (A) the party and contract credited, (B) the date received or invoiced, (C) the products and/or services to be delivered and (D) the conditions for the return of such prepayment, prebilled invoice or deposit. All such prepayments, prebilled invoices and deposits are properly accrued for on the Most Recent Balance Sheet in accordance with GAAP applied on a consistent basis with the past practice of the Seller.

(b)     Section 2.32(b) of the Disclosure Schedule sets forth (i) all prepayments, prebilled invoices and deposits that have been made or paid by the Seller as of the date of this Agreement for products to be purchased, services to be performed or other benefits to be received after the Closing Date and (ii) with respect to each such prepayment, prebilled invoice or deposit, (A) the party to whom such prepayment, prebilled invoice or deposit was made or paid, (B) the date made or paid, (C) the products and/or services to be delivered and (D) the conditions for the return of such prepayment, prebilled invoice or deposit. All such prepayments, prebilled invoices and deposits are properly accrued for on the Most Recent Balance Sheet in accordance with GAAP applied on a consistent basis with the past practice of the Seller.

2.33    Disclosure.  No representation or warranty by the Seller contained in this Agreement, and no statement contained in the Disclosure Schedule or any other document, certificate or other instrument delivered or to be delivered by or on behalf of the Seller pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller that the statements contained in this Article III are true and correct as of the date of this Agreement and will be true and correct as of the Closing as though made as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties will be true and correct as of such date).

3.1    Organization and Corporate Power.  The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. The Buyer has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

3.2    Authorization of the Transaction.  The Buyer has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. The execution and delivery by the Buyer of this Agreement and the Ancillary Agreements and the consummation by the Buyer of the

- 17 -

DH 0000434

transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer. This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms.

3.3    Noncontravention.  Subject to compliance with the obligations to CFIUS, neither the execution and delivery by the Buyer of this Agreement or the Ancillary Agreements, nor the consummation by the Buyer of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the Certificate of Incorporation or by-laws of the Buyer, (b) require on the part of the Buyer any filing with, or permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Buyer is a party or by which it is bound or to which any of its assets is subject, or (d) violate any Law applicable to the Buyer or any of its properties or assets.

3.4    Ability to Close.  The Buyer has the financial ability to make all payments of the Purchase Price to the Seller contemplated herein by the due dates set forth herein.  Provided the Seller's representations and warranties regarding the Assigned Contracts are true and correct, the Buyer also has the financial ability to perform all obligations to be assumed by it under this Agreement with respect to the Assigned Contracts.

3.5    Financial Statements.  The Buyer has provided to the Seller the Buyer Financial Statements.  The Buyer Financial Statements (a) were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except as may be indicated in the notes to such financial statements) and (b) fairly present the financial position of the Buyer as of the dates thereof and the results of its operations and cash flows for the periods indicated, consistent with the books and records of the Buyer, except that the unaudited interim financial statements are subject to normal and recurring year-end adjustments and do not include footnotes.

## ARTICLE IV

## PRE-CLOSING COVENANTS

4.1    Closing Efforts.  Each of the Parties shall use its Reasonable Best Efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including using its Reasonable Best Efforts to cause (i) its representations and warranties to remain true and correct in all material respects through the Closing Date and (ii) the conditions to the obligations of the other Party to consummate the transactions contemplated by this Agreement to be satisfied.

4.2    Governmental and Third-Party Notices and Consents.

(a)    Each Party shall use its Reasonable Best Efforts to obtain, at its own expense, all waivers, permits, consents, approvals or other authorizations from Governmental

- 18 -

DH 0000435

Entities, and to effect all registrations, filings and notices with or to Governmental Entities, as may be required for such Party to consummate the transactions contemplated by this Agreement and to otherwise comply with all applicable Laws in connection with the consummation of the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Buyer shall promptly file any forms and related material that it may be required to file with CFIUS and shall make any further filings or information submissions pursuant thereto that may be necessary, proper or advisable.

(b)     The Seller shall use its Reasonable Best Efforts to obtain, at its expense, all such waivers, consents or approvals from third parties, and to give all such notices to third parties, as listed or are required to be listed in the Disclosure Schedule and the Buyer shall use its Reasonable Best Efforts to cooperate with and assist the Seller in obtaining all such waivers, consents or approvals.

(c)     If (i) any of the Assigned Contracts or other assets or rights constituting Acquired Assets may not be assigned and transferred by the Seller to the Buyer (as a result of either the provisions thereof or applicable Law) without the consent or approval of a third party, (ii) the Seller, after using its Reasonable Best Efforts, is unable to obtain such consent or approval prior to the Closing and (iii) the Closing occurs nevertheless, then (A) such Assigned Contracts and/or other assets or rights shall not be assigned and transferred by the Seller to the Buyer at the Closing and the Buyer shall not assume the Seller's liabilities or obligations with respect thereto at the Closing, (B) the Seller shall continue to use its Reasonable Best Efforts to obtain the necessary consent or approval as soon as practicable after the Closing, and (C) upon the obtaining of such consent or approval, the Buyer and the Seller shall execute such further instruments of conveyance (in substantially the form executed at the Closing) as may be necessary to assign and transfer such Assigned Contracts and/or other assets or rights (and the associated liabilities and obligations of the Seller) to the Buyer.

4.3     Stockholder Approval.  The Seller shall use its Reasonable Best Efforts to obtain, as promptly as practicable, the Requisite Stockholder Approval, either at a special meeting of stockholders or pursuant to a written stockholder consent, all in accordance with the applicable requirements of the Delaware General Corporation Law. If the Requisite Stockholder Approval is obtained by means of a written consent, the Seller shall send, pursuant to Section 228 of the Delaware General Corporation Law, a written notice to all stockholders of the Seller that did not execute such written consent informing them that the sale of the Acquired Assets as contemplated by this Agreement was approved by the stockholders of the Seller.

4.4     Operation of Business.  Except as contemplated by this Agreement, during the period from the date of this Agreement to the Closing, the Seller shall conduct its operations in the Ordinary Course of Business and in compliance with all applicable Laws and, to the extent consistent therewith, use its Reasonable Best Efforts to preserve intact its current business organization, keep its physical assets in good working condition, keep available the services of its current officers and employees and preserve its relationships with customers, suppliers and others having business dealings with it to the end that its goodwill and ongoing business shall not be impaired. Without limiting the generality of the foregoing, prior to the Closing, the Seller shall not, without the written consent of the Buyer:

- 19 -

DH 0000436

(a)     issue or sell any stock or other securities of the Seller or any options, warrants or other rights to acquire any such stock or other securities (except pursuant to the conversion or exercise of options, warrants or other convertible securities outstanding on the date hereof);

(b)     declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its capital stock;

(c)     except in the Ordinary Course of Business, create, incur or assume any indebtedness (including obligations in respect of capital leases); assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person; or make any loans, advances or capital contributions to, or investments in, any other Person;

(d)     except as required to comply with applicable Laws or agreements, plans or arrangements existing on the date of this Agreement and listed in Section 2.21(j) of the Disclosure Schedule, (i) take any action with respect to, adopt, enter into, terminate or amend any Employee Benefit Plan or any collective bargaining agreement, (ii) increase the compensation or benefits of, or pay or promise any bonus to, any director, officer, employee or consultant or materially modify their terms of employment or engagement, (iii) amend or accelerate the payment, right to payment or vesting of any compensation or benefits, including any outstanding equity compensation, (iv) hire any new officers or any new employees, (v) grant any awards under any bonus, incentive, performance or other compensation plan or arrangement or benefit plan, including the grant of equity compensation or performance units or remove any existing restrictions in any benefit plans or agreements or awards made thereunder, or (vi) take any action to fund or in any other way secure the payment of compensation or benefits under any Seller Plan or other compensatory agreement, contract or arrangement;

(e)     except as necessary to dispose of obsolete or outdated office furnishings or equipment, acquire, sell, lease, license or dispose of any assets or property (including any shares or other equity interests in or securities of any corporation, partnership, association or other business organization or division thereof), other than purchases and sales of assets in the Ordinary Course of Business, and other than entry into a new lease agreement on current market terms for the Seller's expiring office lease in Denver, Colorado or engage in marketing efforts or discussions in furtherance of the foregoing;

(f)     mortgage or pledge any of its property or assets or subject any such property or assets to any Lien;

(g)     discharge or satisfy any Lien or pay any obligation or liability other than in the Ordinary Course of Business;

(h)     amend its charter, by-laws or other organizational documents in a manner that could have an adverse effect on the transactions contemplated by this Agreement;

(i)     change its accounting methods, principles or practices, except insofar as may be required by a generally applicable change in GAAP, or make any new elections, or changes to any current elections, with respect to Taxes that affect the Acquired Assets;

- 20 -

DH 0000437

(j)     enter into, amend, terminate, take or omit to take any action that would constitute a violation of or default under, or waive any rights under, any contract or agreement of a nature listed or required to be listed in Section 2.12, Section 2.13 or Section 2.15 of the Disclosure Schedule;

(k)     make or commit to make any capital expenditure;

(l)     institute or settle any Legal Proceeding;

(m)     take any action or fail to take any action permitted by this Agreement with the Knowledge that such action or failure to take action would result in (i) any of the representations and warranties of the Seller set forth in this Agreement not being true and correct at the Closing or (ii) any of the conditions to the Closing set forth in Article V not being satisfied; or

(n)     agree in writing or otherwise to take any of the foregoing actions.

