# **EXHIBIT B**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re | |
| | Case No. 10-24238 HRT |
| SVS HOLDINGS, INC., | Chapter 7 |
| and | |
| | Case No. 14-11360 HRT |
| SEQUOIA VOTING SYSTEMS, INC., | Chapter 11 |
| Debtors. | Jointly Administered under Case No. 10-24238 HRT |

## DECLARATION OF KEVIN HURST

I, Kevin Hurst, hereby depose and state under oath the following to the best of my knowledge and belief:

1.　I am a citizen of the state of Pennsylvania and a resident of Eagleville, Pennsylvania.

2.　From approximately November 2007 until approximately December 2012, I was employed by debtor Sequoia Voting Systems, Inc. ("Sequoia").  I currently am a self-employed business consultant.

3.　I am submitting this affidavit in opposition to the motion filed by the Trustee for Sequoia and its parent, SVS Holdings, Inc. ("SVS") for substantive consolidation of Sequoia with SVS (the "Motion").  I have read the Motion and, based on working for Sequoia for more than five years, including approximately two and a half years after SVS went into bankruptcy, I disagree with several factual assertions in the Motion.

**My Professional Background**

4.　I graduated from the University of Detroit in 1982 and obtained an MBA from the business school at the University of Michigan in 1984.

5.      Starting while I was in business school and continuing thereafter, I spent approximately 19 years working for Burroughs Corporation (which later became Unisys), a Fortune 500 company involved in the manufacture and sale of business equipment.  I worked in a variety of positions at Burroughs/Unisys in the areas of finance and accounting.

6.      In 2003, I left Unisys and in 2004 went to work for Smartmatic, a multinational company that designs, sells and services voting systems.  At Smartmatic I worked in both business development (providing financial and operational support in those efforts) and as a controller with oversight of the company's U.S. operations.

7.      In approximately 2005, Smartmatic acquired Sequoia, which I understand had been in the voting systems business for over 100 years, either as Sequoia or a predecessor company.  Smartmatic owned Sequoia for approximately two years before selling it to SVS in 2007.  Shortly after that sale, in November 2007, I left Smartmatic and went to work for Sequoia as Vice President of Business Strategy and Development, where I remained until 2012.

**Smartmatic's Sale of Sequoia to SVS**

8.      I was working for Smartmatic when it sold Sequoia to SVS in late 2007 and gained knowledge of that transaction in the course of my job.  I went to work for Sequoia shortly after the transaction was completed.

9.      After Smartmatic purchased Sequoia in 2005, the Committee on Foreign Investment in the United States ("CFIUS") began an investigation into the transaction.  The CFIUS review process was resolved by Smartmatic agreeing to divest itself of Sequoia.

10.     Smartmatic ended up deciding to sell Sequoia to Sequoia's then-management.  Smartmatic, which itself was a wholly owned subsidiary of a holding company (Smartmatic International Holding, B.V.), agreed with Sequoia management to a plan in which SVS was

2

created as a vehicle through which management would purchase Sequoia.  SVS did not exist until 2007, and was created solely to serve as a holding company for Sequoia following the structured divestiture.  As Smartmatic understood at the time, Sequoia's management did not have the cash on hand to purchase Sequoia from Smartmatic.  Consequently, pursuant to a stock purchase agreement, SVS purchased Sequoia from Smartmatic for no money down, an unsecured promissory note in the amount of $2 million payable by SVS to Smartmatic, and various future, contingent earn-out payments owed by SVS to Smartmatic.

11.     I see that the Trustee has stated in the Motion that "SVS and Sequoia did not hold themselves out to the public as separate entities" and that "creditors and other parties could not readily distinguish between the two."  Motion ¶ 15.  I am not aware that SVS held itself out to the public at all, because it was a private holding company with no business reason to interact with the public.  Smartmatic, which the Trustee contends is the largest creditor of SVS and Sequoia, certainly was able to distinguish between SVS and Sequoia, because Smartmatic and Sequoia management agreed to the plan which created SVS in order to purchase Sequoia from Smartmatic.