4.5     Access to Information.

(a)     Until the Closing, the Seller shall permit representatives of the Buyer to have full access (at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Seller) to all premises, properties, financial, Tax and accounting records (including the work papers of the Seller's independent accountants), contracts, other records and documents, and personnel, of or pertaining to the Seller for the purpose of performing such inspections and tests as the Buyer deems necessary or appropriate.

(b)     Within 15 days after the end of each month ending prior to the Closing and until the Closing, beginning with April 30, 2010, the Seller shall furnish to the Buyer an unaudited income statement for such month and a balance sheet as of the end of such month, prepared on a basis consistent with the Financial Statements. Such financial statements shall present fairly the financial condition and results of operations of the Seller as of the dates thereof and for the periods covered thereby, and shall be consistent with the books and records of the Seller.

4.6     Notice of Breaches.

(a)     From the date of this Agreement until the Closing, the Seller shall promptly deliver to the Buyer supplemental information concerning events or circumstances occurring subsequent to the date hereof which would render any representation, warranty or statement in this Agreement or the Disclosure Schedule inaccurate or incomplete in any material respect at any time after the date of this Agreement until the Closing. No such supplemental information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation, warranty or statement in this Agreement or the Disclosure Schedule.

(b)     From the date of this Agreement until the Closing, the Buyer shall promptly deliver to the Seller supplemental information concerning events or circumstances occurring subsequent to the date hereof which would render any representation or warranty in

- 21 -

DH 0000438

this Agreement inaccurate or incomplete in any material respect at any time after the date of this Agreement until the Closing. No such supplemental information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation or warranty in this Agreement.

4.7   Exclusivity.

(a)   The Seller shall not, and the Seller shall require each of its officers, directors, employees, representatives and agents not to, directly or indirectly, (i) initiate, solicit, encourage or otherwise facilitate any inquiry, proposal, offer or discussion with any party (other than the Buyer) concerning any merger, reorganization, consolidation, recapitalization, business combination, liquidation, dissolution, share exchange, sale of stock, sale of assets or similar business transaction involving the Seller or any division of the Seller, (ii) furnish any non-public information concerning the business, properties or assets of the Seller or any division of the Seller to any party (other than the Buyer), (iii) engage in discussions or negotiations with any party (other than the Buyer) concerning any such transaction, or (iv) enter in any agreement with any party (other than the Buyer) concerning any such transaction.

(b)   If the Seller receives any inquiry, proposal or offer of the nature described in paragraph (a) above, the Seller shall, within one (1) Business Day after such receipt, notify the Buyer of such inquiry, proposal or offer, including the identity of the other party and the terms of such inquiry, proposal or offer.

4.8   FIRPTA Tax Certificate. Within 10 days prior to the Closing, the Seller shall deliver or cause to be delivered to the Buyer a certification that the Seller is not a foreign Person in accordance with the Treasury Regulations under Section 1445 of the Code. If the Seller has not provided the certification described above to the Buyer on or before the Closing Date, the Buyer shall be permitted to reduce the Purchase Price by an amount equal to any required withholding Tax under Section 1445 of the Code.

## ARTICLE V

## CONDITIONS TO CLOSING

5.1   Conditions to Obligations of each Party. The respective obligations of each Party to consummate the transactions contemplated by this Agreement to be consummated at the Closing are subject to the condition that the sale of the Acquired Assets by the Seller to the Buyer as contemplated by this Agreement shall have received the Requisite Stockholder Approval.

5.2   Conditions to Obligations of the Buyer. The obligation of the Buyer to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction of the following additional conditions:

(a)   the Seller shall have obtained at its own expense (and shall have provided copies thereof to the Buyer) all of the waivers, permits, consents, approvals or other authorizations listed on Schedule 5.2(a);

- 22 -

DH 0000439

(b)     the representations and warranties of the Seller set forth in the first sentence of Section 2.1 and in Section 2.3 and any representations and warranties of the Seller set forth in this Agreement that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Seller set forth in this Agreement shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing as though made as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties shall be true and correct as of such date);

(c)     the Seller shall have performed or complied with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(d)     no Legal Proceeding shall be pending or threatened against the Buyer, the Seller or the Acquired Assets wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement, (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation or (iii) affect adversely the Buyer or the Acquired Assets, and no such judgment, order, decree, stipulation or injunction shall be in effect;

(e)     the Seller shall have delivered to the Buyer the Seller Certificate;

(f)     the Seller shall have delivered to the Buyer an update, as of the date prior to the Closing Date, of each list contained in the Disclosure Schedule that lists or describes Acquired Assets (including the lists set forth in Sections 2.13, 2.15, 2.30, 2.31 and 2.32 of the Disclosure Schedule);

(g)     the Seller shall have delivered to the Buyer documents evidencing the release or termination of all Liens on the Acquired Assets, and copies of filed UCC termination statements with respect to all UCC financing statements evidencing Liens;

(h)     the Seller shall have executed and delivered the Transition Services Agreement to the Buyer;

(i)     the employment, non-competition and non-solicitation agreements dated the date hereof between the Buyer and each of the Key Employees shall be in full force and effect;

(j)     since the date of this Agreement there shall not have been any change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Seller Material Adverse Effect; and

(k)     the Buyer shall have received such other certificates and instruments (including certificates of good standing of the Seller in its jurisdiction of organization and the various foreign jurisdictions in which it is qualified, certified charter documents, certificates as to the incumbency of officers and the adoption of authorizing resolutions) as it shall reasonably request in connection with the Closing.

- 23 -

5.3     Conditions to Obligations of the Seller.  The obligation of the Seller to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction of the following additional conditions:

(a)     the representations and warranties of the Buyer set forth in the first sentence of Section 3.1 and in Section 3.2 and any representations and warranties of the Buyer set forth in this Agreement that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Buyer set forth in this Agreement shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing as though made as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties shall be true and correct as of such date);

(b)     the Buyer shall have performed or complied with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(c)     no Legal Proceeding shall be pending or threatened wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement or (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation, and no such judgment, order, decree, stipulation or injunction shall be in effect;

(d)     the Buyer shall have delivered to the Seller the Buyer Certificate;

(e)     the Buyer shall have executed and delivered the Transition Services Agreement to the Seller;

(f)     the employment, non-competition and non-solicitation agreements dated the date hereof between the Buyer and each of the Key Employees shall be in full force and effect; and

(g)     the Seller shall have received such other certificates and instruments (including certificates of good standing of the Buyer in its jurisdiction of organization, certificates as to the incumbency of officers and the adoption of authorizing resolutions) as it shall reasonably request in connection with the Closing.

## ARTICLE VI

## POST-CLOSING COVENANTS

6.1     Proprietary Information.  From and after the Closing, the Seller shall not disclose or make use of (except to pursue its rights under this Agreement or the Ancillary Agreements), and shall use its commercially reasonable efforts to cause all of its Affiliates not to disclose or make use of, any knowledge, information or documents of a confidential nature or not generally known to the public with respect to Acquired Assets, the Seller's business or the Buyer or its business (including the financial information, technical information or data relating to the Seller's products and names of customers of the Seller) except to the extent that such knowledge,

- 24 -

DH 0000441

information or documents shall have become public knowledge other than through improper disclosure by the Seller or an Affiliate. The Seller shall enforce, at the request of the Buyer, all enforceable confidentiality, invention assignments and similar agreements between the Seller and any other party relating to the Acquired Assets or the business of the Seller which are not Assigned Contracts. Nothing herein shall restrict in any way the ability of the Seller to operate from and after the Closing, or defend against claims asserted against it, including in litigation, or the ability of the Seller to assert claims against any third party that are not part of the Acquired Assets. Additionally, nothing herein shall restrict in any way the ability of the Seller to dissolve, wind-up, liquidate, discontinue its corporate existence, file bankruptcy or make an assignment for the benefit of creditors.

6.2     Solicitation and Hiring.  For a period of five (5) years after the Closing Date, the Seller shall not, either directly or indirectly (including through an Affiliate), (a) solicit or attempt to induce any Restricted Employee to terminate his employment with the Buyer or any subsidiary of the Buyer or (b) hire or attempt to hire any Restricted Employee; provided, that this clause (b) shall not apply to any individual whose employment with the Buyer or a subsidiary of the Buyer has been terminated for a period of six (6) months or longer. The Seller shall enforce, for the benefit of the Buyer, all confidentiality, non-solicitation and non-hiring assignments and similar agreements between the Seller and any other party which are not Assigned Contracts.

6.3     Non-Competition.

        (a)     For a period of five (5) years after the Closing Date, the Seller shall not, either directly or indirectly as a stockholder, investor, partner, consultant or otherwise, (i) design, develop, manufacture, market, sell or license any product or provide any service anywhere in the world which is competitive with any product designed, developed (or under development), manufactured, sold or licensed or any service provided by the Seller within the five-year period prior to the Closing Date or (ii) engage anywhere in the world in any business competitive with the business of the Seller as conducted as of the Closing Date or during the five-year period prior to the Closing Date. The Seller shall enforce, for the benefit of the Buyer, all non-competition and similar agreements between the Seller and any other party which are not Assigned Contracts.