**Treatment of Sequoia as a Separate Entity by Customers and Creditors.**

12.     Up until it sold substantially all of its assets to Dominion Voting Systems, Inc. ("Dominion") in June 2010, Sequoia was an operating company in the voting systems business. While working for Sequoia, I dealt extensively with the company's customers and creditors. Sequoia had hundreds of contracts with states, counties and cities for the provision of voting systems for local elections.  Sequoia received revenues from those contracts.  To my knowledge SVS was solely a holding company with the stock of Sequoia as its principal asset.  Also to my knowledge, the various states, counties and cities who were customers of Sequoia's operations

3

contracted with Sequoia but not with SVS.  Similarly, Sequoia's vendors, such as manufacturers

of voting systems and related hardware and software, contracted with Sequoia but not SVS.

13.     During its final decade of operations, Sequoia was owned by four different parent

companies.  When I worked at Sequoia, it was owned by SVS, which had purchased it from

Smartmatic in 2007.  Sequoia was purchased by Smartmatic from a company called De La Rue

in 2005.  Before that, De La Rue had purchased Sequoia from the Jefferson Smurfit Group in

2002.  Many of Sequoia's creditors had done business with the company for years and I believe

would have been aware both that Sequoia had a parent company and that Sequoia had undergone

changes in ownership.  For example, when Smartmatic sold Sequoia to SVS, the sale was

announced in a press release ("U.S. Voting Technology Leader Sequoia Voting Systems

Announces New Corporate Ownership") which is still available on the BusinessWire website

(http://www.businesswire.com/news/home/20071108005402/en/U.S.-Voting-Technology-

Leader-Sequoia-Voting-Systems#.Ux4XPu-PLIU ).  Nevertheless, prior to the sale of

substantially all of its assets to Dominion in June 2010, I am not aware of any creditor asking

about the financial wherewithal of SVS, asking that SVS provide a guarantee for Sequoia, or

otherwise indicating that the existence of SVS had anything to do with the creditor's decision to

extend credit to Sequoia.  I am not aware of any creditor being asked to, or deciding to, extend

credit to SVS in connection with Sequoia's business operations.

14.     After Sequoia's sale of substantially all of its assets to Dominion in June 2010, I

served as the Chief Executive Officer of Sequoia and was essentially its only employee.  (At the

same time, I also served as Chief Executive Officer of SVS and handled what there was to do for

SVS during the first two-and-a-half years or so of its bankruptcy.)  I devoted my time to

4

discharging Sequoia's obligations to Dominion under the asset purchase agreement, negotiating settlements with Sequoia's many existing creditors and wrapping up the affairs of Sequoia.

15.     The sale of substantially all of Sequoia's assets in June 2010 provided Sequoia with $3 million in cash and dramatically reduced Sequoia's operating costs because Dominion took over Sequoia's contract obligations in the voting system business and most of Sequoia's employees.  I agreed to stay on as de facto CEO of Sequoia in order, among other things, to negotiate as many settlements with Sequoia's creditors as I could.  In fact, one of the reasons that Sequoia did not file for bankruptcy protection in 2010 (even though its parent, SVS, had done so) was because Sequoia was able to use post-sale earn-out payments from Dominion to pay down the company's debts, making an out-of-court wind-down of Sequoia less costly and more beneficial to Sequoia's creditors than a bankruptcy liquidation.

16.     Over the next two and a half years I negotiated settlements with the majority of Sequoia's creditors (by number), with those creditors' claims comprising approximately 85% of Sequoia's debts.  Attached as Exhibit A is a list of Sequoia creditors with whom I negotiated settlements between June 2010 and January 2011.  (Although Smartmatic claims to be a creditor of Sequoia, no one from Smartmatic ever approached me to try to collect, or negotiate a settlement of, Smartmatic's claims against Sequoia.)

17.     As far as I can recall, none of the Sequoia creditors with whom I negotiated (including none of the creditors listed on Exhibit A) stated to me, or otherwise indicated, that they believed that they were creditors of SVS, that they were looking to SVS for payment, or that they otherwise believed that SVS was responsible for paying any of Sequoia's debts.

18.     Based on my extensive experience dealing with Sequoia's creditors, I strongly disagree with the assertion in the Motion that creditors did not rely on the separateness of

5

Sequoia and SVS in extending credit to Sequoia. As I stated above, I am not aware of a single creditor that claimed to have relied on SVS in extending credit to Sequoia or in seeking to collect on unpaid debts owed to Sequoia.

19. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2014
Eagleville, PA

_____
Kevin Hurst

# EXHIBIT A

Sequoia Voting Systems, Inc.
Settlement Agreement and Releases Summary
US$
As of January 19, 2011

| Creditor | Agreement Date | Cash Payment | Claim Amount | Cash Payment as % of Claim | Participate in Contingent Payments? | Void-able? | Confi- dential? | Pending Contingent Obligation | Comment |
|---|---|---|---|---|---|---|---|---|---|
| All Copy Products | 12/17/10 | $2,480 | $22,320 | 11.1% | No | No | No | | |
| American Express Travel Related Services | 10/19/10 | $1,080 | $6,000 | 18.0% | No | No | No | | |
| Arxan Technologies, Inc. | 9/30/10 | $75,000 | $1,181,250 | 6.3% | No | No | No | | |
| Beattie Padovano LLC | 12/9/10 | $51,999 | $288,884 | 18.0% | Yes | No | No | $236,885 | |
| Christopher Lerner | 9/30/10 | $450 | $2,500 | 18.0% | No | No | No | | |
| Dell Marketing, L.P. | 8/13/10 | $97,619 | $97,619 | 100.0% | No | No | No | | Monthly payments of $10k |
| Harvard Custom Manufacturing | 11/15/10 | $335,228 | $1,676,140 | 20.0% | Yes | No | No | $1,340,912 | HCM also credited back some invoices |
| ██████████ | | | | | ██ | | ██ | | |
| Insight Direct USA, Inc. | 1/13/11 | $743 | $3,716 | 20.0% | No | No | No | | |
| Johnson Service Group | 9/20/10 | $408 | $2,269 | 18.0% | No | No | No | | |
| K&J Specialties, Inc. | 10/5/10 | $2,797 | $11,816 | 23.7% | No | No | No | | |
| MK Battery | 10/6/10 | $2,969 | $16,495 | 18.0% | No | No | No | | |
| Oliff & Berridge, P.L.C. | 9/10/10 | $222,922 | $1,238,455 | 18.0% | Yes | Bankruptcy | No | $1,015,533 | |
| Pitney Bowes | 11/5/10 | $3,500 | $5,505 | 63.6% | No | No | No | | |
| Seyfarth Shaw, LLP | 10/4/10 | $1,672 | $9,289 | 18.0% | No | No | No | | |
| Solomon Consulting LLC | 8/26/10 | $4,000 | $16,900 | 23.7% | No | No | No | | |
| Weir and Partners | 10/21/10 | $5,285 | $15,855 | 33.3% | No | No | No | | Obligation on Sequoia books was $10k higher |
| Total | | ██████ | | ██ | | | | $2,593,330 | |



# EXHIBIT C

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re | Case No. 10-24238 HRT |
| | Chapter 7 |
| SVS HOLDINGS, INC., | |
| | Case No. 14-11360 HRT |
| And | Chapter 11 |
| SEQUOIA VOTING SYSTEMS, INC., | Jointly Administered under Case No. |
| Debtors | 10-24238 HRT |

### DECLARATION OF HARRIS N. MILLER

I, Harris N. Miller, hereby depose and state under oath as follows to the best of my knowledge and belief:

1.      I live in McLean, Virginia.

2.      I currently am president of Harris Miller and Associates, a political consulting and lobbying firm, but am not doing anything other than volunteer work because of a health issue.

3.      I am a former director of both debtor SVS Holdings Inc. ("SVS") and debtor Sequoia Voting Systems, Inc. ("Sequoia"). (Jack Blaine and Peter McManemy were the other directors of each company.)

4.      I am submitting this declaration in opposition to the motion filed by Tom H. Connolly, as Trustee for SVS (the "Trustee"), and by the Trustee on behalf of Sequoia for substantive consolidation of SVS and Sequoia ("the Motion"). I have read the motion, and based on serving as an independent director of both companies, I disagree with several factual assertions in the Motion.

### My professional background

5.      I graduated summa cum laude with a bachelor's degree from the University of Pittsburgh in 1972 and with a Master's degree in philosophy from Yale University in 1975.