        (b)     The Seller agrees that the duration and geographic scope of the non-competition provision set forth in this Section 6.3 are reasonable. In the event that any court determines that the duration or the geographic scope, or both, are unreasonable and that such provision is to that extent unenforceable, the Parties agree that the provision shall remain in full force and effect for the greatest time period and in the greatest area that would not render it unenforceable. The Parties intend that this non-competition provision shall be deemed to be a series of separate covenants, one (1) for each and every county of each and every state of the United States of America and each and every political subdivision of each and every country outside the United States of America where this provision is intended to be effective.

        (c)     The Seller shall, and shall use its best efforts to cause its Affiliates to, refer all inquiries regarding the business, products and services of the Seller to the Buyer.

DH 0000442

6.4     Tax Matters.  All sales taxes, transfer taxes, deed excise stamps and similar charges related to the sale of the Acquired Assets contemplated by this Agreement shall be paid by the Seller.

6.5     Sharing of Data.

(a)     The Seller shall have the right for a period of seven (7) years following the Closing Date to have reasonable access to such books, records and accounts, including financial and Tax information, correspondence, production records, employment records and other records that are transferred to the Buyer pursuant to the terms of this Agreement for the limited purposes of concluding its involvement in the business conducted by the Seller prior to the Closing Date and for complying with its obligations under applicable securities, tax, environmental, employment or other Laws.  The Buyer shall have the right for a period of seven (7) years following the Closing Date to have reasonable access to those books, records and accounts, including financial and accounting records (including the work papers of the Seller's independent accountants), Tax records, correspondence, production records, employment records and other records that are retained by the Seller pursuant to the terms of this Agreement to the extent that any of the foregoing is needed by the Buyer for the purpose of conducting the business of the Seller after the Closing and complying with its obligations under applicable securities, tax, environmental, employment or other Laws.  Neither the Buyer nor the Seller shall destroy any such books, records or accounts retained by it without first providing the other Party with the opportunity to obtain or copy such books, records, or accounts at such other Party's expense.

(b)     Promptly upon request by the Buyer made at any time following the Closing Date, the Seller shall authorize the release to the Buyer of all files pertaining to the Seller, the Acquired Assets or the business or operations of the Seller held by any federal, state, county or local authorities, agencies or instrumentalities.

(c)     Nothing herein shall constitute a requirement that the Seller remain in business or continue its corporate existence for any period of time following the Closing, or constitute a limitation in any way on the Seller's ability at any time to dissolve, wind-up, liquidate, file bankruptcy, or make an assignment for the benefit of creditors under state Law.

6.6     Use of Name.  The Seller shall not use, and shall not permit any Affiliate to use, the name "Sequoia" or any name reasonably similar thereto after the Closing Date in connection with any business related to, competitive with, or an outgrowth of, the business conducted by the Seller on the date of this Agreement, except for the wind up of the business of the Seller or the consummation of the transactions contemplated by this Agreement.  Within ten (10) days following the Closing, the Seller shall amend its Certificate of Incorporation and other corporate records, if necessary, to comply with this provision.

6.7     Cooperation in Litigation.  From and after the Closing Date, each Party shall fully cooperate with the other in the defense or prosecution of any litigation or proceeding already instituted or which may be instituted hereafter against or by such other Party relating to or arising out of the conduct of the business of the Seller or the Buyer prior to or after the Closing Date (other than litigation among the Parties and/or their Affiliates arising out the transactions contemplated by this Agreement).  The Party requesting such cooperation shall pay the

- 26 -

DH 0000443

reasonable out-of-pocket expenses incurred in providing such cooperation (including legal fees and disbursements) by the Party providing such cooperation and by its officers, directors, employees and agents, but shall not be responsible for reimbursing such Party or its officers, directors, employees and agents, for their time spent in such cooperation.

6.8     Restriction on Dividends and Distributions.  For a period of two (2) years following the Closing Date, the Seller shall not use any portion of the Purchase Price received from the Buyer for any purpose other than (a) to fund the ordinary and reasonable expenses of the wind-down of its business from and after the Closing (which amount shall not exceed $750,000 without Buyer's prior approval, such approval not to be unreasonably withheld or delayed), including legal and accounting fees, and (b) to pay creditors of Seller in accordance with their respective rights and priorities under applicable Law.  Except as permitted by applicable Law, in no event shall any portion of the Purchase Price be used by Seller to make any distribution to any equity holder or Affiliate of the Seller unless and until all unaffiliated creditors of Seller have been paid in full.

6.9     COBRA Coverage.  The Seller shall be responsible for any notices of COBRA coverage required on or before the Closing Date to any of its employees or their qualified beneficiaries and, to the extent required by Law, shall provide COBRA coverage to such employees or beneficiaries who are receiving or eligible for COBRA coverage before or as of the Closing Date while they are so eligible.  The Buyer shall assume responsibility only for liabilities or obligations arising under COBRA or other similar applicable Laws to the individuals it hires (and their beneficiaries) from the Seller and with respect to periods after the Closing Date.

6.10     Undisclosed Contracts.  If after the Closing the Buyer discovers any contract that was not properly disclosed to the Buyer in Section 2.15 of the Disclosure Schedule, the Buyer shall have the right to reject such contract and re-assign such contract to the Seller.  The Buyer shall not be deemed to have assumed any obligations of the Seller under any such contract.

6.11     Laptops and Blackberries.  Within five (5) days after the Closing, the Seller shall either cause all Acquired Assets residing on any laptop computers and/or Blackberries retained by the Seller to be removed to the Buyer's reasonable satisfaction or, if the Seller fails to do so, the Seller shall permit the Buyer to do so.

6.12     Accounts Receivable.  Within five (5) days after the Closing, the Seller shall provide a schedule of all accounts receivable billed by the Seller at any time after May 20, 2010, which amount shall constitute the Transferred Receivables set forth in clause (b) of the definition of the "Transferred Accounts Receivables."  Notwithstanding the foregoing, the Transferred Accounts Receivable shall not include those accounts receivable which are part of any credit and rebill activity for amounts billed prior to May 20, 2010, in cases where both the credit and the rebilling occur after May 20, 2010.  To the extent the rebill exceeds the amount of the credit, such excess will belong to the account of the Buyer.  At the Buyer's request, the Seller shall send a joint letter with the Buyer to any customer that has a Transferred Accounts Receivable, directing that customer to pay such Transferred Accounts Receivable directly to the Buyer.  In the event that the Seller collects payment for any such accounts receivable billed at any time after May 20, 2010, the Seller shall remit this payment to the Buyer within three (3) Business Days.

- 27 -

DH 0000444

# ARTICLE VII

## INDEMNIFICATION

7.1     Indemnification by the Seller.  The Seller shall indemnify the Buyer in respect of, and hold the Buyer harmless against, any and all Damages incurred or suffered by the Buyer or any Affiliate thereof resulting from, relating to or constituting:

(a)     any breach, as of the date of this Agreement or as of the Closing Date, of any representation or warranty of the Seller contained in this Agreement, any Ancillary Agreement or any other agreement or instrument furnished by the Seller to the Buyer pursuant to this Agreement;

(b)     any failure to perform any covenant or agreement of the Seller contained in this Agreement, any Ancillary Agreement or any agreement or instrument furnished by the Seller to the Buyer pursuant to this Agreement;

(c)     any claim against the Buyer or the Acquired Assets, including claims raised by offset, recoupment, deduction or other defense as a result of any Retained Liabilities or as a result of any claim, demand, or action commenced by or on behalf of the Seller or the Seller's creditors, equityholders or estate, whether prior to or after the Closing, except for any claim, demand or action arising out of or relating to the enforcement of the Buyer's obligations under (i) this Agreement or any Ancillary Agreement or any other agreement or instrument furnished by the Buyer pursuant to this Agreement or (ii) any other subsequent agreement entered into between the Buyer and the Seller after the Closing; or

(d)     any Retained Liabilities.

7.2     Indemnification by the Buyer.  The Buyer shall indemnify the Seller in respect of, and hold it harmless against, any and all Damages incurred or suffered by the Seller resulting from, relating to or constituting:

(a)     any breach, as of the date of this Agreement or as of the Closing Date, of any representation or warranty of the Buyer contained in this Agreement, any Ancillary Agreement or any other agreement or instrument furnished by the Buyer to the Seller pursuant to this Agreement;

(b)     any failure to perform any covenant or agreement of the Buyer contained in this Agreement, any Ancillary Agreement or any other agreement or instrument furnished by the Buyer to the Seller pursuant to this Agreement; or

(c)     any Assumed Liabilities.