ActiveUS 125897355v.2

6.    After a year as a research assistant for the British Parliament, I spent approximately 11 years in staff positions in the United States House of Representatives, the United States Senate and the Carter Administration.

7.    From approximately 1985 to 1995, I was a partner in the Washington D.C. lobbying/consulting firm of Holt and Miller.  Starting in approximately 1991, I also became affiliated with the immigration law firm of Fragomen, Del Rey to handle the lobbying needs of their clients.

8.    From 1995 to 2006, I served as President of the Information Technology Association of America (now known as TechAmerica), a trade association representing computer software and services companies, and its international counterpart, the World Information Technology and Services Association.  In those capacities I became very familiar with companies that designed and sold software and services in the voting systems business both in the US and internationally.

9.    From 1999 to 2006, I served as an outside member of the Board of Directors of ITT Educational Services, one of the largest for profit higher education institutions in the US, including several years as an Audit Committee Member.

10.    In 2006 I ran unsuccessfully for the United States Senate in my home state of Virginia.

11.    From 2007 to 2011 I was the Chief Executive Officer of the Career College Association, which changed its name to the Association of Private Sector Colleges and Universities during my tenure, an umbrella government relations group for over 1,600 accredited market-funded institutions of higher learning.

12.    Since 2011 I have been president of Harris Miller and Associates, though, as noted above, I am limited to volunteer work because of my health.

**My involvement with Smartmatic Corporation, SVS and Sequoia**

13.    My involvement with Sequoia began in approximately 2005, when an attorney for Smartmatic Corporation ("Smartmatic") asked me, based on my knowledge of the voting systems business and more general financial and business knowledge, to serve as an outside trustee to Smartmatic as part of an agreement with the Committee on Foreign Investments in the United States ("CFIUS") to sell Smartmatic's ownership of Sequoia to a third party. I was approved for this position both by the US government, to which I reported regularly after my appointment, and Smartmatic.

14.    At the time, the electronic voting market already had shrunk and was continuing to shrink considerably in the US. Governments at all levels were cutting back on their investments in new and/or updated voting systems, after the initial flood of money the federal government spent after the disputed 2000 Presidential election results in Florida. In addition, many grassroots efforts had developed that were suspicious of electronic voting machines being hacked and producing incorrect results, making elected officials even more reluctant to spend money on new machines. And the international market for voting machines was still very unclear. All voting machine companies were having significant financial problems. These conditions made it virtually impossible to sell Sequoia to an outside buyer.

15.    To satisfy its CFIUS obligations, Smartmatic ended up selling Sequoia to its existing management through a holding company -- SVS. Smartmatic was instrumental in and aware of the creation of SVS as a vehicle for the purchase of Sequoia for SVS. Smartmatic also was aware that SVS had no funds with which to purchase Sequoia, so the Stock Purchase Agreement was structured such that SVS paid nothing upfront and instead was to make

installment payments on an unsecured promissory note and potential additional contingent payments.

16.    At or around the time of the sale of Sequoia by Smartmatic to SVS, Sequoia's Chief Executive Officer, Jack Blaine, asked me to serve on the board of directors of both SVS and Sequoia. I agreed to do so. I was an outside member of both boards, as I was not an officer or employee of either company.

17.    I understood and supported the idea from the beginning that Sequoia and SVS were two separately-incorporated and operated companies. When I voted as a member of the Sequoia board, I acted in the best interest of Sequoia, and when I voted as a director of SVS, I acted in the best interest of SVS. For example, in June 2010 I voted as a director of Sequoia to sell substantially all of the company's remaining assets to Dominion Voting Systems, Inc. because I considered the sale to be in the best interests of Sequoia, which was losing money, had no ability to continue as an independent company, and had no other prospective buyers. I also voted as a member of the SVS board of directors to approve the transaction because it was in the best interests of SVS as the owner of Sequoia to have Sequoia receive consideration for its assets. Similarly, although I voted as a director of SVS to seek bankruptcy protection in June 2010 because SVS had no ability to pay its large debt to Smartmatic, I, like other Sequoia directors, decided that Sequoia should remain out of bankruptcy because, among other things, it would be receiving payments from Dominion and could use the funds to pay employees amounts owed to them and negotiate settlements with Sequoia creditors. In my view, these separate decisions as to bankruptcy are one clear demonstration that the directors of Sequoia and SVS made decisions in the best interests of the separate companies.