7.3     Indemnification Claims.

(a)     An Indemnified Party shall give written notification to the Indemnifying Party of the commencement of any Third Party Action.  Such notification shall be given within 20 days after receipt by the Indemnified Party of notice of such Third Party Action, and shall

- 28 -

DH 0000445

describe in reasonable detail (to the extent known by the Indemnified Party) the facts constituting the basis for such Third Party Action and the amount of the claimed damages; provided, however, that no delay or failure on the part of the Indemnified Party in so notifying the Indemnifying Party shall relieve the Indemnifying Party of any liability or obligation hereunder except to the extent of any damage or liability caused by or arising out of such failure. Within 20 days after delivery of such notification, the Indemnifying Party may, upon written notice thereof to the Indemnified Party, assume control of the defense of such Third Party Action with counsel reasonably satisfactory to the Indemnified Party; provided that (i) the Indemnifying Party may only assume control of such defense if (A) it acknowledges in writing to the Indemnified Party that any damages, fines, costs or other liabilities that may be assessed against the Indemnified Party in connection with such Third Party Action constitute Damages for which the Indemnified Party shall be indemnified pursuant to this Article VII and (B) the *ad damnum* is less than or equal to the amount of Damages for which the Indemnifying Party is liable under this Article VII and (ii) the Indemnifying Party may not assume control of the defense of Third Party Action involving criminal liability or in which equitable relief is sought against the Indemnified Party. If the Indemnifying Party does not, or is not permitted under the terms hereof to, so assume control of the defense of a Third Party Action, the Indemnified Party shall control such defense. The Non-controlling Party may participate in such defense at its own expense. The Controlling Party shall keep the Non-controlling Party advised of the status of such Third Party Action and the defense thereof and shall consider in good faith recommendations made by the Non-controlling Party with respect thereto. The Non-controlling Party shall furnish the Controlling Party with such information as it may have with respect to such Third Party Action (including copies of any summons, complaint or other pleading which may have been served on such party and any written claim, demand, invoice, billing or other document evidencing or asserting the same) and shall otherwise cooperate with and assist the Controlling Party in the defense of such Third Party Action. The fees and expenses of counsel to the Indemnified Party with respect to a Third Party Action shall be considered Damages for purposes of this Agreement if (i) the Indemnified Party controls the defense of such Third Party Action pursuant to the terms of this Section 7.3(a) or (ii) the Indemnifying Party assumes control of such defense and the Indemnified Party reasonably concludes that the Indemnifying Party and the Indemnified Party have conflicting interests or different defenses available with respect to such Third Party Action. The Indemnifying Party shall not agree to any settlement of, or the entry of any judgment arising from, any Third Party Action without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed. The Indemnified Party shall not agree to any settlement of, or the entry of any judgment arising from, any such Third Party Action without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld, conditioned or delayed.

(b)      In order to seek indemnification under this Article VII, an Indemnified Party shall deliver a Claim Notice to the Indemnifying Party. If the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow Agreement, the Indemnifying Party shall deliver a copy of the Claim Notice to the Escrow Agent.

(c)      Within 20 days after delivery of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a Response, in which the Indemnifying Party shall: (i) agree that the Indemnified Party is entitled to receive all of the Claimed Amount (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the

DH 0000446

Indemnified Party of the Claimed Amount, by check or by wire transfer; provided that if the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, within three (3) days following the delivery of the Response, a written notice executed by both parties instructing the Escrow Agent to disburse the Claimed Amount to the Buyer), (ii) agree that the Indemnified Party is entitled to receive the Agreed Amount (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the Indemnified Party of the Agreed Amount, by check or by wire transfer; provided that if the Indemnified Party is the Buyer and is seeking to enforce such claim pursuant to the Escrow Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, within three (3) days following the delivery of the Response, a written notice executed by both parties instructing the Escrow Agent to disburse the Agreed Amount to the Buyer) or (iii) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount.

(d)     During the 30-day period following the delivery of a Response that reflects a Dispute, the Indemnifying Party and the Indemnified Party shall use good faith efforts to resolve the Dispute. If the Dispute is not resolved within such 30-day period, such Dispute shall be resolved in a state or federal court sitting in New York, New York, in accordance with Section 10.12. If the Indemnified Party is the Buyer and is seeking to enforce the claim that is the subject of the Dispute pursuant to the Escrow Agreement, the Indemnifying Party and the Indemnified Party shall deliver to the Escrow Agent, promptly following the resolution of the Dispute (whether by mutual agreement, arbitration, judicial decision or otherwise), a written notice executed by both parties instructing the Escrow Agent as to what (if any) portion of the Escrow Fund shall be disbursed to the Buyer and/or the Seller (which notice shall be consistent with the terms of the resolution of the Dispute).

(e)     Notwithstanding the other provisions of this Section 7.3, if a third party asserts (other than by means of a lawsuit) that an Indemnified Party is liable to such third party for a monetary or other obligation which may constitute or result in Damages for which such Indemnified Party may be entitled to indemnification pursuant to this Article VII, and such Indemnified Party reasonably determines that it has a valid business reason to fulfill such obligation, then (i) such Indemnified Party shall be entitled to satisfy such obligation, without prior notice to or consent from the Indemnifying Party, (ii) such Indemnified Party may subsequently make a claim for indemnification in accordance with the provisions of this Article VII, and (iii) such Indemnified Party shall be reimbursed, in accordance with the provisions of this Article VII, for any such Damages for which it is entitled to indemnification pursuant to this Article VII (subject to the right of the Indemnifying Party to dispute the Indemnified Party's entitlement to indemnification, or the amount for which it is entitled to indemnification, under the terms of this Article VII).

(f)     If the Buyer is the Indemnified Party and the Buyer or the Seller is prevented from complying with the process for indemnification set forth in this Article VII, the Buyer shall nevertheless be permitted to withhold up to $1,000,000 of any New York Payments with respect to any Damages sought by the Buyer in any indemnification claim.

7.4     Survival of Representations and Warranties. All representations and warranties that are covered by the indemnification agreements in Section 7.1(a) and Section 7.2(a) shall

- 30 -

DH 0000447

(a) survive the Closing and (b) shall expire on the date 18 months following the Closing Date, except that (i) the representations and warranties set forth in Sections 2.1, 2.3, 3.1 and 3.2 shall survive the Closing without limitation and (ii) the representations and warranties set forth in Sections 2.9, 2.21 and 2.22 shall survive until 30 days following expiration of all statutes of limitation applicable to the matters referred to therein. If an Indemnified Party delivers to an Indemnifying Party, before expiration of a representation or warranty, either a Claim Notice based upon a breach of such representation or warranty, or an Expected Claim Notice based upon a breach of such representation or warranty, then the applicable representation or warranty shall survive until, but only for purposes of, the resolution of the matter covered by such notice. If the legal proceeding or written claim with respect to which an Expected Claim Notice has been given is definitively withdrawn or resolved in favor of the Indemnified Party, the Indemnified Party shall promptly so notify the Indemnifying Party; and if the Indemnified Party has delivered a copy of the Expected Claim Notice to the Escrow Agent and funds have been retained in escrow after the Termination Date (as defined in the Escrow Agreement) with respect to such Expected Claim Notice, the Indemnifying Party and the Indemnified Party shall promptly deliver to the Escrow Agent a written notice executed by both parties instructing the Escrow Agent to disburse such retained funds to the Seller in accordance with the terms of the Escrow Agreement. The rights to indemnification set forth in this Article VII shall not be affected by (i) any investigation conducted by or on behalf of an Indemnified Party or any knowledge acquired (or capable of being acquired) by an Indemnified Party, whether before or after the date of this Agreement or the Closing Date (including through supplements to the Disclosure Schedule permitted by Section 4.6), with respect to the inaccuracy or noncompliance with any representation, warranty, covenant or obligation which is the subject of indemnification hereunder or (ii) any waiver by an Indemnified Party of any closing condition relating to the accuracy of any representations and warranties or the performance of or compliance with agreements and covenants.

7.5    Limitations.

(a)    Notwithstanding anything to the contrary herein, (i) the aggregate liability of the Seller for Damages under Section 7.1(a) and Section 7.1(c) shall not exceed the Limitation Amount, and (ii) the Seller shall be liable for only that portion of the aggregate Damages under Section 7.1(a) for which it would otherwise be liable which exceeds $10,000; provided that the limitations set forth in this sentence shall not apply to a claim pursuant to Section 7.1(a) relating to a breach of the representations and warranties set forth in Sections 2.1 or 2.3. For purposes solely of this Article VII, all representations and warranties of the Seller in Article II (other than Sections 2.7 and 2.31) shall be construed as if the term "material" and any reference to "Seller Material Adverse Effect" (and variations thereof) were omitted from such representations and warranties.

(b)    Notwithstanding anything to the contrary herein, (i) the aggregate liability of the Buyer for Damages under Section 7.2(a) shall not exceed the Limitation Amount, and (ii) the Buyer shall be liable for only that portion of the aggregate Damages under Section 7.2(a) for which it would otherwise be liable which exceeds $10,000; provided that the limitation set forth in this sentence shall not apply to a claim pursuant to Section 7.2(a) relating to a breach of the representations and warranties set forth in Sections 3.1 or 3.2. For purposes solely of this

DH 0000448

Article VII, all representations and warranties of the Buyer in Article III shall be construed as if the term "material" were omitted from such representations and warranties.

(c)   The Escrow Agreement is intended to secure the indemnification obligations of the Seller under this Agreement. However, the rights of the Buyer under this Article VII shall not be limited to the Escrow Fund nor shall the Escrow Agreement be the exclusive means for the Buyer to enforce such rights. Without limitation of the foregoing, (i) the Buyer shall have the right to deduct up to $1,000,000 of any New York Payments with respect to any claims for indemnification made by the Buyer under this Article VII, including for any claims made by any creditor of Seller against the Buyer within 18 months after the Closing Date, provided that such claims have been made by written demand, including by service of a complaint, on or before the end of such 18-month period, (ii) the Buyer shall be permitted to deduct from any Release Payment, any Assignment Payment or any New York Payment the amount of any Transferred Accounts Receivable collected by the Seller and not remitted to the Buyer within three (3) Business Days and (iii) the Buyer shall be permitted to deduct from any Release Payment, any Assignment Payment or any New York Payment any costs incurred by the Buyer in enforcing the provisions of Section 6.1 of this Agreement.