### Erroneous Assertions

18.    The Trustee has made several erroneous assertions in the Motion.  For example, the Trustee has asserted in the Motion that "SVS and Sequoia had the same or substantially the same officers and boards of directors, which, it appears to Trustee, did not act independently or in the best interests of the separate entities." (See Motion at ¶ 3).  The Trustee has offered no evidence in support of that untrue statement.  As I indicated above, as an outside director of both SVS and Sequoia, I voted in what I considered to be the best interest of each company on its respective board.  From my dealings with Mr. Blaine and Mr. McManemy, the other two directors, I believe that they did the same.  As noted above, I had served as an outside director of a mid-cap publicly-traded company for six years, and I understood clearly the responsibilities of directors.

19.    Furthermore, contrary to the Trustees' additional undocumented assertion, SVS and Sequoia did hold themselves out as separate entities (although as a private holding company SVS had little occasion or reason to present itself to the public).  (See Motion ¶ 3)  Among other things, Sequoia and SVS prepared and maintained separate financial statements.

20.    Finally, I would like to clarify an important statement by the Trustee that does not fully and accurately represent the financial path of Sequoia or the voting machine industry.  It is not accurate to say that Sequoia ran into financial difficulty only between 2007 and 2010.  (See Motion at ¶2)  The significant financial challenges for Sequoia and all the voting machine companies had emerged quite clearly by at least 2006, which is one of the reasons Smartmatic satisfied its obligations to CFIUS by ultimately selling Sequoia to its management through the holding company  (SVS) that was created for that purpose.

21.    Based on these erroneous statements by the Trustee, as well as what I know about the involvement of Smartmatic in the creation of SVS and the sale of Sequoia to SVS, I do not

think that it would be equitable to consolidate SVS with Sequoia for the benefit of Smartmatic as a creditor of SVS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 20, 2014 in McLean, Virginia

_____
Harris N. Miller

# **EXHIBIT D**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re<br><br>SVS HOLDINGS, INC.,<br><br>and<br><br>SEQUOIA VOTING SYSTEMS, INC.,<br><br>Debtors. | Case No. 10-24238 HRT<br>Chapter 7<br><br>Case No. 14-11360 HRT<br>Chapter 11<br><br>Jointly Administered under Case No.<br>10-24238 HRT |

### DECLARATION OF DANIEL DAVIDSON

I, Daniel Davidson, hereby depose and state under oath as follows to the best of my knowledge and belief:

1.     I live in Parker, Colorado.

2.     I currently am the owner of D3 Technology Solutions, LLC ("D3").

3.     D3 provided voting system support, programming services and other related technical services (the "Services") to Sequoia Voting Systems, Inc. ("Sequoia"), in exchange for a promise by Sequoia that it would pay D3 for those Services.  The Services were provided pursuant to an agreement between D3 and Sequoia executed in March, 2010.

4.     As the owner of D3, I worked primarily with Waldeep Singh, Tuyet Ha and Peter McManemy in connection with D3's provision of Services to Sequoia.  I understood that Waldeep Singh, Tuyet Ha and Peter McManemy were employed by Sequoia, and they held themselves out as such.

5.     At the time that D3 did business with Sequoia, I did not know that Sequoia was owned by SVS Holdings, Inc. ("SVS").  All of my dealings were with Sequoia, and to my mind, the existence of SVS had no bearing on D3's business relationship with Sequoia or with D3's decision to extend credit to Sequoia.

ActiveUS 125039278v.1

6.      D3 did not supply any goods or Services to SVS, nor did D3 look to SVS or its assets, or rely on any promise by SVS or in SVS's ability to pay, in extending credit terms to Sequoia.