(d)   Except with respect to claims based on fraud, after the Closing, the rights of the Indemnified Parties under this Article VII, Section 10.13 and the Escrow Agreement shall be the exclusive remedy of the Indemnified Parties with respect to claims resulting from or relating to any misrepresentation, breach of warranty or failure to perform any covenant or agreement contained in this Agreement.

7.6   Treatment of Indemnity Payments. Any payments made to an Indemnified Party pursuant to this Article VII, pursuant to Article VIII or pursuant to the Escrow Agreement shall be treated as an adjustment to the Purchase Price for tax purposes.

## ARTICLE VIII

## TERMINATION

8.1   Termination of Agreement. The Parties may terminate this Agreement prior to the Closing (whether before or after Requisite Stockholder Approval), as provided below:

(a)   the Parties may terminate this Agreement by mutual written consent;

(b)   the Buyer may terminate this Agreement by giving written notice to the Seller in the event the Seller is in breach of any representation, warranty or covenant contained in this Agreement, and such breach (i) individually or in combination with any other such breach, would cause the conditions set forth in clauses (b) or (c) of Section 5.2 not to be satisfied and (ii) is not cured within 20 days following delivery by the Buyer to the Seller of written notice of such breach;

(c)   the Seller may terminate this Agreement by giving written notice to the Buyer in the event the Buyer is in breach of any representation, warranty or covenant contained in this Agreement, and such breach (i) individually or in combination with any other such breach, would cause the conditions set forth in clauses (a) or (b) of Section 5.3 not to be satisfied

- 32 -

DH 0000449

and (ii) is not cured within 20 days following delivery by the Seller to the Buyer of written notice of such breach;

(d)     either Party may terminate this Agreement by giving written notice to the other Party at any time after the stockholders of the Seller have voted on whether to approve the sale of the Acquired Assets contemplated by this Agreement in the event such matter failed to receive the Requisite Stockholder Approval;

(e)     the Buyer may terminate this Agreement by giving written notice to the Seller if the Closing shall not have occurred on or before June 5, 2010 by reason of the failure of any condition precedent under Section 5.1 or 5.2 (unless the failure results primarily from a breach by the Buyer of any representation, warranty or covenant contained in this Agreement); or

(f)     the Seller may terminate this Agreement by giving written notice to the Buyer if the Closing shall not have occurred on or before June 5, 2010 by reason of the failure of any condition precedent under Section 5.1 or 5.3 (unless the failure results primarily from a breach by the Seller of any representation, warranty or covenant contained in this Agreement).

8.2     Effect of Termination.  If either Party terminates this Agreement pursuant to Section 8.1, all obligations of the Parties hereunder shall terminate without any liability of either Party to the other Party (except for any liability of a Party for willful breaches of this Agreement).

# ARTICLE IX

# DEFINITIONS

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"Acquired Assets" shall mean all of the assets, properties and rights of the Seller existing as of the Closing, except those identified as Excluded Assets, including:

(a)     all cash collateral posted for bond obligations and similar obligations to customers or other third parties;

(b)     all inventories of raw materials, work in process, finished goods, supplies, packaging materials, spare parts and similar items, wherever located, including consignment inventory and inventory held on order or in transit;

(c)     all computers, machinery, equipment, tools and tooling, furniture, fixtures, supplies, leasehold improvements, motor vehicles and other tangible personal property;

(d)     all real property, leaseholds and subleaseholds in real property, and easements, rights-of-way and other appurtenances thereto;

(e)     all Intellectual Property;

- 33 -

DH 0000450

(f)    all rights under Assigned Contracts;

(g)    all securities owned by the Seller;

(h)    all rights relating to that portion of any refunds, recovery or recoupment of Taxes, net of Tax Liabilities, not owed by the Seller or SVS Holdings, Inc. to Smartmatic Corporation in accordance with that certain Stock Purchase Agreement dated September 18, 2007;

(i)    all claims, prepayments, deposits, refunds, causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment to the extent not previously expended by the Seller;

(j)    all Permits which are transferable and not required by the Seller after the Closing;

(k)    all insurance policies of the Seller which are transferable and not required by the Seller after the Closing, as well as all proceeds which may be payable thereunder;

(l)    the Transferred Accounts Receivable; and

(m)    all manufacturing and procedural manuals, Intellectual Property records, sales and promotional materials, studies, reports and other printed or written materials.

"Affiliate" shall mean any affiliate, as defined in Rule 12b-2 under the Securities Exchange Act of 1934.

"Agreed Amount" shall mean part, but not all, of the Claimed Amount.

"Ancillary Agreements" shall mean the Escrow Agreement, the bill of sale and other instruments of conveyance referred to in Section 1.5(b)(iii), and the instrument of assumption and other instruments referred to in Section 1.5(b)(iv).

"Assigned Contracts" shall mean any contracts, agreements or instruments to which the Seller is a party, including all customer contracts, dealer contracts and supplier agreements, any leases or subleases of real property and any licenses or sublicenses relating to Intellectual Property.

"Assignment Agreement" shall mean an agreement in substantially the form of Exhibit E attached hereto.

"Assignment Payments" shall have the meaning set forth in Section 1.3(c).

"Assumed Liabilities" shall mean all liabilities of the Seller (a) under the Assigned Contracts to be performed on and after the Closing, (i) excluding any liabilities resulting from (A) any breach or violation prior to the Closing under any Assigned Contract or (B) any act or omission prior to the Closing that would have constituted a breach or violation upon notice or passage of time under any Assigned Contract, (ii) but including the obligations of the Seller for the repair, replacement or return of products manufactured or sold prior to the Closing under such Assigned Contracts and (b) set forth on Schedule 1.2.

- 34 -

DH 0000451

"Business Day" shall mean any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York are permitted or required by Law, executive order or governmental decree to remain closed.

"Buyer" shall have the meaning set forth in the first paragraph of this Agreement.

"Buyer Certificate" shall mean a certificate to the effect that each of the conditions specified in clauses (a) through (c) (insofar as clause (c) relates to Legal Proceedings involving the Buyer) of Section 5.3 is satisfied in all respects.

"Buyer Financial Statements" shall mean:

(a)    the unaudited balance sheets and statements of income, changes in stockholders' equity and cash flows of the Buyer as of the year ended December 31, 2009; and

(b)    the balance sheet and the unaudited consolidated statements of income, changes in stockholders' equity and cash flows for the three (3) months ended as of March 31, 2010.

"CERCLA" shall mean the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CFIUS" shall have the meaning set forth in Section 2.4.

"Claim Notice" shall mean written notification which contains (a) a description of the Damages incurred or reasonably expected to be incurred by the Indemnified Party and the Claimed Amount of such Damages, to the extent then known, (b) a statement that the Indemnified Party is entitled to indemnification under Article VII for such Damages and a reasonable explanation of the basis therefor, and (c) a demand for payment in the amount of such Damages.

"Claimed Amount" shall mean the amount of any Damages incurred or reasonably expected to be incurred by the Indemnified Party.

"Closing" shall mean the closing of the transactions contemplated by this Agreement.

"Closing Date" shall mean the date two (2) Business Days after the satisfaction or waiver of all of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby (excluding the delivery at the Closing of any of the documents set forth in Article V), or such other date as may be mutually agreeable to the Parties.

"Closing Payment" shall have the meaning set forth in Section 1.3(a).

"COBRA" shall mean Part 6 of Subtitle B of Title 1 of ERISA, Section 4980B of the Code and similar state Laws.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commission Payments" shall have the meaning set forth in Section 1.3(d).

- 35 -

DH 0000452

"Controlling Party" shall mean the party controlling the defense of any Third Party Action.

"Customer Offerings" shall mean (a) the products (including Software and Documentation) that the Seller (i) currently develops, manufactures, markets, distributes, makes available, sells or licenses to third parties, or (ii) has developed, manufactured, marketed, distributed, made available, sold or licensed to third parties within the previous six (6) years, or (iii) currently plans to develop, manufacture, market, distribute, make available, sell or license to third parties in the future and (b) the services that the Seller (i) currently provides or makes available to third parties, or (ii) has provided or made available to third parties within the previous six (6) years, or (iii) currently plans to provide or make available to third parties in the future. A true and complete list of all Customer Offerings is set forth in Section 2.13(c) of the Disclosure Schedule.

"Damages" shall mean any and all debts, obligations and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), diminution in value, monetary damages, fines, fees, penalties, interest obligations, deficiencies, losses and expenses (including amounts paid in settlement, interest, court costs, costs of investigators, fees and expenses of attorneys, accountants, financial advisors and other experts, and other expenses of litigation).

"Defense Production Act" shall mean the Defense Production Act of 1950, as amended.

"Disclosure Schedule" shall mean the disclosure schedule provided by the Seller to the Buyer on the date hereof and accepted in writing by the Buyer, as the same may be supplemented pursuant to Section 4.6.