7.      I object to the trustee's motion to substantively consolidate the SVS and Sequoia bankruptcy estates.  I do not believe that it would be fair for creditors of SVS to be allowed to make claims against Sequoia's assets, in competition with the legitimate claims of Sequoia's own creditors, such as D3.  Creditors that extended credit to SVS should have to look to SVS's assets for recovery, not to Sequoia's assets, just as D3 did not look to SVS's assets for recovery on its claims against Sequoia.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2014
Denver, CO


Daniel Davidson

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

|  |  |
|---|---|
| In re<br><br>SVS HOLDINGS, INC.,<br><br>and<br><br>SEQUOIA VOTING SYSTEMS, INC.,<br><br>Debtors. | Case No. 10-24238 HRT<br>Chapter 7<br><br>Case No. 14-11360 HRT<br>Chapter 11<br><br>Jointly Administered under Case No.<br>10-24238 HRT |

## DECLARATION OF DREW SUNSTEIN

I, Drew Sunstein, hereby depose and state under oath as follows to the best of my knowledge and belief:

1.     I live in Exeter, NH.

2.     I currently am the President at Sunrise Labs, Inc ("Sunrise").

3.     Sunrise provided engineering, product development, software programming and other related technical services (the "Services") to Sequoia Voting Systems, Inc. ("Sequoia"), in exchange for a promise by Sequoia that it would pay Sunrise for those Services.

4.     As an employee of Sunrise, I worked primarily with Paul Terwilliger in connection with Sunrise's provision of Services to Sequoia.  I understood that Paul Terwilliger was employed by Sequoia, and he held himself out as such.

5.     At the time that Sunrise did business with Sequoia, I did not know that Sequoia was owned by SVS Holdings, Inc. ("SVS").  All of my dealings were with Sequoia, and to my mind, the existence of SVS had no bearing on Sunrise's business relationship with Sequoia or with Sunrise's decision to extend credit to Sequoia.

ActiveUS 125039278v.1

6.      Sunrise did not supply any goods or Services to SVS, nor did Sunrise look to SVS or its assets, or rely on any promise by SVS or in SVS's ability to pay, in extending credit terms to Sequoia.

7.      I object to the trustee's motion to substantively consolidate the SVS and Sequoia bankruptcy estates.  I do not believe that it would be fair for creditors of SVS to be allowed to make claims against Sequoia's assets, in competition with the legitimate claims of Sequoia's own creditors, such as Sunrise.  Creditors that extended credit to SVS should have to look to SVS's assets for recovery, not to Sequoia's assets, just as Sunrise did not look to SVS's assets for recovery on its claims against Sequoia.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on March  20, 2014
Miami, FL

Drew Sunstein

# **<u>EXHIBIT F</u>**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re<br><br>SVS HOLDINGS, INC.,<br><br>and<br><br>SEQUOIA VOTING SYSTEMS, INC.,<br><br>Debtors. | Case No. 10-24238 HRT<br>Chapter 7<br><br>Case No. 14-11360 HRT<br>Chapter 11<br><br>Jointly Administered under Case No.<br>10-24238 HRT |

### DECLARATION OF ANGIE ROGERS

I, Angie Rogers, hereby depose and state under oath as follows to the best of my

knowledge and belief:

1.      I live in Baton Rouge, Louisiana.

2.      I currently am the Commissioner of Elections for the State of Louisiana, Office of

Secretary of State.  In my capacity as Commissioner of Elections, I am responsible for all aspects

of election administration and related activities for the State of Louisiana, including the

administration of written agreements between the State of Louisiana, Office of Secretary of State

and Sequoia Voting Systems, Inc., ("Sequoia").

3.      Beginning in December 2005, pursuant to a voting system contract, the State of

Louisiana, Office of Secretary of State purchased a voting system, software licenses and related

services from Sequoia.  Through contract amendments, the State of Louisiana, Office of

Secretary of State continued to purchase voting systems, software licenses and related election

services from Sequoia through July of 2010 at which time the contract and amendments were

assigned from Sequoia to Dominion Voting System, Inc. ("Dominion").

4.      All of my dealings were with Sequoia.   I was unaware of the fact that Sequoia

was owned by SVS Holdings, Inc. ("SVS") and only became aware of SVS this March - 2014,

when an employee of Dominion told me about the sale of Sequoia to SVS. By way of example, all of the contract and amendments described above were between the State of Louisiana, Office of Secretary of State and Sequoia, not SVS. As far as I am aware, the existence of SVS had no bearing on the State of Louisiana, Office of Secretary of State's business relationship with Sequoia.

     5.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19th, 2014

Baton Rouge, LA

Angie Rogers