"Dispute" shall mean the dispute resulting if the Indemnifying Party in a Response disputes its liability for all or part of the Claimed Amount.

"Documentation" shall mean printed, visual or electronic materials, reports, white papers, documentation, specifications, designs, flow charts, code listings, instructions, user manuals, frequently asked questions, release notes, recall notices, error logs, diagnostic reports, marketing materials, packaging, labeling, service manuals and other information describing the use, operation, installation, configuration, features, functionality, pricing, marketing or correction of a product, whether or not provided to end user.

"Dominion Asset Purchase Agreement" shall mean the Asset Purchase Agreement between Dominion Voting Systems Corporation and the Seller dated July 15, 2009, as amended prior to the date of this Agreement.

"Employee Benefit Plan" shall mean any (a) "employee benefit plan" as defined in Section 3(3) of ERISA (including those exempt from the application of ERISA), (b) employment, consulting, severance, retention, or other similar contract or policy, and (c) each plan, arrangement, program, contract (written or oral) providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing, bonuses, equity or

- 36 -

DH 0000453

equity-related compensation, stock purchases, executive, or other forms of incentive compensation or post-retirement insurance, or providing for payments in the event of a change of control, change in ownership, change in ownership or effective control or a sale of a substantial portion of the assets of any business, or providing other compensation or benefits.

"Environmental Law" shall mean any Law, directive or Permit relating to the environment, occupational health and safety, or exposure of Persons or property to Materials of Environmental Concern, including any Law pertaining to: (a) the presence of or the treatment, storage, disposal, generation, transportation, handling, distribution, manufacture, processing, use, import, export, labeling, recycling, registration, investigation or remediation of Materials of Environmental Concern or documentation related to the foregoing; (b) air, water and noise pollution; (c) groundwater and soil contamination; (d) the release, threatened release, or accidental release into the environment, the workplace or other areas of Materials of Environmental Concern, including emissions, discharges, injections, spills, escapes or dumping of Materials of Environmental Concern; (e) transfer of interests in or control of real property which may be contaminated; (f) community or worker right-to-know disclosures with respect to Materials of Environmental Concern; (g) the protection of wild life, marine life and wetlands, and endangered and threatened species; (h) storage tanks, vessels, containers, abandoned or discarded barrels and other closed receptacles; and (i) health and safety of employees and other Persons. As used above, the term "release" shall have the meaning set forth in CERCLA.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any entity that is, or at any applicable time was, a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (c) an affiliated service group (as defined under Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes or included the Seller.

"Escrow Agent" shall mean JP Morgan Chase Bank, National Association.

"Escrow Agreement" shall mean an escrow agreement in substantially the form attached hereto as Exhibit A.

"Escrow Fund" shall mean the fund established pursuant to the Escrow Agreement and including the amounts to be paid by the Buyer to the Escrow Agent pursuant to Section 1.4.

"Excluded Assets" shall mean the following assets of the Seller:

(a)    all cash, short-term investments, deposits, bank accounts and other similar assets, other than cash collateral posted for bond obligations and similar obligations to customers or other third parties;

(b)    all trade and other accounts receivable and notes and loans receivable that are payable to the Seller, together with any security held by the Seller for the payment thereof, other than the Transferred Accounts Receivable;

- 37 -

DH 0000454

(c)      the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books and other documents relating to the organization, operation and existence of the Seller as a corporation;

(d)      all financial and accounting books and records;

(e)      all employment contracts;

(f)      all employment and employee files;

(g)      all Employee Benefit Plans;

(h)      any of the rights of the Seller under this Agreement or under the Ancillary Agreements;

(i)      all manufacturing and procedural manuals, records, files, sales and promotional materials, studies, reports and other printed or written materials to the extent relating exclusively to any contract that is not an Assigned Contract;

(j)      all cell phones, blackberries and laptops for any employee of Seller not hired at Closing by Buyer;

(k)      the two servers used by the Seller for Microsoft Dynamics, provided they are not and have not been used by the Seller for any other purpose;

(l)      all privileged attorney-client communications between the Seller and its counsel;

(m)      all rights relating to that portion of any refunds, recovery or recoupment of Taxes, net of Tax Liabilities, required to satisfy Tax Liabilities or owed by the Seller or SVS Holdings, Inc. to Smartmatic Corporation in accordance with that certain Stock Purchase Agreement dated September 18, 2007;

(n)      all claims, prepayments, deposits, refunds, causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment with respect to Smartmatic Corporation and any party asserting a claim that is a Retained Liability; and

(o)      those assets listed on Schedule 1.1(b) attached hereto.

"Expected Claim Notice" shall mean a notice that, as a result of a legal proceeding instituted by or written claim made by a third party, an Indemnified Party reasonably expects to incur Damages for which it is entitled to indemnification under Article VII.

"Exploit" shall mean develop, design, test, modify, make, use, sell, have made, used and sold, import, reproduce, market, distribute, commercialize, support, maintain, correct and create derivative works of.

"Financial Statements" shall mean:

- 38 -

DH 0000455

(a)   the audited balance sheets and statements of income, changes in stockholders' equity and cash flows of the Seller as of the end of and for each of the years ended December 31, 2006, December 31, 2007 and December 31, 2008;

(b)   the unaudited balance sheet and statement of income of the Seller as of the year ended December 31, 2009; and

(c)   the Most Recent Balance Sheet and the unaudited consolidated statement of income for the four (4) months ended as of the Most Recent Balance Sheet Date.

"GAAP" shall mean United States generally accepted accounting principles.

"Governmental Entity" shall mean any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency.

"Harvard" shall have the meaning set forth in Section 1.3(b).

"Indemnified Party" shall mean the party entitled, or seeking to assert rights, to indemnification under Article VII of this Agreement.

"Indemnifying Party" shall mean the party from whom indemnification is sought by the Indemnified Party.

"Intellectual Property" shall mean the following subsisting throughout the world:

(a)   Patent Rights;

(b)   Trademarks and all goodwill in the Trademarks;

(c)   copyrights, designs, data and database rights and registrations and applications for registration thereof, including moral rights of authors;

(d)   mask works and registrations and applications for registration thereof and any other rights in semiconductor topologies under the Laws of any jurisdiction;

(e)   inventions, invention disclosures, statutory invention registrations, trade secrets and confidential business information, know-how, manufacturing and product processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, whether patentable or nonpatentable, whether copyrightable or noncopyrightable and whether or not reduced to practice; and

(f)   other proprietary rights relating to any of the foregoing (including remedies against infringement thereof and rights of protection of interest therein under the Laws of all jurisdictions).

- 39 -

DH 0000456

"Intellectual Property Registrations" means Patent Rights, registered Trademarks, registered copyrights and designs, mask work registrations and applications for each of the foregoing.

"Internal Systems" shall mean the Software and Documentation and the computer, communications and network systems (both desktop and enterprise-wide), laboratory equipment, reagents, materials and test, calibration and measurement apparatus used by the Seller in its business or operations or to develop, manufacture, fabricate, assemble, provide, distribute, support, maintain or test the Customer Offerings, whether located on the premises of the Seller or hosted at a third party site. All Internal Systems that are material to the business of the Seller are listed and described in Section 2.13(e) of the Disclosure Schedule.

"Key Counterparties" shall mean each of the customers and contractual counterparties of the Seller listed on Schedule 1.3(c).

"Key Employee" shall mean each of Jack Blaine, Eric Coomer and Waldeep Singh.

"Knowledge of the Seller" or any phrase of similar import shall mean the knowledge of each of Jack Blaine, Peter McManemy, Kevin Hurst, Waldeep Singh and Eric Coomer, as well as any other knowledge which such persons would have possessed had they made reasonable inquiry with respect to the matter in question.

"Law" shall mean any federal, state, foreign or local law, statute or ordinance, common law or any rule, regulation, standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or permit of any Governmental Entity.

"Lease" shall mean any lease or sublease pursuant to which the Seller leases or subleases from another party any real property.

"Legal Proceeding" shall mean any action, suit, proceeding, claim, arbitration or investigation before any Governmental Entity or before any arbitrator.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, charge or other lien (whether arising by contract or by operation of Law), other than (i) mechanic's, materialmen's, and similar liens, (ii) liens arising under worker's compensation, unemployment insurance, social security, retirement, and similar legislation and (iii) liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course of Business of the Seller and not material to the Seller.

"Limitation Amount" means the lesser of (a) $2,000,000 or (b) the sum of $1,000,000 and the aggregate amount of the Commission Payments.

"Materials of Environmental Concern" shall mean any: pollutants, contaminants or hazardous substances (as such terms are defined under CERCLA), pesticides (as such term is defined under the Federal Insecticide, Fungicide and Rodenticide Act), solid wastes and hazardous wastes (as such terms are defined under the Resource Conservation and Recovery Act), chemicals, other hazardous, radioactive or toxic materials, oil, petroleum and petroleum products (and fractions thereof), or any other material (or article containing such material) listed

- 40 -

DH 0000457

or subject to regulation under any Law, Permit, or directive due to its potential, directly or indirectly, to harm the environment or the health of humans or other living beings.

"Most Recent Balance Sheet" shall mean the unaudited balance sheet of the Seller as of the Most Recent Balance Sheet Date.

"Most Recent Balance Sheet Date" shall mean April 30, 2010.

"New York Payment" shall mean (a) the total amount received by the Buyer or any of its Affiliates from New York, New York or Nassau County, New York in connection with, Nassau County, New York, or any other source in connection with the ImageCast Precinct optical scan voting system machines contemplated in the July 15, 2009 Asset Purchase Agreement between Dominion Voting Systems Corporation and the Seller, including any payment received relating to that certain litigation with the Board of Elections in Nassau County and in the City of New York, less (b) all out-of-pocket litigation expenses incurred by the Buyer or any of its Affiliate in connection with such litigation.  Notwithstanding any contrary provisions in this Agreement or in any other agreement, the "New York Payment" shall be in no way limited by (i) the date when Nassau County, New York, places an order from the 2009 RFP); (ii) the date when New York City, New York, places an order from the 2009 RFP; (iii) the date when the Buyer receives payment from either of the two above jurisdictions in relation to above mentioned bids; or (iv) from whom the Buyer receives payment from either of the two above jurisdictions in relation to above mentioned bids.

"Non-controlling Party" shall mean the party not controlling the defense of any Third Party Action.

"Open Source Materials" means all Software, Documentation or other material that is distributed as "free software", "open source software" or under a similar licensing or distribution model, including, but not limited to, the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), or any other license described by the Open Source Initiative as set forth on www.opensource.org.

"Ordinary Course of Business" shall mean the ordinary course of business consistent with past custom and practice (including with respect to frequency and amount).

"Parties" shall mean the Buyer and the Seller.

"Party" shall mean either the Buyer or the Seller, as the case may be.

"Patent Rights" shall mean all patents, patent applications, utility models, design registrations and certificates of invention and other governmental grants for the protection of inventions or industrial designs (including all related continuations, continuations-in-part, divisionals, reissues and reexaminations).

"Permits" shall mean all permits, licenses, registrations, certificates, orders, approvals, franchises, variances and similar rights issued by or obtained from any Governmental Entity (including those issued or required under Environmental Laws and those relating to the occupancy or use of owned or leased real property).

- 41 -

DH 0000458

"Person" shall mean any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Entity or other entity.

"Purchase Price" shall mean the purchase price to be paid by the Buyer for the Acquired Assets at the Closing, as set forth in Section 1.3.

"Reasonable Best Efforts" shall mean best efforts, to the extent commercially reasonable.

"Release" shall mean a release in substantially the form of Exhibit F attached hereto.

"Release Payment" shall have the meaning set forth in Section 1.3(b).

"Requisite Stockholder Approval" shall mean the approval of the sale of the Acquired Assets by the Seller to the Buyer as contemplated by this Agreement by a two thirds (2/3) majority of the votes represented by the outstanding shares of capital stock of the Seller entitled to vote thereon.

"Response" shall mean a written response containing the information provided for in Section 7.3(c).

"Restricted Employee" shall mean any person who either (i) was an employee of the Buyer on either the date of this Agreement or the Closing Date or (ii) was an employee of the Seller on either the date of this Agreement or the Closing Date and, if employed on the Closing Date, received an offer for full time employment from the Buyer within five (5) Business Days following the Closing Date.

"Retained Liabilities" shall mean any and all liabilities or obligations (whether known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due and accrued or unaccrued, and whether claims with respect thereto are asserted before or after the Closing) of the Seller which are not Assumed Liabilities. The Retained Liabilities shall include, without limitation, all liabilities and obligations of the Seller:

(a)     relating to the Excluded Assets;

(b)     for income, transfer, sales, use or other Taxes arising in connection with the consummation of the transactions contemplated by this Agreement (including any income Taxes arising as a result of the transfer by the Seller to the Buyer of the Acquired Assets);

(c)     for costs and expenses incurred in connection with this Agreement or the consummation of the transactions contemplated by this Agreement;

(d)     under this Agreement or the Ancillary Agreements;

(e)     for any Taxes, including deferred taxes or taxes measured by income of the Seller earned prior to the Closing, any liabilities for federal or state income tax and FICA taxes of employees of the Seller which the Seller is legally obligated to withhold, any liabilities of the

DH 0000459

Seller for employer FICA and unemployment taxes incurred, and any liabilities of the Seller for sales, use or excise taxes or customs and duties;

(f)    under any agreements, contracts, leases or licenses which are listed on Schedule 1.1(b);

(g)    under the Assigned Contracts arising prior to Closing, and any liabilities and obligations resulting from (i) any breach or violation prior to the Closing under any Assigned Contract or (ii) any act or omission prior to the Closing that would have constituted a breach or violation upon notice or passage of time under any Assigned Contract;

(h)    for repair, replacement or return of products manufactured or sold prior to the Closing not constituting Assumed Liabilities;

(i)    arising out of events, conduct or conditions existing or occurring prior to the Closing that constitute a violation of or non-compliance with any Law (including Environmental Laws) of any Governmental Entity, or any Permit or that give rise to liabilities or obligations with respect to Materials of Environmental Concern;

(j)    (i) any liability of the Seller or its ERISA Affiliates with respect to any Seller Plan or any Employee Benefit Plan maintained by any ERISA Affiliate, (ii) workers' compensation liabilities or other employee related claims, payroll, sick pay, vacation, overtime pay or other compensation or benefits owed to any current or former employee of or independent contractor to the Seller in connection with the employment or termination of employment, (iii) any severance benefits to any employee of the Seller whose employment is terminated (or treated as terminated) in connection with the consummation of the transactions contemplated by this Agreement; and (iv) any liabilities or obligations for medical, dental and disability (both long-term and short-term benefits), whether insured or self-insured, owed to employees or former employees of the Seller based upon (A) exposure to conditions in existence prior to the Closing or (B) disabilities existing prior to the Closing (including any such disabilities which may have been aggravated following the Closing);

(k)    to indemnify any Person by reason of the fact that such Person was a director, officer, employee, or agent of the Seller or was serving at the request of the Seller as a partner, trustee, director, officer, employee, or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise); and

(l)    injury to or death of persons or damage to or destruction of property occurring prior to the Closing (including any workers compensation claim).

"Seller" shall have the meaning set forth in the first paragraph of this Agreement.

"Seller Certificate" shall mean a certificate to the effect that each of the conditions specified in clause (a) of Section 5.1 and clauses (a) through (d) (insofar as clause (d) relates to Legal Proceedings involving the Seller) of Section 5.2 is satisfied in all respects.

- 43 -

DH 0000460

"Seller Intellectual Property" shall mean shall the Seller Owned Intellectual Property and the Seller Licensed Intellectual Property.

"Seller Licensed Intellectual Property" shall mean all Intellectual Property that is licensed to the Seller by any third party.

"Seller Material Adverse Effect" shall mean any material adverse change, event, circumstance or development with respect to, or material adverse effect on, (a) the business, assets, liabilities, capitalization, prospects, condition (financial or other), or results of operations of the Seller or (b) the ability of the Buyer to operate the business of the Seller immediately after the Closing. For the avoidance of doubt, the parties agree that the terms "material", "materially" or "materiality" as used in this Agreement with an initial lower case "m" shall have their respective customary and ordinary meanings, without regard to the meaning ascribed to Seller Material Adverse Effect.

"Seller Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by the Seller, in whole or in part.

"Seller Plan" shall mean any Employee Benefit Plan currently sponsored, maintained, or contributed to, by the Seller or any ERISA Affiliate or with respect to which the Seller has or may have any liability.

"Seller Registrations" shall mean Intellectual Property Registrations that are registered or filed in the name of the Seller, alone or jointly with others.

"Seller Source Code" shall mean the source code for any Software included in the Customer Offerings or Internal Systems or other confidential information constituting, embodied in or pertaining to such Software.

"Software" shall mean computer software code, applications, utilities, development tools, diagnostics, databases and embedded systems, whether in source code, interpreted code or object code form.

"Subsidiary" shall mean any corporation, partnership, trust, limited liability company or other non-corporate business enterprise in which the Seller (or another Subsidiary) holds stock or other ownership interests representing (a) more than 50% of the voting power of all outstanding stock or ownership interests of such entity or (b) the right to receive more than 50% of the net assets of such entity available for distribution to the holders of outstanding stock or ownership interests upon a liquidation or dissolution of such entity.

"Taxes" shall mean any and all taxes, charges, fees, duties, contributions, levies or other similar assessments or liabilities in the nature of a tax, including, without limitation, income, gross receipts, corporation, ad valorem, premium, value-added, net worth, capital stock, capital gains, documentary, recapture, alternative or add-on minimum, disability, estimated, registration, recording, excise, real property, personal property, sales, use, license, lease, service, service use, transfer, withholding, employment, unemployment, insurance, social security, national insurance, business license, business organization, environmental, workers compensation, payroll, profits, severance, stamp, occupation, windfall profits, customs duties, franchise and

- 44 -

DH 0000461

other taxes of any kind whatsoever imposed by the United States of America or any state, local or foreign government, or any agency or political subdivision thereof, and any interest, fines, penalties, assessments or additions to tax imposed with respect to such items or any contest or dispute thereof.

"Tax Returns" shall mean any and all reports, returns, declarations, or statements relating to Taxes, including any schedule or attachment thereto and any related or supporting work papers or information with respect to any of the foregoing, including any amendment thereof.

"Third Party Action" shall mean any suit or proceeding by a Person other than a Party for which indemnification may be sought by a Party under Article VII.

"Trademarks" shall mean all registered trademarks and service marks, logos, Internet domain names, corporate names and doing business designations and all registrations and applications for registration of the foregoing, common law trademarks and service marks and trade dress.

"Transferred Accounts Receivable" shall mean the accounts receivable of the Seller that are either (a) under the Seller's contract with the City of San Francisco set forth on Schedule 1.1(a) with the understanding that the Seller may amend the schedule of transferred accounts receivable specified on Schedule 1.1(a) after the Closing Date to substitute other valid and collectible accounts receivable with the City of San Francisco that total at least $500,000 or (b) billed by the Seller at any time after May 20, 2010.

"Transition Services Agreement" shall mean a transition services agreement in substantially the form attached hereto as Exhibit G.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, as amended.

## ARTICLE X

## MISCELLANEOUS

10.1    Press Releases and Announcements.  Neither Party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party; provided, however, that either Party may make any public disclosure it believes in good faith is required by applicable Law or stock market rule (in which case the disclosing Party shall use reasonable efforts to advise the other Party and provide it with a copy of the proposed disclosure prior to making the disclosure).

10.2    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

10.3    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, with respect to the

- 45 -

DH 0000462

subject matter hereof; provided that the Confidentiality Agreement between the Buyer and the Seller shall remain in effect in accordance with its terms.

10.4   Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. Neither Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided that the Buyer may assign some or all of its rights, interests and/or obligations hereunder to one (1) or more Affiliates of the Buyer. Any attempted assignment in contravention of this provision shall be void.

10.5   Counterparts and Facsimile Signature.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.  This Agreement may be executed by facsimile signature.

10.6   Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.7   Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered four (4) Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one (1) Business Day after it is sent for next Business Day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to the Seller:
Sequoia Voting Sytems, Inc.
717 17th St. Suite 310
Denver, CO 80202
Attn: Kevin Hurst

Copy to:
Baker & Hostetler LLP
303 East 17th Avenue
Suite 1100
Denver, Colorado 80203-1264
Attn: Lars Fuller
Fax: (303) 861-7805

If to the Buyer:
Dominion Voting Systems, Inc.
215 Spadina Ave, Suite 200
Toronto, ON  M5T 2C7
Attn : John Poulos
Fax: (416) 762-8663

Copy to:
WilmerHale
60 State Street
Boston, MA 02109
Attn: Jeffrey A. Hermanson
Fax: (617) 526-5000

Either Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is

- 46 -

DH 0000463

received by the party for whom it is intended. Either Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

10.8     Governing Law.  This Agreement (including the validity and applicability of the arbitration provisions of this Agreement, the conduct of any arbitration of a Dispute, the enforcement of any arbitral award made hereunder and any other questions of arbitration Law or procedure arising hereunder) shall be governed by and construed in accordance with the internal Laws of the State of New York, without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of Laws of any jurisdictions other than those of the State of New York.

10.9     Amendments and Waivers.  The Parties may mutually amend any provision of this Agreement at any time prior to the Closing; provided, however, that any amendment effected subsequent to the Requisite Stockholder Approval shall be subject to any restrictions contained in the Delaware General Corporation Law.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.  No waiver by either Party of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver.  No waiver by either Party with respect to any default, misrepresentation, or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

10.11    Expenses.  Except as set forth in the Escrow Agreement, each Party shall bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

10.12    Submission to Jurisdiction.  Each Party (a) submits to the jurisdiction of any state or federal court sitting in New York, New York in any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements (including any action or proceeding for the enforcement of any arbitral award made in connection with any arbitration of a Dispute hereunder), (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) waives any claim of inconvenient forum or other challenge to venue in such court, (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements in any other court and (e) waives any right it may

- 47 -

DH 0000464

have to a trial by jury with respect to any action or proceeding arising out of or relating to this Agreement or the Ancillary Agreements. Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in Section 10.7, provided that nothing in this Section 10.12 shall affect the right of either Party to serve such summons, complaint or other initial pleading in any other manner permitted by Law.

10.13   Specific Performance. Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement (including Sections 6.1, 6.2 and 6.3) are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party shall be entitled to an injunction or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter, in addition to any other remedy to which it may be entitled, at Law or in equity.

10.14   Construction.

(a)   The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against either Party.

(b)   Any reference to any federal, state, local, or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)   Any reference herein to "including" shall be interpreted as "including without limitation".

(d)   Any reference to any Article, Section or paragraph shall be deemed to refer to an Article, Section or paragraph of this Agreement, unless the context clearly indicates otherwise.

- 48 -

DH 0000465

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOMINION VOTING SYSTEMS, INC.

By:
Name: John Poulos
Title:   President and Chief Executive Officer

SEQUOIA VOTING SYSTEMS, INC.

By:
Name: Jack Blaine
Title:   President and Chief Executive Officer

The undersigned hereby joins in this Agreement for the limited purpose of making the representation set forth in Section 3.4.

DOMINION VOTING SYSTEMS
CORPORATION

By:
Name: John Poulos
Title:   President and Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

DH 0000466

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOMINION VOTING SYSTEMS, INC.

By: _____
Name: John Poulos
Title:   President and Chief Executive Officer

SEQUOIA VOTING SYSTEMS, INC.

By:   *Jack A Blaine* _____
Name: Jack Blaine
Title:   President and Chief Executive Officer

The undersigned hereby joins in this Agreement for the limited purpose of making the representation set forth in Section 3.4.

DOMINION VOTING SYSTEMS CORPORATION

By: _____
Name: John Poulos
Title:   President and Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

DH 0000467

# **EXHIBIT J**

REQUEST #2 (2)

UNANIMOUS WRITTEN CONSENT
IN LIEU OF A SPECIAL MEETING
OF THE BOARD OF DIRECTORS OF
SVS HOLDINGS, INC.

June 3, 2010

The undersigned, being all of the members of the Board of Directors of SVS Holdings, Inc., a Delaware corporation (the "**Corporation**"), acting pursuant to Section 141(f) of the Delaware General Corporation Law and the Corporation's internal regulations, hereby adopt the following unanimous resolutions by written consent ("**Written Consent**") as if such action had been taken at a special meeting of the directors of the Corporation duly called and held on the date set forth above:

**WHEREAS**, the Board of Directors of the Corporation (the "**Board**"), deems it to be fair, advisable, and in the best interests of the Corporation for its wholly owned subsidiary, Sequoia Voting Systems, Inc., a Delaware corporation ("**Sequoia**"), to enter into that certain Asset Purchase Agreement, including all exhibits and schedules attached thereto, by Sequoia and Dominion Voting Systems, Inc., a Delaware corporation (the "**Buyer**"), substantially in the form attached hereto as Exhibit A (the "**Asset Purchase Agreement**"), pursuant to which Sequoia will sell, convey, and transfer all or substantially all of its assets to Buyer (the "**Asset Sale**").

**NOW, THEREFORE, BE IT RESOLVED**, that Sequoia be, and it hereby is, authorized to sell substantially all of its assets to the Buyer in accordance with the terms and provisions of the Asset Purchase Agreement;

**FURTHER RESOLVED**, that the Corporation acknowledges and approves the authorization, direction, and empowerment of the officers of Sequoia (each, an "**Authorized Officer**"), to make such changes to the Asset Purchase Agreement in the name and on behalf of Sequoia as such Authorized Officer may approve, to finalize the terms of the Asset Purchase Agreement, and to execute and deliver such Asset Purchase Agreement, and each and every other agreement, instrument, and document, including any ancillary agreements ("**Additional Documents**"), the execution and delivery of which is contemplated in the Asset Purchase Agreement, in the name and on behalf of Sequoia, in each case with such changes, additional terms and conditions, if any, as such Authorized Officer executing such Additional Document may approve, provided such changes do not materially and adversely affect Sequoia's rights under the Asset Purchase Agreement, such approval to be conclusively evidenced by the Authorized Officer's execution of the Additional Document;

**FURTHER RESOLVED**, that the Board hereby recommends that the stockholders of the Corporation approve the Asset Sale, the Asset Purchase Agreement, and the execution and consummation of any ancillary agreements and transactions contemplated by the Asset Sale and the Asset Purchase Agreement;

**FURTHER RESOLVED**, that the Corporation acknowledges and approves the authorization, direction, and empowerment of the Authorized Officers, in the name and on behalf of Sequoia, to do and perform all such further acts and to authorize such expenditures as they, in their



discretion or on the advice of counsel, may deem necessary or advisable to carry out and effectuate any of the foregoing; the authority for such action to be evidenced conclusively by the Authorized Officer's execution and/or performance thereof, and that all acts, transactions, or agreements heretofore undertaken by or with the approval of a proper officer of Sequoia in Sequoia's name in furtherance of the foregoing resolutions be, and they hereby are, ratified, confirmed, and adopted in all respects;

FURTHER RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate the consents set out herein or derogate the authority of the Authorized Officers to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by the foregoing resolutions; and

FURTHER RESOLVED, that an executed copy of this Written Consent shall be filed with the minutes of the proceedings of the Board.

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Corporation have taken this action by written consent as of the date first written above.

DIRECTORS:

_____
Jack Blaine

_____
Peter McManemy

_____
Harris Miller

2